UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CRIMINAL #10-10288-MLW

———————————————

UNITED STATES

v.

TIMOTHY MOYNIHAN

———————————————

**DEFENDANT'S SENTENCING MEMORANDUM
(WITH EXHIBITS)**

**INTRODUCTION**

Following a jury trial, Timothy Moynihan was found guilty of conspiracy to distribute cocaine base and four substantive counts of possession with intent to distribute cocaine and cocaine base based upon his involvement in the sale of those drugs by his co-defendant, Curtis Hester, to a buyer working for the government. The four transactions at issue, all occurring during January, 2010, totaled less than $2,500. It is now incumbent upon the Court to impose sentence upon Mr. Moynihan based upon the jury's verdict. Having presided over the trial, the Court undoubtedly has a full understanding of the nature and circumstances of the offense conduct, which need not be rehashed in detail herein. Nevertheless, some of the facts adduced at trial are discussed below where relevant.

Mr. Moynihan does not dispute the Probation Department's calculation of the applicable guideline range or that he is a career offender. Mr. Moynihan also does not dispute that the applicable statute prescribes a mandatory minimum sentence of 10 years imprisonment due to his prior drug conviction. Accordingly, the primary purpose of this memorandum and the accompanying

exhibits is to provide a fuller picture of Timothy Moynihan in order to assist the Court in considering the statutory sentencing factors and exercising its discretion to make a just sentencing decision.[1]

## I.     OFFENSE CONDUCT.

Notwithstanding the relatively small quantity of drugs involved in the four transactions Mr. Moynihan was convicted of and the other transaction characterized as "relevant conduct," the government's version of the facts, as laid out in the draft PSR, attempts to paint him as a major drug dealer by emphasizing the amount of cash that Mr. Moynihan had in his residence and his cash purchase of a used automobile.  True, Mr. Moynihan did purchase his car with cash.  PSR ¶ 14, n. 3.  However, as the attached documents demonstrate, Mr. Moynihan had a legitimate source of funds for this purchase  – a loan from his mother.  *See* Affidavit of Alana Talarico, appended hereto as *Exhibit 1*, ¶ 3.[2]  Ms. Talarico's affidavit is corroborated by records from her brokerage, RBC Wealth Management, attached hereto as *Exhibit 2*, which show that she had access to significant funds and made several large cash withdrawals in 2009, prior to her loan to her son.  *See Exhibit 2*.

As documented at trial, Mr. Moynihan's car was totaled in an accident in March 2010. According to the records from Commerce Insurance, Mr. Moynihan received $25,289.69 from an insurance settlement.  *Exhibit 3*.  Mr. Moynihan's own bank records show that as of April 2010, Mr. Moynihan had $16,894.69 in his savings account after withdrawing $8,000 in cash.  *Exhibit 4*.

---

[1]     The defendant notes that as of the date of this filing (February 2, 2012), his counsel have not received any sentencing memorandum from the government.  Counsel have also not yet received the final version of the Presentence Report ["PSR"].  Accordingly, the defendant reserves the right (with leave of Court) to respond to same in a supplemental written submission or orally at the sentencing hearing scheduled for February 16, 2012.

[2]     The exhibits to this memorandum are being separately filed under seal pursuant to Court order.  Copies will be provided to the government and Probation.

Clearly, any cash found in Mr. Moynihan's residence following his arrest cannot simply be assumed to be the proceeds of illegal drug transactions. Indeed, there is no proof supporting such a speculative assumption.[3/]

Accordingly, the Court should sentence Mr. Moynihan based upon what the evidence showed and what the jury found – his participation in several small drug sales. Significantly, the charges in this case were brought following a year-long investigation involving dozens of law enforcement agents, wiretaps, and controlled buys. Surely, far more evidence would have been obtained against Mr. Moynihan if he were a major drug supplier. It also makes no sense that a major drug supplier would be personally delivering small amounts of drugs for street-level sales. All of these circumstances belie the government's effort to characterize Mr. Moynihan as something other than what he was.

## II.   BACKGROUND AND PERSONAL CHARACTERISTICS

Timothy Moynihan, who is now 36 years-old, endured a particularly difficult and tumultuous childhood and adolescence. As described in the pertinent records from the Massachusetts Department of Children and Families ["DCF"], appended hereto as *Exhibit 5*, Timothy was born to two drug-addicted parents, who subjected him to both physical and emotional abuse. His childhood was filled with suffering and neglect. From infancy to the time he was 7, Timothy witnessed his father seriously physically abusing his mother. It was at that time that Timothy began seeing a psychologist.

---

[3/]   The defendant has objected to the PSR's discussion of drug sales that did not involve him in any way. The defendant further objected to any reference to a gang investigation or gang activity in his PSR. There is no evidence that Mr. Moynihan was involved in a gang, and references to gang activity in his PSR, which is used by the Bureau of Prisons in determining his placement, is patently unfair.

Timothy was hospitalized for a psychiatric evaluation when he was 10-years-old.  He was referred to Hampstead Hospital in New Hampshire because of problems he was experiencing at home.  The examining physician found Timothy to be an angry child, who had no way to express his anger but through aggressive behavior.  Timothy was also sensitive about his learning disabilities, which prevented him from acting appropriately when facing conflict.  The doctor determined that Timothy had "extremely low self-esteem in part related to [his] perception of his intellectual difficulties and undoubtedly related to relationship problems with his abusive, alcoholic biological father." *Exhibit 5*, p. 5.  The examiner noted that Timothy would often overreact upon the slightest provocation. *Id.*, p. 6.

At age 10, suffering from psychological trauma and severe learning disabilities, Timothy was taken from his mother and placed in a series of foster homes.  After living with his father for a short period of time, Timothy asked DCF to put him back in foster care because his father failed to provide him with adequate heat or food.  Timothy's father continued to physically and emotionally abuse him. *Exhibit 5*, p. 23.

Timothy was hospitalized for a second time at the age of 13.  Though he demonstrated that he was more capable at problem-solving, the examiner noted that his "emotional and behavioral difficulties have also continued to a point where he has required another hospitalization." *Exhibit 5*, p. 11.  The examiner once again noted that "[i]ntellectual limitations of [Timothy's] type, complicated by his history of severe family difficulties, would almost certainly predispose him to significant adjustment difficulties." *Id.*, p. 12.  As before, Timothy demonstrated symptoms of depression and a low self-image. *Id.*, p. 14.  The examiner found that it would be helpful to his development if Timothy were to have a "secure and supportive environment in which he can learn

to better identify his feelings, develop trust in others, and develop more adaptive coping strategies."
*Id.*, p. 14.

After his hospitalization, Timothy participated in the Key Program, where he was monitored by a case worker. When Timothy was 14, the case worker continued to note Timothy's disciplinary problems. Eventually, after dozens and dozens of foster placements, Timothy aged out of DCF at 18. As an adult, Mr. Moynihan has never had protracted mental health counseling, although he recognizes that such treatment would likely be beneficial.

It is clear that Timothy Moynihan is a drug addict who has been abusing drugs or alcohol since the age of 12. In the past, he has received sporadic treatment for substance abuse issues. In 2001, Mr. Moynihan participated in a drug court program in New Hampshire. A couple of years later, Mr. Moynihan was required to participate in a 28-day residential treatment program. More recently, Mr. Moynihan sought out alcoholism treatment, but his arrest in this case prevented him from completing the program. Other than these short-term programs, Mr. Moynihan has not received counseling or treatment for his longstanding substance abuse issues. Significantly, he has never received substance abuse treatment with a corresponding mental health component.

Mr. Moynihan has three children – Brianna, who is 14-years-old, Trinity, age 10, and Miya, age 3. Until his incarceration, Timothy paid child support. *See* Records from the Department of Revenue, appended hereto as *Exhibit 6*. The letters appended hereto as *Exhibits 7-8*, respectively, describe the importance of Timothy Moynihan to his family, as well as his positive characteristics as a person. In her letter to the Court, Brianna's mother, Jacquelin Ambrose, stresses that though she and Tim have had conflicts in the past, they have learned and grown as co-parents in recent years. Ms. Ambrose describes how dedicated Mr. Moynihan has been as a father over the past

several years, and how attentive he is to his daughter. She also describes the destructive impact of

his incarceration upon Brianna. *Exhibit 7*, appended hereto. The letter from Brianna eloquently

describes the impact of her father's absence at this formative time in her life. *Exhibit 8*, appended

hereto. In addition to these letters, the jail tapes provided in discovery by the government

demonstrate that Timothy speaks regularly to Destiny Clevesy, the mother of his other two

daughters, as well as to Trinity and Miya, and that he wants to participate as much as possible in

parenting them.

## III.   CRIMINAL HISTORY.

Mr. Moynihan faces a mandatory minimum sentence of ten years imprisonment under 21

U.S.C. § 841(b)(1)(B)(iii) because the government chose to file an Information pursuant to 21 U.S.C.

§ 851. The triggering offense specified in the Information is a 2007 conviction from the Essex

County Superior Court in Massachusetts for Possession with Intent to Distribute a Class B

Substance.

Mr. Moynihan has a substantial criminal record, and he is a career offender under U.S.S.G.

§4B.1.1.[4] However, Mr. Moynihan's criminal record must properly be considered in light of his

history of trauma, the abuse and neglect he suffered as a child, and his long history of addiction to

---

[4]       The Court should strike all references to weapons contained in paragraph 91 of the
PSR. This paragraph unfairly suggests some connection between the defendant and weapons found
during the search of a residence which he shared with two other individuals in 2003. In fact, on
information and belief, those weapons belonged to another resident, James Clark, and were found
in the bedroom occupied by him. Clark was subsequently charged in the Plaistow District Court
Court with changing marks on a firearm, a felony in the state of New Hampshire, on the same date.
*See Exhibit 9*. On December 14, 2003, Clark was indicted in the Rockingham Superior Court on the
same charges. *Id.* According to the Rockingham Superior Court, Clark was convicted and sentenced
on March 30, 2004, to 12 months in jail. The records from the Rockingham Superior Court are
forthcoming and will be provided to the Court upon receipt. That is the sole reference anywhere in
Mr. Moynihan's criminal history to a firearm.

drugs and alcohol. Though none of this history constitutes an excuse for his criminal conduct, it may help to explain how he got to where he is now. As the letters from his family demonstrate, Mr. Moynihan has many good qualities, he is still young, and with proper counseling and supervision, he may still become a responsible and productive member of the community.

## IV.   PROPORTIONALITY.

While the Court must, of course, treat every defendant as an individual for sentencing purposes, it is in the interests of justice that unwarranted sentencing disparities be avoided and that consistency inform the Court's overall approach. Accordingly, the Court should take into account the terms of the binding plea agreement in the case of his co-defendant, Curtis Hester, if the Court sees fit to accept it. Hester's binding agreement reflects the government's view that a 92-month sentence is appropriate for Hester's role in the very same offenses for which Mr. Moynihan was convicted. Mr. Moynihan, a career offender, presumably has a worse criminal record than Hester, and Mr. Moynihan chose to go to trial while Hester ultimately did not. Nevertheless, where two individuals stand convicted of precisely the same offenses, it would be difficult in most cases to justify a dramatic difference in the sentences they receive. Such a justification is absent here.

## V.   DISCUSSION AND RECOMMENDATION.

Having sentenced hundreds of criminals offenders, this Court is well-aware of the relevant statutory provisions, case law, and policy considerations. While judges are still required to take the Sentencing Guidelines into account, they are now free to consider all the relevant circumstances and treat each offender as an individual in fashioning a sentence which is sufficient, but not greater than necessary, to fulfill its purposes. That task is particularly challenging in a case like this one where there is a huge gap between the career offender guideline range and the statutory mandatory

minimum sentence.  The Court does have the benefit of having presided over the trial, as well as substantial information about the defendant from other sources.

While Timothy Moynihan has a substantial criminal record, he should not be treated as a lost cause.  He has endeavored to be a responsible parent, both emotionally and financially.  With a change in attitude, proper treatment, and close supervision by the Court, Mr. Moynihan can still turn his life around.  Mr. Moynihan has had mental health issues and a chronic drug and alcohol problem since childhood.   Though he received some substance abuse treatment in the past, it was brief and never addressed his corresponding mental health issues.  He is now more mature and more honest about his condition.  Mr. Moynihan will have the opportunity to get the treatment he needs while incarcerated and on supervised release.  Mr. Moynihan is now prepared to face his challenging problems and seeks to avail himself of the intensive residential drug treatment program operated by the Bureau of Prisons, along with any mental health services offered.

Based upon all of the facts and circumstances, the defendant respectfully suggests that a sentence of 120 months' imprisonment, followed by an 8-year term of supervised release, is appropriate.  The defendant further requests that the Court:

1.      Strike those portions of the Offense Conduct section of the PSR (¶¶ 28-30, 31-33), which do not pertain to Mr. Moynihan;

2.      Strike those portions of the Offense Conduct section of the PSR (¶¶ 3-4, 9 n.2), which contain irrelevant references to a gang investigation or gang activity;

3.      Strike all references to a firearm in the PSR (¶ 91);

4.      Recommend that Mr. Moynihan be assigned to a facility as close to Massachusetts as possible;

5.      Recommend that the Bureau of Prisons screen Mr. Moynihan for participation in its

long-term Residential Drug Treatment Program, 28 C.F.R. §550.53, and assign him

to that program if he is eligible;

6.      Based upon Mr. Moynihan's indigency and impending lengthy incarceration, waive

imposition of a fine.  U.S.S.G. §5E1.2(e); and

7.      Recommend appropriate drug treatment and mental health counseling at the direction

of Probation as a condition of supervised release.


                              Respectfully submitted,
                              **TIMOTHY MOYNIHAN**
                              By his attorneys,

                              /s/ James L. Sultan
                              James L. Sultan, BBO #488400
                              Audrey M. Grace, BBO #679119
                              Rankin & Sultan
                              151 Merrimac Street
                              Boston, MA 02114
                              (617) 720-0011
                              agrace@rankin-sultan.com


### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and to U.S. Probation Officer Tricia Marcy on February 2, 2012.

                              /s/ James L. Sultan
                              James L. Sultan