1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3                              No. 1:10-cr-10288-MLW

4

5

6    UNITED STATES OF AMERICA

7

8    vs.

9

10   TIMOTHY MOYNIHAN

11

12

13                        * * * * * * * * *

14

15                    For Jury Trial Before
                      Chief Judge Mark L. Wolf

16

17

18                    United States District Court
                      District of Massachusetts (Boston.)
                      One Courthouse Way
19                    Boston, Massachusetts 02210
                      Tuesday, October 25, 2011

20

21                        * * * * * * * *

22

23              REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
                   United States District Court
24        One Courthouse Way, Room 5200, Boston, MA 02210
                      bulldog@richromanow.com

25

1                    A P P E A R A N C E S

2


3    PETER K. LEVITT, ESQ.
        United States Attorney's Office
4        1 Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
5        (617) 748-3965
        Email: Peter.levitt@usdoj.gov
6        For the United States


7


8    JAMES L. SULTAN, ESQ.
     AUDREY GRACE, ESQ.
9        Rankin & Sultan
        151 Merrimac Street, Second Floor
10       Boston, Massachusetts 02114-4717
        (617) 720-0011
11       Email: Jsultan@rankin-sultan.com
        For Timothy Moynihan

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3      Preliminary motions..........................    5

4      Preliminary instructions to jury.............   22

5      Reading of indictment........................   27

6      Opening statement by Mr. Levitt..............   36

7      Opening statement by Mr. Sultan..............   45

8

9

10     WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS

11

12     SPECIAL AGENT CHRISTOPHER BENCKEN

13        By Mr. Levitt:        50

14        By Mr. Sultan:              135

15

16

17

18

19

20

21

22

23

24

25

1                    E X H I B I T S

2        EXHIBIT 1....................................  74

3        EXHIBIT 2....................................  75

4        EXHIBIT 3....................................  98

5        EXHIBIT 4....................................  99

6        EXHIBIT 5....................................  98

7        EXHIBIT 6....................................  99

8        EXHIBIT 7.................................... 120

9        EXHIBIT 8.................................... 121

10       EXHIBIT 9.................................... 129

11       EXHIBIT 10................................... 129

12       EXHIBITS 11, 12A, 12B, 12C, 13 and 14........  83

13       EXHIBITS 15, 16A, 16B, 16C, 17 and 18........ 101

14       EXHIBITS 19, 20A, 20B, 21 and 22............. 122

15       EXHIBITS 23, 24A, 24B, 24C, 25 and 26........ 130

16       EXHIBIT 29...................................  73

17       EXHIBIT 30................................... 132

18       EXHIBIT 34...................................  61

19       EXHIBIT 35................................... 113

20       EXHIBIT 36................................... 126

21       EXHIBIT 42................................... 134

22                      * * * * * * * * * * *

23       EXHIBITS D, E, F.............................  78

24       EXHIBIT G....................................  78

25       EXHIBIT H1, H2, H3 and H4.................... 135

```
1                    P R O C E E D I N G S
2              (Begins, 9:00 a.m.)
3              THE CLERK:  Criminal number 10-10288, the
4    United States of America versus Timothy Moynihan.  The
5    Court is in session.  You may be seated.
6              THE COURT:  Good morning.  Would counsel
7    please identify themselves for the Court and for the
8    record.
9              MR. LEVITT:  Peter Levitt on behalf of the
10   government.  Good morning, your Honor.
11             MR. SULTAN:  Good morning, your Honor.  James
12   Sultan and Audrey Grace for Timothy Moynihan, who is
13   present.
14             THE COURT:  All right.  We're still waiting
15   for several of the jurors, but there's some things that
16   we need to go over, in any event.
17         First, I see there was a stipulation
18   electronically filed stating that Mr. Moynihan and
19   Curtis Hester knew each other prior to January of 2010.
20   This copy was not signed by Mr. Moynihan, however.
21             MR. SULTAN:  I'll be happy to have him sign
22   it, your Honor.
23             THE COURT:  Okay.  Please do.
24             MR. LEVITT:  Your Honor, there was another
25   stipulation.  Would you like me to have him sign it --
```

```
 1    to give that Mr. Sultan as well to have him sign it?

 2              THE COURT:  Yes.

 3              MR. LEVITT:  That was --

 4              THE COURT:  It actually -- okay.  In all of

 5    these -- the next thing I'm going to get to is the --

 6              (Pause.)

 7              THE COURT:  So are those signed now?

 8              MR. LEVITT:  They are, your Honor.  Would you

 9    like me to --

10              THE COURT:  Yes, give them to Mr. Hohler,

11    please.

12              (Hands up.)

13              THE COURT:  All right.

14         In the caption -- and this is the point I wanted

15    to raise in a superseding indictment that Mr. Hohler

16    will read the jury, you've got 2, Timothy Moynihan,

17    there's no 1, Curtis Hester, and in the superseding

18    indictment that 2 is listed or stated in Count 2.  It's

19    also in Count 3.  But in Count 3, Hester's name is still

20    in.  Is that intended?  In Count 3 --

21              MR. LEVITT:  Yes, your Honor, it was

22    intentional because, as you recall, we originally didn't

23    charge the January 11th buy.  So when we superseded, we

24    were adding that January 11th buy.  He, at the time,

25    Mr. Hester, had not pled to that yet.  He has
```

1    subsequently pled to it.

2         THE COURT:  Well, my point is -- and maybe the

3    larger point is what if anything should I say about

4    Mr. Hester?  I could say they shouldn't speculate or

5    guess why he's not here or I could tell them he's going

6    to be tried separately, but the 2 or the inconsistency

7    in the naming him is something we ought to at least talk

8    about.

9         MR. SULTAN:  Well, your Honor, I think that

10   the indictment should be read as filed.  Um, Hester is a

11   defendant in the indictment and I think it creates more

12   problems than it's worth to try to extract him from

13   here.  If the Court wants to tell the jury that they

14   shouldn't speculate on why Hester isn't here, that's

15   fine.  I don't think the Court should --

16        THE COURT:  All right.  But this is a redacted

17   version, isn't it?

18        MR. LEVITT:  It's not, your Honor.

19        THE COURT:  Oh, okay.

20        MR. LEVITT:  It's misleading in a sense.  If

21   you've just read it, as it is, with both names and were

22   only reading Hester on January 11th, it suggests he

23   wasn't charged with the other buys, he, in fact, was, he

24   just pled to them by the time of the superseding.

25        So, you know, I think it should be either, um, not

1   reading it and saying you shouldn't speculate or he's

2   been charged separately, he's going to be tried

3   separately, um, but I don't think it should be reading

4   it and leaving a misleading impression by having him in

5   one charge and not the others.  Um, I think you can say,

6   your Honor, if you want, you can say he's already pled

7   to those charges.

8           THE COURT:  Well, I'm not going to -- well, do

9   you want me to say that, Mr. Sultan?

10          MR. SULTAN:  Your Honor, look, this is the

11  indictment and I don't think we can change the

12  indictment.  I have no problem with the Court saying

13  that the jury should not speculate on why Mr. Hester is

14  not participating in this trial.  I think that's all the

15  Court should say about it.  And I think that should

16  solve the problem.

17          THE COURT:  I'll tell them that and I'll also

18  tell them they shouldn't speculate as to why he's not

19  named in certain counts because -- for example, with

20  regard to Counts 2 and 4, I expect I -- Mr. Moynihan's

21  charged with aiding and abetting Hester, even though

22  he's not named, so at the end of the case I'll have to

23  explain that, and I foresee I'll be asked to give a

24  *Pinkerton* charge, which I'll probably give as well.

25          MR. SULTAN:  Well, assuming there's some

 1   evidence to support an aiding and abetting instruction,

 2   your Honor, which remains to be seen.

 3            THE COURT:  Okay.  Well, I think Mr. Hohler's

 4   going to read this as it's written, because that's the

 5   purpose at this point, and I will tell them they

 6   shouldn't speculate or guess as to why Mr. Hester's not

 7   here for this trial or why he's not named in certain

 8   counts.  Okay?

 9            MR. LEVITT:  That's fine.

10            THE COURT:  I intend to, as I told you

11   yesterday, give --

12        All right.  I intend to instruct now, and I expect

13   at the end of the case, that the government's going to

14   have to prove beyond a reasonable doubt that Moynihan

15   conspired with Hester.  It wouldn't be sufficient to

16   prove he conspired with somebody unnamed.  Correct?

17            MR. LEVITT:  That's correct.

18            THE COURT:  Then for today's purposes, I'm

19   going to tell them I'm going to give them a brief

20   overview of the applicable law and I'll give them more

21   detailed instructions at the end of the case, which they

22   should follow, if they sound different.  And with regard

23   to the instructions, I'll just derive them from the

24   First Circuit pattern instructions.

25        I propose to tell them that a conspiracy is an

1    agreement to commit a crime.  To find the defendant

2    guilty of conspiracy, you must be persuaded beyond a

3    reasonable doubt, first, that the agreement specified in

4    the indictment and not some other agreement existed

5    between Mr. Moynihan and Mr. Hester to possess cocaine

6    base or cocaine with the intent to distribute it and the

7    defendant, Mr. Moynihan, willful joined in the

8    agreement, meaning that he participated intentionally

9    and understanding his conduct was illegal.

10        In this case the object of the conspiracy that is

11   alleged is to possess either cocaine or -- cocaine base

12   or cocaine or both with intent to distribute it, and

13   those are the substantive charges in Counts 2, 3 and 4.

14   To prove Mr. Moynihan possessed cocaine or cocaine base

15   with intent to distribute it, the government would have

16   to prove beyond a reasonable doubt, first, that on the

17   date alleged he possessed one of those controlled

18   substances, that he did so with the specific intent to

19   distribute it, meaning to transfer it to another person,

20   and he did that intentionally and not by accident or

21   mistake.

22        There's at least one other way that Mr. Moynihan

23   could be convicted on Counts 2, 3, and 4, the possession

24   charges, and that is on a theory of that he aided and

25   abetted Mr. Hester.  So if the government proves that

1   Mr. Hester possessed cocaine base or cocaine on the date

2   alleged with intent to distribute it, um, Mr. Moynihan

3   would be guilty if it's proven that he knew that

4   Mr. Hester was committing that crime and knowingly and

5   willfully did something to help him succeed in doing

6   that.  Something along those lines.  Okay?

7           MR. LEVITT:  That's fine, your Honor.

8           THE COURT:  Thank you.

9       All right.  Then I think one of the jurors asked

10  Mr. Hohler yesterday whether they were going to get

11  notebooks.  And for a short trial like this, I usually

12  don't give the jurors notebooks.  So I'm inclined to

13  tell them they should rely on their memories.

14      But do the parties want to be heard on that?

15          MR. SULTAN:  I think that's fine, your Honor.

16          MR. LEVITT:  That's fine, your Honor.

17          THE COURT:  All right.

18      We're still waiting apparently for some of the

19  jurors, but as I said, I think there are some other

20  things that we can do now.

21      Um, I've done a little more thinking -- I'm

22  sorry.  Are there things you want to raise?

23          MR. LEVITT:  I just want to ask, um, Mike

24  Mahoney is the government's designated --

25          THE COURT:  Yes.

```
 1              MR. LEVITT:  Can he be in here now?

 2              THE COURT:  Yes.  Under the sequestration

 3     order, he can be in the courtroom.  That's fine.

 4         All right.  With regard to the commerce documents,

 5     um, is the government planning to bring in a keeper of

 6     the records?

 7              MR. LEVITT:  Yes.

 8              THE COURT:  All right.  It may not be

 9     necessary to do this on voir dire, it's possible that it

10     can be done just before the jury.  We could see.  But

11     there should be a foundation laid as to whether

12     generally they're business records and then they'll be

13     some issues that will relate to whether the hearsay

14     within hearsay is admissible.  Um, one of the things I'm

15     going to be interested in is when the documents --

16              (Pause.)

17              THE COURT:  It's Exhibit 31, I think, is that

18     correct?

19              MR. LEVITT:  Yes.

20              THE COURT:  Excuse me just one second.

21              (Pause.)

22              THE COURT:  All right.  Exhibit 31 contains

23     documents that were acquired on different dates.  I

24     mean, some of them -- that the first document is March

25     10, 2010, but also in the file some documents that were
```

1    developed later, health records, um, some of them at

2    least I thought post dated March 10th.  But my

3    present -- so I'd like to know when they were

4    assembled.

5         But my present thinking is that the government is

6    likely to prove by a preponderance of the evidence, as

7    required by Rule 104(a), that Mr. Moynihan is the person

8    who gave Commerce the 978-457-8860 number on March 10,

9    2010 and therefore the hearsay within hearsay exception

10   would be met, because that would be admissible under

11   Rule 801(d)(2)(A).  They would also be admissible under

12   Rule 104(b), which I think is actually a lower

13   standard.

14        But the circumstantial evidence -- and I can rely

15   under Rule 104 on circumstantial as well as direct

16   evidence, at this point appears to include the

17   following.  The defendant gave the same number to

18   Merchants' Auto, as I found yesterday, and they verified

19   that he was the person giving the number.  He owned the

20   Chevy that was in the accident.  The evidence, I'm told,

21   will show he was seen driving it.  In fact, I heard last

22   week testimony that he was seen driving it, so he

23   certainly had an incentive to file a claim if it was in

24   an accident.

25        Exhibit 31 lists the home address for Timothy

1    Moynihan is 31 Whittier Street.  It's been represented

2    that Officer Richards saw the defendant leave 31

3    Whittier Street several times to go meet Hester and that

4    evidence indicates to me that the defendant lived there.

5         The March 10, 2010 document, the first document,

6    Exhibit 31, contains the correct name and telephone

7    number for the defendant's father as next of kin.

8    There's a stipulation that the telephone number is the

9    number for, um, Mr. Moynihan's father.

10        And the whole file contains medical records of the

11   defendant, some of which may have been submitted later,

12   but ordinarily a person has to submit his own medical

13   records or give a release.  It's some indication that

14   Mr. Moynihan was participating and pursuing this claim.

15        I haven't to this point and I don't intend to rely

16   on the statement itself.  That's permissible for

17   co-conspirator hearsay.  But as Judge Boudine pointed

18   out, there's not the same express authorization in Rule

19   801(d)(2) for admission.  So I intend to do the analysis

20   without relying on the statement in Exhibit 31, although

21   I do rely to some extent on the Merchants' Auto

22   information.

23        So the question is whether the government -- at

24   this point I predict I would admit it, but I haven't

25   heard all the evidence I need to.

1          Does the government intend to talk about the

2     Commerce records in its opening?

3               MR. LEVITT:  Well, I planned on mentioning

4     them, um, and not going into them at length, and I can

5     not do that if that's what --

6               THE COURT:  All right.  I'm not ordering you

7     one way or the other.  If you wanted to do it, I'm

8     telling you I expect I'll admit it.  On the other hand,

9     um, until I make that decision, you know, it's possible

10    you've taken some risk by mentioning it.  That if it

11    doesn't get admitted, it will prompt a request for a

12    mistrial.

13              MR. LEVITT:  The, um -- I also was going to

14    ask Special Agent Bencken, sort of when he's on the

15    stand, about what he did, and one of the things he'll

16    say is that he subpoenaed those records.  Um, I don't

17    have to do more than that.  But, um, that's one of the

18    things he did in terms of furthering the investigation.

19              THE COURT:  Okay.

20              MR. LEVITT:  Okay.

21         And then, your Honor, the -- in my memorandum on

22    this issue I misspoke, I believe, in indicating that

23    the, um -- that the Commerce insurance records are

24    included in Government Exhibit 28, which is the RMV

25    records for Mr. Moynihan, which, by the way, also lists

1    that 31 Whittier Street address.  In fact, it's the

2    Merchants' Auto documents, they're attached.  So it is

3    my intention to mention those records, both the

4    Merchants' Auto record independently and the RMV records

5    which include the Merchants' Auto records.

6              THE COURT:  Well, based on the voir die we did

7    yesterday, it dispelled, um -- well, I found that those

8    documents were admissible and I intend to admit them.

9         But while we're on that, I'll skip ahead a bit.

10             MR. LEVITT:  Your Honor, before we leave this

11   point, I just wanted to ask --

12             THE COURT:  I was going to ask about Felde.

13             MR. LEVITT:  Well, I'd like a moment to talk

14   to Special Agent Bencken before he testifies to tell him

15   now that those Commerce Insurance documents haven't been

16   admitted yet, so he doesn't, by mistake, talk about

17   them.

18             THE COURT:  Well, you'll have a chance to do

19   that.

20             MR. LEVITT:  Okay.

21             THE COURT:  But with regard to Felde, these

22   are still questions.  One, does she still need to come

23   in and testify?  And, two, if she does -- and does the

24   government want her to come in and testify?  And, two,

25   if she does, so far, um, based on the discussion we had

1    last week, I think the government has agreed not to

2    elicit from her, or anybody else, without coming to see

3    me, um, that the automobile was paid for in cash.

4    Right?

5              MR. LEVITT:  I'm sorry.  That she would

6    testify that it was?

7              THE COURT:  No.  I think the government has

8    agreed -- and I don't know if I actually definitively

9    ruled on this, that it wasn't going to ask her or

10   anybody else, at least in the direct examination,

11   whether the automobile was paid for in cash.

12             MR. LEVITT:  Um, I did agree to that.  My

13   understanding is that the Court did not rule it is out,

14   but tentatively ruled that it's out, and therefore I

15   shouldn't do it unless I come to the Court and say --

16             THE COURT:  Yes.  And, you know, in connection

17   with that, if -- you know, it's possible that Mr. Sultan

18   would open the door to getting that in.  He's shaking

19   his head "No."  But it's possible that a defense lawyer

20   would open the door by asking some of the questions that

21   were properly asked yesterday.  "You didn't see

22   Mr. Moynihan?"  "You didn't" -- "Mr. Marra had memory

23   problems?"  Because the fact that a currency transaction

24   report was going to have to be filed, may, I might find,

25   raises the likelihood that the verification was done.

```
 1    But you -- it doesn't have to be resolved now, you all
 2    can talk about it, but it's possible that the government
 3    won't want or need to call Ms. Felde back if I admit the
 4    documents.
 5              MR. LEVITT:  I think, um, that the only reason
 6    I would call Ms. Felde, at this point, given the Court's
 7    ruling, um, would be if I wanted to elicit that he was
 8    -- that he paid in cash.
 9              THE COURT:  All right.  Well, you should talk
10    about it.  You might be able to save her a trip and us
11    some time.
12         Okay.  With regard to Bencken, um, as I described
13    or explained on October 21, Finley's statements
14    identifying Moynihan and the Chevy are admissible under
15    Rule 8031 as present sense impressions applying the
16    standards discussed by the First Circuit in *MacElroy* at
17    587 F.3d 73.  In addition, certain statements are
18    conditionally admitted under Rule 801(d)(2)(E), for
19    example, in Exhibit 14, um, Hester has had a phone call,
20    I believe, and tells Finley, "he," meaning Moynihan,
21    "said he'll be here in five minutes."  That's a
22    statement in furtherance of a conspiracy, I believe,
23    conditionally admitted.
24              MR. SULTAN:  If your Honor is conditionally
25    admitting them, obviously under -- conditioned upon
```

```
 1    ultimately making a **Petrozziello** finding, I take it I
 2    don't need to object, that is, I'm basically, um,
 3    accepting that Court's ruling.  I'm not waiving my
 4    rights, though.
 5              THE COURT:  See this isn't up to me, it's up
 6    to the First Circuit.
 7              MR. SULTAN:  That's right.
 8              THE COURT:  If you want to object once, um,
 9    and just say, you know, **"Petrozziello"** or something --
10              MR. SULTAN:  That's what I'll do, your Honor.
11              THE COURT:  I'll overrule the objection and
12    say it's conditionally admitted.
13         But what I want to get to is, is there anything --
14    is there any ground other than present sense impression
15    and co-conspirator hearsay on which Mr. Moynihan is
16    objecting to any of the statements in the transcript at
17    this point?
18              MR. SULTAN:  I don't believe so, your Honor.
19              THE COURT:  All right.  I'll proceed on that
20    understanding.
21         And just very quickly then.  Is Bencken going to
22    offer the certification concerning the drugs?
23              MR. LEVITT:  Um, I was going to do it simply
24    because they're not objected to, just to move the
25    process along.
```

```
 1                THE COURT:  All right.  And is the chemist
 2      coming, too?
 3                MR. LEVITT:  The chemist is coming.  And, your
 4      Honor, that's one of the issues I have tomorrow.  I have
 5      -- the chemist can only come tomorrow and Ms. Felde, if
 6      she's needed, can only come tomorrow.  So depending on
 7      where we are, um, I may ask that the Court -- that, you
 8      know, I've indicated Sean Richards would testify third
 9      and I may ask to move them up.
10                THE COURT:  That's fine.  Just keep Mr. Sultan
11      advised, and me.
12                MR. LEVITT:  Yes, I will.
13           And, your Honor, with respect to the tapes and the
14      transcripts --
15                THE COURT:  Well, let me just ask the
16      following.
17           So I take it, Mr. Sullivan, you don't have any
18      objection to Bencken referring to the certification?
19                MR. SULTAN:  No, your Honor.
20                THE COURT:  Okay.  What about the transcripts?
21                MR. LEVITT:  Oh.  My intention, as I indicated
22      in the status memo I provided, was to have Special Agent
23      Bencken identify the tapes and the transcripts and then
24      admit them through Mr. Finley.
25                THE COURT:  Okay.  And I decide whether the
```

```
1    transcripts will be exhibits or chalks.  I have the

2    discretion under **Rengiffo**.

3         All right.  Has the government given the defendant

4    the Finley immunity order?

5              MR. LEVITT:  Yes, your Honor.

6              THE COURT:  I have the government's **Jencks**.

7    Mr. Sultan, you were going to give me, not the

8    government, the documents you intend to use to cross-

9    examine Finley?

10             MR. SULTAN:  Your Honor, I got them together

11   about 7:30 this morning.  I haven't had the chance to

12   copy them.  Mr. Hohler was busy so I have --

13             THE COURT:  That's fine.  Do it at the end of

14   the day today.

15             MR. SULTAN:  I will, your Honor.

16             THE COURT:  So I can glance at them tomorrow

17   morning.

18             MR. SULTAN:  I will, your Honor.

19             THE COURT:  That's fine.

20        All right.  And you're going to talk and see

21   whether Felde needs to come in to testify.

22        Okay.  The jurors have all arrived and unless

23   there's something else you all would like to discuss,

24   I'll bring them in.

25             MR. LEVITT:  Um, your Honor, one other
```

1   matter.  I have binders here, which have all the

2   transcripts.

3           THE COURT:  Okay.

4           MR. LEVITT:  That when Mr. Finley testifies,

5   and I'm going to play the tapes, I'd like to ask

6   Mr. Hohler to hand them out.

7           THE COURT:  That's fine.

8           MR. SULTAN:  I'm sorry, Mr. Levitt?

9           MR. LEVITT:  These are binders for the jury

10   that include all the transcripts.  When Mr. Finley

11   testifies, we're going to hand them out.

12           MR. SULTAN:  Oh, okay.  Yes, your Honor.

13           MR. LEVITT:  And then, your Honor, before you

14   bring the jury in, would this be a good time for me to

15   quickly talk to Special Agent Bencken?

16           THE COURT:  Yes.  Well, let me see.  Well,

17   that's -- that's fine.  Do you want to talk to Bencken?

18           (Mr. Levitt leaves courtroom.)

19           (Mr. Levitt returns.)

20           MR. LEVITT:  Thank you, your Honor.

21           (Jury enters and is seated in box.)

22           THE COURT:  All right.  Ladies and gentlemen,

23   good morning.  Welcome back.

24      As some of you learned, um, I was right when I

25   said yesterday that it could take longer to get back

1    here than you anticipated.

2            (Pause.)

3            THE COURT:  All right.  We may readjust you in

4    the box, um, later to get you back to the way you were

5    yesterday.

6            Yesterday you were sworn in as the jury in this

7    case and you will be the jury and deliberate and

8    eventually decide the case.  Only 12 of the 14 of you

9    will participate in deciding the case.  At the moment

10   the last two of you are alternates.  But even in a

11   relatively short trial like this one, um, and

12   particularly at this time you and everybody I know seems

13   to be catching a cold, um, often, you know, we have to

14   replace a juror.  So it's very important that all 14 of

15   you pay careful attention.

16           As the jury it's going to be your obligation to

17   find the facts based on the evidence, apply the law as I

18   describe it at the end of the case, and reach a

19   unanimous verdict.  You shouldn't interpret, or to be

20   more precise, misinterpret anything that I say or do in

21   the course of the case as a suggestion of what I think

22   your verdict should be.  That's entirely up to you.

23           I've just told you that you're going to decide the

24   case based on the evidence.  The evidence is going to

25   come to you in several forms.  It will come to you from

1   witnesses who will begin testifying later today, it will

2   come to you in the form of documents that are admitted

3   as exhibits, which you'll have back in the jury room, it

4   will come to you in the form of certain stipulations,

5   facts the parties agree are true and you may accept as

6   true for the purpose of deciding the case.

7        You're also going to be exposed to some things

8   that are not evidence.  Anything the lawyers themselves

9   say is not evidence.  In a little while you'll hear the

10  lawyers' opening statements.  Then you'll hear them

11  question witnesses.  At the end of all the evidence

12  you'll hear them make closing arguments.  Those

13  statements, those questions, those arguments are not

14  themselves evidence.

15       In the course of the case I expect that you will

16  hear one or more lawyers object to a question being

17  answered or a document being admitted in evidence.  I

18  want to explain that process to you.

19       In federal court we operate under the Federal

20  Rules of Evidence, which are essentially laws that

21  define what kind of information is sufficiently relevant

22  and reliable for you to consider in making your

23  decisions in this case.  If an attorney thinks that the

24  answer to a question or a document is not admissible

25  under the Rules of Evidence, he or she will object.  If

1    it's clear to me -- and the lawyer should not explain

2    the basis for their objection beyond a word or two in

3    the presence of the jury.  If it's clear to me what the

4    reason for the objection is and how I should rule on it,

5    I will say either "allowed" or "denied."  If I allow the

6    objection, it means it's meritorious and the witness

7    won't be allowed to answer or the document won't come

8    into evidence.  If I deny the objection, you'll hear the

9    answer or you'll receive the document and you can

10   consider it like anything else.

11        If -- sometimes evidence is admissible only for a

12   particular or limited purpose and if I admit evidence

13   for a limited purpose, I'll tell you and you'll consider

14   it only for that limited purpose.  Anything you see or

15   hear outside the railing of this courtroom is not

16   evidence.  And anything you might see outside the

17   courtroom is not evidence.

18        The evidence will come to you essentially in two

19   forms, there's direct evidence and there's

20   circumstantial evidence.  Direct evidence is direct

21   proof of a fact, such as the testimony of a witness who

22   says, "I was there," "This is what I saw."

23   Circumstantial evidence is proof of facts from which you

24   may infer or conclude that other facts exist.

25        Now, as I've just described it, that concept of

1    circumstantial evidence might sound like some

2    complicated legal concept.  It's not.  You really reason

3    from circumstantial evidence every day of your life.

4    For example -- and I understand this could really happen

5    during this trial.  If you went to sleep one night and

6    the ground was green in front of your house and you got

7    up the next day and there was snow on the ground, you

8    would infer that during the night, while you were

9    sleeping, it snowed, although you didn't see it and

10   nobody told you it happened.  That's reasoning from

11   circumstantial evidence.  Circumstantial and direct

12   evidence are equal in the law.

13        As jurors it's going to be your job to decide the

14   credibility, meaning the believability of evidence.  At

15   the end of the case, in my final instructions, I'll give

16   you sort of a checklist of common sense considerations

17   you might want to use in making these credibility

18   determinations.

19        In the process of selecting you as jurors

20   yesterday, I introduced you to the most fundamental

21   principles that apply in any criminal case like this

22   one.  I will instruct you on them further at the end of

23   the case, but I want to remind you of them now.

24        First among them is that the defendant,

25   Mr. Moynihan, is presumed innocent.  In a minute I'm

1    going to have Mr. Hohler, the Deputy Clerk, read you the

2    indictment.  The indictment is only a charge, it's an

3    accusation, it is not any evidence or proof that

4    Mr. Moynihan is guilty.

5         The defendant starts with a clean slate.  The

6    burden of proof is on the government throughout the

7    case.  The defendant does not have to prove he is

8    innocent or present any evidence at all.  And if the

9    defendant does not testify, you may not draw any

10   suggestion that he is guilty from his decision not to

11   testify.

12        Finally, for these basic essential principles, the

13   government must prove the defendant is guilty beyond a

14   reasonable doubt to achieve his conviction on any

15   charge.  Some of you may have served previously on a

16   jury in a civil case, there there's a lower standard of

17   proof, proof by a preponderance of the evidence.  In

18   this case the law requires proof beyond a reasonable

19   doubt.  At the end of the case, in my final

20   instructions, I'll explain this concept of reasonable

21   doubt to you in some detail.

22        Now I'm going to have Mr. Hohler read to you what

23   the accusation of the indictment is in this case, what

24   the charges are in this case.

25             THE CLERK:  The United States District Court,

1   the District of Massachusetts, the United States of

2   America versus (1) Curtis Hester, aka "CJ," and (2)

3   Timothy Moynihan, defendants.   CR Number 10-10288-MLW.

4   Violations:   21 U.S.C. Section 846, conspiracy to

5   distribute cocaine base and cocaine, 21 U.S.C. Section

6   841(a)(1), distribution of cocaine base, 21 U.S.C.

7   Section 841(a)(1), distribution of cocaine, 18 U.S.C.

8   Section 2, aiding and abetting, and 21 U.S.C. Section

9   853, criminal forfeiture allegation.

10         The superseding indictment.   Count 1.   21 U.S.C.

11   Section 846, conspiracy to distribute cocaine base and

12   cocaine.   The grand jury charges that in or about

13   January of 2010, at Haverhill and elsewhere in the

14   District of Massachusetts, Curtis Hester, aka "CJ," and

15   Timothy Moynihan, the defendants herein, did knowingly

16   and intentionally combine, conspire and confederate and

17   agree with each other and other persons unknown to the

18   grand jury to possess with intent to distribute and

19   distribute cocaine base and cocaine, both Schedule II

20   controlled substances in violation of Title 21 of the

21   United States Code, Section 841(a)(1).   The grand jury

22   further alleges that the conspiracy described herein

23   involved at least 28 grams of a mixture and substance

24   containing a detectable amount of cocaine base, a

25   Schedule II controlled substance.   Accordingly, Title

1  21, United States Code, Section 841(b)(1)(B)(iii) is

2  applicable to this count.  All in violation of Title 21,

3  United States Code, Section 846.

4       Count 2, 21 U.S.C. Section 841(a)(1), distribution

5  of cocaine base, 18 U.S.C. Section 2, aiding and

6  abetting.  The grand jury further charges that on or

7  about January 7th, 2010, at Haverhill in the District of

8  Massachusetts, (2) Timothy Moynihan, the defendant

9  herein, did knowingly and intentionally possess with

10  intent to distribute and distribute cocaine base, a

11  Schedule II controlled substance, all in violation of

12  Title 21, United States Code, Section 841(a)(1) and

13  Title 18, United States Code, Section 2.

14       Count 3, 21 U.S.C. Section 841(a)(1), distribution

15  of cocaine base and cocaine, 18 U.S.C. Section 2, aiding

16  and abetting.  The grand jury further charges that on or

17  about January 11th, 2010, at Haverhill in the District

18  of Massachusetts, (1) Curtis Hester, aka "CJ," and (2)

19  Timothy Moynihan, the defendants herein, did knowingly

20  and intentionally possess with intent to distribute and

21  distribute cocaine base and cocaine, both Schedule II

22  controlled substances, all in violation of Title 21,

23  United States Code, Section 841(a)(1) and Title 18,

24  United States Code, Section 2.

25       Count 4, 21 U.S.C. Section 841(a)(1), distribution

1    of cocaine base, 18 U.S.C. Section 2 aiding and

2    abetting.  The grand jury further charges that on or

3    about January 13th, 2010, at Haverhill in the District

4    of Massachusetts, (2) Timothy Moynihan, the defendant

5    herein, did knowingly and intentionally possess with

6    intent to distribute and distribute cocaine base, a

7    Schedule II controlled substance, all in violation of

8    Title 21, United States Code, Section 841(a)(1) and

9    Title 18, United States Code, Section 2.

10        Count 5, 21 U.S.C. Section 841(a)(1), distribution

11    of cocaine base, 18 U.S.C. Section 2, aiding and

12    abetting.  The grand jury further charges that on or

13    about January 15th, 2010, in Haverhill in the District

14    of Massachusetts, (2) Timothy Moynihan, the defendant

15    herein, did knowingly and intentionally possess with

16    intent to distribute and distribute cocaine base, a

17    Schedule II controlled substance, all in violation of

18    Title 21, United States Code, Section 841(a)(1) and

19    Title 18, United States Code, Section 2.

20            THE COURT:  And stop there, I think, for now.

21        Okay.  Ladies and gentlemen, you should not

22    speculate or try to guess why Curtis Hester, who's also

23    named in parts of this indictment, is not charged in all

24    the counts or here for this trial.  Your focus is on

25    whether the government, in this case, is proving -- has

1    proven, um, Mr. Moynihan guilty of any or all of these

2    charges beyond a reasonable doubt.  Although you will

3    hear evidence, I expect, concerning Mr. Hester as well

4    and you may consider that evidence.

5         I'm now going to give you a brief overview of the

6    applicable law to provide a framework as you listen to

7    the evidence.  I'm going to give you much more detailed

8    instructions at the end of the case.  If there's

9    anything that I say at the end of the case that seems

10   inconsistent with what I'm telling you now, you should

11   follow the instructions I give you at the end of the

12   case.

13        But as you heard, Count 1 charges a conspiracy.  A

14   conspiracy is an agreement to commit a crime.  For you

15   to find Mr. Moynihan guilty of the conspiracy charged in

16   Count 1, the government has to prove beyond a reasonable

17   doubt, first, that the agreement specified in the

18   indictment, and not some other agreement, existed

19   between Mr. Moynihan and Mr. Hester to possess cocaine

20   base or to possess cocaine or both with intent to

21   distribute it.  And second, that Mr. Moynihan willfully

22   joined that agreement.  In fact, "willfully" means to

23   act intentionally, not by accident or mistake, and

24   knowing that your conduct is unlawful.

25        The alleged object of the conspiracy in the --

1    what we call "substantive crime," charged in Counts 2,

2    3, 4 and 5, is possession with intent to distribute a

3    controlled substance.  To prove possession with intent

4    to distribute, the government has to prove beyond a

5    reasonable doubt, first, that the defendant, on the date

6    alleged, possessed crack cocaine or cocaine.  Second,

7    that he did so with the intent to distribute it, to

8    transfer it somebody else, and third, that he did that

9    intentionally and knowingly, not by accident or mistake.

10        With regard to Counts 2, 3, 4 and 5, there are at

11   least two ways that the government can prove

12   Mr. Moynihan is guilty of the charge.  They can prove

13   that he committed the offense himself completely or it

14   can prove, beyond a reasonable doubt, that Mr. Hester

15   committed the offense and Mr. Moynihan aided and betted

16   that crime.  To aid -- to prove aiding and abetting, the

17   government would have to prove first that Mr. Hester

18   committed the crime charged; second, that Mr. Moynihan

19   knew he was trying to commit that crime; and third, that

20   Mr. Moynihan knowingly and willfully did something to

21   help Mr. Hester succeed in committing the crime.

22        Let me shift a bit and tell you the following, and

23   I mentioned this yesterday.  It's very important that

24   you listen carefully to the evidence.  While I have my

25   Court Reporter here, there will not be a transcript

1    available when you're deliberating and deciding.

2         In addition, because this is a relatively short

3    trial, um, I'm not going to give you notebooks and you

4    may not take notes.  I want you to listen carefully to

5    the evidence and rely on your memories of it.

6         It's very important, as I told you yesterday, that

7    you keep an open mind until it's time to deliberate and

8    decide the case, until you -- the evidence will come in

9    like pieces in a jigsaw puzzle.  Until you have all that

10   evidence, the lawyers' arguments, and particularly my

11   final instructions, which will define the questions, you

12   cannot properly begin to make your mind up as to what

13   the answer is.  And you may see that things look or

14   sound different depending on who the witness is or who's

15   questioning the witness.  So it's important to keep an

16   open mind.

17        While the case is going on, until it's time to

18   deliberate, don't discuss the case and the evidence with

19   each other or anyone else.  As I told you yesterday, you

20   may not discuss the evidence with anybody who's not on

21   the jury because you have to decide the case based on

22   the evidence and you're the only people hearing all of

23   it.  You shouldn't discuss the case among yourselves

24   because until you have all the evidence you can't

25   properly begin to make up your mind, and if you start

1   discussing it, you'll start making up your mind.  You

2   shouldn't read or watch or listen to anything about the

3   case, you shouldn't do any research on the Internet, nor

4   should you communicate about the case through any kind

5   of social media.

6        You should let Mr. Hohler know if anybody

7   approaches you and tries to talk to you about the case.

8   And, in fact, you need to understand that nobody can

9   properly talk to you about the case.  So if you're

10  coming in the building and you see one of the lawyers

11  and they don't say "hello" to you or something, it's not

12  that they're being impolite, it's that they're being

13  very careful not to create even the appearance that

14  they're talking to you about the case.  If somebody

15  tries to do that, let Mr. Hohler know.

16       Finally, I want to tell you something about the

17  architecture of the trial.  In a moment you're going to

18  hear the opening statements of the lawyers.  As I told

19  you, what the lawyers say is not evidence, but this is

20  the opportunity they have to give you a prediction of

21  what they expect the evidence will be or to point out

22  other things they would like you to keep in mind.

23       Then, because the government has the burden of

24  proof, the government will call the witnesses first.  So

25  the government will call witnesses, the government will

1   conduct what's called direct examination, the defendant

2   will have an opportunity for cross-examination, the

3   government will have an opportunity for redirect, if it

4   wants, the defendant will have an opportunity for

5   recross, and absent something very unusual coming up on

6   recross, that will be the end of it.  They get two

7   chances to question each witness.

8          Then the defendant will have an opportunity, if he

9   wants, to present evidence.  As I told you, the

10  defendant is not under any obligation to present

11  evidence.  But then they'll be closing arguments where

12  the lawyers get a chance to argue what they remember the

13  evidence to be and what inferences they would like you

14  to draw.  And after that I will give you detailed

15  instructions and you will deliberate and in a view to

16  reaching a unanimous verdict on each of the counts.

17         As you know, in the courtroom with me are my Court

18  Reporter, the Deputy Clerk, and then I have some law

19  clerks, recent law graduates who work for me, and I have

20  some law students working for me now as well.  So you'll

21  see some of them here at the table and now you know who

22  they are.

23         So unless the lawyers have anything to discuss,

24  we'll move to the government's opening statement.

25  Okay?

1           MR. LEVITT:  Thank you, your Honor.

2

3    OPENING STATEMENT BY MR. LEVITT:

4           Good morning, ladies and gentlemen.  My name is

5    Peter Levitt.  I'm an Assistant U.S. Attorney and I

6    represent the United States in this case against Timothy

7    Moynihan.

8           Over the course of the next few days the

9    government will prove beyond a reasonable doubt that the

10   defendant, Timothy Moynihan, is a drug supplier who

11   conspired with Curtis Hester to possess with intent to

12   distribute and to distribute cocaine base, commonly

13   known as crack cocaine, as well as cocaine, that the

14   conspiracy involved at least 28 grams of cocaine base,

15   and that on four separate occasions in the span of about

16   a week in January of 2010, Timothy Moynihan possessed

17   with intent to distribute and distributed over 28 grams

18   of cocaine base, and on one of those occasions, January

19   11th, also distributed cocaine with the cocaine base.

20          Over the next few minutes, I'm going to provide

21   you with an outline or a road map of some of the

22   evidence the government expects to introduce in this

23   case.  As Chief Judge Wolf said, what I or the other

24   lawyer says is not evidence.  The evidence comes from

25   the witness stand and from the documents, the physical

1     evidence, the documents, the tape-recorded conversations

2     and meetings that you hear, and from stipulations that

3     the parties enter into.  Again, the opening is simply

4     designed to give you a sense beforehand of the evidence

5     the government expects to introduce.

6          Let me start by telling you a little bit about the

7     charges.  Chief Judge Wolf has outlined them.  If

8     anything I say or the other lawyer says is inconsistent

9     with what Chief Judge Wolf says about the charges, you

10    should follow what the judge says.

11         They're pretty self-explanatory.  The defendant's

12    charged with conspiring with Curtis Hester, in or about

13    January of 2010, to possess with intent to distribute

14    and distribute cocaine base and cocaine.  A conspiracy

15    is just an agreement with another person.  It can be

16    implicit or explicit.  It's an agreement to do

17    something, in this case to possess with intent to

18    distribute and to distribute cocaine base and cocaine.

19         A conspiratorial agreement doesn't have to be in

20    writing.  Indeed criminal conspiracies, for obvious

21    reasons, usually aren't.  They're based on a wink, a

22    nod, or simply an understanding based on conduct.  The

23    government will also show that the overall conspiracy

24    involved at least 28 grams of cocaine base.

25         The government will also show that Timothy

Moynihan possessed with intent to distribute crack
cocaine on four occasions, January 7th, 2010, January
11th, 2010, January 13th, 2010, and January 15th, 2010,
that the overall amount was over 28 grams, and that on
one of those occasions he also distributed cocaine.  And
you heard Chief Judge Wolf tell you about aiding and
abetting as well.

So let's get to the evidence in this case.  The
evidence will show you that, um, there are four buys in
the case, they are controlled purchases made by an FBI
task force using a cooperating witness.  The cooperating
witness was wearing audio recording equipment and the
car he was in was wired for audio and video.  Each of
the buys started with the cooperating witness making a
consentually-recorded telephone call to Curtis Hester.
The agents were with the cooperating witness, listened
while he ordered the crack cocaine.

So on January 7th, 2010, you'll hear that the
cooperating witness calls Curtis Hester.  Curtis Hester
says, "What do you need?"  The cooperating witness says,
"a 7 hard" -- a 7th of crack, and Mr. Hester says, "All
right, let me call him right now."  And what you're
going to hear on the recorded calls is that that's what
happens in every buy.  In every buy the CW calls Hester,
makes the order, and Hester says, "All right, let me

1  call him.  Let me call my guy."  And what he's talking

2  about, you'll see from the evidence, is he's talking

3  about his supplier or his connect, and what you'll hear

4  from the evidence is that that man is Timothy Moynihan.

5       So on January 7th, 2010, Hester calls back the CW,

6  tells him what the price is.  They talk a little bit

7  about the price.  Hester's got to call back Moynihan a

8  couple of times.  They arrange to meet.  The CW picks up

9  Hester.  They drive to a location in Haverhill, Fourth

10 Avenue.  They're on audio/video at this point.  You'll

11 see that.  And during the time that they're together,

12 you'll hear again, um, Hester talking about his guy, his

13 supplier, who he's got to get the drugs from, and that

14 they're going to meet on Fourth Avenue.

15      And you'll hear from Special Agent Bencken of the

16 FBI and Deputy Sheriff Matt Doucot, um, that they were

17 on surveillance that day, watching the CW and Hester

18 together, and they were looking to see who his supplier

19 is going to be, who's going to show up, and you'll hear

20 that the man who showed up was Timothy Moynihan and he

21 was driving a white Chevy Trailblazer.  And that, um, he

22 pulled in behind Hester and the CW and that, um, you'll

23 hear on the tape Hester take the money from the CW, go

24 into the car, get into the car with Mr. Moynihan.  They

25 go around the block.  They come back.  Hester gets out

1   of the car, gets back in the car with the CW, and gives

2   him the crack.

3          And you'll hear that Special Agent Bencken and

4   Deputy Sheriff Doucot saw Timothy Moynihan in the white

5   Chevy Trailblazer that day on several occasions.  They

6   didn't know who he was at the time.  They hadn't seen

7   him before.  He was new on the scene.  They pulled up

8   his driver's license photo, his RMV photo.  Um, Deputy

9   Sheriff Doucot had a laptop with him.  They pulled up

10  his RMV photo based on a license plate of the, um, white

11  Chevy Trailblazer and up came a photo of the defendant,

12  Timothy Moynihan, with an address of 31 Whittier Street

13  in Haverhill.

14          You'll hear that they also showed the cooperating

15  witness a photo of Mr. Moynihan from that day.  He also

16  identified him as the person that met with the CW that

17  day.  And you'll hear, when Mr. Hester gets back in the

18  car, that, um, the CW complains about the crack, he

19  says, "It looks a little small," and, um, Mr. Hester

20  says, "No, No, it's right, he weighed it," talking about

21  his supplier, "He weighed it right in the car.  It's

22  8.1."  And they go back and forth talking about that a

23  little more.

24          Now, who is the CW?  His name is Kharis Finley.

25  He will testify.  And, um, ladies and gentlemen, he's

1    exactly the type of person you would expect would be

2    able to make controlled purchases of crack cocaine on

3    the streets of Haverhill.  He's a former gang member.

4    He's got a history of ADHD.  He has sold drugs in the

5    past.  He uses marijuana.  Um, he started cooperating

6    with the FBI and has cooperated in a variety of cases

7    for money as a paid witness, a paid informant.  Um, he

8    made quarter buys in this case and in numerous other

9    cases and he's testifying pursuant to an immunity order.

10        Most of what you're going to hear when Mr. Finley

11   testifies and what you can see when he testifies is the

12   tape recordings that he made.  You're going to hear him

13   talking with Mr. Hester on tape before the buys.  He

14   calls and you're going to see him, um, with Mr. Hester

15   during the buys on the tape, on audio, on video.

16        Now, there are three other buys -- and I'm not

17   going to go into detail about them now, but the three

18   subsequent buys, on January 11th, 13th, and 15th, all

19   took place in a similar fashion, the agents met with the

20   CW, made a consentually-recorded phone call to Hester,

21   ordered up the drugs, Hester said, "Let me call my guy,"

22   he makes a call, he gets back to them and they make

23   arrangements to meet with somebody.  The difference now

24   is that now they've got an idea of who the supplier is.

25        So Special Agent Bencken has one of the agents on

1   the Task Force, Deputy Sheriff Sean Richards, set up

2   surveillance at 31 Whittier Street in Haverhill, the

3   address that came up on the Registry of Motor Vehicles

4   for Timothy Moynihan, and what you'll hear is that on

5   all three buys Deputy Sheriff Richards goes to that

6   location and he's reporting to the other agents by radio

7   what he sees.

8        And what he sees is, first, all right, the white

9   Chevy Trailblazer, the same white Chevy Trailblazer is

10  out in front of the house.  Next, after those calls we

11  talked about, the consentually-recorded calls, he sees

12  Moynihan come out of the house and get into the white

13  Chevy Trailblazer.  He's got his own photo of him.  He

14  identifies him as well.  And then he sees the defendant

15  drive towards the location in Haverhill where the buy is

16  going to be taking place and he tells everybody, "He's

17  on the way," so they can be on the lookout for him, and

18  Deputy Sheriff Richards follows the defendant to the buy

19  location.  When he gets to that area, he peels off and

20  lets Special Agent Bencken and Deputy Sheriff Doucot

21  take over the surveillance.

22        You'll hear there's other people on surveillance,

23  but they're the ones that have eyes on the CW's car with

24  Hester, they're the ones that are closest to the deal,

25  they're the ones that see Moynihan when he arrives, and

1    you'll hear that with respect to all three of the next

2    buys, um, some or all of Bencken, Doucot and Richards

3    see the defendant go into the buy and meeting with --

4    pulling in behind the CW's car with Hester.  In each

5    case there are conversations between the CW and Hester

6    leading up to Moynihan showing up in which they talk

7    about "He's waiting for his supplier to show up."

8         You'll also hear that, um, in addition to

9    identifying Mr. Moynihan on each of the buys, um,

10   Special Agent Bencken also subpoenaed or asked a Deputy

11   Sheriff Intelligence Analyst named Mike Mahoney to

12   subpoena phone records.  They had the phone number for

13   Curtis Hester.  That was the number that the CW was

14   calling.  They subpoenaed his phone records.  And

15   Special Agent Bencken asked Mahoney to subpoena those to

16   make the connections between Hester and -- Hester's

17   phone and the defendant's phone.

18        And you'll hear that Special Agent Bencken also

19   subpoenaed documents from Merchants Auto in New

20   Hampshire and that those documents show that, um, the

21   defendant bought that white Chevy Trailblazer about a

22   week before the first buy in this case, on December

23   30th, 2009, and that the phone number on those documents

24   -- that he listed his address as 31 Whittier Avenue in

25   Haverhill and that the phone number on those documents

1    is the number that Deputy Sheriff Mahoney used to make

2    the connections.  And you will hear Deputy Sheriff

3    Mahoney, towards the end of the case, testify about

4    those connections.

5         The phone number that was on those Merchants Auto

6    documents, I used for shorthand the last four digits,

7    8860, and so you'll see that, um, on each of these buys

8    the phone contacts show the CW calling Hester, asking

9    him for the crack, Hester calling that 8860 number, the

10   number associated with Moynihan, the number on the

11   Merchants Auto records when he purchased the car, and

12   that throughout the buy there's contacts back and forth

13   between Hester and Moynihan.  That happens on every

14   single one of the four buys.

15        You'll also hear testimony from the DEA drug lab,

16   a chemist will testify about the drugs that were

17   seized.  You'll hear that the net weight of the cocaine

18   base was approximately 40 grams.

19        So, ladies and gentlemen, that's a very brief road

20   map of some of the evidence the government expects to

21   introduce at trial.

22        At the close of the case, um, the government will

23   ask you to return the only verdict consistent with the

24   evidence, that you find the defendant, Timothy Moynihan,

25   guilty of conspiracy to possess with intent to

1   distribute and distribute cocaine base and cocaine, that

2   you find that the conspiracy involved over 28 grams of

3   cocaine base, and that you find him guilty of the -- of

4   four counts of distribution of cocaine base, for January

5   7th, January 13th, January 15th, and January 11th of

6   2010, and additionally for distributing cocaine on

7   January 11th.  Thank you.

8           THE COURT:  Mr. Sultan.

9           MR. SULTAN:  Thank you, your Honor.

10

11  OPENING STATEMENT BY MR. SULTAN:

12          Good morning.  Seems like a long time since

13  yesterday morning, so let me start by reintroducing

14  myself and the people at the defense table.  My name is

15  Jamie Sultan and together with my associate, Audrey

16  Grace, we represent Timothy Moynihan.

17          Let me say at the outset, I do not represent

18  Curtis Hester, I represent Timothy Moynihan, the only

19  person on trial in this courtroom.

20          Now, you've just heard the government's opening,

21  the government's story, and it sounded pretty good,

22  didn't it?  In some countries that might be enough to

23  convict somebody of a serious crime and take away their

24  liberty, but not in the United States of America.  In

25  this country people don't get convicted of crimes based

1  on stories or allegations, the government has to produce

2  evidence, reliable evidence to prove its case.

3      Now, have you heard any evidence yet?  No.  Not a

4  scintilla.  Not a snippet.  Not an iota.  None.  You

5  have not heard any evidence yet.  You've simply heard

6  the government's story.  So your job really hasn't

7  started yet because your job is to focus on the evidence

8  and determine whether the government has proven its case

9  beyond a reasonable doubt against my client, Timothy

10  Moynihan.

11      Now, how do you go about meeting that very

12  important task?  Let me suggest to you a few things to

13  keep in mind as you focus on the evidence during the

14  course of the trial.

15      Ask yourselves first are you being provided the

16  full story by the government or are you being fed

17  selective snippets of evidence that fit the government's

18  story to try to convince you to go along with that

19  version?

20      Second, ask yourselves if someone is trying to

21  tell you what to think of the evidence, how to interpret

22  the evidence?  All of you are intelligent people.  I

23  urge you to make up your own minds about the evidence,

24  not to let anybody tell you what to think about it and

25  what to make of it.  That's your decision and only your

1    decision.

2          Third, can you believe a single word that comes

3    out of the mouth of the government's paid, immunized

4    informant, Kharis Finley, a key member of the

5    prosecution team in this case?

6          Fourth, did the government do an adequate job

7    investigating the case or are there serious and

8    disturbing gaps?

9          And fifth, in a case which relies primarily on

10   recordings, secretly recorded phone calls, secretly

11   recorded meetings, secret surveillance, is there a

12   single phone call where Mr. Moynihan appears?  Is there

13   a single meeting that Mr. Moynihan participates in?  Is

14   there a single witness who is going to say, "Yeah,

15   Moynihan sold me drugs"?  Is there a single surveillance

16   photograph of Mr. Moynihan?

17         You're going to hear plenty of evidence about

18   Curtis Hester.  Yeah, there were drug deals.  No doubt

19   about it.  Curtis Hester was the seller.  Kharis Finley,

20   working for the government, was the buyer.  No doubt

21   about it.  But what is the evidence, where is the

22   evidence against Mr. Moynihan?  That is the question

23   that you're going to have to face in this case.

24         Now, you're going to hear some evidence which

25   casts some suspicion on Mr. Moynihan.  You're going to

1    hear evidence that Mr. Moynihan knew Curtis Hester.

2    They knew each other.  They lived in the same town.

3    There's going to be some things you're going to hear

4    that casts suspicion on him, "Gee, maybe he was involved

5    in this.  This sound pretty fishy, pretty suspicious."

6    But in this country that's not good enough, suspicion

7    guesswork, conjecture, that doesn't cut it.  There has

8    to be proof, proof that my client committed these

9    serious charges.  That's the government's burden.  And

10   if they haven't met it, it's clear what your

11   responsibility will be.

12        Now, this is obviously an important case, my

13   client is facing serious charges, and I know you're

14   going to listen very carefully to all of the witnesses,

15   and not only to their testimony on direct examination by

16   the government counsel, but on cross-examination by me.

17   What are some of the things that you're going to have

18   to -- that's part of your job is weighing the

19   credibility of the witnesses.  What are some of the

20   things to keep in mind as you weigh the credibility of

21   the witnesses?

22        First, does the witness appear evasive or

23   forthcoming?  They're going to be right in front of you,

24   you can eyeball them and make that kind of an

25   assessment.  Is the witness's testimony consistent or

1    inconsistent with other things the witness has said

2    before or with what other witnesses say?  Is the

3    witness's testimony believable?  Does the witness have

4    some stake -- some stake in the outcome of the case,

5    some motive to fabricate, exaggerate, just shave things

6    a little bit to help the government win a conviction?

7    And if the witness does have such a motive, does that

8    affect your willingness to rely on everything that

9    witness says from the witness stand?  Those are some of

10   the things, I submit, you should keep in mind as you

11   assess the credibility of these witnesses.

12        And finally, after you've heard all the testimony,

13   you basically will have to make a determination as to

14   whether or not the government has proven its case, not

15   based upon guilt by association, not based upon

16   speculation, not based upon guesswork, but based upon

17   proof.  Not proof against Mr. Hester.  Mr. Hester is not

18   on trial here.  I don't represent Mr. Hester.

19   Mr. Moynihan, he's the defendant, he's the person you

20   have to judge.  And ultimately you're going to have to

21   answer the question as to whether the government has

22   proven its case against Mr. Moynihan or rather whether

23   they've simply -- they've thrown some stuff out there

24   and want you to fill in the gaps, want you to accept

25   their story pretty much on blind faith, hook, line and

1    sinker.

2         At the end of the case, after you've heard all the

3    evidence, I'll have an opportunity to come back and

4    address you again and ask you, based on the evidence and

5    based on the absence of evidence, to find my client,

6    Timothy Moynihan, not guilty of each and every one of

7    these false charges.  Thank you.

8              THE COURT:  All right.  Ladies and gentlemen,

9    that concludes the opening statements, which as I told

10   you earlier, are not evidence in the case.

11        The United States may now call the first witness.

12             MR. LEVITT:  The government calls Special

13   Agent Chris Bencken.

14             (SPECIAL AGENT CHRISTOPHER BENCKEN, sworn.)

15

16             *******************************

17             SPECIAL AGENT CHRISTOPHER BENCKEN

18             *******************************

19

20   DIRECT EXAMINATION BY MR. LEVITT:

21   Q.  Would you please state your name and spell your last

22   name for the record.

23   A.  My name is Christopher Michael Bencken and my last

24   name is spelled "B," as in "boy," E-N-C-K-E-N.

25   Q.  And how are you employed?

1    A.   I'm an FBI Special Agent.

2    Q.   How long have you worked for the FBI?

3    A.   Since April of 2006.

4    Q.   What's your current assignment?

5    A.   I'm currently assigned to the Reading FBI office

6    located in California.

7    Q.   And how long have you been assigned to an office in

8    California?

9    A.   Just over a year.

10   Q.   Prior to that where were you located?

11   A.   I was assigned to the Boston FBI.

12   Q.   And you started there in when?

13   A.   In 2006.

14   Q.   Could you describe what you did, what your various

15   assignments were at the Boston office of the FBI?

16   A.   I was first assigned to the Boston Division in

17   Boston to the drug and gang squad and then I transferred

18   up to the Lowell resident agency, a small office, and

19   then I was assigned to the North Shore Gang Task Force.

20   Q.   And how long had you worked at that task force?

21   A.   Just over two years.

22   Q.   And that would be 2008 to 2010, about?

23   A.   Correct.

24   Q.   Would you describe your law enforcement experience

25   prior to joining the FBI?

1   A.   I was employed with the State of California.   I

2   worked for the California Department of Corrections from

3   '97 till about 2001, and from 2001 to about 2005, I

4   worked for the California Department of Justice, and

5   then I worked for the Employment Development Department

6   from 2005 until 2006.

7   Q.   What did you do in the California Department of

8   Justice?

9   A.   I worked as a criminal investigator for them.

10   Q.   And then afterwards what were you doing?

11   A.   A criminal investigator.

12   Q.   Could you describe very briefly your training at the

13   FBI?

14   A.   Yeah, we're trained in surveillance and, um, arrest

15   and control, and firearms training, um, physical

16   fitness, evidence collection.

17   Q.   Do you have any training with respect to identifying

18   particular drugs?

19   A.   Yes, I do.

20   Q.   Are you familiar with an investigation of Curtis

21   Hester and Timothy Moynihan?

22   A.   Yes, I am.

23   Q.   What was your role in that investigation?

24   A.   I was the co-case agent assigned to that

25   investigation.

1    Q.   Who was the other case agent?

2    A.   Special Agent Gary Coffey.

3    Q.   Were there any other agencies involved?

4    A.   Yes, there were.

5    Q.   Which agencies?

6    A.   The Massachusetts State Police, the Middlesex County

7    Sheriff's Department, the Essex County Sheriff's

8    Department, the Lawrence Police Department, and the

9    Haverhill Police Department.

10   Q.   And is it fair to say this was part of a larger

11   investigation?

12   A.   Yes, it was.

13   Q.   And where was that sort of larger investigation

14   focused, what geographical area?

15   A.   In the Lawrence and Haverhill areas of

16   Massachusetts.

17   Q.   And when did that larger investigation focus on

18   Curtis Hester and Timothy Moynihan?

19   A.   Um, it began around December of 2009.

20   Q.   And at the beginning of the investigation were you

21   focusing on just one of those individuals?

22   A.   No.

23   Q.   Um, the -- did you use a particular investigative

24   technique in connection with that investigation?

25   A.   Yes, we did, we used a cooperating witness to make

1     controlled drug evidence buys.

2     Q.   Who was the cooperating witness?

3     A.   Kharis Finley.

4     Q.   Would you describe his background a little bit, what

5     you knew about him at the time?

6     A.   Mr. Finley was a gang member, a former gang member.

7     We knew he had been arrested for distributing drugs, for

8     possessing drugs and using drugs.  We knew that he had

9     been arrested for things, um, for possession of

10    marijuana.  We knew that he was using marijuana.  And,

11    um, we knew that he had ADHD and, um, we knew that he

12    had been a cooperating witness in the FBI office in

13    Boston.

14    Q.   You knew all that stuff when you started using

15    Kharis Finley to make controlled buys in this case?

16    A.   Yes, we did.

17    Q.   Why did you use him?

18    A.   Mr. Finley was in a position to, um, go out and make

19    controlled buys with the associations he had with some

20    of the subjects of our investigation, and in order to do

21    that we had corroborated -- he would corroborate

22    information he was telling us by making audio and video

23    recordings of those buys.

24    Q.   So how did his -- did his background affect how you

25    conducted the investigation?

1    A.   Yes, it did.

2    Q.   How did it affect it?

3    A.   It affected it in the sense that we used measures

4    and techniques to control what he did and we had him

5    wear audio and video recording equipment to corroborate

6    what he was telling us.

7    Q.   And on each of the buys did you use certain

8    procedures?

9    A.   Yes, we did.

10   Q.   Could you describe those procedures?

11   A.   We would meet with Mr. Finley and, um, we would, um,

12   search him, we would have him make consentually-recorded

13   phone calls to targets of the investigation.  We would,

14   um, debrief him at length and talk to him about what he

15   knew and how he knew it.  And we would, um, search the

16   vehicle that we put him in to make the controlled buys.

17   Things like that.

18   Q.   And once a buy was set up to happen what procedures

19   would you employ?

20   A.   We would meet with the source, Mr. Finley in this

21   case, and we would search him.  We would make sure he

22   didn't have any drugs on him, any contraband, any extra

23   money, things like that.  And we would have him make a

24   consentually-recorded phone call to the target of the

25   investigation.  We would, um, you know, advise him and

1    direct him to what his objective was on that day.  And

2    we would, um, search the vehicle that we were placing

3    him in and we would equip him with audio and video

4    recording equipment, including a transmitter, so we

5    could listen in on what was being said and what was

6    happening.  And we would send surveillance out to the

7    locations and then we would surveil him to where he was

8    going to make the controlled buy.

9    Q.   Would you provide him with the money for the buy?

10   A.   Yes, we would.

11   Q.   Do you know when the last time he worked for the FBI

12   was, Mr. Finley?

13   A.   The best that I could recall would be, um, March or

14   April of 2010.

15   Q.   And is he open or closed now?

16   A.   He's currently closed.

17   Q.   Let me direct your attention to January 7th, 2010.

18        Did something happen in connection with the

19   investigation on that day?

20   A.   Yes, it did.

21   Q.   And what happened?

22   A.   Mr. Finley made a controlled drug evidence buy on

23   that day.

24   Q.   Okay.  Who did he make it from?

25   A.   He made it from Curtis Hester.

1    Q.   Could you describe how the buy started on that day?

2    A.   We met at a predetermined meet location, um, and

3    debriefed Mr. Finley and we had him make a consentually-

4    recorded phone call to Mr. Hester.

5    Q.   Is that the first contact you had with Mr. Hester on

6    the investigation?

7    A.   No, it's not.

8    Q.   When was the prior contact?

9    A.   January 6th.

10   Q.   And was there a controlled buy on that day?

11   A.   Yes, there was.

12   Q.   Did that controlled buy involve Mr. Moynihan to the

13   best of your knowledge?

14   A.   No, it did not.

15   Q.   Do you know approximately -- do you recall

16   approximately what time you had -- on January 7th, that

17   you had, um, the cooperating witness make the

18   consentually-recorded telephone call to Mr. Hester?

19   What time did they actually speak about the deal?

20   A.   Um, the best I can recall is around -- between 1:45

21   and 2:00 p.m. on January 7th.

22   Q.   Um, do you recall what phone number the cooperating

23   witness was using?

24   A.   We utilized a direct connect phone and he utilized,

25   um -- Mr. Finley's phone number at the time was 181

1  star, um, 131 star, 947.

2  Q.  Um, was that the phone you had given him?

3  A.  Yes, it was.

4  Q.  An undercover phone?

5  A.  Yes.

6  Q.  And do you know what number he called to contact

7  Curtis Hester?

8  A.  He utilized another direct connect phone number and

9  that was 181 star, 130 star, 5159.

10  Q.  So Curtis Hester was using 181-130-5159?

11  A.  Correct.

12  Q.  And on all four buys that are at issue in this case,

13  January 7, January 11, January 13, January 15, did the

14  cooperating witness use that same direct connect number

15  ending in 947?

16  A.  Yes, he did.

17  Q.  And on all four of those buys did Mr. Hester use the

18  same direct connect number ending in 5159?

19  A.  Yes, he did.

20  Q.  Now, were you listening in on that call on January

21  7th, 2010?

22  A.  Yes, I was.

23  Q.  And I'm referring to a call, but is it fair to say

24  there was more than one setting up the deal?

25  A.  Yes, there was.

1   Q.  And is it fair to say that sometimes he'd call and

2   couldn't reach him, there was a back and forth going on?

3   A.  Yes.

4   Q.  And how were you listening in on the call?

5   A.  He was talking on the direct connect feature of the

6   phone, the walkie-talkie, so we could listen live.

7   Q.  Is it fair to say that most of the calls between the

8   cooperating witness and Hester were on that direct

9   connect?

10  A.  Yes.

11  Q.  And, um, what -- after that call was complete, what

12  was your game plan?

13  A.  After the phone call was complete we would search

14  him, we would provide him -- we would count out official

15  agency funds to provide him the money for the agreed-

16  upon price for the drugs.

17  Q.  Is it fair to say the procedures you testified

18  about, you used those on all the buys?

19  A.  Yes, we did.

20  Q.  Um, did you set up surveillance on that buy, January

21  7th, 2010?

22  A.  Yes, we did.

23  Q.  And where did you have surveillance set up?

24  A.  We had surveillance set up in Haverhill,

25  Massachusetts in the area around Summer and -- Summer

1    Street in Haverhill.

2    Q.  And did you follow the cooperating witness when he

3    went to pick up Mr. Hester?

4    A.  Yes, we did.

5    Q.  And do you recall where he went that day?

6    A.  He went to, um, the -- Mr. Finley went to pick up

7    Mr. Hester at Mr. Hester's mother's house on January

8    7th.

9    Q.  Do you recall where that was?

10   A.  On Summer Street in Haverhill.

11   Q.  And where did they go once Mr. Hester got in the

12   car?

13   A.  They went to the area of Fourth Ave. in Haverhill,

14   Massachusetts.

15   Q.  And what happened when they arrived on Fourth Ave?

16   A.  Um, when Mr. Hester and Mr. Finley arrived, um, on

17   Fourth Avenue, um, they set up in front of -- they

18   parked in front of 28 or 29, around that area, on Fourth

19   Avenue.

20   Q.  I'm going to show you what's been marked as

21   Government Exhibit 34.

22              (On screen.)

23              THE COURT:  Hold on just one second.  Is there

24   going to be any objection to Exhibit 34?

25              MR. SULTAN:  That's the map, your Honor?

```
 1                THE COURT:  Is that the map?

 2                MR. SULTAN:  No, your Honor.

 3                MR. LEVITT:  Your Honor, in the future, I'll

 4    show Mr. Sultan the exhibits --

 5                THE COURT:  All right.  In fact, we'll talk

 6    about this later, but it may be possible to admit some

 7    of these.  Let me put it back on the jury's monitors.

 8                (On screen.)

 9    Q.  Do you recognize that, Special Agent Bencken?

10    A.  Yes, I do.

11    Q.  What is it?

12    A.  It's a map of the area of Fourth Avenue in

13    Haverhill, Massachusetts.

14    Q.  Does it fairly and accurately depict that area?

15    A.  Yes, it does.

16                MR. LEVITT:  The government moves to admit

17    Exhibit 34.

18                THE COURT:  It is admitted.

19                (Exhibit 34, marked.)

20    Q.  Using some of the cross streets, can you identify

21    approximately the location where Mr. Hester and

22    Mr. Finley set up that day?

23    A.  Yes.  They were parked in between Auburn and Cedar

24    Street on the right side of the street closer to Cedar

25    Street -- I'm sorry, closer to Auburn Street.
```

```
 1   Q.  So in this area between Fourth -- on Fourth Avenue?

 2   A.  In the area between Auburn and Portland Street.

 3   Q.  I'm sorry.  In this area closer to Auburn?

 4   A.  Yes.

 5   Q.  On the right-hand side?

 6   A.  Yes.

 7   Q.  Facing which way?

 8   A.  Facing towards Cedar Street.

 9   Q.  Okay.  And you were on surveillance?

10   A.  Yes, I was.

11   Q.  Were you with anybody?

12   A.  Yes, I was with Deputy Sheriff Matt Doucot.

13   Q.  Who was driving?

14   A.  I was.

15   Q.  What kind of car were you drying?

16   A.  I was driving a gray, silver Caravan.

17   Q.  What kind of car was Mr. Finley driving?

18   A.  He was driving a Ford Expedition.

19   Q.  Where were you located on surveillance once you got

20   situated?

21   A.  I was parked, um, on the right side of the street on

22   Fourth Avenue in between Auburn Streets and Cedar

23   Streets, facing Cedar.

24   Q.  Were you closer to one or the other?

25   A.  I was closer to Auburn.
```

1    Q.  Sort of in this area?

2    A.  Yes.

3    Q.  So you were in front of the car that Finley and

4    Hester were in?

5    A.  That's correct.

6    Q.  And were you able to listen to what they were

7    saying?

8    A.  Yes.

9    Q.  Did you have a transmitter?

10   A.  Yes.

11   Q.  And were you, um, on the lookout for anything that

12   day?

13   A.  Yes, we were.

14   Q.  What were you on the lookout for?

15   A.  We were able to listen over the transmitter that

16   Mr. Hester indicated to Mr. Finley that his connection

17   was on its way to the area.

18   Q.  What do you mean "his connection," what's that mean?

19   A.  His connection for the drugs.

20   Q.  Okay.  And, um, at some point, um, did another car

21   arrive?

22   A.  Yes, it did.

23   Q.  And where did that car go?

24   A.  Um, that car, um, parked behind Finley and Hester on

25   Fourth Avenue.

1    Q.   Was it directly behind, um, Finley and Hester?

2    A.    It was parked behind it, but it was out on the

3    street a little bit.  So it was out a little bit from

4    where Mr. Finley was parked.

5    Q.   Could you see that car from that point?

6    A.   Yes.

7    Q.   Could you see what kind of car it was?

8    A.   Yes.

9    Q.   What kind of car was it?

10   A.    It appeared to be a white Chevrolet Trailblazer.

11   Q.   Was that the first time you saw that Chevy white

12   Trailblazer on this day?

13   A.   No.

14   Q.   When had you seen it previously?

15   A.    I had seen it previously on Portland Street.

16   Q.   When?

17   A.    When we followed Mr. Finley from, um, the area of

18   Mr. Hester's mother's house over on Summer Street, we

19   heard on the transmitter that -- we knew that

20   Mr. Hester's connection for the drugs was on his way, so

21   we were on the lookout for a vehicle.  We just didn't

22   know what vehicle at the time it was.

23   Q.   And, um, do you recall where you were on Portland

24   Street when you saw it?

25   A.    I don't remember exactly where I was, no.

1  Q.  And how did you see it?  Were you behind it?  Was it

2  coming towards you?  What happened?

3  A.  The vehicle passed me at some point on Portland

4  Street.

5  Q.  And did you see the driver at that point?

6  A.  Yes.

7  Q.  And going back to where you were on Fourth Avenue,

8  um, you're listening on the transmitter, and at some

9  point did you hear Hester, um, getting out of Finley's

10  car?

11  A.  Yes, we did.

12  Q.  And could you hear whether, um, in -- and could you

13  see him at that point, could you see where he went?

14  A.  No, we heard the door open and we had a very limited

15  view of Hester getting out of the car at that point.

16  Q.  Okay.  How were you watching this transpire, you

17  personally?

18  A.  Through my rear view mirror and through my side view

19  mirror.

20  Q.  And at some point did that white Chevy Trailblazer

21  move from its spot?

22  A.  Yes, it did.

23  Q.  And, um, did you see where it went?

24  A.  Yes.

25  Q.  Where did it go?

1   A.   They -- the vehicle pulled out from behind, um,

2   Mr. Finley, and came down Fourth Avenue toward Cedar

3   Street.  So they came right past me.

4   Q.   And were you able to see into that white Chevy

5   Trailblazer when it came up behind you?

6   A.   Yes.

7   Q.   And how were you looking at it?

8   A.   I was looking at it through my rear view mirror,

9   through my side mirror and turning my head.

10  Q.   As it got closer and came by, you turned your head?

11  A.   Yes.

12  Q.   And could you see who was in that white Chevy

13  Trailblazer?

14  A.   Yes.

15  Q.   Who was in it?

16  A.   Mr. Hester was in the passenger seat and

17  Mr. Moynihan was in the driver's seat.

18  Q.   And at that time did you know Mr. Moynihan, did you

19  know who he was?

20  A.   No, I didn't.

21  Q.   You identified him later?

22  A.   Yes.

23  Q.   Um, could you see, um -- and did you get the license

24  plate of that white Chevy Trailblazer when he drove by?

25  A.   Yes, I did.

1    Q.   What was their license plate?

2    A.   383HA8.

3    Q.   Is it a Mass. plate?

4    A.   Yes, it was.

5    Q.   Were you able to see, um -- after Hester and

6    Moynihan drove by you in the, um, white Chevy

7    Trailblazer were you able to see where they went?

8    A.   They made a right turn onto Cedar, but at that point

9    they were out of my view, so I didn't --

10   Q.   And did that white Chevy Trailblazer come back?

11   A.   Yes, it came back and parked, again, immediately

12   behind Mr. Finley or Mr. Finley's vehicle.

13   Q.   How long did it take to go back there?

14   A.   I would estimate two or three minutes.

15   Q.   So it basically made the block?

16   A.   Yes.

17   Q.   And then what were you able to see and hear when,

18   um, the Trailblazer came back with Moynihan and Hester?

19   A.   Um, we heard Mr. Finley telling us that the car was

20   coming back with the transmitter and he was calling out

21   the license plate and describing the vehicle and the

22   driver of the vehicle, and then we heard Mr. Hester get

23   back into the vehicle with Mr. Finley.

24   Q.   And could you hear what transpired between Hester

25   and, um, Finley when Hester got back in the car?

```
 1    A.   Yes.

 2    Q.   What?

 3    A.   They were talking about, um, the drugs.

 4             MR. SULTAN:   Your Honor, I guess at this point

 5    I object for the reasons that were previously stated

 6    under *Petrozziello*.

 7             THE COURT:   Okay.   The objection is

 8    overruled.   The evidence is conditionally admitted.

 9    Q.   Go ahead.

10    A.   They were having a conversation about what the drug

11    weighed and the price of the drug.

12    Q.   What happened after Hester got into the, um,

13    Finley's car and they talked about the drugs, what

14    happened with Moynihan?

15    A.   Um, Mr. Moynihan left the area.

16    Q.   Do you recall how he drove off?

17    A.   He pulled back onto Fourth Avenue, but I don't

18    recall if he made the right onto Auburn Street or if he

19    went down past us again and made a right onto Cedar.   I

20    don't remember.

21    Q.   So you were here.   (Indicates.)   You can't recall if

22    he went down Auburn or just went right by it?

23    A.   Yes.

24    Q.   Do you recall whether you were able to see him when

25    he pulled up to that intersection of Cedar and Fourth
```

1  through your rear view mirror or side mirror?

2  A.  Yes.  Yes.

3  Q.  And were you able to again see who was the driver of

4  the white Chevy Trailblazer?

5  A.  Yes, I was.

6  Q.  And who was it?

7  A.  Timothy Moynihan.

8  Q.  Um, and where did, um, the CW and Hester go at that

9  point?

10  A.  Mr. Finley went to take Mr. Hester home and then

11  they met back at a predetermined meet location with us.

12  Q.  When you say "they," who met back?

13  A.  Mr. Finley did.

14  Q.  And did you follow Finley and Hester back to

15  Hester's house?

16  A.  Yes.

17  Q.  And then follow Finley to the predetermined meeting

18  location?

19  A.  Yes, we did.

20  Q.  Did you do anything at that point, um, to try to

21  identify the driver of the white Chevy Trailblazer?

22  A.  Yes, we did.

23  Q.  Am I correct that you didn't know who it was at that

24  point?

25  A.  No, we didn't, not at the time.

Q.   So what did you do?

A.   We ran the license plate of the vehicle through the

Registry of Motor Vehicles.  Matt Doucot had a laptop

that was able to look up the license plate and the

registered owner of the vehicle.

Q.   Let me show you what's been marked as Government

Exhibit 28.  Do you recognize that?

A.   Yes, I do.

Q.   Um, what's that?

A.   That's the, um, Registry of Motor Vehicles's record,

driver's record for Timothy Moynihan with an address of

31 Whittier Street in Haverhill, Massachusetts.

Q.   Is that the RMV photo that you pulled up that day?

A.   Yes.

Q.   And when you pulled it up, did you recognize that

photo?

A.   Yes, I did.

Q.   And who did you recognize it to be?

A.   I recognized that as the driver of the Chevy

Trailblazer that we had just seen.

            THE COURT:  Do you want to move that into

evidence?

            MR. LEVITT:  I do, your Honor.  Thank you.

            MR. SULTAN:  Your Honor, I object under

*Vigneau* to a portion of this set of documents.  As we

1    discussed yesterday, your Honor.

2              THE COURT:  Yes.  The objection is overruled.

3    You can put that back up.

4              MR. LEVITT:  I'm done with it, your Honor.

5              THE COURT:  The jury hasn't seen it.

6              MR. LEVITT:  Oh, I'm sorry.  My mistake.

7              THE COURT:  You haven't moved it into

8    evidence.

9              MR. LEVITT:  My mistake, your Honor.  Thank

10   you.

11             (Shows.)

12   Q.  So I just ask again, did you recognize the

13   individual in that photo?

14   A.  Yes, I did.

15   Q.  And who did you recognize it to be?

16   A.  Timothy Moynihan.

17   Q.  Did you recognize it to be the driver from that day?

18   A.  Yes, I did.

19   Q.  The white Chevy Trailblazer?

20   A.  Yes.

21   Q.  And, um, is it fair to say that there are -- that in

22   these records is, um, the -- it indicates that he's the

23   registered owner of that white Chevy Trailblazer from

24   that day?

25   A.  Yes.

Q.   When you, um, met with -- about how long after the
buy in this case did you meet with, um, Mr. Finley?

A.   About 15 or 20 minutes.

Q.   Okay.  So that's sort of in between the time he
dropped -- the buy takes place, he drops off Hester, and
then you guys meet at a predetermined meeting location?

A.   Yes.

Q.   And when you met with him at the predetermined
meeting location, are there procedures that you employ
at that point?

A.   Yes, we recover the drug evidence immediately from
Mr. Finley, um, we turn off the recording equipment, and
we search him again to make sure there's nothing else on
him, money or drugs, things like that, and then we bring
him into an office and interview him.

Q.   And on that day did you, um -- did you show him a
photo?

A.   Yes, I did.

Q.   I show you Government Exhibit 29.  (On screen.)  Do
you recognize that?

A.   Yes, I do.

Q.   What's that?

A.   That's a photo of Timothy Moynihan.

Q.   Is that the photo you showed the CW on that day?

A.   Yes, it was.

1          MR. LEVITT:  The government wishes to admit
2   Government Exhibit 29.
3          THE COURT:  It is admitted.
4          (Exhibit 29, marked.)
5   Q.  And when you showed the photo to Mr. Finley, what
6   did you say?
7   A.  I asked him if he could identify the person that he
8   had seen, um, on the day of the buy that was driving the
9   white Trailblazer.
10  Q.  And what did he say?
11  A.  He said he could.
12  Q.  And what happened?
13  A.  I showed him the photo and he immediately said that
14  was the same person.
15  Q.  And what's that?  (Indicates.)
16  A.  That's his code name signature, "Schwinn."
17  Q.  And so that's Finley's signature?
18  A.  Yes, it is.
19  Q.  And the date?
20  A.  Yes.
21  Q.  Did he put that in there?
22  A.  Yes.
23          MR. LEVITT:  May I approach, your Honor?
24          THE COURT:  With what?  Okay.  Yes.
25  Q.  Let me show you what's -- what will be marked as

1    Government 1.

2              MR. LEVITT:  Let me ask Mr. Hohler if he could

3    mark these.

4              (Pause.)

5    Q.  Let me show you what's been marked as Exhibit 1.  Do

6    you recognize that?

7    A.  Yes, I do.

8    Q.  What is it?

9    A.  It's the drug evidence we purchased on January 7th,

10   2010.

11   Q.  And that's what Mr. Finley gave you when you met him

12   at the predetermined location?

13   A.  Yes, it is.

14             MR. LEVITT:  And I move to admit Government

15   Exhibit 1.

16             THE COURT:  It is admitted.

17             (Exhibit 1, marked.)

18   Q.  Let me show you Government Exhibit 2.  What's that?

19   A.  This is a Drug Enforcement Administration laboratory

20   report from the drugs submitted on January 7th, 2010.

21   Q.  Have you reviewed it?

22   A.  Yes, I have.

23   Q.  Does it appear to be accurate?

24   A.  Yes.

25             MR. LEVITT:  I move to admit Government

1   Exhibit 2.

2            THE COURT:  It is admitted.

3            (Exhibit 2, marked.)

4   Q.  On that day when you received the -- when you

5   received the drugs from Mr. Finley, did you do anything

6   with them?

7   A.  Yes, I -- we field tested them and we also weighed

8   them and packaged them and sealed them and submitted

9   them in evidence.

10  Q.  And did the field test positive for anything?

11  A.  Yes, they field tested positive for cocaine.

12  Q.  And then is it correct that you sent it to the DEA

13  lab or DA lab to determine if it's that particular form

14  of cocaine known as cocaine base?

15  A.  Yes.

16  Q.  And did you send it to the DEA lab?

17  A.  Yes, I did.

18  Q.  Um, did you inspect it yourself, visually look at

19  it?

20  A.  Yes.

21  Q.  And is there a way, based on your training and

22  experience, to distinguish cocaine from crack cocaine

23  when you look at it?

24  A.  Yes, it appeared to have -- cocaine base is commonly

25  known as crack, it's more -- the texture is different,

```
 1    it smells different, it looks different.  It's solid.

 2    It's not as powdery as cocaine hydrochloride.

 3    Q.  And when you examined the drugs on January 7th, did

 4    it appear consistent with crack cocaine?

 5    A.  Yes, it did.

 6    Q.  And I showed you the exhibit, um, it was yellow and

 7    powdery.  Is that the way that it looked on the day of

 8    the buy?

 9    A.  No, it didn't.

10    Q.  What did it look like at that time?

11    A.  It was more solid.

12    Q.  Like a rock, kind of?

13    A.  Yes.

14    Q.  Do you see, um, in court here today, um, the

15    individual that you saw driving the white Chevy

16    Trailblazer on January 7th, 2010?

17    A.  Yes, I do.

18    Q.  Would you point him out, please, and describe an

19    item of clothing?

20    A.  Yes, he's sitting there at the end table.  He's

21    wearing a blue sport coat with a white or a light blue

22    undershirt with a gray tie.

23              MR. LEVITT:  May the record reflect the

24    identification of the defendant.

25              THE COURT:  Yes.
```

1   Q.  And when you saw him when he drove by you were you

2   able to determine if it was the same person you had seen

3   on Portland Street?

4   A.  Yes.

5   Q.  And was it?

6   A.  Yes.

7           THE COURT:  Mr. Levitt, it's almost 11:00.  I

8   understand you've got a way to go, but when you reach a

9   convenient breaking point, we'll take the morning break.

10          MR. LEVITT:  Yes, your Honor.  Just one minute

11  would be a good time.

12  Q.  Let me show you what's been marked as government

13  Exhibit 11.  Do you recognize that?

14  A.  Yes, I do.

15  Q.  What is it?

16  A.  That is a copy of the recorded telephone

17  conversations that we had with Mr. Moynihan and

18  Mr. Hester on January 7th, 2010.

19  Q.  Okay.  It's an excerpt?

20  A.  Yes.

21  Q.  Let me show you Government Exhibits 12A, B, and C.

22  Do you recognize those?

23  A.  Yes, I do.

24  Q.  What are those?

25  A.  Those are transcripts from the phone calls that we

1  made on January 7th.

2  Q.  Again, excerpts?

3  A.  Yes.

4  Q.  And Government Exhibit 13, do you recognize that?

5  A.  Yes, I do.

6  Q.  What is that?

7  A.  That's an audio/video recording of the buy that we

8  did on January 7th, 2010.

9  Q.  And Government Exhibit 14?

10  A.  Yes, that's a copy of the excerpt of the transcript

11  from the audio/video buy.

12          MR. LEVITT:  Your Honor, I just ask that these

13  be marked for identification at this point.

14          THE COURT:  If they are going to be marked for

15  identification, they'll need to get letters.  What is

16  the next letter?

17          THE CLERK:  D, Judge.

18          THE COURT:  So what the government proposes to

19  admit as Exhibit 11 is Exhibit D.  The proposed Exhibit

20  12 is Exhibit E.  The proposed Exhibit 13 is Exhibit F.

21          (Exhibits D, E and F, marked.)

22          MR. LEVITT:  And then there's Exhibit 14.

23          THE COURT:  That will be Exhibit G.

24          (Exhibit G, marked.)

25          MR. LEVITT:  And this is a convenient time to

```
 1   break, your Honor.
 2            THE COURT:  Ladies and gentlemen, everyday
 3   about 11:00 we'll take about a 15-minute break.  There
 4   should be something back there for you to eat.  So we
 5   will be in recess and resume at 11:15.  The Court is in
 6   recess.
 7            (Short recess, 11:00 a.m.)
 8            (Resumed, 11:20 a.m.)
 9            THE COURT:  I'm told by the Deputy Clerk that
10   one of the jurors said she recognized the man in the
11   brown suit sitting in the gallery, which Mr. Hohler
12   thinks is Mr. Hayden.  I don't know whether --
13        Tell me again what she said?
14            THE CLERK:  She said she doesn't know his
15   name, just that he looks familiar to her.
16            THE COURT:  She said she doesn't know his
17   name, that he looks familiar.
18        Is there anything I should say to her other than
19   "Don't worry about it"?  Mr. Sultan is nodding his head,
20   "yes."  Okay.  I'll note that.
21        All right.  And I understand we have a document
22   Mr. Sultan needs, but not right this minute.  Being --
23        I'm surprised it's not in the courtroom.
24            THE CLERK:  It is, Judge.
25            THE COURT:  All right.
```

```
 1              MR. SULTAN:  Yeah, that's it.  Thank you, your
 2     Honor.
 3              THE COURT:  All right.
 4         And did you want to say something about the
 5     witnesses?
 6              MR. LEVITT:  I did, your Honor.  In fact, I
 7     talked with Mr. Sultan to see -- we have Kharis Finley
 8     here waiting, and to see -- well, if he agreed -- we
 9     think it's inconceivable that we'll get to him today and
10     we did -- we both think that if we finish with
11     Mr. Bencken today, um, it would be 10 of 1:00, that sort
12     of thing.  So I was thinking about letting him go, but I
13     didn't want to do it before consulting with the Court.
14              THE COURT:  That's smart.
15         All right.  How much more do you think you have
16     with Agent Bencken?
17              MR. LEVITT:  I would say half an hour.
18              THE COURT:  And about how long do you expect
19     to be, Mr. Sultan?
20              MR. SULTAN:  I would say more than an hour of
21     cross.
22              THE COURT:  Okay, Mr. Levitt.
23         But I want to bring the jury back.
24              MR. LEVITT:  I'm just going to tell somebody
25     to tell Mr. Finley to leave.
```

```
 1            THE COURT:  Go ahead, and Mr. Hohler will go

 2   get the jury.  Actually I wanted to ask you one other

 3   thing beforehand.

 4        We've marked the transcripts as numbered items for

 5   identification.  We discussed this a bit last week.  I

 6   have the discretion to admit them as numbered exhibits

 7   or to keep them as aids, not send them to the jury room,

 8   and give them to the jurors only if they ask for it.

 9        What's the government's request?

10            MR. LEVITT:  The government would ask that

11   they go to the jury.  I think there's no question raised

12   about their accuracy.  I think it's helpful.  This is a

13   short case and I don't see any reason why it wouldn't be

14   anything other than helpful for them to have them.

15            THE COURT:  Mr. Sultan?

16            MR. SULTAN:  I think that the tapes should be

17   treated as the evidence, the transcripts are an aid.  I

18   don't have an objection to them going to the jury room

19   as aids, but I don't think they should be marked as

20   exhibits.

21            THE COURT:  Well, I'll do the following, I'll

22   have them marked with numbers, but I will instruct them

23   today and at the end of the case that if there's any

24   difference between the transcript and what they hear on

25   the tape, that they have to rely on what they hear on
```

1    the tape.  Okay?

2              MR. LEVITT:  Your Honor, this may go faster,

3    if there's no objection, I can move the tapes and the

4    transcripts in through Mr. Bencken.  We don't have to do

5    this in sort of a two-step process.

6              MR. SULTAN:  I have no objection to that, your

7    Honor.

8              THE COURT:  And, in fact, I want you to go

9    over, before tomorrow, all of the exhibits.  Those that

10   there are no objections and you're sure you want to use,

11   I'll admit them all together, and it will expedite

12   things.  Okay?

13        All right.  Mr. Hohler is going to get the

14   jurors.

15        And, Mr. Levitt, you can do what you want, but

16   tell Mr. Finley he's got to be back at 9:00 tomorrow

17   morning.

18              MR. LEVITT:  It's taken care of, your Honor.

19              (Man enters courtroom.)

20              MR. SULTAN:  That's just a package delivery,

21   your Honor, please.

22              (Mr. Sultan signs for package.)

23              MR. SULTAN:  Thank you, your Honor.

24              (Pause.)

25              (Jury enters, 11:30 a.m.)

```
 1              THE COURT:  Mr. Levitt, you may resume.
 2              MR. LEVITT:  Your Honor, at this point I would
 3    move to admit the two tape recordings and the associated
 4    transcripts previously marked for identification as D,
 5    E, F and G, and I move to admit them as Government
 6    Exhibits 11, 12A through C, 13 and 14.
 7              THE COURT:  And are 12 -- which are the
 8    transcripts?
 9              MR. LEVITT:  The transcripts, your Honor, are
10    12A through C, and 14.
11              THE COURT:  Okay.  The tapes and the
12    transcripts are admitted.
13              (Exhibits 11, 12A, 12B, 12C, 13 and 14,
14    marked.)
15              THE COURT:  Ladies and gentlemen, you are
16    going to, at some point in this trial, hear these tapes.
17    You're going to have the written transcripts as an aid
18    to your listening.  But if while we're in the courtroom
19    or while you're deliberating you hear something on the
20    tape that's different than what's written on the
21    transcript, you must rely on what you hear rather than
22    on what you read.  Okay?
23         Go ahead.
24    Q.  Special Agent Bencken, you testified earlier about
25    the January 7th, 2010 buy.  You said that the
```

1  consentually-recorded telephone call from Mr. Finley and

2  Mr. Hester where they arranged the deal was more or less

3  about 1:45 to 2:00?

4  A.  Yes.

5  Q.  And that's an approximation on your part?

6  A.  Yes, it is.

7  Q.  And is there a period when you meet with the

8  cooperating witness after the buy that you turn off the

9  equipment?

10  A.  Yes.

11  Q.  And is that sort of one of the first things you do

12  when you meet with him?

13  A.  Yes.

14  Q.  And on that day, January 7th, 2010, do you recall

15  approximately when that happened?

16  A.  On January 7th, the best I remember.  Um, I don't

17  recall exactly, no.

18  Q.  Okay.  Have you -- is that something you have

19  remembered in the past?

20  A.  Yes.

21  Q.  But now you can't remember it?

22  A.  No.

23  Q.  Is there anything that would refresh your

24  recollection?

25  A.  If I saw my report from that day, it would be

1  helpful, yes.

2  　　　　　MR. LEVITT:  Your Honor, may I approach the

3  witness to refresh his recollection?

4  　　　　　THE COURT:  Yes.

5  　　　　　MR. LEVITT:  I'm sorry.  The copy I have here

6  has some highlighting on it, so --

7  　　　　　THE COURT:  Well, you could also put it up, if

8  you want to, without the jurors seeing it.

9  　　　　　MR. LEVITT:  All right.  Thank you, your

10  Honor.

11  　　　　　(On screen.)

12  　　　　　MR. SULTAN:  Your Honor, I assume this is not

13  being displayed to the jury, is that right?

14  　　　　　THE COURT:  It is not.

15  　　　　　MR. SULTAN:  Thank you.

16  Q.  Is that your report from that day?

17  A.  Yes, it is.

18  Q.  What I'll ask you to do is take a look at it.  I've

19  got it on the second page.  If that refreshes your

20  recollection, then would you advise us as to what time

21  approximately you turned off the equipment that day?

22  A.  Yes, this is -- I remember the equipment was turned

23  off at 2:50, or approximately around that time.

24  Q.  (Off screen.)  Did something happen on January 11th,

25  2010 in connection with this investigation?

1   A.   Yes, it did.

2   Q.   And was there another controlled buy that day?

3   A.   Yes, there was.

4   Q.   And prior to, um -- well, did you meet with the CW?

5   A.   Yes, we did.

6   Q.   And were there any consentually-recorded telephone

7   calls?

8   A.   Yes, we made a consentually-recorded phone call with

9   Mr. Finley and Mr. Hester on that day.

10  Q.   Using the same numbers that we talked about earlier?

11  A.   Yes.

12  Q.   And was a -- arrangements made for a buy?

13  A.   Yes.

14  Q.   And did you do anything with respect to -- did you

15  give any instructions to any of your surveillance agents

16  that day?

17  A.   Yes.   On January 11th we had surveillance agents set

18  up to surveil 31 Whittier Street in Haverhill,

19  Massachusetts.

20  Q.   And why did you do that?

21  A.   Because that was the same residence of Timothy

22  Moynihan.

23  Q.   That was what was on his RMV photo?

24  A.   Yes.

25  Q.   Do you recall who was set up to do surveillance on

1  that location that day?

2  A.  Sean Richards.

3  Q.  And who is he?

4  A.  He's a Deputy Sheriff with the Essex's sheriff's

5  department.

6  Q.  And was he on the Task Force at the time?

7  A.  Yes, he was.

8  Q.  I should have asked that about Deputy Sheriff

9  Doucot.  Was he also on the task force at the time?

10  A.  Yes, he was.

11  Q.  And do you recall approximately when, um, you had

12  Finley, when Finley connected with Hester to make a buy

13  that day by phone, when was the consentually-recorded

14  phone call?

15  A.  It was approximately 2:15 in the afternoon.

16  Q.  Again, that's an approximation?

17  A.  Yes.

18  Q.  And did you have Richards set up at that point?

19  A.  Yes, I did.

20  Q.  Was he communicating with you in any way?

21  A.  Yes, by telephone and by radio.

22  Q.  And, um, after you, um, did the consentually-

23  recorded telephone call with Mr. Hester -- well, let me

24  say, when those calls were made, were you listening?

25  A.  Yes.

1   Q.  And did you have any sense, based on listening, as

2   to how the deal was going to go down?

3   A.  Yes, it appeared, from what we could hear, that

4   Hester was calling his connect again to arrange for the

5   drugs to be delivered.

6   Q.  And, um, did you employ those procedures you talked

7   about earlier with Mr. Finley?

8   A.  Yes, we did.

9   Q.  You searched him and gave him money?

10  A.  Yes.

11  Q.  A car with audio and video?

12  A.  Yes.

13  Q.  Um, do you remember what the deal was for this time?

14  A.  Um, on the January 11th buy we arranged to buy 7

15  grams of crack and 7 grams of powdered cocaine.

16  Q.  Do you recall why it ended up being 7 of each?

17  A.  I believe we were not able to get the full 14 of

18  one, so we got 7 of each.

19  Q.  What do you mean you were not able to get the full

20  14?

21  A.  We originally were trying to get 14 grams of crack

22  cocaine.

23  Q.  And what was your understanding as to why you could

24  only get 7 grams?

25  A.  It wasn't available, there was only 7 grams of crack

1    and 7 grams of powder.

2    Q.  Did you hear Hester say something about that?

3    A.  Yes.

4    Q.  And what do you recall him saying?

5    A.  He indicated that it wasn't available at that time

6    on that day.

7    Q.  Um, did you surveil the CW for the location on that

8    day?

9    A.  Yes, we did.

10   Q.  The CW, Mr. Hester?

11   A.  Yes.

12   Q.  And where did they go?

13   A.  They went to the Cordovan apartments on Summer and

14   Emerson Streets in Haverhill, Massachusetts.

15   Q.  And did you hear anything -- and you followed them

16   there?

17   A.  Yes.

18   Q.  Who were you with?

19   A.  Matt Doucot.

20   Q.  And did you hear anything from Mr. Richards while

21   you were on surveillance?

22   A.  He indicated that the same white Chevy Trailblazer

23   was at 31 Whittier Street in Haverhill.

24   Q.  And at some point did he indicate anything else that

25   you're aware of?

1    A.   He indicated that he had observed Timothy Moynihan

2    outside the residence at 31 Whittier Street.

3    Q.   And this is while you're on surveillance?

4    A.   Yes.

5    Q.   And did you set up surveillance somewhere?

6    A.   Yes, we did.

7    Q.   And where was that?

8    A.   We set up surveillance in the Comcast parking lot

9    above Summer Street.

10   Q.   Um, what street does it look down on?

11   A.   Summer Street.

12   Q.   Is that where the Cordovan apartments is?

13   A.   Yes.

14   Q.   You testified earlier that you followed Hester on

15   January 7th to his mother's house.  Do you recall that?

16   A.   Yes.

17   Q.   And you said that was on Summer Street?

18   A.   Yes, Hester's mother lives on Summer, and I think

19   Bartlett Street.  It's Summer and Bartlett, the corner

20   apartment, across from the library.

21   Q.   Okay.  And are the Cordovan apartments there?

22   A.   No, the Cordovan apartments are on Summer and

23   Emerson Street in Haverhill.

24   Q.   So what was your vantage point from Comcast, what

25   street were you looking down on?

1  A.   We were looking down on Summer.

2  Q.   Where did the CW and Hester park?

3  A.   They parked on Summer Street on the Cordovan

4  apartments side of the street facing Emerson Street.

5  Q.   And you think that's Summer Street?

6  A.   Yes.

7  Q.   And why did you choose that location?  You said you

8  were up on the Comcast parking lot?

9  A.   Yes.

10 Q.   Why did you choose that location for surveillance?

11 A.   It was an elevated, um, vantage point, so we felt it

12 was a good place to look down and observe the drug buy.

13 Q.   Did you think that anyone else was going to come

14 that day?

15 A.   Yes.

16 Q.   Who?

17 A.   Timothy Moynihan.

18 Q.   Did you hear anything more from Richards on that day

19 while you were waiting on surveillance?

20 A.   Yes, we did.  We heard from --

21         MR. SULTAN:  Your Honor, I guess I object.

22 It's hearsay, what he heard from Richards.

23         THE COURT:  I'll see counsel at sidebar.

24

25         AT THE SIDEBAR

```
 1              THE COURT:  What do you expect he's going to
 2    say?
 3              MR. LEVITT:  Well, it's not being offered for
 4    the truth of the matter asserted, it's being offered
 5    because it's the reason he's looking for Moynihan -- or
 6    that Moynihan is aware of it is because Richards says,
 7    "He's in the car, he's heading your way," you know, and
 8    he follows him.
 9              THE COURT:  What's the basis of the
10    objection?
11              MR. SULTAN:  Hearsay.
12              THE COURT:  Well, two things.  One, it would
13    come in under 8031 as a present sense impression and,
14    second of all, it's admissible under 8031.
15         Okay.  Go ahead.
16
17              (In open court.)
18              THE COURT:  The objection is overruled.
19    Q.  What did you hear Richards say on the radio?
20    A.  He indicated on the radio that Mr. Moynihan was
21    traveling towards the Cordovan apartments.
22    Q.  Did he indicate what he was driving?
23    A.  He was driving the white Chevrolet Trailblazer with
24    Massachusetts license plate 383HA8.
25    Q.  At some point did you see that vehicle arrive?
```

1    A.   Yes, we did.

2    Q.   And where did it go?

3    A.   It parked behind Mr. Finley's vehicle.

4    Q.   Do you recall if it was directly behind it or how it

5    was situated?

6    A.   There was a car in between Mr. Finley's vehicle and

7    Mr. Moynihan's vehicle.

8    Q.   And were they on the side of the street closest to

9    you or farther away from you?

10   A.   Farther away.

11   Q.   So you were up in a parking lot and you're looking

12   down across the street?

13   A.   Correct.

14   Q.   And, um, do you recall approximately how far away

15   you were?

16   A.   Approximately 100 feet.

17   Q.   Is that an estimate?

18   A.   Yes.

19   Q.   And when Moynihan pulled up were you able to see --

20   well, when the white Chevy Trailblazer pulled up were

21   you able to see who was in it?

22   A.   Yes.

23   Q.   And who was the driver?

24   A.   Timothy Moynihan.

25   Q.   And what did you see next -- what did you see or

```
1   hear next that was of interest to you?

2   A.  We heard that Hester and -- Mr. Hester and

3   Mr. Finley were speaking and then we saw Mr. Hester get

4   out of the car with Mr. Finley and was getting into the

5   car with Mr. Moynihan.

6   Q.  And do you recall what Finley and Hester were

7   speaking about?

8   A.  That his connect had arrived.

9   Q.  Something to that effect?

10  A.  Yes.

11  Q.  And you saw Hester get out and get into the car with

12  Moynihan?

13  A.  Yes.

14  Q.  And, um, what if anything did you see at that point?

15  A.  They were sitting in the car together and it

16  appeared like they made some sort of motion with their

17  arms back and forth and then they pulled out onto the

18  street and broke right in front of us as they went

19  towards Emerson Street.

20  Q.  When you say they made some kind of motion, would

21  you describe how they were moving?

22  A.  They appeared to make some sort of motion towards

23  each other with their arms.

24  Q.  And, um, based on your training and experience did

25  that appear to be consistent with anything?
```

1              MR. SULTAN:  Objection.

2              THE COURT:  Sustained.

3    Q.  You said that they pulled out and drove right in

4    front of you?

5    A.  Yes.

6    Q.  And when they pulled out and drove in front of you

7    did you see again who was the driver of the Chevy

8    Trailblazer was?

9    A.  Yes, I did.

10   Q.  And who was that?

11   A.  Timothy Moynihan.

12   Q.  Did you see who the passenger was?

13   A.  Yes, I could.  It was Curtis Hester.

14   Q.  Would you estimate how far away you were at that

15   point?

16   A.  I would say approximately 50 to 75 feet.

17   Q.  Did you see where they went?

18   A.  They went to the corner and we heard, over

19   surveillance, that they were making -- that they turned

20   right onto Emerson and appeared to go around the block.

21   Q.  And did they return at some point?

22   A.  Yes, they did.

23   Q.  About how long until they returned?

24   A.  Two or three minutes.

25   Q.  And where did they go -- where did Moynihan and

1   Hester go when they returned in front of the --

2   A.  They pulled in, at that point, behind Mr. Finley's

3   vehicle.

4   Q.  The car wasn't there anymore?

5   A.  No.

6   Q.  And what did you see at some point?

7   A.  We saw Mr. Hester get out of the vehicle with

8   Mr. Moynihan and get back into the car with Mr. Finley.

9   Q.  And could you hear what went on between them, Finley

10  and Hester, at that point?

11  A.  Yes.

12  Q.  And generally what did you hear?

13  A.  Um, we heard that the deal had been completed and

14  Mr. Hester passed the crack to -- the cocaine to

15  Mr. Finley.  And, um, at that point we saw Mr. Moynihan

16  pull out again and Finley depart the area.

17  Q.  Drive by you again?

18  A.  Yes.

19  Q.  Did you see who it was again?

20  A.  Yes.

21  Q.  Who was it?

22  A.  Timothy Moynihan.

23  Q.  And did you then follow the CW and Hester to that

24  pre-determined meeting location?

25  A.  Yes.

1    Q.   And again how long did it take between the time that

2    the buy took place and getting to that location?

3    A.   15 or 20 minutes, approximately.

4    Q.   Is that approximately how long it took on each buy?

5    A.   Yes.

6    Q.   And when you met up with him, um, what did you do

7    that day?

8    A.   We immediately recovered the drugs, the cocaine and

9    the crack from Mr. Finley, turned off the recording

10   equipment, searched him, went through all the procedures

11   as we did every time.

12   Q.   And do you recall approximately when it was on that

13   day that you turned off the equipment?

14   A.   It was approximately 3:45.

15   Q.   Let me show you what's been marked as Government

16   Exhibit 3.  (On screen.)  And I ask you to take a look

17   at that.  Do you recognize that?

18   A.   Yes, I do.

19   Q.   What is it?

20   A.   That's the cocaine and the crack cocaine that we

21   purchased on January 11th, 2010.

22   Q.   I'm sorry.  Well, that's Government Exhibit 3.  And

23   then this is Government Exhibit 5.  (On screen.)

24        So putting them together, do you recognize

25   Government Exhibit 3?

1    A.   Yes.

2    Q.   What is that?

3    A.   That's the crack that we purchased on January 11th.

4    Q.   And Government Exhibit 5?

5    A.   That's the cocaine.

6              MR. LEVITT:   I move to admit Government

7    Exhibits 3 and 5.

8              THE COURT:   They are admitted.

9              (Exhibits 3 and 5, marked.)

10   Q.   And just viewing those on the screen here, the --

11             THE COURT:   Well, hold on just a second.

12             (Pause.)

13             MR. LEVITT:   May I proceed?

14             THE COURT:   Oh, yes.   I'm sorry.   I just

15   wanted to turn the jurors' monitors off.

16   Q.   You said the crack was this one?

17   A.   Yes, it was.

18   Q.   And this was the cocaine?

19   A.   Yes.

20   Q.   And is that the difference in color that you were

21   talking about earlier?

22   A.   Yes.

23   Q.   The white versus the sort of yellow brown?

24   A.   Yes.

25   Q.   And the crack is sort of granular?

1    A.   Yes.

2    Q.   Is that what it looked like when you bought it?

3    A.   No.

4    Q.   When you bought it two years ago, what did it look

5    like?

6    A.   The crack was much solider, like a rock, just like a

7    clump, and the, um -- it wasn't as granulated and all

8    broken up as it is there.

9    Q.   And powder, is that how it looks approximately?

10   A.   Approximately, yes.

11            MR. LEVITT:   I move to admit -- to show the

12   witness Exhibit 4.

13   Q.   Do you recognize that?

14   A.   Yes, I do.

15   Q.   What's that?

16   A.   That's the Drug Enforcement lab report that was

17   submitted for the crack cocaine on January 11th.

18   Q.   And Government Exhibit 6?

19   A.   That's the Drug Enforcement Administration lab form

20   that was submitted for the cocaine on January 11th.

21            MR. LEVITT:   I move to admit Government

22   Exhibits 4 and 6.

23            THE COURT:   They are admitted.

24            (Exhibits 4 and 6, marked.)

25   Q.   I show you Government Exhibit 15.  Do you recognize

1  that?

2  A.  Yes, I do.

3  Q.  What's that?

4  A.  That's the excerpted recorded telephone conversation

5  we made on January 11th, 2010.

6  Q.  And Government Exhibit 15A?

7  A.  That's a copy of the transcripts from the call on

8  January 11th.

9  Q.  Actually, I misspoke, it's Government Exhibit 16A

10  and 16B and 16C.  Do you recognize those?

11  A.  Yes, I do.

12  Q.  What are they?

13  A.  It's all telephone transcripts from January 11th,

14  2010.

15  Q.  I show you Government Exhibit 17.  Do you recognize

16  that?

17  A.  Yes.

18  Q.  What's that?

19  A.  That's an excerpt recording from January 11th, 2010.

20  Q.  That's the recorded meeting, the audio/video?

21  A.  Yes.

22  Q.  And Government Exhibit 18?

23  A.  Yes, I recognize that as the transcript from the

24  same date, January 11th.

25          MR. LEVITT:  I move to admit, your Honor,

1    Government Exhibits 15, 16A through C, 17 and 18.

2             MR. SULTAN:  Your Honor, I take it that these

3    are all being conditionally admitted?

4             THE COURT:  Yes, they are, certain statements

5    in them are being conditionally admitted.

6             (Exhibits 15, 16A through 16C, 17 and 18,

7    marked.)

8             MR. LEVITT:  If I could just have a moment,

9    your Honor?

10            (Pause.)

11   Q.  Special Agent Bencken, do you recall seeing this,

12   what's been marked as Defense Exhibit 44?

13   A.  Yes, I do.

14   Q.  Do you recall what that is?

15   A.  It's a video, um, re-creation.  There are some

16   excerpts from the buy that occurred on January 7th.

17            THE COURT:  Hold on just a second.  They're

18   not government and defense exhibits, they're just

19   exhibits.

20        Is this a second Exhibit 44?  Does the government

21   have its own Exhibit 44?

22            MR. LEVITT:  Um, yes.  These are Defense

23   Exhibits 43 and 44, that's just how they were marked.

24            THE COURT:  Well, that's not --

25            MR. LEVITT:  No, I understand, your Honor.

```
 1              THE COURT:  Well, what's the next exhibit?
 2              THE CLERK:  57, Judge.
 3              THE COURT:  All right.
 4         Do you want these admitted now?
 5              MR. LEVITT:  Yes, I do.
 6              MR. SULTAN:  Your Honor, I object.
 7              THE COURT:  To them being admitted?
 8              MR. SULTAN:  Well, being admitted through this
 9    witness.  I don't know how this witness can testify as
10    to what these are.
11              THE COURT:  I think we discussed this last
12    week and I -- here, I'll see you at sidebar.
13
14              AT THE SIDEBAR
15              THE COURT:  I believe last Friday I asked
16    whether the government had any objection to the video
17    and Mr. Levitt said, no, as long as he could use them in
18    his case in chief as well.
19              MR. SULTAN:  I guess I have a problem with
20    this witness describing something that he had no part
21    of, that he has no personal knowledge of it.
22              THE COURT:  What do you want to ask him?
23              MR. LEVITT:  I want to play it and then I'm
24    going to ask him if the conditions were the same on
25    January 11th, 2010 as they were in the video, based on
```

1    what he sees in the video?

2              MR. SULTAN:  All right.  I guess it just saves

3    a step to not have to bring him back.

4              THE COURT:  Right, and it's also consistent

5    with, I think, the discussion last week.

6

7              (In open court.)

8              THE COURT:  The objection has been withdrawn.

9    The -- there are two recordings here.  One's Exhibit 57,

10   one's Exhibit 58, but I don't know what's on each of

11   them.

12        What's on 57?

13             MR. LEVITT:  They're the same, your Honor,

14   it's just a question of, um, where the car is parked

15   that he's looking at, two different --

16             THE COURT:  Okay.  Just please make clear

17   which one you're playing at which time.

18             MR. LEVITT:  I will, your Honor.

19        I'm going to play, um, to start, Government

20   Exhibit -- I'm sorry, Exhibit 58, which is the Video

21   Position E as indicated on the CD.

22   Q.  Have you seen these before, Special Agent Bencken?

23   A.  Yes, I have.

24             MR. LEVITT:  And so I'd ask Mr. Hohler if he

25   could --

1              (Pause.)

2              THE COURT:  So you're going to play 58,

3    correct?

4              MR. LEVITT:  Correct.

5              THE COURT:  Hold on just a second.

6         Do the jurors in the back have their monitors out?

7              THE JUROR:  Yes, sir.

8              THE COURT:  Okay.

9    Q.  And, Special Agent Bencken, um, let me start there

10   first.

11        Is this the approximate vantage point you had --

12             THE COURT:  There's nothing on the monitor.

13             MR. LEVITT:  Oh, I'm sorry.

14             (Plays video.)

15   Q.  Is this the approximate vantage point you had on

16   January 11th, 2010?

17   A.  Yes, it is.

18   Q.  (Plays video.)  And, um, that blue, I'll represent,

19   Chevy Trailblazer or blue SUV that you see on the

20   screen, do you see that?

21   A.  Yes, I do.

22   Q.  Is that the approximate location that

23   Mr. Moynihan -- that Mr. Moynihan was in when he first

24   arrived on, um, January 11th?

25   A.  Yes, it is.

1    Q.  And, um, were the conditions on January 11th, 2010,

2    um, the same as they appear to be in this video, this

3    defense video?

4    A.  No, they are not.

5    Q.  What was different on January 11th, 2010?

6    A.  There was no glare on that window, the driver's side

7    window.

8    Q.  You're referring to the driver's side window, the

9    upper part of the driver's side window?

10   A.  Yes.

11   Q.  It's obscuring the face of the driver?

12   A.  Yes.

13   Q.  And do you see -- and do you see below that, the

14   bottom half?

15   A.  Yes.

16   Q.  That's clear?

17   A.  Yes.

18   Q.  Is that more like what it was on January 11th?

19   A.  Yes, it is.

20   Q.  And was there anything else different on January

21   11th?

22   A.  There were no leaves on the tree.

23   Q.  (Plays video.)  The car that just pulled out, um, a

24   woman whose face is obscured by a leaf, is that what

25   happened when Mr. Moynihan pulled out, did he pull into

1    that lane?

2    A.   Yes, he did.

3    Q.   And that's when he drove right by you?

4    A.   Yes.

5    Q.   Do you remember if his window was up or down?

6    A.   It was up.

7    Q.   Had you also reviewed the, um, Exhibit 57, um, which

8    is Video Position D?

9    A.   Yes, I had.

10   Q.   And it's fair to say that just shows the blue SUV in

11   the spot up one?

12   A.   Yes.

13   Q.   And do you recall when you viewed that video whether

14   the conditions, whenever that was taken, were the same

15   as when you were looking at the white SUV on January

16   11th, 2010?

17   A.   They were not, no.

18   Q.   And what was the difference with respect to that

19   video and January 11th?

20   A.   Again there was no glare on the window on that day

21   and there were no leaves on the trees.

22   Q.   And by that day you were referring to January 11th,

23   2010, the middle of winter?

24   A.   Yes.

25   Q.   And what were the -- do you recall what the, um,

1  sort of what the weather was like?

2  A.  It was a typical cold New England day.  It was

3  cloudy, but it was clear, you know, overcast skies.

4         MR. LEVITT:  Mr. Hohler, I'm done with the

5  laptop.  Thank you.

6  Q.  Was there another buy on January 13th, 2010?

7  A.  Yes, there was.

8  Q.  And do you recall when, um, you met with the CW and

9  he contacted Hester on that one?

10  A.  Yes, it was approximately 1:00 p.m.

11  Q.  And do you recall that conversation at all?

12  A.  Yes, I do.

13  Q.  What was the general gist of that?

14  A.  Mr. Finley had made a consentually-recorded phone

15  call with Mr. Hester and they had agreed to purchase 14

16  grams of crack cocaine.

17  Q.  And after, um, Mr. Finley asked for the crack, what

18  if anything did Mr. Hester say?

19  A.  He, um, told Mr. Finley he was going to call his

20  connect again and, um, asked for Mr. Finley to come pick

21  him up.

22  Q.  And you're not testifying as to what was said

23  verbatim, you're giving the general gist of it?

24  A.  Yes.

25  Q.  And did you employ the procedures we discussed

1    earlier?

2    A.   Yes, I did.

3    Q.   And provide Mr. Finley with the money to make the

4    buy?

5    A.   Yes.

6    Q.   And did you have surveillance set up in the location

7    of the buy?

8    A.   Yes, we did.

9    Q.   Did you have surveillance set up any place else?

10   A.   We had surveillance set up at 31 Whittier Street in

11   Haverhill, Massachusetts.

12   Q.   Who was on that surveillance?

13   A.   Deputy Sheriff Richards.

14   Q.   And when he arrived at 31 Whittier Street did Deputy

15   Sheriff Richards advise you of anything?

16   A.   He advised that Mr. Moynihan's vehicle, initially,

17   if I remember correctly, it wasn't there initially, it

18   appeared a short time later, and he indicated that, as

19   we were doing surveillance, that it was again on its way

20   back over towards Fourth Ave.

21   Q.   And when you say "Moynihan's vehicle," you're

22   talking about the white Chevy Trailblazer?

23   A.   Yes.

24   Q.   And did he indicate anything about Mr. Moynihan?

25   A.   He described his clothing and what he was wearing

1    that day.

2    Q.  Well, let me ask you.  Did he indicate whether he

3    saw Moynihan?

4    A.  Yes.

5    Q.  What did he say?

6    A.  He said that he saw him getting into his later-

7    identified 2007 Chevrolet Trailblazer.

8    Q.  You're talking about the same white Chevy

9    Trailblazer?

10   A.  Yes.

11   Q.  Um, so when you set up surveillance, based on what

12   you're hearing from Richards, were you on the lookout,

13   frankly?

14   A.  Yes, we were looking out for Timothy Moynihan,

15   again, in the Chevy Trailblazer.

16   Q.  Do you remember -- let me step back for a moment.

17        Do you remember, on this buy, whether you

18   surveilled Hester and Finley directly to -- was it

19   Fourth Avenue where it ultimately took place?

20   A.  Yes, it was.

21   Q.  Do you remember if you surveilled them directly

22   there or somewhere else?

23   A.  I don't recall exactly where we surveilled them on

24   that day, but I know we ended up on Fourth Avenue again.

25   Q.  Okay.  Do you know, from listening to the tapes,

1    whether Hester and Finley did something before they went

2    to Fourth Avenue, putting aside where exactly they went?

3    A.  Yes.  I remember, um, they went to, um, another

4    location first to buy marijuana.

5    Q.  And what do you recall hearing on the tapes about

6    that?

7    A.  I remember hearing Hester, um, mentioning to Finley

8    that, "We're going to go somewhere first," to another

9    individual's house, "to buy marijuana," before they were

10   going to go to Fourth Avenue.

11   Q.  And do you recall hearing where they went or whom

12   they went to see?

13   A.  They went to an individual that Hester identified as

14   Shawn Do, his residence is close to where Mr. Hester's

15   mother lived on Bartlett and Summer Streets in

16   Haverhill, Massachusetts.

17   Q.  And at some point did they then go to Fourth Avenue?

18   A.  Yes, they did.

19   Q.  And, um, do you remember any conversation about

20   marijuana when they were going to Fourth Avenue?

21   A.  Yes.  Hester had indicated to Mr. Finley that, you

22   know, that marijuana -- that he had purchased marijuana

23   and that they had it in the car and they were traveling

24   towards Fourth Avenue.

25   Q.  And did you surveil them to Fourth Avenue?

A.   Yes.

Q.   And, um, who were you with?

A.   Um, I was with Matt Doucot.

Q.   And do you recall where Finley and Hester parked on

Fourth Avenue?

A.   They, again, parked on the same side of the street

as they did on January 7th.  They were facing Auburn and

Cedar Streets, but they were in between Portland and --

          MR. LEVITT:  Your Honor, I'm putting on the

screen Government Exhibit 34, which has previously been

admitted.

          THE COURT:  It has been?

          MR. LEVITT:  Yes.

Q.   I'm sorry.  If you could just again identify, using

the cross-streets, where on Fourth Avenue they parked?

A.   Sure.  They were in between Portland and Auburn

Street on the right side facing Auburn.

Q.   And do you recall if they were closer to Auburn or

Portland, approximately?

A.   They were closer to Auburn Street.

Q.   In this area somewhere?

A.   Yes.

Q.   And do you recall where you and Deputy Sheriff

Doucot were?

A.   We, again, were parked at the bottom of Fourth

1    Avenue facing towards Cedar Street.

2    Q.   When you say "the bottom," is Fourth Avenue -- is

3    there a grade on it?

4    A.   Yes.

5    Q.   A little downhill?

6    A.   Yes.

7    Q.   And is that what you mean by "top" and "bottom"?

8    A.   Yes.

9    Q.   So the top is where?

10   A.   The top would be more Portland Street and the bottom

11   would be more Cedar Street.

12   Q.   Okay.  So where did you go?

13   A.   We were parked in between Auburn and Cedar facing

14   Cedar, but we were closer to Auburn Street where we were

15   parked.

16   Q.   Closer to this area?

17   A.   Yes.

18   Q.   And did you stay in that location?

19   A.   Yes.

20   Q.   At some point did someone else arrive?

21   A.   Yes, Timothy Moynihan arrived.

22   Q.   And what was he driving?

23   A.   He was driving the same white Chevy Trailblazer with

24   Massachusetts license plate 383HA8.

25   Q.   And where did he park?

1    A.  He parked, again, behind Mr. Finley on Fourth Avenue

2    facing Cedar Street.

3    Q.  And at some point did you -- did somebody -- did you

4    or Deputy Sheriff Doucot take a surveillance picture of

5    the white Chevy Trailblazer?

6    A.  Yes, I did.

7    Q.  Who did that?

8    A.  I believe Matt Doucot took the picture.

9    Q.  Let me show you Government Exhibit 35.

10           THE COURT:  Is there any going to be any

11   objection to this?

12           MR. SULTAN:  No, your Honor.

13           THE COURT:  Okay.  It is admitted.

14           (Exhibit 35, marked.)

15   Q.  Is this the surveillance picture that Deputy Sheriff

16   Doucot took?

17   A.  Yes.

18   Q.  Maybe you could clarify this.  This picture is taken

19   from behind the white Chevy Trailblazer, correct?

20   A.  That's correct.

21   Q.  And maybe I misheard you, but I thought you

22   indicated, when you first got there, you parked and this

23   white Chevy Trailblazer was behind the car that Finley

24   and, um, Hester are in?

25   A.  Yes, it is.

1    Q.   So is that -- am I pointing to the car that Finley
2    and Hester are in?
3    A.   Yes.
4    Q.   You can kind of see it in between these two cars
5    right there?
6    A.   Yes.
7    Q.   And so the Trailblazer is out a little bit in the
8    street?
9    A.   Yes.
10   Q.   Is that similar to what you were describing on
11   January 7th when you were saying it was behind, the
12   Trailblazer was behind Finley and Hester, but a little
13   out on the street?
14   A.   Yes.
15   Q.   In the same type of position?
16   A.   Yes.
17   Q.   And this picture is from behind Mr. Moynihan's car.
18   I thought -- maybe I misheard, that you indicated you
19   were parked in front of, at least at the beginning, the
20   CW and Mr. Hester?
21   A.   Yes, we ended up at the bottom of Fourth Avenue.
22   Prior to arriving at that final location for
23   surveillance, we passed it on Portland Street towards
24   Fifth and we took a picture, down Fourth Avenue, of the
25   vehicle as it arrived, and we ultimately parked at the

1    bottom of Fourth.

2    Q.  So you were driving by on Portland and took a

3    picture while you were driving, you stopped and took a

4    picture?

5    A.  Yes, but we didn't stop, we were still driving.

6    Q.  Okay.  Um, and that's this picture here?

7    A.  Yes.

8              THE COURT:  Mr. Levitt, do you have much more

9    for this witness?

10             MR. LEVITT:  Not much more, your Honor.

11   Q.  After the buy did you meet up with -- well, what

12   happened when Mr. Moynihan left?

13   A.  Um, Mr. Hester, again, got out of the vehicle with

14   Mr. Finley and walked back and got in the car with

15   Mr. Moynihan, and they circled the block again and came

16   back around and parked again behind Mr. Finley.

17   Q.  Um, and then what happened?

18   A.  Um, when they came back around they parked and

19   Mr. Hester got out of the car and Mr. Moynihan got back

20   into the car with Mr. Finley, and then Mr. Moynihan

21   departed the area.

22   Q.  Did you get a good look at Mr. Moynihan that day?

23   A.  Yes.

24   Q.  Was there -- there were four buys, correct?

25   A.  Yes.

1    Q.   Involving Hester and Moynihan?

2    A.   Yes.

3    Q.   Were there any of the buys that you didn't get as

4    good a look as the others?

5    A.   Yes.  The 13th is probably the day that I didn't get

6    the best look at him.  The 15th is better.

7    Q.   How about the 7th?

8    A.   The 7th was -- I got a good look at him on that day.

9    Q.   And the 11th?

10   A.   Yes.

11   Q.   When you, um -- you met up with the CW subsequently,

12   I take it?

13   A.   Yes.

14   Q.   After you dropped off --

15   A.   Yes.

16   Q.   At the predetermined meeting location?

17   A.   Yes.

18   Q.   You get the drugs, you get the equipment back, go

19   through the procedures, is that correct?

20   A.   That's correct.

21   Q.   Do you -- do you recall if there was ever any issue

22   with respect to, um, Finley smoking marijuana with

23   Hester while he was working with you?

24   A.   Yes.

25   Q.   And do you remember how many times that took place?

1  A.  I don't know the exact amount of conversation we had

2  with him, but on the 13th I remember having a

3  conversation with him about it.

4  Q.  Why?

5  A.  I smelled it on him when he came back from the

6  predetermined location.

7  Q.  And what did he say?

8  A.  He said that he had been smoking marijuana with

9  Mr. Hester.

10  Q.  And, by the way, when, um -- after Moynihan left do

11  you recall hearing anything on the Kel that happened

12  before Hester and Finley left Fourth Avenue?

13          THE COURT:  Did he hear anything on the --

14  through the transmitter?

15          MR. LEVITT:  I'm sorry.  The transmitter.

16  Thank you.

17  Q.  After Moynihan left, when Hester and Finley are

18  still on Fourth Avenue.

19  A.  Yeah, an individual was walking down the street on

20  Fourth Ave., um, he would be walking towards Portland

21  Street, and Mr. Hester conducted a dime bag deal of

22  marijuana to an individual on the street.

23  Q.  And so when you talked to Finley about him smoking

24  marijuana, this isn't the first time that came up, is

25  it?

1   A.   No, it's not.

2   Q.   There were other buys, is that correct?

3   A.   Yes.

4   Q.   And there were other buys -- there was at least one

5   other buy before January 7th for Mr. Hester?

6   A.   Yes.

7   Q.   So what did you say to Finley when he says that he

8   smoked marijuana with Hester?

9   A.   I advised him that his behavior wasn't going to be

10  tolerated and he wasn't to engage in smoking marijuana

11  while he was under our direction and while he was

12  working with us.

13  Q.   What if anything do you remember him saying?

14  A.   He indicated that he, by associating with people,

15  with Mr. Hester and other parties in the investigation,

16  that it would be very difficult for him to do what he

17  was doing without smoking marijuana and engaging in that

18  type of behavior.

19  Q.   Did he explain why?

20  A.   He said they wouldn't trust him.  He said that they

21  wouldn't believe him unless he was doing that with them.

22  Q.   And did you try to give him any advice in that

23  respect?

24  A.   Yes, we did.  I tried to explain to him that he

25  could come up with excuses such that he had an

1   employment opportunity that drug tested him or he had a

2   probation search or probation drug testing that would be

3   done and that he wouldn't be able to do it.  I tried to

4   come up with reasons like that so that he could give

5   those excuses to Mr. Hester and other people involved in

6   the investigation.

7   Q.  But fair to say that -- notwithstanding that, this

8   was a recurring problem?

9   A.  Yes, it was.

10  Q.  Do you recall approximately what time the buy ended

11  on January 13th, 2010?  By that I mean what time did you

12  turn off the equipment, if you can recall.

13  A.  If I remember correctly, I think it was around

14  3:45 p.m.

15  Q.  On January 13th, 2010?

16  A.  I don't remember exactly on that date, no.

17  Q.  Um, it is your testimony you're not sure?

18  A.  Yes, I'm not sure.

19  Q.  Did you know at some point?

20  A.  Yes, I did.

21  Q.  Is there anything that would refresh your

22  recollection?

23  A.  My report would be helpful.

24          MR. LEVITT:  Your Honor, permission to show

25  outside the jury's presence?

1           THE COURT:  Yes.

2  Q.  I show you the first page.  Is that the appropriate

3  report from January 13th?

4  A.  Yes, it is.

5  Q.  And I'd just ask you to read, um, this, and if it

6  refreshes your recollection, um, advise us so.

7  A.  Yes, it does.  We turned the equipment off at

8  approximately 2:15 p.m.

9  Q.  Let me show you what's been marked as Government

10  Exhibit 7, and take a look at that.  And do you

11  recognize that?

12  A.  Yes, I do.  That's the crack that we purchased on

13  January 13th, 2010.

14           MR. LEVITT:  Move to admit Government Exhibit

15  7.

16           THE COURT:  It is admitted.

17           (Exhibit 7, marked.)

18  Q.  Do you recognize this, Government Exhibit 8?

19  A.  Yes, I do.

20  Q.  What's that?

21  A.  That's the Drug Enforcement Administration lab

22  report that I submitted to the DEA on January 13th for

23  the crack cocaine.

24           MR. LEVITT:  Move to admit Government 8.

25           THE COURT:  It also is admitted.

1            (Exhibit 8, marked.)

2            MR. LEVITT:  I don't know if the jurors saw

3    Exhibit 7, so I'll just put it back up.

4            (On screen.)

5    Q.  And, um, I show you Government Exhibit 19.  Do you

6    recognize that?

7    A.  Yes, I do.

8    Q.  What is that?

9    A.  That's a recorded telephone excerpt from January

10   13th, 2010.

11   Q.  I show you Government Exhibits 20A and 20B.  Do you

12   recognize that?

13   A.  Yes, I do.  Those are transcripts from the telephone

14   calls on January 13th, 2010.

15   Q.  I show you Government Exhibit 21.  Do you recognize

16   that?

17   A.  Yes, I do.  That's the video recording excerpt from

18   January 13th, 2010.

19   Q.  I show you Government Exhibit 22.  Do you recognize

20   that?

21   A.  Yes, that's the transcript from the video from

22   January 13th, 2010.

23            MR. LEVITT:  I move to admit Government

24   Exhibits 19 through 22, your Honor.

25            MR. SULTAN:  Conditionally, your Honor.

1           THE COURT:  Yes.  The statements of Mr. Hester

2    are conditionally admitted.

3           (Exhibits 19, 20A, 20B, 21 and 22, marked.)

4    Q.  And then lastly, was there a buy on, um, January

5    15th, 2010?

6    A.  Yes, there was.

7    Q.  And did you meet with the CW and have him make

8    consentually-recorded telephone calls to Mr. Hester?

9    A.  Yes, we did.

10   Q.  Do you recall approximately when that happened?

11   A.  Approximately 1:00 p.m.

12   Q.  And let me ask you.  When you're dealing with

13   Mr. Finley, um, do you give him any instructions about,

14   um, talking with Mr. Hester when he's not with you guys,

15   when he's not being recorded?

16   A.  Yes, he had several conversations with Mr. Hester

17   outside of our presence and he explained to us that he

18   had to do that in order to be believed by Mr. Hester in

19   what he was doing.  He didn't want to just call him just

20   for drugs.  So he would engage in various conversations

21   with Mr. Hester.  But we instructed him that if he were

22   to have any kind of conversations where he would be

23   setting up or arranging for drug deals, we would make

24   every effort to record those calls.

25   Q.  Um, so this one, your best recollection, is about

1    1:00 p.m.?

2    A.  Yes.

3    Q.  And did you employ the procedures that you discussed

4    earlier with Mr. Finley?

5    A.  Yes, we did.

6    Q.  Did you have somebody set up surveillance at 31

7    Whittier?

8    A.  Yes, we did.

9    Q.  Do you recall who?

10   A.  Sean Richards.

11   Q.  Do you remember if anyone was with him that day?

12   A.  Yeah, Special Agent Dan Romanzo from the FBI.

13   Q.  And, um, you sent Finley and Hester off to make the

14   buy?

15   A.  Yes.

16   Q.  And did you have an understanding as to whether they

17   were going to meet anybody?

18   A.  Yes, we had an understanding that we were going to

19   be meeting the same -- Mr. Moynihan again on Fourth

20   Avenue.

21   Q.  And what was that based on?

22   A.  Based on Mr. Hester's comments to Mr. Finley in the

23   vehicle.

24   Q.  Um, and was there anything different about this buy

25   in terms of getting to the location?  Did it take place

1   on Fourth Avenue?

2   A.  It did take place on Fourth Avenue, but it took a

3   while because the CW had to drive -- Mr. Finley had to

4   drive to Lawrence first to pick up Mr. Hester and bring

5   him back to Haverhill to eventually meet Mr. Moynihan on

6   Fourth Avenue.

7   Q.  But eventually the CW and Hester arrived at Fourth

8   Avenue?

9   A.  Yes, they did.

10  Q.  And, um, do you recall where they sat or where they

11  parked?

12  A.  On the 15th, um, they, um --

13  Q.  Let me show you Government Exhibit 34, if it's

14  helpful.  Sorry.

15  A.  So, again, they were parked in between Portland and

16  Auburn Street, but on this occasion they were actually

17  facing Portland Street.

18  Q.  Okay.  And closer to Portland or Auburn?

19  A.  They were closer to Portland and they were on the

20  opposite side of the street that they had been on the

21  7th, 11th, and 13th.

22  Q.  Well, the 11th didn't take place on Fourth Ave.?

23  A.  Oh, correct.

24  Q.  So it's kind of the reverse of where they were

25  parked on the 7th and the 13th?

A.   Correct.

Q.   And, um, you were with Special Agent Doucot?

A.   Yes, I was.

Q.   Do you remember where you guys set up surveillance?

A.   We were parked on Fourth Ave. facing Cedar Street, but closer to Auburn.

Q.   Okay.  On which side?

A.   We were parked on the opposite side, so --

Q.   I'm sorry.  Which way were you facing?

A.   We were facing Cedar Street.

Q.   Okay.  So you're facing Cedar Street and you're parked on the right side facing Cedar?

A.   Yes, the right side of the street facing Cedar.

Q.   And prior to getting there while you were on the way to that location did anything happen?  Did you see anything?

A.   We had heard, um, through the transmitter, through the Kel, that, um, Mr. Moynihan was on his way to Fourth Ave.

Q.   And did you see anything when you were driving to your spot on Fourth Avenue?

A.   (Pause.)  We saw Mr. Moynihan pull in behind Mr. Finley.

Q.   And where were you when that happened?

A.   On Fourth Avenue.

1    Q.   Where on Fourth Ave.?

2    A.   We were parked on Fourth Ave. facing Cedar and we

3    saw him pull back, pull in behind Mr. Finley on the

4    opposite side of the street.

5    Q.   Okay.  And my question was, before you got into your

6    surveillance location, whether you saw him?  If you

7    don't recall, that's fine.

8    A.   I don't recall.

9    Q.   Okay.  Um, did somebody take a surveillance video

10   that day?

11   A.   Yes.

12   Q.   Who did that?

13   A.   Um, Matt Doucot.

14            MR. LEVITT:  Your Honor, Government Exhibit

15   36, there's no objection.

16            THE COURT:  Okay.  It is admitted as Exhibit

17   36.

18            (Exhibit 36, marked.)

19   Q.   (Plays video.)  So, um, what are we looking at here?

20   A.   You're looking at -- Mr. Finley's vehicle is in the

21   front, in the Ford Expedition with the lights

22   illuminated, and he's facing towards Portland Street.

23   So he's on the top end of Fourth Avenue.  And

24   Mr. Moynihan's vehicle is parked behind him.

25   Q.   Okay.  (Plays video.)  And who is that?

1    A.   Curtis Hester.

2    Q.   (Plays video.)  Special Agent Bencken, is that -- is

3    that, um -- what we just saw, is that consistent with,

4    um, what happened on the four other buys in the sense

5    that after Mr. Hester gets out of Mr. Moynihan's car,

6    Mr. Moynihan's car pulls out right away?

7    A.   Yes.

8    Q.   Did you see -- were you able to identify

9    Mr. Moynihan in the white Chevy Trailblazer on January

10   15th?

11   A.   Yes.

12   Q.   And do you remember where you were when that

13   happened, where he was?

14   A.   I don't remember my exact location when I saw him

15   that day.

16   Q.   Do you remember what the positioning was in terms of

17   was he driving by you -- was he driving by when you were

18   looking through?

19   A.   I know initially we had driven down Portland again

20   and looked down the street, Fourth Ave., and saw him

21   again pull in behind.  So we saw him through his

22   windshield.  And then we went to the bottom of Fourth

23   Ave. where we parked and where the video was taken.

24             MR. LEVITT:  So if we could go back to the

25   document camera, please.

1   Q.  So before the buy took place, before you set up your

2   surveillance position, you saw Mr. Moynihan in the white

3   Chevy Trailblazer pull in behind Hester and Finley?

4   A.  Correct.

5   Q.  And where were you located on this map when it

6   happened?

7   A.  So we would have been driving -- we were driving on

8   Portland Street towards Fifth Avenue and so when we

9   looked -- I was able to look down Portland Avenue again

10  and see through the windshield, um, Mr. Moynihan.

11  Q.  And then you made the block and pulled into your

12  surveillance spot?

13  A.  Yes.

14  Q.  And after -- you just saw in the surveillance video

15  Finley and Hester pull out -- did Finley drop off

16  Hester?

17  A.  Yes, he did.

18  Q.  You surveilled him back to the meeting location?

19  A.  Yes, we did.

20  Q.  And then turned off the equipment?

21  A.  Yes.

22  Q.  Got the drugs?

23  A.  Yes.

24  Q.  What -- was that the same 15 or 20 minutes after the

25  buy, approximately?

1    A.   Yes.

2    Q.   Sometimes longer depending on where he's dropping

3    off Hester?

4    A.   Yes.

5    Q.   What sort of a range in terms of from the buy to the

6    turning off the equipment?

7    A.   Between 15 and 20 minutes.

8    Q.   I show you Government Exhibit 9.  What's that?

9    A.   That's the crack that we purchased on January 15th,

10   2010.

11              MR. LEVITT:  Move to admit it, your Honor.

12              THE COURT:  It is admitted.

13              (Exhibit 9, marked.)

14   Q.   And, again, the form is a little different now?

15   A.   Yes, it is.

16   Q.   Then Government Exhibit 10.  Do you recognize that?

17   A.   Yes, I do.  That's the Drug Enforcement

18   Administration lab report that I submitted for the crack

19   on January 15th.

20              MR. LEVITT:  Move to admit Government Exhibit

21   10.

22              THE COURT:  It is admitted.

23              (Exhibit 10, marked.)

24   Q.   And just going to Government Exhibit 23.  Do you

25   recognize that?

 1    A.   Yes, I do.

 2    Q.   What's that?

 3    A.   That's an excerpt recorded telephone from the

 4    January 15th, 2010 buy.

 5    Q.   And the Government Exhibits 24A, B, and C, do you

 6    recognize those?

 7    A.   Yes, I do, those are the transcripts from the

 8    telephone calls.

 9    Q.   Government Exhibit 25?

10    A.   Yes, that's the audio/video recording from January

11    15th.

12    Q.   And Government Exhibit 26?

13    A.   Yes, that's the transcript from the January 25th or,

14    I'm sorry, January 15th, 2010.

15              MR. LEVITT:  Your Honor, I move to admit

16    Government Exhibits 23 through 26.

17              MR. SULTAN:  Conditionally, your Honor.

18              THE COURT:  Mr. Hester's statements are

19    conditionally admitted.  The documents are otherwise

20    admitted.

21              (Exhibits 23, 24A, 24B, 24C, 25 and 26,

22    marked.)

23    Q.   After that buy on the 15th, did you do anything else

24    to further the investigation of Hester and Moynihan?

25    A.   Yes, we did.

1    Q.   What did you do?

2    A.   We subpoenaed various records.

3    Q.   Do those include telephone records?

4    A.   Yes, it did.

5    Q.   Did you have anybody do that?

6    A.   Yes, I did.

7    Q.   Who was that?

8    A.   Mike Mahoney from the Middlesex County Sheriff's

9    Department.

10   Q.   Is he an intelligence analyst?

11   A.   Yes, he is.

12   Q.   And whose number did you have him subpoena records

13   for initially?

14   A.   Mr. Hester's phone.

15   Q.   And what did you ask Mr. Mahoney to do?

16   A.   We asked him to subpoena the phone information to

17   find out who the subscriber was, and then also on the

18   days of the buys, we wanted to look at what number

19   Mr. Hester's phone was calling on those times and dates.

20   Q.   Were you trying to identify a phone number for

21   Mr. Moynihan?

22   A.   Yes, we were.

23   Q.   And did you also subpoena documents from, um,

24   Merchants' Auto?

25   A.   Yes, we did.

1          MR. LEVITT:  Your Honor, with no objection, I

2    show you the Government Exhibit 30 and ask that --

3          MR. SULTAN:  There was a previous objection,

4    your Honor.  The Court has already ruled on it.

5          THE COURT:  Okay, there is an objection and

6    the objection is overruled for the reasons stated

7    yesterday.

8       Exhibit 30 is the Merchants' Auto record, is that

9    right?

10          MR. LEVITT:  Correct, your Honor.

11          THE COURT:  The objection's overruled.

12          (Exhibit 30, marked.)

13   Q.  Do you recognize these documents?

14   A.  Yes, I do.

15   Q.  And what are they?

16   A.  That's the vehicle history and the vehicle

17   transaction that occurred from Merchants' Auto for

18   Timothy Moynihan's vehicle.

19   Q.  And does this show a purchase date of December 30th,

20   2009?

21   A.  Yes.

22   Q.  And 31 Whittier Street in Haverhill, is that the

23   same address that you set up surveillance on on three

24   occasions?

25   A.  Correct.

1    Q.  And is this the same Chevy Trailblazer that you saw

2    on all four buys?

3    A.  Yes, it is.

4    Q.  And the phone number that's listed here, um, this is

5    the number that is associated with these records, is

6    that right?

7    A.  That's correct.

8    Q.  Could you read that out.

9    A.  It's area code 978-457-0860.

10   Q.  I ask you to take a closer look at that.

11   A.  978-457-8860.

12   Q.  And with respect to that number did you ask

13   Mr. Mahoney to do anything?

14   A.  Yes, we asked him to subpoena the subscriber

15   information for that telephone number and to try to

16   correlate that number with Mr. Hester's phone on the

17   days of the buys.

18   Q.  I show you Government Exhibit 42.  Do you recognize

19   that document?

20   A.  Yes, I do.

21   Q.  What is it?

22   A.  It's an RMV photo of Christy Scapes' record from 31

23   Whittier Street in Haverhill, Massachusetts.

24              MR. LEVITT:  Move to admit Government Exhibit

25   42.

1           THE COURT:  It is admitted.

2           (Exhibit 42, marked.)

3    Q.  Special Agent Bencken, do you know who that is?

4    A.  Yes, that's Timothy Moynihan's sister.

5           MR. LEVITT:  Your Honor, if I could just have

6    one minute.  I'm just looking for one thing and then

7    I'll be done.

8           THE COURT:  Okay.

9           (Pause.)

10           MR. LEVITT:  May I approach, your Honor?

11           THE COURT:  Yes.

12           MR. LEVITT:  Your Honor, there are four tapes

13   that I'm going to ask just to be marked for

14   identification.

15           THE COURT:  Okay.

16   Q.  And do you recognize that?  And if you need to take

17   the slip off to take a look at it.

18   A.  (Takes off slip.)

19   Q.  What's that?

20   A.  This is a copy of the, um, the crack buy that we did

21   with Curtis Hester on January 7th, 2010.

22   Q.  That's the full tape, the unredacted version?

23   A.  Yes, it is.

24   Q.  And January 11th, 2010, um, what's that?

25   A.  That's a copy of the January 11th, 2010 buy.

1    Q.  Again, the unredacted version?

2    A.  Yes, it is.

3    Q.  The next one?

4    A.  This is a copy, unredacted version, of the January

5    13th, 2010 buy.

6    Q.  And the last one?

7    A.  This is an unredacted copy of the one January 15th,

8    2010 buy.

9           MR. LEVITT:  Your Honor, I would ask that they

10   be admitted for identification -- oh, I'm sorry, that

11   they be marked for identification only.

12          THE COURT:  What are the next?

13          THE CLERK:  H, Judge.

14          THE COURT:  Why don't we make them H1, 2, 3

15   and 4.

16          MR. LEVITT:  Thank you.

17          (Exhibits H1, 2, 3 and 4, marked.)

18          MR. LEVITT:  Nothing further, your Honor.

19          THE COURT:  Mr. Sultan?

20          MR. SULTAN:  Yes, your Honor.

21

22   CROSS-EXAMINATION BY MR. SULTAN:

23   Q.  Good afternoon, Special Agent Bencken.

24   A.  Good afternoon.

25   Q.  You told us that are the FBI's co-case agent on

1   this case, right?

2   A.   That's correct.

3   Q.   And that's been true for approximately two years, is

4   that right?

5   A.   Yes.

6   Q.   So this, in effect, is your case, is that right?

7   A.   Yes.

8   Q.   Did you prepare for your testimony here today?

9   A.   Yes, I did.

10   Q.   Have you reviewed all of the relevant reports in

11   this case?

12   A.   Yes.

13   Q.   Have you reviewed all of the relevant tapes in this

14   case?

15   A.   Yes.

16   Q.   Have you reviewed all of the relevant records in

17   this case?

18   A.   Yes.

19   Q.   Including the records related to your cooperating

20   informant, Kharis Finley?

21   A.   Yes.

22   Q.   Have you met with the prosecutor on numerous

23   occasions in connection with this case?

24   A.   Yes, I have.

25   Q.   And have you worked closely with the prosecutor to

1  help prepare this case for trial?

2  A.  Yes.

3  Q.  When was your most recent meeting with the

4  prosecutor?

5  A.  Um, last night.

6  Q.  And did you discuss your testimony during that

7  meeting?

8  A.  Yes, we did.

9  Q.  When did you last meet with Deputy Sheriff Matthew

10 Doucot?

11 A.  Um, well, I've been living in California since last

12 year so I haven't seen him professionally since last

13 year.

14 Q.  Is it your testimony that you have not met with

15 Mr. Doucot, Deputy Sheriff Doucot, in the past year?

16 A.  I saw him the last couple of days.

17 Q.  So you've seen him the last couple of days and

18 spoken with him, is that right?

19 A.  Yes.

20 Q.  When was the last time you spoke with Kharis Finley?

21 A.  A few minutes before I came into the courtroom, I

22 said hi to him.

23 Q.  Today?

24 A.  Yes.

25 Q.  Now, did you testify in a hearing in this case in

1    this courtroom last week?

2    A.  Yes, I did.

3    Q.  And were you provided a copy of your testimony?

4    A.  Yes, I was.

5    Q.  Who provided you with a copy?

6    A.  Peter Levitt.

7    Q.  The prosecutor?

8    A.  Yes.

9    Q.  Did you read your testimony of last week?

10   A.  Yes, I did.

11   Q.  Is it fair to say that you are a member of the

12   prosecution team in this case, Agent Bencken?

13   A.  I'm a witness in the case, yes.

14   Q.  Well, you're the case agent, right?  So is it fair

15   to say that your job is to help the government try to

16   convict Mr. Moynihan at this trial?

17   A.  I'm a witness in the trial, so I'm working with the

18   prosecution, yes.

19   Q.  Now, this case arose out of an investigation called

20   "Operation Pitchfork," correct?

21   A.  Correct.

22   Q.  And that investigation began in early 2009?

23   A.  Correct.

24   Q.  And you were involved with it since the very

25   beginning, right?

1    A.   Correct.

2    Q.   Okay.   And the investigation lasted well over a

3    year, all the way to September of 2010, is that right?

4    A.   That's correct.

5    Q.   Okay.   And I think you told us on direct examination

6    that this investigation involved a half dozen law

7    enforcement agencies, right?

8    A.   Yes, it did.

9    Q.   And fair to say many law enforcement officers were

10   involved in this investigation?

11   A.   Yes, they were.

12   Q.   And during the course of this investigation you,

13   meaning you personally and the other law enforcement

14   people involved in the investigation, you eavesdropped

15   on numerous phone calls, right?

16   A.   We made consentually-recorded calls.   Is that --

17   Q.   You listened to numerous -- you secretly listened to

18   numerous phone calls, right?

19   A.   Yes, we did.

20   Q.   And you recorded them, right?

21   A.   Yes, we did.

22   Q.   And you also secretly recorded numerous face-to-face

23   meetings, right?

24   A.   Yes, we did.

25   Q.   And you made audio and video recordings of those

1    meetings, right?

2    A.   Yes.

3    Q.   Okay.  And you conducted a whole lot of surveillance

4    during the course of this investigation, right?

5    A.   Correct.

6    Q.   You followed people around?

7    A.   Yes.

8    Q.   You took surveillance photographs?

9    A.   Yes.

10   Q.   Is it fair to say that an awful lot of resources

11   went into this particular investigation, Agent Bencken?

12   A.   Yes.

13   Q.   Now, out of all the phone calls that you secretly

14   eavesdropped on and then recorded between early 2009 and

15   September of 2010, on how many of those calls is my

16   client, Timothy Moynihan, speaking?

17   A.   None of them.

18   Q.   And out of all the meetings that you secretly

19   videotaped, in how many of those meetings does my client

20   personally appear?

21   A.   He doesn't.

22   Q.   None, right?

23   A.   Correct.

24   Q.   Am I correct?

25   A.   Correct.

```
 1    Q.  And out of all the surveillance photographs that
 2    were made by you and all these other law enforcement
 3    agents during this 21-month-long investigation, do you
 4    have any surveillance photographs of my client, Timothy
 5    Moynihan?
 6    A.  No, just the video and the photo that we took.
 7    Q.  You're referring to the video that the jury saw a
 8    few minutes ago?
 9    A.  Correct.
10    Q.  Well, that video showed a car, right?
11    A.  Correct.
12    Q.  And is it a car that's on trial in this courtroom?
13    A.  No.
14              MR. LEVITT:  Objection.  Argumentative, your
15    Honor.
16    Q.  Does that video depict my client, Timothy Moynihan?
17    A.  No, it doesn't.
18    Q.  Now, would you agree with me, Special Agent Bencken,
19    that Kharis Finley played a key role in this
20    investigation?
21    A.  Yes, he did.
22    Q.  Okay.  So let's talk about Mr. Finley.  The FBI
23    first hired him in April of 2006, right?
24    A.  Correct.
25    Q.  And back then in 2006 he had a code name "Sam,"
```

1     S-A-M, right?

2     A.   Correct.

3     Q.   And when he was hired by the FBI, the FBI knew he

4     had a history of substance abuse, you told us, right?

5     A.   Yes.

6     Q.   And you knew he had sold crack cocaine, right?

7     A.   Yes.

8     Q.   And you knew he had a substantial arrest record,

9     right?

10    A.   Yes, we did.

11    Q.   Did you check out his record before you signed him

12    up?

13    A.   Yes, we did.

14    Q.   Was Mr. Finley allowed to deal drugs while he was

15    working for the FBI?

16    A.   No, he wasn't.

17    Q.   Did he deal drugs while he was working for the FBI?

18    A.   Yes, he did.

19    Q.   Was he allowed to use drugs while he was working for

20    the FBI?

21    A.   No, he wasn't.

22    Q.   Did he use drugs while he was working for the FBI?

23    A.   Yes, he did.

24    Q.   What was Finley's stated motivation in signing up to

25    work for the FBI in 2006?

1    A.    Monetary.

2    Q.    He wanted to make some money, right?

3    A.    Yes.

4    Q.    And he's been paid some substantial sums of money

5    for his efforts, right?

6    A.    Yes, he has.

7    Q.    Now, back in 2006 when Finley was first signed up by

8    your agency, what was the FBI's deal with him?

9    A.    I wasn't involved when he first began working with

10   the FBI, so --

11   Q.    Well, you've reviewed all of the FBI records that

12   relate to Mr. Finley, haven't you, sir?

13   A.    Yes.

14   Q.    Okay.  So tell us, please, what was the FBI's deal

15   with Finley when he was first signed up?

16   A.    He was making or attempting to make consentually-

17   recorded calls and controlled buys, the same thing.

18   Q.    And what was the arrangement in terms of what he was

19   going to get paid?

20   A.    The arrangement is he gets paid depending on, you

21   know, the outcome of what he does, the success of the

22   investigation and whatnot.

23   Q.    Okay.  So he wasn't being paid a particular salary

24   every month, right?

25   A.    No.

1  Q.  He was being paid based on what he produced, right?

2  A.  Correct.

3  Q.  So the more he produced in the way of drug deals,

4  the more money he would make, right?

5  A.  Correct.

6  Q.  Were those terms written down anywhere, by the way?

7  A.  The terms of the agreement?

8  Q.  The agreement about how he was going to get paid

9  based on what he produced.  Is that written down

10  anywhere?

11  A.  Not what he -- no, not what he's produced or what he

12  produces, it's just an understanding from him that he's

13  to provide information and it's determined at that time

14  how he's paid or how much he's paid.

15  Q.  That wasn't in any document, right?

16  A.  It's in the document when he first signs up, yes.

17  Q.  So you're telling us that the payment arrangement is

18  set forth in the original opening application, is that

19  your testimony?

20  A.  Correct.

21          MR. SULTAN:  May I approach the witness, your

22  Honor?

23          THE COURT:  Yes.

24  Q.  Special Agent Bencken, I put a document in front of

25  you.  Do you recognize that what document is?

A.   Yes, I do.

Q.   What is it?

A.   This is the opening document that we did at the time

for opening a source.

Q.   So that's the official kind of document that's used

when, um, you sign up somebody new to be a paid

confidential informant, correct?

A.   It's one of many, yes.

Q.   Okay.  And can you show me -- um, and is this a

standard FBI document that's used with respect to

confidential informants in the regular course of the

FBI's business?

A.   At that time it was, but it's changed.

Q.   And can you look at this document and tell us if

this appears to be a complete and accurate copy of the

Kharis Finley 2006 opening document?

A.   Yes, it appears to be so, yes.

          MR. SULTAN:  I'd offer it as the next exhibit,

your Honor.  It has not been previously marked.

          MR. LEVITT:  Your Honor, I would like to be

heard at sidebar on that.

          THE COURT:  Okay.


          AT THE SIDEBAR

          MR. LEVITT:  We've had a list of exhibits for

```
 1   probably two months.
 2              THE COURT:  They're exhibits that somebody
 3   intends to use in their case in chief.  You don't have
 4   to mark documents for cross-examination.
 5              MR. LEVITT:  Oh, okay.  Yes, that's true.
 6   That's true.  I guess I'd like to take a look because I
 7   wasn't given any notice on it.
 8              MR. SULTAN:  That one specific issue, your
 9   Honor, I didn't know if I could ask him where in the
10   document it appeared without having his memory
11   refreshed.
12              MR. LEVITT:  Well, I don't have any problem
13   with that.  It's just if it's going to be put into
14   evidence, then I want to take a look at it, because I
15   don't know what's in there.
16              THE COURT:  Well, we're actually going to
17   break at 5 of 1:00 and I can talk to you about it.
18         Do you want to go through it with him to see if he
19   --
20              MR. SULTAN:  Well, I'll go through it and see
21   if he's seen it and then hold off on whether we are
22   admitting it or not.
23              THE COURT:  That's fine.
24
25              (In open court.)
```

1  Q.  Sir, would you look at that document, please, and

2  show me where in that document it says -- sets forth the

3  terms under which Mr. Finley was to be paid for his work

4  with the FBI?

5  A.  I wouldn't know, in this document, where exactly it

6  would be, but when we open up a source they are

7  informed, as a prerequisite, that there's no guarantee

8  of a payment and there's no guarantee of how much

9  payment there will be, if any, during the course of when

10  they're working with us.

11  Q.  It's left completely up to the FBI's discretion,

12  right?

13  A.  Yes.

14  Q.  Thank you.

15            THE COURT:  Is this a good point to stop?

16            MR. SULTAN:  Yes, your Honor.

17            THE COURT:  Ladies and gentlemen, we're going

18  to stop for today so I can talk to the lawyers for a few

19  minutes and get us organized for tomorrow.

20       It's important that you get back here at 9:00.  I

21  hope we'll be ready to start right at 9:00.  We're going

22  to excuse you now.

23       Please remember what I told you earlier.  Continue

24  to keep an open mind.  Don't discuss the case among

25  yourselves or with anybody else.  Don't do any research

1    on the case or communicate about the case on the

2    Internet.  And, um, we will resume at 9:00 tomorrow

3    morning.

4         The Court is in recess for the jury.

5              (Jury leaves, 12:55 p.m.)

6              THE COURT:  And, Agent Bencken, you're excused

7    until 9:00 tomorrow morning.

8              (Witness leaves stand.)

9              MR. LEVITT:  Your Honor, Sheriff Mahoney is

10   still in the courtroom.  Should he be out?

11             THE COURT:  Well, he doesn't need to be, since

12   he's your designated representative.

13             MR. LEVITT:  Oh, okay.

14             THE COURT:  All right.

15        We started a little later than estimated because

16   we were waiting for the jury, but we haven't got through

17   the first witness.  And I don't think you were

18   inefficient, Mr. Levitt, but we're going to need some

19   more reliable estimates in view of the length of time

20   that I told the jury the case would take, because at

21   some point we'll have to start sitting in the

22   afternoons, I expect, if we proceed at this pace.

23        Do you have a sense, Mr. Sultan, about how long

24   you are likely to be with Mr. Bencken?

25             MR. SULTAN:  I would guess, your Honor, about

1   an hour to an hour and a half.

2           THE COURT:  All right.  Then who is going to

3   be the next witness tomorrow?

4           MR. LEVITT:  I think what I would do at that

5   point is, since they're flying in, or one of them is, I

6   would put on the DEA chemist first, which would be

7   quick, very quick.

8           THE COURT:  And she's going to testify about

9   testing the drugs?

10          MR. LEVITT:  Correct, and there's no

11  stipulation agreed to, so.

12          THE COURT:  Is that right, Mr. Sultan?

13          MR. SULTAN:  I didn't object to the

14  certificates, your Honor, but there's no stipulation.

15          MR. LEVITT:  Well, the certificates aren't

16  good enough, so.

17          THE COURT:  Right.

18          MR. LEVITT:  But she'll be quick.

19      And Suzanne Felde, we need to talk about.

20          THE COURT:  Okay.

21          MR. LEVITT:  But she can't get here till about

22  11:00.  She has child care duties.  So she would be

23  someone we would be looking to slip in on that day.

24          THE COURT:  Between other witnesses.  I don't

25  anticipate I'm going to interrupt one witness to put her

1   in.

2            MR. LEVITT:  Right.  Well, it may be a

3   situation where I'd ask the Court for some indulgence at

4   the end.

5            THE COURT:  I've got other matters scheduled.

6            MR. LEVITT:  Okay.

7       Well, then I'm going to talk to her and see if she

8   can -- if we need her, see if we can get her to get here

9   at 9:00, so she can immediately follow the chemist.

10           THE COURT:  Okay.

11           MR. LEVITT:  I'm also going to talk to --

12  well, the Commerce Insurance issue, I guess, we need to

13  address.  Um, I could have her come tomorrow.  I could

14  have her come Thursday.  I guess the question is, um, is

15  the Court reserving -- you know, I just don't remember

16  from this morning.

17      Is the Court reserving decision on those documents

18  pending her testimony?

19           THE COURT:  Well, that's what I said this

20  morning based on what I know.  I mean, I don't know if

21  there's some question about whether they qualify as

22  business records, um, and --

23           MR. SULTAN:  I don't have any problem with

24  them being business records, your Honor, it's just the

25  same hearsay-within-hearsay issue.

1           THE COURT:  I think it would be prudent to

2      have her testify.  I'll think about it more.  She

3      doesn't have to testify tomorrow if she's generally

4      available, but I thought some voir dire concerning the

5      practices would put me in a better position to make the

6      rulings I need to make about the hearsay within

7      hearsay.  But as I said, even independent of what she

8      says, it looks to me as if you've got a lot of

9      circumstantial evidence that it was Mr. Moynihan who

10     made the statements.

11          MR. LEVITT:  And then after that it's

12     Mr. Finley and, you know, the government's direct is

13     going to be short, it's basically playing the tapes.

14     You know, I mean, it's -- 90 percent of his testimony is

15     just simply playing the tapes through him.  It will take

16     some time, but there's not that many, and the calls are

17     short.

18          And then, you know, I think clearly, in terms of

19     the longest government witnesses, clearly Agent Bencken

20     is the longest.  We're putting in a lot of --

21          THE COURT:  Okay, that's fine.  And, as I

22     said, I don't think you've been inefficient, it's just

23     that I think you had hoped to get a couple of witnesses

24     in today and you haven't finished the first.  It's just

25     something to be alert to.

1          MR. LEVITT:  One thing I've proposed, and I

2     obviously don't know the Court's schedule, but rather

3     than, um, using Monday and Tuesday of next week, as

4     possible afternoons, if Thursday's available?  And the

5     parties should --

6          THE COURT:  Well, we can talk about it

7     tomorrow.  We'll see where we are.  And part of the

8     problem is, what I told the jurors when they were

9     selected, that I'd have to consult them on their

10    availability.  But why don't you remind me of that

11    tomorrow morning, because some time on Thursday might be

12    an option.

13         Okay.  We're in recess till 9:00 tomorrow morning.

14              (Adjourned, 1:00 p.m.)

15

16                   C E R T I F I C A T E

17

18         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

19    hereby certify that the foregoing record is a true and

20    accurate transcription of my stenographic notes, before

21    Chief Judge Mark L. Wolf, on Tuesday, October 25, 2011,

22    to the best of my skill and ability.

23

24    /s/ Richard H. Romanow 09-07-12
      _____
25    RICHARD H. ROMANOW   Date