1                 UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3                           No. 1:10-cr-10288-MLW

4

5

6    UNITED STATES OF AMERICA

7

8    vs.

9

10   TIMOTHY MOYNIHAN

11

12

13                      *********

14

15               For Jury Trial Before
                 Chief Judge Mark L. Wolf

16

17

18               United States District Court
                 District of Massachusetts (Boston.)
                 One Courthouse Way
19               Boston, Massachusetts 02210
                 Wednesday, October 26, 2011

20

21                      ********

22

23        REPORTER: RICHARD H. ROMANOW, RPR
                  Official Court Reporter
                 United States District Court
24   One Courthouse Way, Room 5200, Boston, MA 02210
                 bulldog@richromanow.com

25

1                    A P P E A R A N C E S

2

3     PETER K. LEVITT, ESQ.
         United States Attorney's Office
4         1 Courthouse Way, Suite 9200
         Boston, Massachusetts 02210
5         (617) 748-3965
         Email: Peter.levitt@usdoj.gov
6         For the United States

7

8     JAMES L. SULTAN, ESQ.
     AUDREY GRACE, ESQ.
9         Rankin & Sultan
         151 Merrimac Street, Second Floor
10        Boston, Massachusetts 02114-4717
         (617) 720-0011
11        Email: Jsultan@rankin-sultan.com
         For Timothy Moynihan

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2

 3     WITNESS                 DIRECT  CROSS  REDIRECT  RECROSS

 4
       SPECIAL AGENT CHRISTOPHER BENCKEN (Continued.)
 5
          By Mr. Levitt:                      53
 6
          By Mr. Sultan:             12                74
 7

 8
       MANDY McGEHEE
 9
          By Mr. Levitt:      75                95
10
          By Mr. Sultan:            86
11

12
       KHARIS FINLEY
13
          By Mr. Levitt:      96
14
          By Mr. Sultan:
15

16

17

18

19

20

21

22

23

24

25
```

E X H I B I T S

1

2

3    EXHIBIT 12.................................... 103

4    EXHIBIT 14.................................... 103

5    EXHIBIT 16.................................... 103

6    EXHIBIT 18.................................... 103

7    EXHIBIT 20.................................... 103

8    EXHIBIT 22.................................... 103

9    EXHIBIT 24.................................... 103

10    EXHIBIT 26.................................... 103

11    EXHIBIT 51....................................  99

12    EXHIBIT 59....................................  33

13    EXHIBIT 60....................................  39

14    EXHIBIT 61....................................  42

15    EXHIBIT 62....................................  43

16    EXHIBIT 63....................................  44

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2            (Begins, 9:00 a.m.)

3            THE CLERK:  This is Criminal Number 10-10288,

4    the United States of America versus Timothy Moynihan.

5    The Court is in session.  You may be seated.

6            THE COURT:  Good morning.  Would counsel

7    please identify themselves for the record.

8            MR. LEVITT:  Peter Levitt on behalf of the

9    government.  Good morning, your Honor.

10           MR. SULTAN:  Good morning, your Honor.  James

11   Sultan and Audrey Grace for Mr. Moynihan, who is

12   present.

13           THE COURT:  Okay.

14      A couple of things before we get the jury and all

15   the jurors are here.  When I told the jurors we might

16   sit next Tuesday afternoon, I forgot that that was

17   November 1st, the first Tuesday of the month, and

18   therefore I have to preside in a court meeting on

19   Tuesday afternoon.  What I propose to do is ask the

20   jurors if they are available to sit tomorrow afternoon,

21   if necessary, to essentially maintain the schedule and

22   tell them we won't sit next Tuesday.

23      Does anybody have concerns about that?

24           MR. SULTAN:  Your Honor, the only issue I want

25   to raise with respect to the schedule has to do with

```
1    Monday.  Monday is Halloween and some of the jurors may
2    well have activities with their children in the late
3    afternoon on Monday.  I know I was hoping to have an
4    activity with my children, young children, in the late
5    afternoon on Monday.  I would hope the Court would not
6    sit, um, late in the day on Monday.
7              THE COURT:  Well, what do you consider late in
8    the day?
9              MR. SULTAN:  After 3:00, your Honor.  And we
10   can go tomorrow as late as the Court would want.  I
11   think we're in good shape.
12             THE COURT:  Well, okay, I'll be sensitive to
13   that.  I'm just concerned because I also realized I'm
14   obligated to teach a class next Wednesday afternoon.
15   But we'll see where we are.  We'll go a day at a time.
16   Times have changed since I was a young father, but
17   probably for the better.  This should be doable.  Let's
18   just -- I'll have Mr. Hohler talk to them at 11:00 about
19   whether sitting tomorrow afternoon is a problem and
20   we'll get this straight.
21             MR. LEVITT:  And, your Honor, when you say not
22   sitting Tuesday, you mean not sitting after --
23             THE COURT:  Not sitting after 1:00.
24             MR. LEVITT:  Yes.
25             THE COURT:  All right.
```

1          Then very briefly, and we'll discuss this more,

2     um, I realized yesterday, when the indictment was read,

3     that it alleges that the conspiracy involved more than

4     28 grams of cocaine.

5               MR. LEVITT:  Of cocaine base.

6               THE COURT:  Of cocaine base.  Excuse me.

7          Am I correct that that amount raises the maximum

8     possible penalty?

9               MR. LEVITT:  It does, your Honor.  In this

10    case it raises the maximum from 20 to 40, and then the

11    government has also filed an information, pursuant to

12    Section 851, which raises it to life.  So the maximum

13    sentence on Count 1 is life.

14              THE COURT:  All right.  Therefore, the jury

15    has to decide the amount.

16         Is the government asking for a special verdict

17    form and, in effect, a lesser included offense charged

18    that would permit the jury to find that the defendant

19    was engaged in a conspiracy but one that involved less

20    than 28 grams?

21              MR. LEVITT:  What I typically do and what I

22    think I would do in this case is, yes, a special verdict

23    form, um, that would say, "(1) was the defendant

24    involved in a conspiracy to possess with intent to

25    distribute cocaine base?  If you answer 'yes' to that

1   question, answer Question 2, did the overall conspiracy

2   involve 28 grams or more of cocaine base?"  All right?

3   That's how I would phrase it in this case.

4           THE COURT:  And would the defendant have any

5   objection to that?

6           MR. SULTAN:  Well, I think that's the right

7   form, your Honor.  I think the question is whether the

8   defendant, um, agreed to distribute 28 grams or more.

9           THE COURT:  Yes, I mean it would have to be --

10  it would have to be -- the instructions would have to be

11  proper instructions.

12          MR. SULTAN:  But I think in terms of format, I

13  think that's exactly the right way to do it.

14          THE COURT:  Okay.  So it would be possible --

15  the one thing I want to clarify is it would be possible,

16  in that circumstance, for the jury to find the defendant

17  guilty of a conspiracy, but not one that triggered the

18  higher maximum sentence.

19          MR. SULTAN:  I think that's correct, your

20  Honor.

21          THE COURT:  Okay.

22          MR. LEVITT:  And, your Honor, just to forecast

23  it.  If Mr. Sultan's suggesting that the phrasing of the

24  special verdict should be -- other than what I said,

25  should be, "Did the defendant agree?"  I submit that's

1     wrong, because the issue is --

2           THE COURT:  Well, here's -- I just wanted to

3     surface it and I don't want it to keep the witnesses and

4     the jurors waiting.

5           I want you to confer and, you know, I'm going to

6     need some -- I want you to give me the proposed verdict

7     form, although I think it's pretty simple, and I want

8     you each to give me -- you know, to talk to each other.

9     We may avert -- you know, we may be talking shorthand

10    here.  But I want you to give me a proposed jury

11    instruction so if you have a substantive difference,

12    I'll resolve it.  Because this case is going relatively

13    fast.  I'll be instructing the jury probably early next

14    week.  And I don't want this to be dealt with at the

15    last minute for the first time.  All right?

16          So since I saw you last, I understand I have some

17    materials related to the cross-examination of

18    Mr. Finley.

19          MR. SULTAN:  Those are the materials the Court

20    asked me to provide ex parte.

21          THE COURT:  Right.

22          MR. SULTAN:  That's cross-examination of

23    Special Agent Bencken, your Honor.

24          THE COURT:  Of Bencken.

25          MR. SULTAN:  Right.

1            THE COURT:  Okay.  And some additional ***Jencks***

2   for Mahoney, right?

3            MR. LEVITT:  Correct.

4            THE COURT:  Is there anything else I should

5   have received?

6            MR. LEVITT:  No, your Honor.

7            THE COURT:  All right.

8            MR. LEVITT:  Although Mr. Sultan and I did

9   speak about Suzanne Felde.

10           THE COURT:  Oh, yes.

11           MR. LEVITT:  Um, neither party thought that

12  there's any reason to call her at this point.  I just

13  simply reserve the right if something changes.

14           THE COURT:  Okay.  I think that's a very

15  sensible way of proceeding.

16       All right.  Is there anything else before we put

17  Mr. Bencken back on the stand and get the jury?

18                (Mr. Bencken takes the stand.)

19                (Jury enters, 9:15 a.m.)

20           THE COURT:  All right.

21       Ladies and gentlemen, good morning.  Thank you for

22  getting back so promptly.  I've been talking to the

23  lawyers to deal with a few things that I hope will

24  contribute to everything continuing to progress

25  smoothly.

1        Since we recessed yesterday I realized that

2   although I told you we might sit next Tuesday afternoon,

3   um, that's November 1st, the first Tuesday of the month

4   when the district judges meet, and I'm the chief judge

5   and I need to preside at that meeting.  So we won't be

6   sitting next Tuesday.  At the break I would like you to

7   tell Mr. Hohler whether you would be available to sit

8   tomorrow afternoon until maybe 4:00 instead of possibly

9   next Tuesday.  We'll see how we're progressing.  And it

10  may not even be necessary to do that to use all that

11  time, but if it wouldn't be disruptive to your plans, I

12  think it would assure that we stay on track.

13       I've also been reminded that Monday is Halloween

14  and people may want to get home sooner rather than later

15  and not sit after, say, 3:00 on Monday, if we need to

16  sit on Monday afternoon at all.  So I think if we sit

17  tomorrow afternoon, it will give me greater comfort that

18  we can complete this case on the schedule that I gave

19  you.  But if that's going to be very inconvenient or

20  impossible for any of you, you'll tell us and we won't

21  do it.  Okay?

22       We're going to resume with the testimony, the

23  cross-examination of Special Agent Bencken.

24       Do you understand that you're still under oath?

25            THE WITNESS:  I do.

1          THE COURT:  Okay.

2          MR. SULTAN:  May I proceed, your Honor?

3          THE COURT:  You may.

4

5   CROSS-EXAMINATION BY MR. SULTAN:  (Continued.)

6   Q.  Good morning, Special Agent Bencken.

7   A.  Good morning.

8   Q.  When we left off yesterday we were talking about --

9   do you recall we were talking about Kharis Finley?

10  A.  Yes, we were.

11  Q.  And you told us he started working as a paid

12  informant for the FBI in 2006, correct?

13  A.  Correct.

14  Q.  And he was, in fact, paid in 2006, right?

15  A.  Correct.

16  Q.  And do you recall that shortly after going to work

17  for the FBI in 2006, um, Finley was arrested for dealing

18  cocaine in July of 2006?

19  A.  Yes.

20  Q.  And he was terminated by the FBI that same month,

21  right?

22  A.  Correct.

23  Q.  And he was ultimately convicted in that case of

24  possession with intent to distribute cocaine, right?

25  A.  Correct.

1    Q.   Okay.   In the following year, in April of 2007,

2    Finley was reopened as a paid informant by the FBI,

3    right?

4    A.   Correct.

5    Q.   And at the time he was reopened in April of 2007 he

6    was on probation for his cocaine distribution

7    conviction, right?

8    A.   Correct.

9    Q.   And once again, in 2007, based on the paperwork that

10   was filed in your agency, Finley's motivation was to

11   make money, right?

12   A.   Yes.

13   Q.   He wasn't doing this because he wanted to help get

14   drugs off the streets, right?

15   A.   No.

16   Q.   In fact, he was involved in putting drugs out on the

17   streets, right?

18   A.   Correct.

19   Q.   And when Finley was reopened as a paid informant in

20   2007 he was told in writing, was he not, that he was

21   required to pay taxes on any monies that he received

22   from the FBI?

23   A.   Yes.

24   Q.   And, in fact, he signed a form acknowledging that he

25   had been so advised, right?

1   A.   Yes, he did.

2   Q.   And he was paid during 2007, right?

3   A.   Correct.

4   Q.   And am I correct that just three months after the

5   FBI rehired Finley he was arrested again for

6   distribution of cocaine in 2007?

7   A.   Correct.

8   Q.   And he was subsequently convicted in that case and

9   put on probation until September 25th, 2009?

10  A.   Correct, yes.

11  Q.   And about one month after that arrest the FBI

12  terminated Finley for the second time, right?

13  A.   Correct.

14  Q.   And am I correct that notwithstanding his recent

15  convictions Finley was rehired for a third time by the

16  FBI as a paid informant in September of 2009?

17  A.   That's correct.

18  Q.   And the first time his code name was "San," S-A-N?

19  A.   That's correct.

20  Q.   And this time he had a new code name, "Schwinn,"

21  right?

22  A.   Correct.

23  Q.   By it was the same guy, the same Kharis Finley,

24  right?

25  A.   Yes, it was.

```
1    Q.   And you were his handler for the FBI, right?

2    A.   Correct.

3    Q.   So you prepared the source opening document when he

4    was rehired by the FBI on September 18th, 2009, right?

5    A.   Yes.

6    Q.   Was that document accurate and complete?

7    A.   To the best of my knowledge, yes.

8    Q.   (Pause.)  In this form, the source opening form --

9    and this is a form you're pretty familiar with, right?

10   A.   Yes.

11   Q.   There's a bunch of questions that have to be

12   answered by the agent who is filling out the form?

13   A.   Yes.

14   Q.   Do you recall that one of the questions on that

15   source opening document, Question O, is:  "Has the CHS"

16   -- and what does "CHS" stand for?

17   A.   Confidential Human Source.

18   Q.   Confidential Human Source.  In this case that was

19   Finley, right?

20   A.   Correct.

21   Q.   "Has the CHS ever acted as a CHS for any LE," that's

22   law enforcement --

23   A.   Correct.

24   Q.   "-- agency?"  Do you recall that question?

25   A.   Yes.
```

Q.  And do you recall that -- well, the true answer to
that question was "yes," right?

A.  Yes.

Q.  You answered that question "no," didn't you?

A.  I don't -- I haven't seen that form for a while, so
I would have to look at that.

            MR. SULTAN:  May I approach the witness, you
Honor?

            THE COURT:  Why don't you put it up on the
jurors' screens.  The jurors' monitors are off right
now.

            MR. SULTAN:  Mr. Levitt, would you like to
look at that document?

            MR. LEVITT:  I can see it.

            MR. SULTAN:  But would you want to look at the
whole document?

            MR. LEVITT:  Yes.

            THE COURT:  What page number is it, do you
know?

            MR. SULTAN:  Page 18, your Honor.

            MR. LEVITT:  Thank you.

Q.  Showing you Page 18 of this source opening document
from 2009, Agent Bencken, does this refresh your
recollection that in response to the question, "Has the
CHS --" Confidential Human Source, meaning Finley, "--

1  ever acted as a CHS for any law enforcement agency?"

2  And you answered that question "No"?

3  A.   That's correct.  Usually when we fill out a form for

4  that question, it's for the local law enforcement

5  agency, so it's asking for a local, nonFBI agency.

6  Q.   So you interpreted that question as referring to any

7  law enforcement agency other than the FBI, is that your

8  explanation?

9  A.   Correct.  Yes.

10  Q.   Okay.  Well, do you recall that on Page 22 of this

11  statement document you were asked to summarize

12  Mr. Finley's criminal history, correct?

13  A.   Correct.

14  Q.   Okay.  And did you include all significant charges

15  that he had been arrested for in the summary you

16  provided when you reopened Finley for a third time as a

17  paid informant in 2009?

18  A.   I'd have to look at the form.  I don't remember

19  exactly what I wrote on the form.

20         MR. SULTAN:  Can I show it to the witness,

21  your Honor?

22         THE COURT:  Yes.

23  Q.   Showing you Page 22 of that same document that you

24  prepared.  Does that refresh your recollection as to

25  what you wrote down to summarize Mr. Finley's, um,

1    arrest history?

2    A.  Yes, it does.

3    Q.  Okay.  And did you include all of his significant

4    arrests?

5    A.  I included all the major offenses at that time, yes.

6    Q.  Well, you left out his sex offense involving a child

7    under 14, didn't you, Special Agent Bencken?

8    A.  I guess I did.  I didn't realize that he had a sex

9    offense.

10           MR. SULTAN:  May I approach the witness, your

11   Honor -- or I'll show it to him on this.

12           (On screen.)

13   Q.  You had fully looked into Mr. Finley's criminal

14   record before you signed him up for the third time,

15   right?

16   A.  Yes.

17   Q.  I'll show you a document.  (On screen.)  Does this

18   refresh your recollection?

19   A.  I don't remember that specific document, no.  I

20   don't.

21   Q.  You've never seen this before?

22   A.  I don't remember it, no.

23   Q.  Well, in 2009, when you signed Finley up for the

24   third time, did you know that he had a prior arrest for

25   indecent assault and battery on a child under 14?

1    A.   I didn't know that, no.

2              THE COURT:   May I see counsel at sidebar.

3

4              AT THE SIDEBAR

5              THE COURT:   All right.   I guess -- there

6    hasn't been an objection, but I want to get the facts

7    straight.   There was this complaint.

8         Was Mr. Finley convicted?

9              MR. SULTAN:   Well, it was continued without a

10   finding, your Honor, but that's not the point.   This is

11   the arrest history on this document.   This document is

12   grossly incomplete because --

13             THE COURT:   Well, it says the "criminal

14   history," and whether that's a conviction or not --

15   well, here's the only concern.   I assume there's been --

16        Where's the book?   No, the little evidence book.

17   Right there.

18             (Clerk hands judge evidence book.)

19             THE COURT:   You're bringing this in, I assume,

20   to show that the -- to impeach the FBI's credibility and

21   care and he can give what answer he can give, he can

22   say, "I didn't know about it," but if Mr. Finley was on

23   the stand, then you wouldn't be allowed to use this to

24   impeach him under 609.

25             MR. SULTAN:   I agree, your Honor.

1          THE COURT:  All right.

2      What's that?

3          MR. SULTAN:  Nor would I try to do so.

4          THE COURT:  All right.  We'll see where we go

5   with all of this.  But maybe, at this point, if the

6   government wants to bring out --

7          MR. SULTAN:  If Mr. Finley says that he

8   disclosed his entire arrest history and didn't disclose

9   this, I think I'm entitled to impeach him.

10         MR. LEVITT:  Well, your Honor, it's not his

11  criminal record.  I mean, this is just a game.

12         THE COURT:  This is not his criminal record?

13         MR. LEVITT:  Yeah, it's not his criminal

14  record.  He was 18, so, you know --

15         THE COURT:  Okay.  Fine.  There's no

16  objection.  I just wanted to be careful.

17

18         (In open court.)

19  Q.  Now, Agent Bencken, do you recall, on the same form,

20  you were asked on Page 24 whether the CHS, the

21  Confidential Human Source in this case, Mr. Finley, is a

22  state or local probationer, correct?

23  A.  Right.

24  Q.  And as of 9-18 of 2009, he was a state probationer,

25  right?

1    A.  I don't recall exactly at that time if he was or

2    not.

3    Q.  Well, let me show you a document.

4        You had checked this guy's record out thoroughly

5    before you signed him up again, right?

6    A.  Yes, I reviewed his criminal history first.

7    Q.  Okay.  Let me show you the first page of the

8    document first.

9    A.  (Looks.)

10   Q.  Okay.  And now I'm going to show you the second page

11   of the same document.

12   A.  (Looks.)

13   Q.  Does that refresh your recollection that Mr. Finley

14   was still on state probation as of September 18th, 2009

15   when you filled out this document rehiring him as a paid

16   informant for the FBI?

17   A.  I don't remember this specific document, no.  I

18   don't remember exactly what his status was at the time.

19   Q.  So you don't know whether -- as you sit here today,

20   your recollection is not refreshed by this, right?

21   A.  No.

22   Q.  And you don't know whether or not he was, in fact,

23   on probation when, um, you filled out this document in

24   September of 2009.  Is that your testimony?

25   A.  I know that he was prior to when we opened, I just

1     don't know the exact date of when he was not on

2     probation.  My understanding, when I opened him, was

3     that he wasn't on probation.

4     Q.  I'm sorry?

5     A.  My understanding was, when we opened him, he wasn't

6     currently on probation.

7     Q.  When you opened him for the third time on September

8     18th, 2009 --

9     A.  That's correct.

10    Q.  -- your understanding was that he was not on

11    probation?

12    A.  Yes.

13    Q.  And that's why you answered that question "no" on

14    the form, right?

15    A.  Yes.

16    Q.  And your understanding that he wasn't on probation,

17    did you just take his word for it?

18    A.  No.  I don't recall exactly how, um -- I don't

19    remember if we went to the courts or how I found out or

20    how I discovered his status at that point.

21    Q.  Well, would it be your general practice, in checking

22    somebody out before you signed him up as a paid

23    informant, to go to the court where he had a criminal

24    conviction and look at the paperwork in the clerk's

25    office there to see exactly what the terms of the

1    individual's sentence were?

2    A.   Not always.   It just depended on the circumstances.

3    Q.   And in this case did you bother to do that?

4    A.   No, I didn't do that.

5    Q.   And were the terms of Mr. Finley's engagement by the

6    FBI, this third time beginning in September of 2009,

7    pretty much the same as they had been on the earlier

8    occasions?

9    A.   As far as?

10   Q.   Getting paid.

11   A.   Yes.

12   Q.   That is, he'd be paid based on what he did?

13   A.   Yes.

14   Q.   Okay.   And again he was told in writing, when you

15   signed him up in 2009, that he had to pay taxes on

16   whatever he got from the FBI?

17   A.   Yes.

18   Q.   And he was paid in 2009, right?

19   A.   Yes, he was.

20   Q.   Now, am I correct that you testified on direct

21   examination that Mr. Finley last worked for the FBI in

22   March or April of 2010?

23   A.   That's the best that I can remember, yes.

24   Q.   Well, I want you to think about it again.   Was

25   that -- to the best of your memory, is that when he

1    stopped working for you?

2    A.   That's the best I can remember, yes.  I don't recall

3    the exact date that he stopped working.

4    Q.   Well, isn't it true that he continued to work as a

5    paid informant for the FBI throughout the year of 2010?

6    A.   He was open as a source but I don't know as far as

7    operational-wise.  I don't remember him doing anything

8    past the summer.

9    Q.   Well, he was getting paid all the way to the very

10   end of 2010, right?

11   A.   Yes.

12   Q.   In fact, just for the period of July 1st to

13   September 7th of 2010, he received over $14,000 in

14   expenses and $2,500 for work that he did, right?

15   A.   Correct.

16   Q.   That was July to September, right?

17   A.   Correct.

18   Q.   And, in fact, Mr. Finley continued to have full

19   operational status as a paid confidential informant into

20   2011, didn't he?

21   A.   Yes, he did.

22   Q.   You now know that on May 14th, 2011 of this year --

23   May 14th, Mr. Finley was arrested for possession of

24   marijuana with intent to distribute?

25   A.   Yes, I know that.

1   Q.   Okay.   And am I correct that Finley didn't disclose

2   that arrest to the FBI until July, or six weeks later?

3   A.   I don't know.   I've been in California since June of

4   2010.   I don't know exactly when he disclosed that or

5   the timeline.

6   Q.   So you don't know if he disclosed it to somebody

7   else, is that right?

8   A.   That's correct.

9   Q.   Okay.   But he called you in California in July of

10  this year, right?

11  A.   Yes, he did.

12  Q.   Okay.   And he told you that his driver's license had

13  been suspended because he got arrested and he asked you

14  if you would help him get his license back?

15  A.   That's correct.

16  Q.   And did you make a call to see if you could help him

17  out?

18  A.   Yeah.   I contacted Deputy Sheriff Matt Doucot and

19  asked him for the details and Matt indicated that there

20  were charges pending and he told me not to make any

21  efforts to assist him.   So I told Mr. Finley that there

22  wasn't anything that I could do.

23  Q.   So it's your testimony that Deputy Sheriff Doucot

24  told you not to do anything to help Finley?

25  A.   Yes.

1   Q.   Okay.  So you didn't?

2   A.   I didn't, no.

3            MR. SULTAN:  Just a moment your Honor, please.

4            (Pause.)

5   Q.   Agent Bencken, didn't you make a call to someone at

6   the Registry that you knew on behalf of Mr. Finley after

7   he called you in July of 2011 and asked you for some

8   help?

9   A.   Initially I called to see the status of his license.

10  Q.   You made a call to the Registry?  Yes or no.

11           MR. LEVITT:  Your Honor, I'd ask that the

12  witness be allowed to answer.

13           MR. SULTAN:  I asked a "yes" or "no" question.

14           MR. LEVITT:  Your Honor --

15           THE COURT:  We'll do it this way.

16       Mr. Bencken, say what's necessary to answer the

17  question fully, but don't go beyond it.  If there's some

18  elaboration that's required, Mr. Levitt will have a

19  chance to invite it.

20       So if you want a direction to be given to the

21  witness, please ask me to give it, and if it's

22  appropriate, I will.

23           MR. SULTAN:  Thank you, your Honor.

24  Q.   Let me ask the question a little different way,

25  Special Agent Bencken.

1          After Finley called you in early July and asked

2     you for some help in getting his driver's license back,

3     did you make a call on his behalf to the Registry?  Yes

4     or no.

5     A.  No, I didn't make a call, I sent an e-mail.

6     Q.  After his arrest in May of 2011, was Finley

7     terminated by the FBI as a paid informant?

8     A.  After his arrest?

9     Q.  Yes, sir.

10    A.  Yes.

11    Q.  Do you know when he was terminated?

12    A.  I don't know the exact date, no.

13          MR. LEVITT:  Your Honor, if the defense

14    counsel is going to try to refresh the witness's

15    recollection, I would like to first have him determine

16    that he ever knew something before he shows him a

17    document to ask him to refresh his recollection.

18          THE COURT:  Okay.

19          MR. SULTAN:  Happy to do that, your Honor.

20    Q.  Did you ever know when Mr. Finley was terminated?

21    A.  The last time?  The exact time?  The exact date?

22    Q.  Yes, sir.

23    A.  No.

24    Q.  But you know he was terminated sometime after his

25    arrest, right?

1  A.  Yes, I do.

2  Q.  Was it your understanding at some point that the

3  government was planning to bring federal charges against

4  Finley based on his May, 2011 arrest?

5  A.  Yes, I did hear that.  Yes.

6  Q.  Have any federal charges ever been brought against

7  Finley, to your knowledge?

8  A.  No.

9  Q.  Agent Bencken, did Finley ever lie to you in the

10  course of your work with him?

11  A.  (Pause.)  Yes, there were occasions.  Yes.

12  Q.  Do you consider him to be a trustworthy individual?

13  A.  (Pause.)  Yes, I do.

14  Q.  Now, turning to your use of Mr. Finley in this

15  investigation.

16      Am I correct that you testified on direct

17  examination that you were not focusing on Hester as

18  opposed to Moynihan at the outset, is that right?

19  A.  There were several subjects of investigation.

20  Q.  Well, in December of 2009, didn't you direct your

21  paid informant, Finley, to make some phone calls to

22  Hester to try to buy some crack cocaine?

23  A.  Yes, we did.

24  Q.  That wasn't his idea, that was your idea, right?

25  A.  He reported to us places or people that he could buy

1    drugs off of.  So he reported the information and so we

2    directed him to try to make calls.

3    Q.  Because in December of 2009 you had never heard of

4    my client, Timothy Moynihan, right?

5    A.  No, I had not.

6    Q.  So on December 23, 2009, Finley made three calls to

7    Hester looking to buy crack cocaine, right?

8    A.  Right.

9    Q.  And you recorded those calls, right?

10   A.  Yes.

11   Q.  And Hester told Finley that he would have to contact

12   his source in New Hampshire and get back to him, right?

13   A.  Correct.

14   Q.  So as of the end of 2009 and moving into 2010,

15   Finley hadn't produced anything yet with respect to

16   Mr. Hester, right?

17   A.  No.

18   Q.  Okay.  And then on January 6th of 2010, was that the

19   first time that Finley bought drugs off of Hester?

20   A.  Yes.

21   Q.  And on that occasion, um, -- and you were involved

22   in surveilling, following, um, Finley and Hester as they

23   drove to a location and conducted some kind of a drug

24   deal, right?

25   A.  Yes.

1  Q.  Okay.  And am I correct that on that trip, on that

2  day, Finley and Hester drove to the Cordovan apartments

3  in Haverhill, then to High Street, and then to an

4  autobody shop on West Street named Anchor Auto Parts?

5  A.  That's correct.

6  Q.  Okay.  And do you recall that -- and you were -- the

7  conversation between the two of them, this was going on

8  in the truck that you provided to Finley, right?

9  A.  That's correct.

10  Q.  And that was a truck that had recording equipment in

11  it?

12  A.  Yes.

13  Q.  It had a video camera and audio recording equipment,

14  right?

15  A.  Yes, it did.

16  Q.  So you could overhear the conversation that they

17  were having?

18  A.  Yes.

19  Q.  And during that conversation between Finley and

20  Hester on October 26th, do you recall that Finley said

21  that he wanted to go to High Street because his source

22  for crack cocaine lived there?

23  A.  That Finley said that?

24  Q.  Yes, sir.

25  A.  I don't remember him saying that.

```
 1    Q.   I'm sorry.   That Hester said it?

 2    A.   Yes, I remember Hester said it.

 3    Q.   Sorry.   I apologize.   Hester said, "We need to go to

 4    High Street because that's where my source for crack

 5    is"?

 6    A.   Yes, I remember that.

 7    Q.   And there was, in fact, cocaine sold by Hester to

 8    Finley on January 6th, 2010, right?

 9    A.   Yes, that's correct.

10    Q.   And, um, nobody claims to have seen a white Chevy

11    Trailblazer anywhere near that deal, right?

12    A.   Right.

13    Q.   Am I correct?

14    A.   You're correct.

15    Q.   Now, let's turn to January 7th.   On January 7th

16    Finley was in this truck that the FBI had provided to

17    him, right?

18    A.   Yes.

19    Q.   You said it was a Ford Expedition?

20    A.   Correct.

21    Q.   With tinted windows?

22    A.   Yes.

23    Q.   And do you have any idea whether Finley was using

24    marijuana that day?

25    A.   I don't recall if that day, no.
```

Q.   And you were with Deputy Sheriff Doucot?

A.   That's correct.

Q.   And you guys were in some kind of a van, a Dodge
Caravan or something?

A.   Yes.

Q.   And your vehicle also had tinted windows, right?

A.   Yes.

Q.   And at some point this, um, white Chevy Trailblazer
showed up on Fourth Street?

A.   Correct.

Q.   And that vehicle also had tinted windows, right?

A.   Yes, it did.

Q.   And the Chevy Trailblazer, that's a pretty big
vehicle, right?

A.   Correct.

Q.   It seats like seven or eight people?

A.   Yes.

Q.   And you have no idea who was in the back of that
Chevy Trailblazer on January 7th, 2010, do you?

A.   I didn't see anybody else in the back, no.

Q.   Well, you don't know who was in the back, is that
correct?

A.   That's correct.

Q.   And on that day Hester was with Finley in the Ford
Expedition, right?

1    A.   That's correct.

2    Q.   And they went from Bartlett Street to Fourth Avenue,

3    back to Bartlett Street, and back to Fourth Avenue,

4    right?

5    A.   That's correct.

6    Q.   They went to all those places before this white

7    Trailblazer showed up, right?

8    A.   That's correct.

9    Q.   I'm going to show you a photograph, Special Agent

10   Bencken.

11       Do you recognize this as a photograph of Fourth

12   Avenue in Haverhill?

13   A.   Yes.

14           MR. SULTAN:   I'd offer this as the next

15   exhibit, your Honor.

16           MR. LEVITT:   No objection.

17           THE COURT:   If there's no objection, it's

18   admitted as Exhibit 59.

19           (Exhibit 59, marked.)

20   Q.   I'm showing you what's now in evidence as Exhibit

21   59, um, Fourth Avenue in Haverhill.

22       It's a residential street, right?

23   A.   That's correct.

24   Q.   It's not particularly heavily trafficked, right?

25   A.   No.

1   Q.   There's not a lot of cars parked on it, right?

2   A.   No.

3   Q.   A caravan with two law enforcement agents sitting on

4   Fourth Avenue for a period of time, do you think that

5   would be kind of conspicuous?

6   A.   Yes.

7   Q.   Now, while -- at some point after this white

8   Trailblazer showed up, Hester got out of the Ford

9   Expedition where Finley was and got into the

10   Trailblazer, right?

11   A.   Right.

12   Q.   And when that happened, Finley, um, gave you guys a

13   little report over the radio about what was happening,

14   right?

15   A.   Yes.

16   Q.   And at that point did Finley tell you that, um, he

17   saw a white male, a Puerto Rican male, in the

18   Trailblazer?

19   A.   Yes, he did.

20   Q.   Now, this particular deal -- and there was, in fact,

21   a drug transaction, you told us, that happened on

22   January 7th, right?

23   A.   Yes, that's correct.

24   Q.   Exhibit 1, that's the drugs that Hester sold to

25   Finley that day?

```
 1    A.   Correct.
 2    Q.   Okay.  And this deal it was for -- how much money
 3    was this deal for, do you remember?
 4    A.   I don't recall the exact amount.
 5    Q.   Well, 350 bucks, does that sound right?
 6    A.   Yes.  Yes.
 7    Q.   That's what we're talking about as far as the drug
 8    deal on January 7th, was $350?
 9    A.   Correct.
10    Q.   For this quantity of drugs, right?
11    A.   Right.
12    Q.   Now, it was a few grams, right?
13    A.   Correct.
14    Q.   Okay.  And there's 28 grams in an ounce, right?
15    A.   Correct.
16    Q.   So for those of us who don't deal in grams all the
17    time, there's 16 ounces in a pound, right?
18    A.   Correct.
19    Q.   So am I correct that there are 448 grams in a
20    pound?  Just to give the jury some sense of what we're
21    talking about here.
22    A.   Yes.
23    Q.   Now, a drug addict could use this amount of crack
24    cocaine in a couple of days, right?
25    A.   Correct.
```

1    Q.  Now, after this transaction that took place, this

2    drug deal that took place on January 7th, you took

3    Finley back to your office, right?

4    A.  That's correct.

5    Q.  Okay.  And as an FBI agent are you trained in proper

6    identification techniques?

7    A.  Yes.

8    Q.  That is, techniques of properly, um, determining

9    from the witness whether the witness can identify

10   somebody?

11   A.  Correct.

12   Q.  You've been trained, right?

13   A.  Yeah.

14   Q.  Okay.  And have you been taught to use a photo

15   array, that is, a selection of photographs as opposed to

16   showing somebody a single photograph in order to avoid,

17   um, making a -- being improperly suggestive to them.

18   Have you been taught that?

19   A.  Depending on the circumstances, yes.

20   Q.  You've been taught that whenever possible you should

21   use a photo array rather than a single photograph?

22   A.  Yes.

23   Q.  How many photographs did you show Kharis Finley on

24   January 7th, 2010 when you asked him to make the

25   identification?

```
 1    A.  One.
 2    Q.  The only photograph you showed him was a photograph
 3    of my client, Timothy Moynihan, right?
 4    A.  That's correct.
 5    Q.  Now, this meeting that occurred between, um, Finley
 6    and Hester, they were in that car together for roughly
 7    an hour on that date, is that a fair estimate?
 8    A.  That's correct.
 9    Q.  And we're talking about January 7th?
10    A.  Yes.
11    Q.  And everything that happened between Hester and
12    Finley in that Ford Expedition for that hour, that was
13    all recorded, right?
14    A.  Correct.
15    Q.  On videotape?  Audiotape?
16    A.  Yes.
17    Q.  The whole hour, right?
18    A.  Correct.
19    Q.  Now, what was put into evidence a few moments ago
20    under direct examination yesterday, I should say,
21    represents only a few minutes of that hour-long meeting,
22    is that right?
23    A.  That's correct.
24    Q.  Let's turn to January 11th, Agent Bencken.
25         There was another drug deal that day between
```

1   Hester and Finley, right?

2   A.   That's correct.

3   Q.   And do you know whether Finley was using marijuana

4   that day?

5   A.   I don't remember if that day, no.  I don't remember

6   him using marijuana that day, no.

7   Q.   I'm sorry?  Is it your testimony that he was not

8   using marijuana on that day?

9   A.   I don't recall it being an issue that day or that we

10  confronted him on it, no.

11  Q.   Do you know whether or not he was using marijuana

12  that day?

13  A.   No.

14  Q.   Now, this -- on that day you told us that at some

15  point Finley's Ford Expedition with Hester inside parked

16  next to the Cordovan apartments in Haverhill, right?

17  A.   Yes.

18  Q.   And did you tell us yesterday that that was at the

19  intersection of Emerson and Summer Streets?

20  A.   Yes, I did.  I don't remember the exact cross

21  street, but that was my best recollection, yes.

22            MR. SULTAN:  May I have a moment, your Honor?

23            (Pause.)

24  Q.   Let me show you a map of Haverhill, Agent Bencken.

25  (On screen.)  Do you see where -- do you see where

1    Fourth Avenue is on this map that I'm pointing to with

2    my finger?

3    A.   Yes, I do.

4    Q.   And the jury heard about Fourth Avenue yesterday?

5    A.   Yes.

6    Q.   Okay.  I'm moving the map over.

7         Do you see where Whittier Street is on this map?

8    A.   Yes.

9    Q.   And the jury heard about Whittier Street yesterday?

10   A.   Yes.

11              THE COURT:  Do you want to mark that as an

12   exhibit?

13              MR. SULTAN:  Yes, your Honor.

14              THE COURT:  Okay.  We'll make this map Exhibit

15   60.

16              (Exhibit 60, marked.)

17   Q.   Now, do you see where my finger is, Emerson and

18   Walnut Streets?

19   A.   Yes.

20   Q.   Does that refresh your recollection that, in fact,

21   the Cordovan apartments is at the intersection of

22   Emerson and Walnut Streets, does that sound right?

23   A.   That sounds right.

24   Q.   And Walnut Street goes into Bailey Boulevard?

25   A.   Correct.

1   Q.  And that's where the main police station is for the

2   City of Haverhill, just a block down from that

3   intersection?

4   A.  That's correct.

5   Q.  And that intersection, um, the intersection of

6   Walnut and Emerson Streets, that's a pretty major

7   intersection in the City of Haverhill, isn't it?

8   A.  Yes, it is.

9   Q.  Let me show you a -- an overhead photograph of that

10  intersection.  (Shows.)

11      Does that appear to be an accurate overhead

12  photograph of the intersection of Emerson and Walnut

13  Streets in Haverhill?

14  A.  Yes, it does.

15  Q.  And this building that I'm pointing at right here,

16  is that the Cordovan apartments?

17  A.  Yes.

18  Q.  Okay.  So -- and I think you told us yesterday that,

19  um, on January 11th, you and your partner, um, Doucot,

20  you were doing surveillance from the parking lot of the

21  Comcast building, right?

22  A.  That's correct.

23  Q.  And this building I'm pointing to right there,

24  that's the Comcast building, right?

25  A.  Correct.

1    Q.  And you were facing Walnut Street, the right-hand

2    corner, so you were over here somewhere where my big

3    finger is?

4    A.  Actually over to your right, over at the corner.

5    Q.  Well, I guess this would work.  Let me give you the

6    photograph and have you point.

7            THE COURT:  Well, actually if you leave it on

8    there, I think if he touches it it will make it more --

9            MR. SULTAN:  Okay.

10   Q.  Can you point to where --

11   A.  I was right there.  (Indicates.)

12   Q.  So that's where you were located?

13   A.  Yes.

14   Q.  In the -- behind the Comcast building?

15   A.  Correct.

16   Q.  Not in the lot that's right next to the street, but

17   rather where the "X" is, which is kind of right on the

18   back edge of the Comcast building?

19   A.  Correct.

20   Q.  And there's an incline.  That's up above Walnut

21   Street?

22   A.  Yes.

23   Q.  You were looking down Walnut Street, correct?

24   A.  Yes.

25   Q.  And where the -- where Finley parked his car, um,

1    was somewhere along the building on Walnut Street,

2    right?

3    A.  Correct.

4    Q.  Can you point to where, approximately, where Finley,

5    um, parked his Expedition on January 11th?

6    A.  (Indicates.)

7    Q.  Okay.

8            MR. SULTAN:  May I have this marked as the

9    next exhibit, your Honor?

10           THE COURT:  It will be marked as Exhibit 61,

11   the overhead view.

12           (Exhibit 61, marked.)

13   Q.  And Walnut Street, it's four lanes, right, two lanes

14   each way?

15   A.  Um, I think it's only two lanes.

16   Q.  Okay, about a block from the police station, which

17   is over this way?

18   A.  Correct.

19   Q.  Okay.  And do you recall that January 11th, 2010 was

20   a Monday afternoon?

21   A.  I don't remember the exact day, but I'm sure that's

22   correct, yes.

23   Q.  And so there was plenty of traffic on a weekday

24   afternoon in that part of the city, right?

25   A.  Yes.

1   Q.  And you told us yesterday that it was overcast that

2   day?

3   A.  Correct.

4           MR. SULTAN:  Your Honor, I want to show a

5   photograph that probably the jury shouldn't see yet.

6           THE COURT:  Okay.

7   Q.  I show you a photograph, um, Agent Bencken.  Does

8   that appear to be a photograph of the parking lot of the

9   Comcast building with the fence in front of it that you

10  were doing surveillance in on January 11th, 2010?

11  A.  Yes, it does.

12          MR. SULTAN:  Okay.  I'd offer this as an

13  exhibit, your Honor.

14          THE COURT:  Is there any objection?

15          MR. LEVITT:  No, your Honor.

16          THE COURT:  It is admitted as Exhibit 62.

17          (Exhibit 62, marked.)

18  Q.  (On screen.)  So you can see from this parking lot,

19  the building that's down here, and this is the Cordovan,

20  right?  (Indicates.)

21  A.  That's correct.

22  Q.  And do you see on this photograph -- the parking lot

23  that you guys are in, there's a video camera right here

24  on the side of the building, right?

25  A.  Yes.

1    Q.  Did you ever bother to subpoena the film from the

2    camera for that date?

3    A.  No, I didn't.

4              MR. SULTAN:  Your Honor, I want to show

5    another photograph that the jury probably shouldn't see

6    yet, a diagram actually.

7    Q.  Special Agent Bencken, I'm showing you a diagram.

8    Does this appear to be an accurate depiction of your

9    location, your surveillance location on January 11th and

10   the location of the, um, parking spaces on Walnut Street

11   in front of the Cordovan?

12   A.  Yes.

13             MR. SULTAN:  I'd offer this as the next

14   exhibit, your Honor.

15             MR. LEVITT:  No objection.

16             THE COURT:  It is admitted as Exhibit 63.

17             (Exhibit 63, marked.)

18   Q.  So this little car up here, that's where you guys

19   were, right?

20   A.  Correct.

21   Q.  And can you tell the members of the jury which of

22   these lettered parking spaces was Finley in when he

23   first showed up on Walnut Street on that day?

24   A.  In parking space C.

25   Q.  Okay.  So Finley was in C.  And -- and at some point

1   this Chevy Trailblazer showed up, right?

2   A.   That's correct.

3   Q.   And where was the Trailblazer?

4   A.   In parking spot E as in "Edward."

5   Q.   E.   And that's because you said -- someone else was

6   parked in D?

7   A.   That's correct.

8   Q.   Okay.  So is it your testimony that when Hester left

9   the Expedition and went into the Trailblazer, the

10  Trailblazer was in parking space E?

11  A.   Correct.

12  Q.   Okay.  And whatever observations you made you were

13  making from parking space D?

14  A.   Correct.

15  Q.   Okay.  And the observations you were making from up

16  here, um, you weren't using binoculars that day, right?

17  A.   I don't recall using them, but I had them.

18  Q.   Well, whether you had them with you or not, you

19  didn't use them that day, did you, Special Agent

20  Bencken?

21  A.   If I would have needed them, I would have used them.

22  Q.   Special Agent Bencken, did you use your binoculars

23  that day?  Yes or no.

24  A.   No.

25  Q.   Thank you.  And you couldn't see who was in the back

```
1    of the Blazer that day, could you?

2    A.  I didn't see anybody in the back, no.

3    Q.  Well, that's not my question.  Could you see who was

4    in the back?

5    A.  No --

6    Q.  Could you see in the back through the tinted

7    windows?

8              THE COURT:  Which question do you want to --

9    Q.  Could you see into the back?

10   A.  No.

11   Q.  And am I correct that on that day that Finley and

12   Hester went to the Cordovan, then they went to Bartlett

13   Street, correct?

14   A.  Correct.

15   Q.  And they were seen on Bartlett Street at 3:03, does

16   that sound right?

17   A.  Correct.

18   Q.  And then they went back to the Cordovan at 3:12?

19   A.  Correct.

20   Q.  And then they went -- they were spotted at Fourth

21   Street at 3:26, right?

22   A.  Correct.

23   Q.  And then they were spotted, 7 minutes later, back at

24   the Cordovan?

25   A.  That's correct.
```

1    Q.   They made all of those stops before the white

2    Trailblazer showed up shortly after 3:33 p.m., correct?

3    A.   That's correct.

4    Q.   Do you have a video of the transaction, the drug

5    deal, that took place on January 11th, 2010?

6    A.   No, we don't.

7    Q.   Do you recall that deal was for 575 bucks?

8    A.   Correct.

9    Q.   2 grams of crack?

10   A.   Yes.

11   Q.   Finley and Hester were in that car together for at

12   least an hour that day, right?

13   A.   Correct.

14   Q.   That was all recorded, right?

15   A.   Yes.

16   Q.   The piece the government has put into evidence is

17   only a few minutes of that, right?

18   A.   That's correct.

19   Q.   Let's turn to January 13th.  There was another sale

20   of drugs from Hester to Finley on January 13th, right?

21   A.   That's correct.

22   Q.   And on that date do you recall that Finley and

23   Hester started out to Cordovan, then they went to

24   Bartlett Street, and then they went to Fourth Street?

25   A.   Correct.

```
 1   Q.  And do you recall -- again, you're listening to
 2   what's going on inside that car, right?
 3   A.  That's correct.
 4   Q.  Do you recall that Hester directed Finley to go to a
 5   particular house on Bartlett Street?
 6   A.  I do recall that, yes.
 7   Q.  Okay.  And that was the house where Hester said
 8   someone named Shawn Do lived, correct?
 9   A.  That's correct.
10   Q.  Who is Shawn Do?
11   A.  He's an individual he identified.  I don't recall
12   his exact name, but that was his -- what they called
13   him.
14   Q.  Well, as part of your investigation you determined
15   who Shawn Do is, right?
16   A.  That's correct.
17   Q.  And you determined, did you not, that Shawn Do's
18   real name was Louis Ledesma, right?
19   A.  Yes.
20   Q.  And Louis Ledesma is the nephew of Orlando Ledesma,
21   right?
22   A.  That's correct.
23   Q.  And Orlando Ledesma was one of the targets of this
24   investigation, right?
25   A.  That's correct.
```

1    Q.  And you learned, as part of your investigation, did

2    you not, that Louis Ledesma, who lived on Bartlett

3    Street, had multiple convictions for possession of

4    cocaine, right?

5    A.  Yes.

6    Q.  And you recall this particular deal on January 13th,

7    2010 was for 650 bucks?

8    A.  Correct.

9    Q.  And, once again as with the earlier transactions,

10   Hester and Finley were in the car together for an hour

11   or more?

12   A.  Yes.

13   Q.  And it was all recorded?

14   A.  Yes.

15   Q.  And the piece the government has put into evidence

16   is just a few minutes out of that, right?

17   A.  That's correct.

18   Q.  Okay.  Finally let's turn to January 15th.

19   A.  (Turns.)

20   Q.  Now, on that day, as on the 13th, Finley and Hester

21   drove to Bartlett Street, didn't they?

22   A.  Yes.

23   Q.  And on that day Finley paid Hester $800 for drugs,

24   right?

25   A.  Correct.

1   Q.   That was the biggest of the four deals, right?

2   A.   Yes.

3   Q.   They were all under $1,000, right?

4   A.   Correct.

5   Q.   And as on the other occasions Finley and Hester were

6   in the car together, the truck together, the Ford

7   Expedition, it was for roughly an hour?

8   A.   Yes.

9   Q.   And it was all recorded?

10   A.   Yes, it was.

11   Q.   And the piece the government has put into evidence

12   is just a few minutes of that, right?

13   A.   That's correct.

14   Q.   Now, I think you told us, on direct examination,

15   that something else you did in this part of your

16   investigation was, um, to do some kind of analysis

17   regarding phone records, right?

18   A.   That's correct.

19   Q.   Okay.  And am I correct that you and your colleagues

20   examined, initially examined Hester's phone records?

21   A.   That's correct.

22   Q.   To try to see if they would provide you with some

23   clues in seeking to identify his drug source?

24   A.   That's correct.

25   Q.   And those records were run through some fancy

1    software program that created all kinds of fancy

2    reports, correct?

3    A.   That's correct.

4    Q.   And that was done by Deputy Mahoney?

5    A.   Yes, it was.

6    Q.   He did that work, right?

7    A.   That's correct.

8    Q.   Do you see Deputy Mahoney in the courtroom?

9    A.   I do.

10   Q.   Where is he?

11   A.   He's there in the corner.  (Indicates.)

12   Q.   Sitting all the way in the back row on the jury

13   side, the side of the courtroom where the jury box is?

14   A.   Yes.

15   Q.   And he's been there throughout your testimony,

16   right?

17   A.   Yes.

18   Q.   And you saw the results of his analysis, correct?

19   A.   Yes.

20   Q.   Now, when you looked at Deputy Mahoney's analysis of

21   Hester's phone records, did you notice calls to or from

22   a number of the same people on these different dates

23   when Hester sold drugs to Finley?

24   A.   To the same people?

25   Q.   Yeah.  Were there some of the same phone numbers

1   popping up on the different days?

2   A.   Yes.

3   Q.   And part of the analysis was to determine whose

4   numbers those were, right?

5   A.   Correct.

6   Q.   And did you notice, on more than one occasion, that

7   Hester called Louis Ladezma, also known as Shawn Do?

8   A.   Yes.

9   Q.   Did you notice, on more than one occasion on these

10   dates, that Hester called someone named William Pena?

11   A.   Yes.

12   Q.   Do you know who he is?

13   A.   I don't remember exactly who he is, no.

14   Q.   Do you recall that, on more than one of these dates,

15   Hester called someone named Steve Berry?

16   A.   I don't remember that exact name, but I know that he

17   called several people.

18   Q.   Well, did you look into, for example, Steve Berry's

19   background to see if he had a record for convictions for

20   distributing cocaine?  Did you look into that?

21   A.   I didn't personally, no.

22   Q.   And as part of this massive investigation, did the

23   government investigate who Hester was text-messaging

24   with on each of the dates in question?

25   A.   I don't remember the text messages, no.

1    Q.   You don't remember if that was done?

2    A.   I don't recall that, no.

3    Q.   You've never seen any analysis of Hester's text-

4    messages, have you?

5    A.   I might have, but it's been over a year, so I don't

6    remember exactly what the phone records indicated and

7    what the specific numbers were and who he specifically

8    called.  I don't remember the exact --

9    Q.   I'm not asking you that, Agent Bencken.  I'm asking

10   you whether anyone ever bothered to look at who Hester

11   was exchanging text-messages with on these dates.

12   A.   I don't know.

13           MR. SULTAN:  Thank you, sir.

14        That's all I have, your Honor.

15           THE COURT:  Is there any redirect?

16           MR. LEVITT:  Yes, your Honor.

17

18   REDIRECT EXAMINATION BY MR. LEVITT:

19   Q.   Special Agent Bencken, um, Mr. Sultan asked you on

20   each of these buys whether the tapes that were put in

21   were the full tapes from the case or not.  Do you

22   remember that?

23   A.   I do.

24   Q.   And you said they were excerpts?

25   A.   Yes.

1    Q.   Do you remember me showing you some additional tapes

2    that were marked for identification at the end of your

3    testimony, four tapes of, um, buys in this case.  Do you

4    remember me showing you those?

5    A.   Yes, I do.

6    Q.   And do you remember whether those are the full tapes

7    of the buys in this case?

8    A.   Those are, yes.

9    Q.   And do you know if, in the normal course of how

10   things are done in discovery, those are sent earlier on

11   to the defense, the tapes?

12   A.   Yes.

13   Q.   Um, Mr. Sultan asked you -- I think he asked you

14   questions for about an hour and a half on Mr. Finley.

15   Do you recall that?

16   A.   Yes, I do.

17   Q.   And, um, you said, in terms of opening and closing

18   Mr. Finley, um, that essentially the FBI made that

19   call.  Do you recall that?

20   A.   Yes.

21   Q.   But isn't it correct that when you open a

22   cooperating witness, you need to get concurrence from

23   the U.S. Attorney's office?

24   A.   Yes, that's correct.

25   Q.   And that in the file of records that has been

1    produced to the defense, there are those letters?

2    A.   That's correct.

3    Q.   Indicating that the FBI talked to an Assistant U.S.

4    Attorney and they concurred in that, the opening and

5    closing?

6    A.   Yes.

7    Q.   And, in fact, the same thing happens with payments?

8    A.   That's correct.

9    Q.   You can't even pay a cooperating witness unless you

10   have a conversation with an Assistant U.S. Attorney,

11   right?

12   A.   That's correct.

13   Q.   And there was also some talk about whether somebody

14   is open and nonactive and/or closed and nonactive.  Do

15   you remember that?

16   A.   Yes, I do.

17   Q.   And, um, is there other times when a cooperating

18   witness is open and not doing anything?

19   A.   Yes, there are.

20   Q.   And was that the case with Mr. Finley?

21   A.   Yes.

22   Q.   After the pitchfork case came down?

23   A.   Yes.

24   Q.   And, um, there was also testimony about a large

25   payment, a $14,000 payment, that went to him.  Do you

1   remember that?

2   A.   Yes.

3   Q.   Do you recall if that was for moving expenses at the

4   close of the case?

5   A.   Yes, it was.

6   Q.   And that's what you do when a case is over, you've

7   got to move the guy?

8   A.   Yes.

9   Q.   So you give him a big lump sum as reimbursement for

10  getting moved?

11  A.   Yes.

12  Q.   And that's one of the things that you tell them at

13  the beginning of the case, that at the conclusion you

14  will help him and his family move for his own safety,

15  correct?

16  A.   That's correct.

17  Q.   And you always do that in these cases, correct?

18  A.   That's correct.

19  Q.   And when you open up a cooperating witness, you look

20  at the criminal record?

21  A.   Yes.

22  Q.   And did you do that in this case?

23  A.   Yes, I did.

24  Q.   And if that, um, charge that Mr. Sultan's talked

25  about, the indecent A&B, is on the criminal record, you

1    see that?

2    A.   Yes.

3    Q.   Do you recall right now if it was on it or not?

4    A.   No, I don't.

5              MR. LEVITT:  May I approach, your Honor --

6              THE COURT:  Yes.

7              MR. LEVITT:  -- the witness, your Honor?

8    Q.   I'm going to show you a document --

9              THE COURT:  Well, actually maybe you ought to

10   put it up on the monitor without the jurors.

11              (On monitor.)

12   Q.   So I'll show you the first page, just ask you to

13   take a look at it, and then I'll show you -- see if that

14   refreshes your recollection.

15   A.   Yes.

16   Q.   And, um, that refreshed your recollection that that

17   was on his criminal record?

18   A.   Yes.

19   Q.   Is that something you look at?

20   A.   Yes.

21   Q.   Is that something that you typically discussed with

22   the AUSA at the time?

23   A.   Yes.

24   Q.   You were asked some questions about tinted windows.

25   Do you recall that?

1    A.   Yes, I do.

2    Q.   Let's just be clear.  The tint on the windows, in

3    all the cars we're talking about here, was the front

4    windshield tinted?

5    A.   No, it was not.

6    Q.   Were the front driver's side and passenger's side

7    tinted?

8    A.   No, they were not.

9    Q.   So we're talking about the back windows and the back

10   passenger and back driver's side windows, correct?

11   A.   Correct.

12   Q.   Those are tinted, is that correct?

13   A.   Yes.

14   Q.   And the back window of the vehicle itself?

15   A.   Yes.

16   Q.   And is this factory tint?  Do you know what that is?

17   A.   Yes.

18   Q.   That's kind of like the standard tint that comes

19   with a car?

20   A.   Yes.

21   Q.   Okay, nothing special, no extra thing that you do to

22   make it super secret?

23   A.   No.

24   Q.   Okay.  And the -- there were questions about whether

25   you saw -- I think Mr. Sultan phrased it, that you

1    didn't see who was in the back seat.  Do you remember
2    those questions?
3    A.  Yes.
4    Q.  About the Chevy Trailblazer?
5    A.  Yes.
6    Q.  There were occasions, were there not, when you saw
7    Mr. Moynihan through his front windshield, correct?
8    A.  That's correct.
9    Q.  July 7th, you saw that, correct?
10   A.  January 7th.
11   Q.  I'm sorry.  January 7th, correct?
12   A.  Correct.
13   Q.  January 13th?
14   A.  Yes.
15   Q.  And then January 15th?
16   A.  Yes.
17   Q.  January 11th, you had the side view?
18   A.  Yes.
19   Q.  When you were looking through the front windshield
20   of the Chevy Trailblazer on January 7th, January 13th,
21   January 15th, did you see anybody in the back seat?
22   A.  No, I did not.
23   Q.  Could you see into the back seat area?
24   A.  Yes.
25   Q.  You were also asked a question, um, about -- I

1   thought the question was on the January -- on the

2   January 11th buy, um, whether you had -- do you recall

3   the question whether you had a video of the January 11th

4   buy?

5   A.  Yes.

6   Q.  And you said "No"?

7   A.  Yes.

8   Q.  And what were you referring to when you said that?

9   A.  The equipment malfunctioned on that day so we only

10  had audio, we didn't have video recording.

11  Q.  And let me show you what's been marked as Government

12  Exhibit 18.

13          MR. LEVITT:  Your Honor, this is one of the

14  transcripts.

15          THE COURT:  Are you going to play the tape?

16          MR. LEVITT:  I was not.  I was just going to

17  show him something on the transcript.

18          THE COURT:  For what purpose?

19          MR. LEVITT:  About this January 11th buy.

20          THE COURT:  Are you asking that the transcript

21  be admitted?

22          MR. LEVITT:  Let me ask the question first,

23  your Honor.  It might avoid this issue at this point.

24          THE COURT:  Okay.

25  Q.  Were you listening to the transmitter on January

1    11th?

2    A.   Yes.

3    Q.   You're in your car with Special Agent Doucot

4    listening to the transmitter, correct?

5    A.   Correct.

6    Q.   And do you recall that when -- after Mr. -- after

7    Mr. Moynihan showed up in the white Chevy Trailblazer

8    and parked behind Finley and Hester, do you recall

9    hearing Mr. Hester get out of Mr. Finley's car?

10   A.   I do.

11   Q.   And you saw it happen, too?

12   A.   Yes.

13   Q.   And he went into the car with Mr. Moynihan, correct?

14   A.   That's correct.

15   Q.   And that's when you saw them engaging in some kind

16   of bodily movement together, moving towards each other?

17   A.   That's correct.

18   Q.   And when Mr. Hester was out of the car you remember

19   the CW, Mr. Finley, calling out some stuff on the

20   transmitter?

21   A.   Yes.

22   Q.   And do you recall that he, um, called out something

23   to the effect of "They left" um, "in a white", "white

24   truck", "the same white truck."  Do you recall that?

25   A.   Yes, I do.

1    Q.   And that's when they made the block that you

2    testified about?

3    A.   Yes.

4    Q.   When you saw them and they pulled up kind of right

5    in front of you?

6    A.   Yes.

7    Q.   And then Finley called out "383HA8."  Do you recall

8    that?

9    A.   Yes.

10   Q.   And what's that?

11   A.   It's a Massachusetts license plate for Timothy

12   Moynihan's vehicle.

13   Q.   And he says, "Taking a right, got some 18-inch

14   chrome rims on it."  Do you recall that?

15   A.   Yes.

16   Q.   And then do you recall seeing Moynihan pull back in

17   behind Mr. Finley's car?

18   A.   I do.

19   Q.   And this was -- now he's in position D?

20   A.   Correct.

21   Q.   And did you see, um, Hester get out of the car at

22   that point?

23   A.   I did.

24   Q.   And you hear him get back into the CW's car?

25   A.   Correct.

1   Q.  And when he got back into the CW's car, did you hear

2   Mr. Hester say, "Yeah, this is that thick shit, nigga,

3   God damn," says the CW.  Do you remember that?

4   A.  Yes.

5   Q.  And based on your training and experience did you

6   have an understanding as to what he was referring to?

7               MR. SULTAN:  Objection.

8               THE COURT:  To the opinion evidence?

9               MR. SULTAN:  Yes, sir.

10              THE COURT:  Sustained.

11  Q.  And after that is when Moynihan left, the CW left

12  with Hester, dropped off Hester, met with you guys and

13  handed you the crack and coke?

14  A.  That's correct.

15  Q.  You also, um -- defense counsel also asked you some

16  questions about the January 13th buy.  Do you recall

17  that?

18  A.  Yes.

19  Q.  And about Shawn Do?

20  A.  Yes.

21  Q.  And do you recall that -- were you listening to the

22  transmitter that day?

23  A.  Yes.

24  Q.  Do you recall that when Mr. Finley picked up

25  Mr. Hester, the first thing Mr. Hester said is, "What's

1   up, man?  Let's go get some weed, man"?

2   A.  Yes.

3   Q.  And then do you recall Mr. Hester, on the phone,

4   saying, "Yo, where you at?  I need a dime."

5   A.  Yes, I remember that.

6   Q.  Do you know what a dime bag of weed is?

7   A.  Yes.

8   Q.  And then do you recall later on, again, Mr. Hester

9   on the phone saying, "Where you at?  All right.  I'm

10  coming through.  I need some weed"?

11  A.  Yes.

12  Q.  And this is important to you guys because you want

13  to know where they are calling from and what they are

14  doing?

15  A.  Correct.

16  Q.  So you're listening carefully at that point?

17  A.  Yes.

18  Q.  And then do you remember the CW saying, "Where,

19  where are you going, Shawn Do's or --"  And Hester says,

20  "Yeah, yeah, just the same way you go to my mom's

21  house," right?

22  A.  Yes.

23  Q.  And that was just after he said, "I'm coming

24  through, I need some weed," right?

25  A.  Correct.

1    Q.  And then again when -- after Finley and Hester show

2    up at that house, um -- was it on Bartlett Street?  I

3    can't remember.

4    A.  Yes.

5    Q.  Um, do you remember hearing Hester get out of the

6    car?

7    A.  Yes.

8    Q.  And the CW, again, um, talks to the agents.  He says

9    -- do you remember him saying, "A green and white house,

10   Shawn Do's house"?

11   A.  Yes.

12   Q.  Just to let you know what's going on?

13   A.  Yes.

14   Q.  Um, do you remember hearing Hester get back in the

15   car with the CW?

16   A.  I do.

17   Q.  And do you remember right away the CW saying,

18   "You've got the bud?"  And Hester says, "Oh, yeah, I've

19   got the bud"?

20   A.  Yes.

21   Q.  Um, and this is the day, you testified earlier, that

22   later on Hester sold some weed to a guy on the street?

23   A.  Yes.

24   Q.  And do you recall, um -- after that do you recall

25   him saying to Finley, "Yo, let's go get more weed so we

1    can smoke.  I did my good deed for the day.  I sold that

2    nigga a dime for 8 bucks"?

3    A.  I do remember that.

4    Q.  And then do you remember hearing him on the phone

5    saying "Yo, I'm coming to get another one.  All right"?

6    A.  Yes.

7    Q.  And this is the day, do you recall, um, having a

8    conversation with, um, Finley about the fact that he

9    smoked?

10   A.  Yes.

11   Q.  And, do you remember, didn't you say that he smelled

12   like it and you confronted him?

13   A.  Yes.

14   Q.  (Pause.)  You were asked by defense counsel whether

15   you thought Mr. Finley was trustworthy.  Do you remember

16   that?

17   A.  Yes, I do.

18   Q.  And you said "Yes."  Have you ever heard Ronald

19   Reagan's statement "Trust, but verify"?

20              MR. SULTAN:  Objection.

21              THE COURT:  Sustained.  Go ahead.

22   Q.  Why do you employ -- you testified about all the

23   procedures you used in this case.  Do you recall that?

24   A.  I do.

25   Q.  You meet with the CW.  You search him.  You search

1   the vehicle.  You give him audio and video recording

2   equipment.  You set up surveillance at the location

3   where the buy is going to happen.  You surveil him to

4   the location where the buy is going to happen.  You, um,

5   have a transmitter so you can listen live to what's

6   going on.  After the buy you surveil, you surveil the

7   buy, you surveil him to the meeting location, you search

8   him --

9              MR. SULTAN:  I object to this question, your

10   Honor, it's just a little too long for me to follow.

11             THE COURT:  Overruled.  Go ahead.

12   Q.  You follow him to the meeting location, you search

13   him, um, you get the drugs, you get the recording

14   equipment.  Do you recall all of that?

15   A.  Yes, I do.

16   Q.  Do you recall testifying about, after the buy, the

17   subpoenaed phone records -- you had Mike Mahoney

18   subpoena phone records, correct?

19   A.  Correct.

20   Q.  You have the Merchants' Auto documents, correct?

21   A.  Correct.

22   Q.  You asked Mike Mahoney to do an analysis of the

23   phone records?

24   A.  Yes.

25   Q.  Why do you do all of that?

1   A.   To corroborate the information that we were given by

2   Mr. Finley.

3   Q.   (Pause.)  The photo of the distances you were shown,

4   the defense exhibit from January 11th.  Do you recall

5   that?

6   A.   Yes.

7   Q.   You had seen that photo before with those distances?

8   A.   Yes, I have.

9   Q.   You saw that, what, about a week ago?

10  A.   Yes.

11  Q.   Um, you were asked questions about whether you'd

12  seen Deputy Sheriff Doucot in the last couple of days?

13  A.   Yes.

14  Q.   And whether you had seen Kharis Finley in the last

15  couple of days?

16  A.   Yes.

17  Q.   Do you recall that?

18  A.   Yes.

19  Q.   Did you talk to him about your testimony?

20  A.   No.

21  Q.   Did you talk to him about the case at all?

22  A.   No, not at all

23  Q.   In fact, there's a sequestration order in this case,

24  right?

25  A.   That's correct.

1    Q.   You're not allowed to do that?

2    A.   No, I'm not.

3    Q.   Did you violate that court order?

4    A.   No, I did not.

5    Q.   Um, Special Agent Bencken, on January -- um, you

6    heard some conversations about, um, that you were asked

7    questions about the January 6th buy.  Do you recall

8    that?

9    A.   Yes.

10   Q.   And your testimony on direct was that that didn't

11   involve Moynihan, right?

12   A.   No, it did not.

13   Q.   And was he charged in that buy?

14   A.   No, he was not.

15   Q.   And there was another buy, correct, at the end of

16   January, is that right, from Mr. Hester?

17   A.   Yes.

18   Q.   And that one didn't involve Mr. Moynihan either?

19   A.   That's correct.

20   Q.   Um --

21            MR. LEVITT:  Your Honor, may I approach for a

22   moment?

23            THE COURT:  Yes.

24

25            AT THE SIDEBAR

1            MR. LEVITT:  I don't know if I'm being overly

2    cautious, but I'm going to do it anyway.  I was going to

3    ask him, "But there was another buy from Mr. Moynihan?

4    What's the second buy?"

5            MR. SULTAN:  Your Honor, I don't think I'm on

6    notice that they're going to put that in.  I think it

7    sounds like some kind of a 404 --

8            THE COURT:  Yeah, I don't know what you're

9    talking about.

10           MR. LEVITT:  There was a buy on March 2nd,

11   2010 involving Mr. Moynihan and I think he opened the

12   door, because he talked about the January 6th buy, and

13   he said Mr. Moynihan wasn't there, so --

14           THE COURT:  So why isn't that 404B evidence of

15   which the pretrial order requires you to give notice?

16           MR. LEVITT:  Well, two things.  One, I think I

17   did give notice of it.  I have to take a look at my

18   disclosure letter on that, but I think I did.  But I'd

19   have to check it to confirm that.  And, two, because he

20   offered it in cross, it's not coming in in his case in

21   chief, it's coming in on redirect.

22           MR. SULTAN:  Your Honor, what happened in

23   March I don't think has much bearing on what happened in

24   January.  Number 1.  But, Number 2, if they want to put

25   in evidence of the March transaction, that's another

1    thing, but to have this witness testifying in a

2    conclusory manner about it, I think is completely

3    unfair.  And on redirect I didn't bring up March.  It's

4    totally unfair.

5              MR. LEVITT:  He brought up January.

6              THE COURT:  What's he going to testify, that

7    he was there on surveillance?

8              MR. LEVITT:  That he saw --

9              THE COURT:  At this point I'm going to exclude

10   it under Rule 403.

11             MR. LEVITT:  Okay.

12             THE COURT:  No, let me finish explaining.

13        I assume you gave notice of it, so Mr. Sultan's,

14   at least, familiar with it and, you know, it could have

15   some probative value if they were dealing drugs together

16   in March because, perhaps, identification is a proper

17   404B purpose.  However, I thought we were coming to the

18   end of this witness.  We're going to put in a whole new

19   transaction and cross-examination of that transaction?

20   I think that given all the other, I would say, effective

21   or all the other ammunition you have that you've already

22   employed, that the marginal relevance, the marginal

23   probative value of yet another transaction would be

24   substantially outweighed by undue delay, waste of time,

25   and, in my view, and I don't know if it's cumulative,

```
 1    but those considerations.
 2              MR. LEVITT:  Yes, your Honor.  Thank you.
 3
 4              (In open court.)
 5    Q.  Special Agent Bencken, were you listening to the
 6    transmitter on January 7th, 2010, January 11th, 2010,
 7    January 13th, 2010, and January 15th, 2010?
 8    A.  Yes, I was.
 9    Q.  Did a crack sale, a cocaine sale, ever occur on
10    those dates before Mr. Moynihan showed up in the white
11    Chevy Trailblazer?
12    A.  I'm sorry.  Could you repeat the question?
13    Q.  On January 7th, 2010, was there a crack deal, a
14    crack sale before Mr. Moynihan showed up in the white
15    Chevy Trailblazer?
16              MR. SULTAN:  I object, your Honor.  He can
17    only talk to what's on the videotapes.  He doesn't know
18    what else happened.
19              MR. LEVITT:  But he was listening to the
20    transmitter.
21              THE COURT:  Well, essentially, I think this
22    question asks him for his opinion about what those
23    events constituted, so I'm going to sustain the
24    objection.
25    Q.  Did you watch the video for the January 7th deal?
```

1  A.  Yes, I did.

2  Q.  And did you listen to the tape?

3  A.  Yes.

4  Q.  And did you see or hear a crack deal between

5  Mr. Hester and Mr. Finley --

6           MR. SULTAN:  I object, your Honor.  The tapes

7  speak for themselves.  They are in evidence.  The jury

8  can decide what they mean.

9           THE COURT:  Sustained.

10           MR. LEVITT:  May I just have a minute, your

11  Honor?

12           THE COURT:  Yes.

13           (Pause.)

14  Q.  You were also asked some questions about the phone

15  records in this case?

16  A.  Yes.

17  Q.  Is it fair to say you delegated that job to Mike

18  Mahoney?

19  A.  Yes.

20  Q.  He's the intelligence analyst?

21  A.  Yes.

22  Q.  Thank you.

23           MR. LEVITT:  Nothing else.

24           THE COURT:  Is there recross?

25           MR. SULTAN:  Very briefly, your Honor.

1

2      RECROSS-EXAMINATION BY MR. SULTAN:

3      Q.  Let me ask you a few questions about vehicle

4      tinting, Special Agent Bencken.

5           Now, the tinting on all three of these vehicles

6      was something called "privacy tinting," correct?

7      A.  That's correct.

8      Q.  It's not just a little shading that maybe every

9      vehicle has from the factory, right?

10     A.  Correct.

11     Q.  It's dark privacy tinting, that's what it's called,

12     "privacy tinting," right?

13     A.  Yes.

14     Q.  Okay.  And so, for example, on January 11th, when

15     you're looking down at the Blazer, am I correct that you

16     cannot see into the back seat because of the tinting?

17     A.  That's correct.

18               MR. SULTAN:  Thank you, sir.

19               THE COURT:  Okay.  Thank you.  Your testimony

20     is complete.

21          Who is the next government witness going to be?

22               MR. LEVITT:  Your Honor, I was going to take

23     the DEA chemist out of order because she flew in from

24     New York.

25               THE COURT:  About how long do you think she'll

1  be?

2        MR. LEVITT:  10 minutes.  15 minutes.

3        THE COURT:  All right.  Why don't you call the

4  witness.  Perhaps we'll get through the direct at least

5  before the break.

6        MR. LEVITT:  The government calls Mandy

7  McGehee.

8        (MANDY McGEHEE, sworn.)

9

10       * * * * * * * * * * * * *

11       MANDY McGEHEE

12       * * * * * * * * * * * * *

13

14  DIRECT EXAMINATION BY MR. LEVITT:

15  Q.  Would you please state your name and spell your last

16  name for the record.

17  A.  Mandy McGehee.  Last name is spelled M-C-G-E-H-E-E.

18  Q.  How are you employed?

19  A.  I'm a forensic chemist for the Drug Enforcement

20  Administration.

21  Q.  How long have you been a forensic chemist for the

22  DEA?

23  A.  I've worked there since 2006.

24  Q.  And do you have any other, um, pertinent experience?

25  A.  I was hired as an intern actually for the DEA.  I

1    worked there for one year.  Before that I worked at
2    Laboratory Techs at Pace University and at Millsaps
3    College.
4    Q.  And how long approximately did you do that?
5    A.  Throughout undergrad, so approximately three years
6    at Millsaps College and about a year and a half at Pace
7    University.
8    Q.  And, um, could you describe your educational
9    background.
10   A.  Yes, sir.  I have a bachelor of science in biology
11   from Millsaps College and I have a master's of forensic
12   science from Pace University.
13   Q.  And do you do any sort of professional training or
14   teaching that's pertinent to your testimony?
15   A.  I also teach forensic science at John Jay College of
16   Criminal Justice in New York.
17   Q.  And you do some sort of ongoing training at -- for
18   the DEA?
19   A.  Yes, they require us to do certain training inside
20   the lab as well as out.
21   Q.  And, um, what do you do as a forensic chemist?
22   A.  The primary responsibilities as a forensic chemist
23   are to analyze evidence for the presence or absence of
24   controlled substances.  I then write reports of my
25   findings and I testify in court when needed.  I also

1    assist agents as needed.

2    Q.  Can you give us an approximation on how many drug

3    exhibits you've examined over the years?

4    A.  Hundreds.

5    Q.  And what percentage of your cases are cocaine or its

6    derivative, cocaine base?

7    A.  Um, approximately 90 percent of the exhibits we get

8    in our lab are cocaine.

9            MR. LEVITT:  I think this would be easier,

10   your Honor, if I approached on the exhibits.

11           THE COURT:  Okay.

12   Q.  Let me show you what's been marked as, um,

13   Government Exhibit 1 and then I'll show you also

14   Government Exhibit 2 and ask if you recognize those

15   exhibits?

16   A.  Yes, sir, this Government Exhibit 1 is evidence that

17   I've analyzed.  And Exhibit 2 is the report that

18   correlates with the evidence.

19   Q.  Okay.  And how do you know that that's evidence that

20   you examined?

21   A.  Um, I have signed the seal at the bottom of the

22   evidence, which I do when I finished with the analysis,

23   as well as the inner seals, I have my initials with my

24   signature.

25   Q.  And how do you correlate the one exhibit to the

1    second exhibit, Exhibit 1 to Exhibit 2?

2    A.   The case numbers and the laboratory number are on

3    the bag of evidence as well as on the report.

4    Q.   Okay.  And are those identical in this case?

5    A.   Yes, sir.

6    Q.   The, um -- or I should say they're identical,

7    they're two different numbers, but they both appear on

8    the same two exhibits?

9    A.   Yes, they do.

10   Q.   And, um, could you tell us what your conclusion --

11   could you tell us first the date of the -- um, with

12   respect to, um, Exhibit 2, you can take a look at it,

13   (Hands it over.) um, could you tell us what the first

14   page is and what the second page is?

15   A.   The first page is actually my report, the typed

16   report and the, um -- the second page is what we call

17   the DEA-7, which is the form that's submitted with the

18   evidence.

19   Q.   Okay.  So --

20            MR. LEVITT:  And this I would like to show the

21   jury, your Honor.  These are admitted.

22            (On the screen.)

23   Q.   So the first page of Government Exhibit 2, you said,

24   is your report?

25   A.   Yes, sir.

1    Q.   And is that your signature down at the bottom?

2    A.   Yes, it is.

3    Q.   And then who is Thomas Blackwell?

4    A.   Thomas Blackwell is our laboratory director.

5    Q.   Why does he sign it as well?

6    A.   It's a process of checking.  So once I finish the

7    analysis, I actually have a supervisor who then goes

8    over all the data and makes sure everything is okay.

9    And then it's checked once again by the laboratory

10   director.  So we have multiple checks.

11   Q.   And to be clear, there's a bunch of backup data

12   that's generated for each once of these exhibits, is

13   that correct?

14   A.   Yes, sir, that's correct.

15   Q.   And you produced that all to the U.S. Attorney's

16   office?

17   A.   Yes, sir.

18   Q.   And so then the second page is what?

19   A.   This is the DEA-7.  It's a form that's submitted to

20   the lab with the evidence, whenever the evidence is

21   dropped off.

22   Q.   So this is whatever agency does the investigation,

23   they do this form and give it to you?

24   A.   Right.

25   Q.   And this form indicates this is for the buy that

1    took place on January 7th, 2010 in Haverhill?

2    A.   Yes, sir.

3    Q.   So is it, um, correct that your conclusion with

4    respect to Exhibit 2, the crack that's in the -- the

5    cocaine base that's in front of you, is in this area

6    here?

7    A.   Yes, sir.

8    Q.   And what was your conclusion?

9    A.   Um, Exhibit Number 1 contained cocaine base.

10   Q.   And is it correct that your conclusion as to, um --

11   is it correct -- is there two sort of phases for what

12   you do in terms of your analysis?

13   A.   Um --

14   Q.   Well, let me try to be more clear.

15        Is there a qualitative aspect and a quantitative

16   aspect?

17   A.   Yes, there is.

18   Q.   And could you describe what those are?

19   A.   Sure.   Qualitative just says what is the substance

20   and then quantitative is the purity or how much of the

21   substance is actually there -- how much of the

22   controlled substance is actually there.

23   Q.   And you also weigh it?

24   A.   Yes.

25   Q.   Is that part of what you mean?

A.   Yes.   The net weight is the weight of just the drug

minus any packaging that's submitted with the evidence.

Q.   And is it correct that that's the column that I'm

pointing to that says "Net Weight"?

A.   Yes, sir.

Q.   What was you conclusion to the net weight of Exhibit

1?

A.   The net weight for Exhibit 1 was 6.7 grams.

Q.   And then it asks you to, if you could, um, pull

towards you Government Exhibit 3.   Do you see that?

A.   Yes, sir.

Q.   And, um, can you describe what that is?   Have you

seen that before?

A.   Yes, I have.

Q.   What is it?

A.   This is also evidence that I've analyzed.

Q.   And you know that for the same reasons as Exhibit 1?

A.   Yes, it's the signatures and the initials.

Q.   And then let me show you Exhibit 4.   Do you see that

--

A.   Yes.

Q.   -- on the screen?

A.   Yes.

Q.   And, um, can you tell us, um, whether that

correlates with Government Exhibit 3?

1    A.  Yes, this is the written report for the drug

2    evidence that's Exhibit 3.

3    Q.  And again how do you know that?

4    A.  The lab number and the case number is the same.

5    Q.  The case number stays the same, isn't that correct?

6    A.  Yes, sir.

7    Q.  The lab number changes?

8    A.  The lab number and the exhibit number are specific

9    for each piece of evidence.

10   Q.  So you're looking at the lab number and comparing it

11   to the actual drugs that you have in your hand?

12   A.  Right.

13   Q.  And, um, this is the report that was sent to you?

14   A.  Yes, sir.

15   Q.  It indicates it's for evidence purchased on January

16   11th, 2010 in Haverhill?

17   A.  Right.

18   Q.  And then your conclusion as to the drug contained in

19   this exhibit?

20   A.  Exhibit 3 contained cocaine base at a weight of 6.7

21   grams.

22   Q.  And I'd asked you to, um, look at what's been marked

23   as Exhibit 8 -- I'm sorry.  Exhibit 7.

24   A.  (Turns.)

25   Q.  My mistake.  Exhibit 5.

1    A.   (Turns.)  Okay.

2    Q.   And, um, what's that?

3    A.   This is also evidence that I've analyzed.

4    Q.   You know that by the signatures again?

5    A.   Yes, sir.

6    Q.   And then let me show you government Exhibit 6.  Can

7    you tell if that correlates with Government Exhibit 5 or

8    Exhibit 5?

9    A.   Yes, that's the type of form for this piece of

10   evidence.

11   Q.   Again by the lab number?

12   A.   That's correct.

13   Q.   Um, and it indicates this is also on January 11th,

14   2010?

15   A.   Yes.

16   Q.   In Haverhill?

17   A.   Yes.

18   Q.   Um, and what was your conclusion with respect to

19   Exhibit 5?

20   A.   This exhibit contains cocaine hydrochloride at a net

21   weight of 6.8 grams.

22   Q.   That's basically cocaine?  That's the formal name

23   for cocaine?

24   A.   It's cocaine with a hydrochloride module, so it's

25   the soft form of cocaine.

1   Q.  Um, and there's a number here -- on all of these net

2   weights there's a number in parentheses under -- you

3   said it was 6.8 grams and there's a number under it.

4   I'll just read it.  Plus/minus .0007g.  What does that

5   mean?

6   A.  Um, any time we take a measurement or a weight,

7   there is an uncertainty associated with measurements,

8   and that is, um, that based on the scale we used to take

9   the weight, that was the uncertainty associated with

10  that specific balance.

11  Q.  So it's kind of like a margin for error?

12  A.  Yes.

13  Q.  On that weight?

14  A.  Yes.

15  Q.  And in that case it's .0007?

16  A.  Yes.

17  Q.  And is it fair to say that you -- did you use the

18  same scale, I'll call it, for weighing all of the these

19  exhibits?

20  A.  I believe so.  That would be in my data.  I have to

21  say which scale I used.  But I'm pretty positive it was.

22  Q.  Let me just then show you Exhibit 2.

23       The same margin for error there, .007?

24  A.  .0007.  Yes, sir.

25  Q.  And then, um, for 4 as well?

1    A.   Right.

2    Q.   And now I'd ask you to look at, um, Exhibit 7, I

3    believe it is.  Do you recognize that?

4    A.   Yes, sir.

5    Q.   And what's that?

6    A.   This is also evidence that I analyzed.

7    Q.   And then I'll show you Government Exhibit 8.  Can

8    you see if that correlates with the exhibit that you're

9    looking at right now?

10   A.   Yes, sir, that's the written report for this piece

11   of evidence.

12   Q.   The same lab number?

13   A.   Yes.

14   Q.   And what was your conclusion -- your qualitative

15   conclusion?

16   A.   Qualitatively this is cocaine base at a weight of

17   13.7 grams.

18   Q.   And with that same .0007 grams margin for error on

19   the weight?

20   A.   Yes.  Correct.

21   Q.   And then finally if you would look at Exhibit 9.

22   And, I guess, just before I do that, for

23   Government Exhibit 8, which was the DEA form for, um,

24   for the exhibit that you just looked at, that indicates

25   it was purchased in Haverhill on January 13th, 2010?

1    A.   Yes, sir.

2    Q.   Okay.  Now, on Exhibit 9, do you recognize that?

3    A.   Yes, sir, this is evidence that I analyzed.

4    Q.   Again by the signatures and the sealing?

5    A.   Correct.

6    Q.   And Government Exhibit 10, do you recognize that?

7    A.   That's the written report for this piece of

8    evidence.

9    Q.   The same lab number?

10   A.   Yes.

11   Q.   And your conclusions?

12   A.   Cocaine base with the weight of 13.3 grams.

13   Q.   And the margin for error on the weight?

14   A.   0.0007 grams.

15           MR. LEVITT:  Thank you, Ms. McGehee.

16           THE COURT:  Okay.  Is there cross-examination?

17           MR. SULTAN:  Yes, your Honor.

18           THE COURT:  Okay.

19

20   CROSS-EXAMINATION BY MR. SULTAN:

21   Q.   Good morning, Miss McGehee.

22   A.   Good morning.

23   Q.   Do you still have those exhibits there in front of

24   you?

25   A.   Yes, sir.

1    Q.   Let me show you again, start with Exhibit 2.

2    A.   (Turns.)

3    Q.   Am I correct that Exhibit 2, this relates to

4    evidence, your analysis of evidence which you were told

5    was purchased in Haverhill, Massachusetts on January

6    7th, 2010, right?

7    A.   Um, I believe so.  That would be on the next sheet.

8    Q.   Okay.  This being the next sheet.  But it's part of

9    the same exhibit, right?

10   A.   Yes, it's part of the same exhibit.

11   Q.   Am I right, it's January 7th, 2010, that's what you

12   were told?

13   A.   Yes, sir.

14   Q.   Okay.  Go back to Page 1.

15        Now, do you see this column right here where it

16   says "Amount of Actual Drug," right?

17   A.   Yes, sir.

18   Q.   And does that column represent the actual amount of

19   cocaine base contained in this exhibit?

20   A.   Yes, that's correct.

21   Q.   Okay.  And what was the actual amount of cocaine

22   base contained in Exhibit 1?

23   A.   Um, of pure cocaine base, it would be 4.2 grams.

24   Q.   Okay.  So the amount of the actual cocaine base

25   contained in this exhibit was 4.2 grams, right?

1    A.   Yes.

2    Q.   Okay.   Turning to Exhibit 4.

3              MR. LEVITT:  Your Honor, if the defense is

4    going to go through each exhibit and show the amount of

5    actual drug, I'm going to object on relevancy grounds.

6              THE COURT:  Well, I'll see counsel at

7    sidebar.  In fact, you know what I'm going to do?  It's

8    11:00.  We'll take the morning break for the jurors.

9    We'll come back at 11:20.  I'll talk to the lawyers

10   about this matter.  The Court is in recess.

11             (Jury leaves, 11:00 a.m.)

12             THE COURT:  And you're excused until 12:20.

13   Thank you.

14             MR. LEVITT:  11:20, I believe, your Honor.

15             THE COURT:  11:20.  Excuse me.  Just one

16   second.

17             (Witness leaves courtroom.)

18             THE COURT:  Okay.  Why don't you go ahead.

19             MR. LEVITT:  Well, your Honor, I mean, the law

20   says that the operative weight in determining drug

21   weight is the net weight.  I mean, the Supreme Court has

22   been saying that, the First Circuit has been saying

23   that.

24             THE COURT:  In which cases?

25             MR. LEVITT:  I don't have them off the top of

1   my head, your Honor.  But, I mean, it's so well-

2   established that I didn't even think it was an issue.

3   I've been doing drug cases for 10 years.

4        So, I mean, I could certainly provide you with

5   cases, your Honor, but when -- um, I mean, we calculate

6   drug weight all the time in this courthouse and it's

7   always based on the net weight.  And, um, that's why

8   it's a -- the charge, even if it's a mixture or a

9   substance containing a detectable amount of -- because

10  it's always mixed.  Um, so the operative basis is always

11  the net weight.

12       So all this is is, you know, something to confuse

13  the jury and there's -- it should be excluded.  It's

14  irrelevant and it's --

15            THE COURT:  Mr. Sultan.

16            MR. SULTAN:  Well, your Honor, I resent the

17  suggestion I'm trying to confuse the jury.

18       Number 1, um, it's part of her analysis and I

19  think I have every right to ask her about her analysis

20  and what's on her report.

21       Number 2, while I think it is true that the law at

22  present is that, um, sentencing, including mandatory

23  minimums, can be based on a mixture, I think that is

24  correct, that is the law in the First Circuit.  But I

25  have a right to essentially set up a record to challenge

1     that law and I'm doing that in an evidentiary way.  I

2     assume the Court will instruct the jury appropriately at

3     the end of the trial and I'll live with the Court's

4     instructions.  But I have a right to explore this

5     laboratory technician's analysis, and that's part of her

6     analysis.

7              MR. LEVITT:  Well, your Honor, the reports are

8     now in evidence and he's done it with respect to one.

9     It's going to apply to all five exhibits the same way.

10    And he can make that argument on closing if he thinks

11    it's really an argument that he wants to make.

12             THE COURT:  Well, this is helpful.  My

13    understanding is the same as the understanding that

14    you've each expressed, that it's the net weight of the

15    mixture, not the weight of the actual cocaine base that

16    is relevant for the purposes of triggering different

17    potential sentences, although I haven't focused on this

18    either and looked at the cases lately.  But I don't

19    think it's, um, impermissible for Mr. Sultan to cover

20    this somewhat, um, and I will -- I will certainly, at

21    the end of the case, give an instruction as to what

22    weight is the legal relevant weight.  But I'm not sure

23    what the cases or the leading cases from the Supreme

24    Court or First Circuit are that supports our common

25    understanding.

1       So we're going to take a break.  You bring me back

2   the cases and show me.  I might give them an interim

3   instruction now.  But in any event, I'll instruct them

4   at the end of the case.  All right?

5               MR. SULTAN:  Well, your Honor, I guess I would

6   have a problem with the Court instructing them now,

7   because it would suggest that there's something improper

8   about my cross-examination.  I don't think my cross-

9   examination is improper, I think it's perfectly

10  acceptable.

11              MR. LEVITT:  Your Honor, I would request one.

12  I think the point here is to avoid jury confusion.

13              THE COURT:  Well, I'll think about it.  But

14  the first thing to do is bring me the cases.  All

15  right?

16          The Court is in recess.

17                  (Recess, 11:10 a.m.)

18                  (Resumed, 11:25 a.m.)

19              THE COURT:  Mr. Levitt, did you have an

20  adequate opportunity to find the authority for what we

21  all understand to be the law?

22              MR. LEVITT:  I sent an intern up and he's not

23  back yet.

24              THE COURT:  That's fine.  I think what I'll

25  do, for present purposes, is just tell the jurors that

1    at the end of the case, if not earlier, I'll tell them

2    which of these weights is the legally relevant weight,

3    okay, or the weight to be used in reaching their

4    verdict.

5         Okay.  We'll get the jury and find out about their

6    availability tomorrow afternoon.

7              MR. LEVITT:  Your Honor, would you like the

8    witness on the stand or not?

9              THE COURT:  We can put her on the stand, yes.

10             (Witness enters.)

11             THE COURT:  Well, here are some cases that may

12   be what we want.  **Young,** 992 F.2d 207.  **Shibaz**, 933 F.2d

13   1029.  **Laserchick**, 924 F.2d 211.

14        I think it addresses the issues of the guidelines

15   and the statutes and indicating that they intend the

16   weight of the mixture should be used for all drugs.

17             MR. LEVITT:  Your Honor, then in light of the

18   fact that you found those cases, would you then consider

19   that instruction to be rather than that you'll tell them

20   at the end, but that you'll tell them now?

21             THE COURT:  No, because I haven't read the

22   cases and I don't know if it's up to date.

23             (Pause.)

24             (Jury enters, 11:30 a.m.)

25             THE COURT:  Ladies and gentlemen, Mr. Hohler

1    tells me you would be available tomorrow afternoon, if

2    necessary, until 4:00.  So we'll proceed with that

3    understanding.  You should plan to be here that long and

4    we'll see where we are tomorrow as to whether or not

5    it's necessary.  We won't sit next Tuesday afternoon if

6    we're not finished with the evidence in the case.  We

7    will sit next Tuesday morning.  Okay?

8              MR. SULTAN:  May I proceed, your Honor?

9              THE COURT:  Yes.  Are you going to continue

10   along the line?

11             MR. SULTAN:  Your Honor, I'm going to wrap

12   this up very, very quickly.  No, I'm not going to

13   continue along that line.

14             THE COURT:  Okay.

15   Q.  Ms. McGehee, I'm not going to go through each of

16   these reports, to avoid taking up too much time, I just

17   want to make sure it's completely clear for the jury.

18        But for each of your reports, you list a number of

19   different weights, right?

20   A.  Yes, sir.

21   Q.  And on each report the first weight that you list is

22   a gross weight, correct?

23   A.  Yes.

24   Q.  Tell us, please, what the gross weight means?

25   A.  Sure.  The gross weight is this entire exhibit, it's

1      the bag and everything.  It includes the packaging.

2      Q.  It includes everything?

3      A.  Yes, sir.

4      Q.  And you write that down as the "gross weight"?

5      A.  Correct.

6      Q.  And the next column is the net weight, right?

7      A.  Yes, sir.

8      Q.  And please tell the jury what the net weight

9      represents?

10     A.  Sure.  The net weight is just the powder or the

11     sample itself.  So if it came in a bag, it's the weight

12     of the drug without the bag.

13     Q.  Okay.  And then the third thing that you weigh or

14     calculate is the amount of the actual drug, right?

15     A.  Yes, sir.

16     Q.  And tell the jury, please, what that means?

17     A.  Because I did a quantitative test, I found the

18     purity of the sample, um, the -- I was unable to

19     calculate the amount of the pure drugs, the amount of

20     nothing but the cocaine base, which was 4.2 grams.

21     Q.  And you did the same calculation for each and every

22     one of these exhibits, correct?

23     A.  Yes.

24              MR. SULTAN:  Thank you very much, ma'am.

25              THE COURT:  And, ladies and gentlemen, with

1    regard to these exhibits, the indictment charges that

2    more than 28 grams was involved in the overall alleged

3    conspiracy, um, that it is alleged Mr. Moynihan is part

4    of.  At the end of the case I'll tell you which of those

5    columns is the legally correct column to use in

6    calculating the weight, if you reach that issue.  Okay?

7          Is there any redirect?

8              MR. LEVITT:  Just one question, your Honor.

9

10   REDIRECT EXAMINATION BY MR. LEVITT:

11   Q.  With respect to the cocaine-based exhibits, the form

12   they're in now, that granular form, is that what they

13   looked like when you got them?

14   A.  Yes, sir.  According to my handwritten notes, which

15   I think you have there, it's a chunkier substance.

16   Q.  And do you break it down as part of your -- your

17   examining it?

18   A.  Part of our sampling plan is you have to grind it,

19   so that's the representative sample.

20              MR. LEVITT:  Nothing else, your Honor.

21              THE COURT:  All right.  You are excused.

22   Thank you very much.

23          The United States may call the next witness.

24              MR. LEVITT:  The government calls Kharis

25   Finley.

```
 1              (KHARIS FINLEY, sworn.)
 2              MR. LEVITT:  Your Honor, if I might just
 3    approach to take back the exhibits?
 4              THE COURT:  Yes.
 5
 6              * * * * * * * * * * * * *
 7              KHARIS FINLEY
 8              * * * * * * * * * * * * *
 9
10    DIRECT EXAMINATION BY MR. LEVITT:
11    Q.  Would you please state your name and spell your
12    first and last name?
13    A.  Kharis Finley, K-H-A-R-I-S, F-I-N-L-E-Y.
14    Q.  Mr. Finley, how old are you?
15    A.  27.
16    Q.  And, um, is it correct you're testifying here today,
17    um, pursuant to an immunity order that was signed by the
18    judge here?
19    A.  Yes, sir.
20              MR. LEVITT:  I ask to show that to the
21    witness, your Honor.  It hasn't been admitted yet.  I
22    don't know if you want to turn off the camera, but I
23    don't know if there's any objection.
24              THE COURT:  Is there any objection to this
25    being admitted?
```

1          MR. SULTAN:  Could we approach sidebar, your

2     Honor?

3          THE COURT:  Yes.

4

5          AT THE SIDEBAR

6          THE COURT:  Yes?

7          MR. SULTAN:  Your Honor, I guess the issue

8     that I have is, um, the fact that Mr. Levitt has now

9     raised and the fact that your Honor signed this order,

10    um -- and I think perhaps this is something that can be

11    addressed at the end of the trial in the instructions,

12    but I don't want the jury to think that your Honor has

13    given some kind of imprimatur to it.

14         THE COURT:  Okay.  Do you want me to just tell

15    them that when the government applies for an order, the

16    Court's obligated to issue it?

17         MR. SULTAN:  Yes, your Honor.  Yes.  Thank

18    you.

19         THE COURT:  Okay.

20

21         (In open court.)

22         THE COURT:  Ladies and gentlemen, let me

23    explain something to you.  You're going to see and, I

24    expect, hear some testimony about an order that I issued

25    pursuant to a statute that provides the witness a

1    certain degree of immunity for his testimony, and you

2    should understand that that was not a discretionary

3    decision on my part.  When the government files a proper

4    application for such an order, the Court issues it, has

5    to issue it, but the judge makes -- doesn't participate

6    in deciding whether that immunity should be granted or

7    not.  That's solely an executive branch decision.  Okay?

8              MR. LEVITT:  Okay.  Thank you, your Honor.

9    Q.  Let me show you what's been admitted now as

10   Government Exhibit 52.

11        Have you seen this order before, um, signed

12   October 21st, 2011, um, concerning you?

13   A.  Yes, sir.

14   Q.  And, um, it indicates that you refused to testify or

15   provide other information at the suppression hearing and

16   trial on the basis of the privilege against self-

17   incrimination.  Is that correct?

18   A.  Yes, sir.

19   Q.  And this order, um, orders you to testify, is that

20   correct?  Is that your understanding?

21   A.  Yes, sir.

22   Q.  And it says that, um, your compelled testimony, um,

23   may not be used against you except in any -- in any

24   criminal case.  Do you see that?

25   A.  Yes, sir.

1    Q.  And then it says, um, except a prosecution for

2    perjury, giving a false statement or otherwise failing

3    to comply with this order.  Do you understand that?

4    A.  Yes, sir.

5    Q.  And you also had something called a proffer letter

6    earlier --

7               (Pause.)

8               MR. LEVITT:  There's no objection to this,

9    your Honor, to my understanding.

10              THE COURT:  Is that correct, Mr. Sultan?

11              MR. SULTAN:  Yes, your Honor.

12              THE COURT:  What's the next number?

13              MR. LEVITT:  Exhibit 51.

14              THE COURT: Exhibit 51 is admitted.

15              MR. LEVITT:  Thank you.

16              (Exhibit 51, marked.)

17   Q.  And is that your signature?

18   A.  Yes, sir.

19   Q.  And do you recognize that letter?

20   A.  Yes, sir.

21   Q.  You've been a cooperating witness with the FBI for

22   several years, is that right?

23   A.  Yes.

24   Q.  You've been involved in numerous investigations with

25   several different agents?

1    A.  Yes, sir.

2    Q.  Was the most recent one up in Haverhill?

3    A.  Yes.

4    Q.  And you're involved in controlled buys from numerous

5    targets, is that correct?

6    A.  Yes.

7    Q.  Prior to that you'd done some work for agents in

8    Boston, is that right?

9    A.  Yes.

10   Q.  And, um -- and you've been paid?

11   A.  Yes.

12   Q.  Um, do you know how much?  Do you remember how much?

13   A.  I'm not sure.

14   Q.  Um, if I tell you it's about $30,000, does that

15   sound about right?

16   A.  Yes, I guess so.

17            MR. SULTAN:  I object to the leading, your

18   Honor.

19            THE COURT:  Sustained.

20   Q.  Have you ever sold drugs in the past?

21   A.  Yes.

22   Q.  And used drugs?

23   A.  Yes.

24   Q.  What's your drug of choice to use?

25   A.  Marijuana.

1    Q.   Do you still use it?

2    A.   Every once in a while.

3    Q.   And you also have some -- have you been diagnosed

4    with anything?

5    A.   Yes.

6    Q.   What's that?

7    A.   Um, a sleeping disorder, bipolar, and ADHD.

8    Q.   And, um, were you ever in a gang?

9    A.   Yes.

10   Q.   What gang?

11   A.   LGD.

12   Q.   What's that stand for?

13   A.   Latin Gangsta' Disciples.

14   Q.   And are you still involved with that gang?

15   A.   No.

16   Q.   Were you involved in a controlled purchase of drugs

17   from Curtis Hester on January 7th, 2010?

18   A.   Yes.

19   Q.   And did you know Curtis Hester prior to that?

20   A.   Yes.

21   Q.   How long did you know him?

22   A.   Since about '07.

23          MR. LEVITT:  Your Honor, at this time I'm

24   going to be playing tapes and I'd ask that the

25   transcript binders be handed out to the jurors.

```
 1              THE COURT:  Yes.
 2         Ladies and gentlemen, Mr. Hohler is going to give
 3    you a binder that has transcripts that correspond with
 4    the tapes and they're going to be marked as evidence so
 5    you'll have them in the jury room if you want to use
 6    them, the transcripts, if you decide to listen to the
 7    tapes again.  But you should understand the following.
 8    If there's some difference that you hear between what's
 9    on the transcript and what's on the tape, you must
10    consider the tape recording to be the evidence, and, um,
11    rely on the tape to the extent that it's any different
12    than the transcript.  Okay?
13              (Hands out binders.)
14              MR. LEVITT:  There should be an extra one for
15    the Court.
16         And if I could approach to give the witness one,
17    your Honor?
18              THE COURT:  And these have exhibit numbers,
19    correct?
20              MR. LEVITT:  They do, your Honor.  And the way
21    we tabbed them correlates with the exhibit number.
22              THE COURT:  Okay.
23              MR. LEVITT:  So Tab 12 is for Exhibit 12.
24              THE COURT:  Okay.  Exhibit 12 is the tape?
25              MR. LEVITT:  It's the transcript.
```

1          THE COURT:  Oh, it's the transcript.  Okay.

2    Well, I will say then Exhibits 12, 14, 16, 18, 20, 22,

3    24 and 26 are admitted.

4          (Exhibits 12, 14, 16, 18, 20, 22, 24 and 26,

5    marked.)

6    Q.  Mr. Finley, did you have a name for Curtis Hester

7    that you called him?

8    A.  Yes.  I called him "CJ."

9          MR. LEVITT:  And then I would play, your

10   Honor, Exhibit 11, which has been previously admitted.

11   It's the recorded telephone conversations from January

12   7th.

13         THE COURT:  And is it Exhibit 12 that

14   corresponds with that?

15         MR. LEVITT:  Correct.

16      So this is audio from Mr. Hohler.

17         (Plays audio and videotape.)

18         MR. LEVITT:  So it just comes up as tracks.

19         (Plays audio and video.)

20   Q.  Is that your voice?

21   A.  Yes.

22   Q.  (Plays audio.)  Whose voice is that?

23   A.  CJ's.

24   Q.  Curtis Hester's?

25   A.  Yes, sir.

1          (Continues to play.)

2    Q.   Mr. Finley, what's that reference to 7-4?

3    A.   Um, 7 grams of crack.

4    Q.   When you say, "Yo, it's pop and fan, fucking 7-4,"

5    do you know what that is?

6    A.   It's basically like "What's up?" basically.

7    Q.   When you ask for the "7 hard," what are you asking

8    for?

9    A.   7 grams of crack.

10          (Continues to play.)

11   Q.   Mr. Finley, is 325 high for 7 grams of crack?

12   A.   Yes.

13   Q.   And when you say that you charged that nigga 350,

14   and you would call back, who are you talking about?

15   A.   About the officers, basically.

16   Q.   You pretend you have somebody you're selling to?

17   A.   Yes.

18   Q.   And, um, so then you talk to the officers about, "Do

19   you want me to do this or not"?

20   A.   Yes.

21   Q.   (Continues to play.)  I'm sorry.  (Plays.)

22          MR. LEVITT:  And now, Mr. Hohler, with the

23   video.

24       And that would be, your Honor, the correlating

25   exhibit would be Exhibit 14.

1              (Plays video.)

2     Q.  Who is that?

3     A.  CJ.

4     Q.  Curtis Hester?

5     A.  Yes.

6              (Plays video.)

7              MR. LEVITT:  Your Honor, I would just like to

8     play that again.  I wonder if you could turn it up just

9     a bit.

10             THE COURT:  Okay.

11             (Plays video.)

12    Q.  Mr. Finley, that last part we just heard, who are

13    you talking to?

14    A.  I'm talking to one of the officers.

15    Q.  And why are you telling him that?

16    A.  Basically because that's the government's money.

17    Q.  You're just giving it to Hester?

18    A.  Yes.

19    Q.  And, um, when you started doing this description --

20    when you started talking, how were you -- what were you

21    seeing behind you?

22    A.  Moynihan's truck, basically.  I was looking through

23    the rear view mirror.

24    Q.  You didn't know it was Moynihan's truck at that

25    time?

1    A.   No.

2    Q.   Did you know Moynihan at that time?

3    A.   No.

4    Q.   You're looking through the rear view mirror?

5    A.   Yes, sir.

6    Q.   And at some point did you change how you were

7    watching?

8    A.   Yes.

9    Q.   How did you change?

10   A.   I went from looking through the rear view mirror to

11   actually turning around and taking a good look.

12   Q.   And did you get a better view of the person behind

13   you in the white Chevy through the rear view mirror or

14   when you turned around and looked?

15   A.   When I turned around and looked.

16   Q.   And when did you turn around and look, looking at

17   the transcript, approximately when?

18   A.   Um, right after I basically said "a Puerto Rican

19   male," because I didn't think he was actually Puerto

20   Rican because of the tint through the glass.  So

21   basically right after I gave, the second time, the

22   license plate, I actually was like staring directly at

23   him.

24   Q.   So when you said "383HA8," you turned around again

25   and looked?

```
 1   A.  Yes.
 2   Q.  And at that time could you tell whether the guy
 3   behind you was a white male or a Puerto Rican male?
 4   A.  Yes.
 5   Q.  And what was he?
 6   A.  White.
 7              (Plays video.)
 8   Q.  What did Mr. Hester just hand you?
 9   A.  Crack.
10              (Continues to play.)
11   Q.  Mr. Finley, um, do you have any understanding as to
12   what it means when Hester says that "that shit just came
13   out of the pot right now, a little while ago"?
14   A.  Basically he just meant that he just cooked, he just
15   got done preparing it.  Cooking it basically.
16   Q.  And when you say on the same page, when you said,
17   "you didn't use too much cut on it," what does that
18   mean?
19   A.  Meaning that it was a lot purer than the normal
20   person would give you to try to make money.
21   Q.  And you see -- you heard when Mr. Hester said, um,
22   "Probably tomorrow I could get that cheaper.  I could
23   call my other man.  You know what I'm saying?"  You
24   understood Mr. Hester had other suppliers for crack?
25              MR. SULTAN:  Objection.
```

1           THE COURT:  Sustained at this point.

2   Q.  Prior to January 7th, had you made a crack buy from

3   Mr. Hester before?

4   A.  Yes.

5   Q.  And did he go to somebody else other than Moynihan?

6   A.  Yes.

7           MR. SULTAN:  I object to the form of the

8   question, your Honor, and I belatedly move to strike the

9   answer.

10          THE COURT:  It's belated.  Overruled.

11          MR. LEVITT:  Your Honor, with permission I'd

12  like to play the third telephone conversation excerpt,

13  January 11th, 2010, and those correlate with Exhibits

14  16A, B and C.

15          THE COURT:  Okay.

16  Q.  During all these telephone conversations we're

17  playing, um, where are you when this is going on?

18  A.  I'm with the agents or with CJ.

19  Q.  For the telephone calls?

20  A.  Oh, the telephone calls?  I'm with the agents.

21  Q.  So I'd ask you to turn to Exhibit 16.

22  A.  Yes.  (Turns.)

23          MR. LEVITT:  Your Honor, I'm sorry, I

24  neglected to do something.  I would do it here before I

25  move on.

1          (Pause.)

2          MR. LEVITT:  And, Mr. Hohler, I'll need the

3     document camera.  My apologies.

4     Q.  After the buy on January 7th that we just discussed,

5     did you meet with the agents?

6     A.  Yes.

7     Q.  Did they show you a photograph?

8     A.  Yes.

9     Q.  Let me show you what's been marked, what has been

10    admitted as Government Exhibit 29.  Do you recognize

11    that?

12    A.  Yes.

13    Q.  Um, is that the photograph they showed you that day?

14    A.  Yes.

15    Q.  And when they showed you that, did you recognize

16    that person?

17    A.  Yes.

18    Q.  Who is it?

19    A.  Timothy Moynihan.

20    Q.  At that time did you know his name?

21    A.  No.

22    Q.  At that time -- did you recognize him at that time?

23    A.  Yes.

24    Q.  Who did you recognize it to be?

25    A.  It's CJ'S connection.

1   Q.   Was that the guy in the white Chevy Trailblazer that

2   day?

3   A.   Yes.

4   Q.   And what's that right there pointing to?

5   A.   "Schwinn."

6   Q.   Is that your code name?

7   A.   Yes.

8   Q.   Did you sign that?

9   A.   Yes.

10  Q.   And date it?

11  A.   Yes.

12  Q.   Do you see, in the courtroom, the person that was in

13  the white Chevy Trailblazer on January 7th that CJ met

14  with?

15  A.   Yes.

16  Q.   And would you point him out and describe an article

17  of clothing.

18  A.   A blue tie.  A blue suit.

19  Q.   Can you point to him?

20  A.   (Indicates.)

21          MR. LEVITT:  May the record reflect the

22  witness has identified the defendant?

23          THE COURT:  Yes.

24          MR. LEVITT:  Now we're on to telephone calls

25  from January 11th, 2010 and the transcripts at 16.

```
 1            And, I'm sorry, Mr. Hohler, let me get it back to

 2     the --

 3                 (Plays video.)

 4     Q.   Do you recognize the voices on these tapes as well?

 5     A.   Yes.

 6     Q.   And who are they?

 7     A.   Me and CJ.

 8     Q.   And when you say, "I'll see if I can bless you with

 9     something," what do you mean?

10     A.   Basically give up some money or something like that.

11     Q.   In the middle of the deal?

12     A.   Yup.

13                 (Continues playing.)

14     Q.   Mr. Finley, what's that reference to "7 of hard and

15     7 of soft"?

16     A.   A 7-gram bag of coke and a 7-gram bag of crack,

17     basically.

18

19                 (Continues playing.)

20                 MR. LEVITT:  Should be on 16E.

21                 (Continues playing.)

22     Q.   And, Mr. Finley, what do you mean when you say

23     you're going to "show him a little love today"?

24     A.   Basically throw him a few bucks for being a middle

25     man, basically.
```

1              MR. LEVITT:  And then go to the video for

2     January 11th, which corresponds with Exhibit 18.

3              (Plays video.)

4              MR. LEVITT:  Your Honor, I'm having a

5     technical glitch here on January 11th with the video.

6     So what I'm going to do is move to the 13th and we'll

7     come back to this.

8              THE COURT:  Okay.  Thank you.

9              (Pause.)

10             MR. LEVITT:  Oh, Mr. Sultan wisely corrected

11    me that there is no video for the 11th.  That's the one

12    that's all audio.

13             THE COURT:  That's the one that malfunctioned?

14             MR. LEVITT:  That's correct.  Thank you.

15             THE COURT:  So which exhibit?

16             MR. LEVITT:  It's Exhibit 17.  And it's

17    audio.  And it correlates with Exhibit 18.

18             (Plays audio.)

19    Q.  Do you recognize the voices on this tape?

20    A.  Yes, I do.

21    Q.  And whose are they?

22    A.  Mine and CJ's.

23    Q.  And it's at your car at this point?

24    A.  Yes.

25             (Plays audio.)

```
 1   Q.  Mr. Finley, do you remember this paragraph here

 2   where, um, Mr. Hester is talking?  Do you remember who

 3   he's talking to?

 4   A.  I believe he was talking to, um -- to one of his

 5   brothers, I believe.

 6   Q.  Is he on the phone?

 7   A.  Yes.

 8               (Plays audio.)

 9               MR. LEVITT:  That went all the way back to the

10   beginning.

11               (Plays audio.)

12               MR. LEVITT:  All right.  That's it.

13               (Plays audio.)

14   Q.  You and Hester are talking there about the white

15   SUV.  Do you recall that?

16   A.  Yes.

17   Q.  And what are you guys looking at there?

18   A.  The SUV basically when it passed the truck and CJ

19   was saying, like, you know, "That's my truck right

20   there," I knew.

21   Q.  And did you recognize that white SUV?

22   A.  Yes.

23   Q.  And what did you recognize it as?

24   A.  Moynihan's truck.

25   Q.  The same one from January 7th?
```

1   A.  Yes.

2              (Plays audio.)

3   Q.  Do you remember if Mr. Hester was talking on the

4   phone at this point?

5   A.  I believe he was talking on the phone.

6              THE COURT:  Excuse me.  What was your answer,

7   please?

8              THE WITNESS:  I believe he was talking on the

9   phone.

10             (Plays audio.)

11             MR. LEVITT:  Sorry about that, your Honor.

12             (Continues playing.)

13  Q.  You're saying here, "They left in a white truck, the

14  same white truck," you say the license plate.  What are

15  you talking about?  Who are you talking to?

16  A.  Um, I'm talking to the agents and I was saying it's

17  the Moynihan truck.

18  Q.  And did you see Moynihan on that buy as well?

19  A.  Yes.

20  Q.  And was it the same person that you identified

21  earlier?

22  A.  Yes.

23  Q.  And, um, Mr. Hester gets in the car.  Does he give

24  you anything?

25  A.  Um, I'm not even sure.  Oh, when he gets back into

1    the truck?

2    Q.  When he gets back into the truck.

3    A.  Yes, he gives me the crack.

4    Q.  And is that -- what's the reference to that "thick

5    shit," when he says, "Yeah, it's that thick shit"?

6         MR. SULTAN:  I object, your Honor, unless he's

7    testifying as an expert on drugs.

8         THE COURT:  No, the objection is overruled.

9    He would be testifying based on his personal knowledge

10   of what Mr. Hester was giving him or showing to him when

11   he says "this is that."

12        Okay.  You may answer.

13   A.  Yes.  Well, can you repeat the question?

14   Q.  Sure.

15        Do you see where it says, Hester says, um, "Yeah,

16   this is that thick shit."  Do you see that?

17   A.  Yes.

18   Q.  Um, was he showing you something?

19   A.  Yes, he was showing me the crack inside the bag.

20   Q.  And did he also give you cocaine on this deal?

21   A.  Yes.

22   Q.  And -- before Mr. Hester got out of the car to go,

23   um, meet with Moynihan, did you give him anything?

24   A.  Yes, I gave him the money.  I counted it and then

25   handed it to him.

1   Q.   And did you do that on January 7th as well before he

2   got out of the car and met with Moynihan?

3   A.   Yes.

4              MR. LEVITT:   I'll play Exhibit 19, the

5   recorded conversations from January 13th, 2010, and they

6   would correlate with Exhibit 20, the transcripts.

7              (Plays audio.)

8   Q.   Mr. Finley, do you recognize the voices on that?

9   A.   Yes.

10  Q.   And who are they?

11  A.   Mine and CJ's.

12             (Continue playing.)

13             MR. LEVITT:   Your Honor, I apologize.  This is

14  for some reason stuck on the same one.

15             (Continue playing.)

16             THE COURT:   Maybe we ought to just go through

17  it again and see if it advances.

18             (Continue playing.)

19             MR. LEVITT:   Apparently not, your Honor.  I'll

20  take a look at it and see if I can get it resolved and

21  then move on.

22             THE COURT:   Okay.  But if we don't play that

23  audio, Page 20b will have to come out of the books.

24             MR. LEVITT:   Correct, your Honor.  I

25  understand.

1          I'll play the excerpt of the recorded video on

2     January 13, 2010.  It's Exhibit 21.  It correlates with

3     Exhibit 22.

4               (Plays video.)

5     Q.  What are you talking about there, Mr. Finley?

6     A.  I was basically talking like I had somebody waiting

7     for me, basically.

8     Q.  It's part of your cover?

9     A.  Yes.

10              (Continue playing.)

11    Q.  Who is Shawn Do?

12    A.  A person he gets weed off of.

13              (Continue playing.)

14    Q.  Mr. Finley, you mentioned that Hester gets weed off

15    of Shawn Do?

16    A.  Yes.

17    Q.  Do you know if he ever gets crack off of him?

18    A.  I'm not sure.  I would suppose.

19    Q.  You would suppose?

20    A.  Yes.

21              (Continue playing.)

22    Q.  When you say you "got the bud," what are you

23    referring to?

24    A.  Weed.

25              (Continue playing.)

```
 1   Q.  What are you referring to when you say there, "You
 2   can roll in here, you just can't burn in here"?
 3   A.  Basically that you can roll the weed in the truck,
 4   but you can't smoke it in the truck, basically.
 5   Q.  And when Hester says, "I don't got no dutch," what's
 6   dutch?
 7   A.  A blunt.
 8   Q.  It's what you put the weed in?
 9   A.  Yes.  A dutch master.
10   Q.  It's like a cigar?
11   A.  Yes.
12            (Continue playing.)
13   Q.  Do you know who "N-O-R-I" is?
14   A.  Yes, that was one of his buddies that lived in
15   Haverhill.
16   Q.  What's that guy's name?
17   A.  Um, Nori.
18            (Continue playing.)
19   Q.  And Mr. Hester said, looked over his shoulder and
20   said, "Yo, that's him right there."  Did you see what he
21   was looking at?
22   A.  Yeah, that's Timothy Moynihan's white truck.
23            (Continue playing.)
24   Q.  When you say "same guy," who are you referring to?
25   A.  Timothy Moynihan.
```

1    Q.   The same guy as on the prior bust?

2    A.   Yes.

3                (Continue playing.)

4    Q.   What was Hester just doing with that guy at the

5    window?

6    A.   Basically just sold him a dime bag of weed.

7    Q.   What's that phrase when he says "your only work,"

8    what's "work"?

9    A.   Like product.  Basically like, "Is this your only

10   bag of weed?" or "Is this your only ball?"  Like that.

11               (Continue playing.)

12   Q.   After Mr. Hester sold that guy the dime bag, did you

13   guys go get some more weed?

14   A.   I'm not sure.  I don't believe he did.  He just went

15   in and grabbed the material.  He was ready.

16   Q.   Do you recall if you smoked weed with Mr. Hester on

17   this day?

18   A.   I'm not really sure.  It was two years ago.  But I

19   know I smoked on two of the buys at least.

20   Q.   When you smoked weed on the buys, did the agents

21   talk to you about it?

22   A.   Yes.

23   Q.   What did they say?

24   A.   Basically not to do it.

25   Q.   And what did you say?

A.   That that basically messed up my cover, basically.
Like they know I smoke weed.  So if I tell them, no,
they are going to be basically, "What's up with that?"
Q.   Did the agents give you any instructions or advice
on how to get around that?
A.   Yes, basically to tell them I can't do it in the
truck basically.
Q.   Anything else?
A.   Basically tell them that I couldn't smoke really
right now.  That I'm trying to get money.
Q.   That didn't work?
A.   No.
          (Continue playing.)
Q.   What are you referring to there?  What are you guys
looking at there when you say, um, "What is this plastic
bag?"  And he says, "No, that shit looks straight,
dog."  Then you say, "It's solid."  And he says, "It's
that thicky thick."  What are you guys talking about?
A.   The crack.
          (Continue playing.)
          MR. LEVITT:  Your Honor, Government Exhibit 23
is the telephone conversations from January 15th and
correlating Exhibits 24.
          (Plays audio.)
Q.   Who are you talking to there?

```
 1   A.   One of the agents.

 2              (Continue playing.)

 3              MR. LEVITT:  Exhibit 25, your Honor, with 26

 4   on the transcript.

 5              (Plays video.)

 6   Q.   Do you recognize the voices here?

 7   A.   Yes.

 8   Q.   Whose voices are we hearing?

 9   A.   Mine and CJ's.

10   Q.   So you guys are talking on the direct connect?

11   You're in the car?

12   A.   Yes.

13   Q.   And he's not there yet?

14   A.   No.

15              (Continue playing.)

16              THE COURT:  Um, I think we've got about 4 more

17   pages on the transcript and it's almost 1:00.  Do you

18   have any idea how much longer the rest of this one will

19   take?

20              MR. LEVITT:  No, I'm going to play the

21   transcript, I might ask one or two more questions and

22   then I'm done.

23              THE COURT:  Right now we're listening to what

24   I understand is music?

25              MR. LEVITT:  This section right here.
```

```
 1              THE COURT:  No, the whole rest of the tape?
 2              MR. LEVITT:  How long is the tape going to
 3      take?  I don't know, your Honor.  I can't remember.  I
 4      don't think it's that long.  This is the buy that they
 5      went to Lawrence and they just took a long time.
 6              THE COURT:  Yes, I think we're going to stop
 7      right here and you can start at the beginning of Exhibit
 8      26 tomorrow morning, because I did tell the jury we
 9      would stop today at 1:00, and we will.
10          Ladies and gentlemen, I am going to excuse you for
11      today.  Please remember to continue to keep an open
12      mind, don't discuss the case among yourselves or with
13      anybody else, don't communicate about the case with or
14      through the social media, or read or listen to or
15      research anything relating to the case.  You did a great
16      job getting back here at 9:00 a.m. this morning.  Do it
17      again tomorrow morning.  I hope we'll start again
18      promptly and we'll continue into the afternoon to make
19      sure that we're on a pace to finish around the time that
20      I predicted when you were selected.
21          The Court will be in recess for the jury.
22              (Jury leaves, 1:00 p.m.)
23              THE COURT:  Mr. Finley, you're excused until
24      9:00 tomorrow morning.
25              (Witness leaves.)
```

1              THE COURT:  You may be seated.

2         All right.  Tomorrow the witnesses after

3    Mr. Finley will be who?

4              MR. LEVITT:  Um, Sean Richards.  Ms. Vasapoli,

5    who is Commerce Insurance.  And, um, I think at that

6    point it would likely be Mr. Mahoney after that.  I

7    mean, the only witnesses I have left, your Honor, just

8    to give you the full spectrum, is after Mahoney is

9    Doucot and possibly Wood, the expert.

10             THE COURT:  You're not sure you're going to

11   call Mr. Wood?

12             MR. LEVITT:  I'm not sure.

13             THE COURT:  Okay.  And are there disputed

14   exhibits beyond the Commerce exhibits relating to

15   Richards and Mahoney at this point?

16             MR. LEVITT:  I don't think there's anything in

17   dispute.  But just to clarify your ruling or what you

18   advised us with respect to the two photographs that, um,

19   Richards identified, that of Mr. Mahoney -- of

20   Mr. Moynihan, my recollection is, one, that they should

21   be redacted completely, which they have been, and,

22   two --

23             THE COURT:  You're talking about the booking

24   photos?

25             MR. LEVITT:  Correct.

1          THE COURT:  So you'll take off all the text

2     and just keep the photos?

3          MR. LEVITT:  Correct.

4          THE COURT:  My memory is I told you that he

5     could say he looked at three photos and --

6          MR. LEVITT:  If I could say, the question is

7     --

8          THE COURT:  Go ahead.

9          MR. LEVITT:  The question is you said that,

10    and then I proposed, "Can I have him look at those two,

11    mark them for identification, and not introduce them?"

12    And you didn't say anything.

13         THE COURT:  Yes, you can.  Well, for

14    identification.  They wouldn't go in as exhibits.

15         MR. LEVITT:  Right, they don't go in.  And

16    then I would say, basically, "What's the most recent

17    one?"  He would say the RMV photo.  And that's the one

18    that we would use.

19         THE COURT:  Yes.  All right.  I'll listen to

20    the questioning about Commerce.

21         All right.  So hopefully we'll get through those

22    four today.  Doucot is the last -- I'm sorry, tomorrow,

23    Doucot is the last witness.

24         Does the defendant anticipate presenting any

25    evidence?

1          MR. SULTAN:  Your Honor, I'm likely to present

2    either one or two witnesses with respect to the

3    reenactment and some related photographs, since the

4    government brought the reenactment up.  So I'm not

5    completely decided yet, but I would probably call one or

6    two witnesses on that one narrow issue.

7          THE COURT:  So on that schedule, we ought to

8    finish the evidence on Monday then?

9          MR. SULTAN:  I think we'll finish on Monday,

10   your Honor.

11         MR. LEVITT:  I think so.

12         THE COURT:  Well, I'm going to start looking

13   at the jury instructions.  And there have been some

14   nuances that are emerging today, so I may want to have

15   some discussion with you about that later tomorrow

16   afternoon, no later than on Monday, and hopefully we'll

17   get to the jury on Tuesday morning.

18        Anything further for today?

19         MR. SULTAN:  No, your Honor.

20         THE COURT:  The Court will be in recess.

21         (Adjourned, 1:00 p.m.)

22

23

24

25

1               C E R T I F I C A T E

2

3

4        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do

5   hereby certify that the foregoing record is a true and

6   accurate transcription of my stenographic notes, before

7   Chief Judge Mark L. Wolf, on Wednesday, October 26,

8   2011, to the best of my skill and ability.

9

10

11   /s/ Richard H. Romanow 09-07-12
     _____
12   RICHARD H. ROMANOW  Date

13

14

15

16

17

18

19

20

21

22

23

24

25