1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                          No. 1:10-cr-10288-MLW

4

5

6   UNITED STATES OF AMERICA

7

8   vs.

9

10   TIMOTHY MOYNIHAN

11

12

13                    *********

14

15              For Jury Trial Before
                Chief Judge Mark L. Wolf

16

17

18              United States District Court
                District of Massachusetts (Boston.)
                One Courthouse Way
19              Boston, Massachusetts 02210
                Monday, October 31, 2011

20

21                    ********

22

23         REPORTER: RICHARD H. ROMANOW, RPR
                  Official Court Reporter
                United States District Court
24     One Courthouse Way, Room 5200, Boston, MA 02210
                bulldog@richromanow.com

25

```
1                    A P P E A R A N C E S

2

3   PETER K. LEVITT, ESQ.
        United States Attorney's Office
4       1 Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
5       (617) 748-3965
        Email: Peter.levitt@usdoj.gov
6       For the United States

7

8   JAMES L. SULTAN, ESQ.
    AUDREY GRACE, ESQ.
9       Rankin & Sultan
        151 Merrimac Street, Second Floor
10      Boston, Massachusetts 02114-4717
        (617) 720-0011
11      Email: Jsultan@rankin-sultan.com
        For Timothy Moynihan

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2

3       Charge Conference...........................    4

4       Closing Argument by Mr. Levitt...............   33

5       Closing Argument by Mr. Sultan...............   54

6       Rebuttal by Mr. Levitt.......................   68

7       Judge's Charge to the Jury...................   71

8       Juror Question 1............................  111

9

10

11                    E X H I B I T S

12

13      EXHIBIT J1, J2, J3 and J4....................   18

14      EXHIBIT K....................................   30

15      EXHIBIT L....................................   32

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2                (Begins, 9:15 a.m.)
 3                THE CLERK:  Criminal matter 10-10288, the
 4      United States of America versus Timothy Moynihan.  The
 5      Court is in session.  You may be seated.
 6                THE COURT:  Good morning.  Would counsel
 7      please identify themselves for the record.
 8                MR. LEVITT:  Peter Levitt on behalf of the
 9      government.  Good morning, your Honor.
10                MR. SULTAN:  Good morning, your Honor.  Jamie
11      Sultan and Audrey Grace for Mr. Moynihan, who is
12      present.
13                THE COURT:  All right.
14           Since I saw you on Thursday, I've received
15      Mr. Moynihan's supplemental request for jury
16      instructions, the government's proposed verdict form,
17      the government's memorandum regarding drug quantity,
18      Moynihan's memorandum in support of the buyer/seller
19      jury instruction, Moynihan's proposed verdict form, the
20      government's revised request for jury instructions,
21      Moynihan's second supplemental request for jury
22      instructions relating to transcripts and common sense
23      inferences, the government's opposition to the
24      buyer/seller instruction, Moynihan's objection to the
25      chalks, and the United States, it's opposition to that
```

1  objection, and Moynihan's Rule 29 motion.

2       Is there anything else I should have received?

3            MR. SULTAN:  Just the memo in support of the

4  Rule 29 motion.

5            THE COURT:  I have that.

6       All right.  If there's time, I -- I apologize for

7  coming in late, I wanted to finalize my instructions,

8  subject to speaking to you, and read the Rule 29 motion.

9       With regard to the jury instructions -- the Rule

10  29 motion we can discuss if there's time, otherwise I'll

11  reserve it at least until after the closing arguments.

12  At the moment it does not appear to be meritorious to

13  me.

14       With regard to the jury instructions, my present

15  contention is to tell them, the jurors, that they should

16  not speculate or guess or draw any inference from

17  Hester's absence, which I think we discussed at some

18  point.

19       Do either or both of you want me to give a

20  constructive and joint possession instruction in view of

21  the evidence in this case?

22            MR. SULTAN:  Well, your Honor, I think that

23  the government's theory is that Moynihan had these drugs

24  and handed them over to Hester who handed them over to

25  Finley.  So I don't think there's any basis to give that

```
 1   kind of an instruction.
 2              THE COURT:  Okay.  That -- I was thinking
 3   that, although there's some evidence that there was a
 4   third person in the vehicle on one occasion.
 5         What's the government's view?
 6              MR. LEVITT:  Well, I don't see how it -- I
 7   don't see the harm to it.
 8              THE COURT:  I don't see -- it's not going to
 9   be a lengthy instruction.  On the other hand, you know,
10   I want to make the whole case as intelligible to the
11   jury as possible.  If you want it, I'll give it, but
12   there's not much evidence on which Mr. Moynihan could be
13   convicted for constructive possession.
14              MR. LEVITT:  No, there isn't, although, you
15   know, defense counsel was trying to raise the point that
16   he couldn't see in the back seat and I don't know if --
17              THE COURT:  All right.  Well, I will give
18   that, or plan to give it.
19         Then with regard to the substantive counts, um,
20   possession with intent to distribute of crack or, on one
21   occasion, cocaine, the government's theory is that
22   Mr. Moynihan possessed the, um, crack, and on one
23   occasion cocaine, in order to -- well, intending to
24   transfer it to Hester, right?
25              MR. LEVITT:  Well, to -- with intent to
```

```
1    transfer it to Hester and the intent that that would be
2    transferred to Finley.  You know, it's -- the notion is
3    that Hester was the mere broker or middle man for the
4    deal and that, you know, Moynihan knew where it was
5    going.
6              THE COURT:  Well, but for the purpose -- and
7    this came into focus as I was doing the instructions
8    this weekend.
9         For the purpose of the conspiracy, I -- this gets
10   into the buyer/seller issue.  I believe you have to
11   prove that Moynihan and Hester agreed to possess crack
12   with the intent to transfer it to a third party, but you
13   don't necessarily have to prove that to prove the
14   substantive counts because it would be sufficient for
15   Moynihan to possess it with intent to provide it to, um,
16   Hester.
17        My power is out at home.  I mean literally out.
18            (Laughs.)
19            THE COURT:  The -- which sounds like a non
20   sequitur, but isn't.
21        The -- I mean, I could give a general instruction
22   that would embrace Hester and someone else, like Finley,
23   but I did want to make that -- that distinction came
24   into focus for me.  It would be sufficient with regard
25   to the substantive counts, in my present view, to prove
```

1    merely that Moynihan possessed crack or cocaine with

2    intent to provide it to Hester.  Right?

3                MR. LEVITT:  No, I think that's true, um, and

4    I guess I would just ask that if what you're suggesting

5    is to give a general instruction that it's, you know,

6    it's sufficient to Mr. Hester or someone else, that's

7    fine.

8                THE COURT:  Okay.  Well, I'll do a further

9    revision.

10         And then the government had asked for an

11   instruction that I sometimes give that, you know, an

12   intent to distribute can be inferred from the amount.

13   But it doesn't appear to me that the evidence, at the

14   moment, would support that.  There's no expert testimony

15   with regard to what amount, um, is consistent with

16   personal use and what amount is consistent with

17   distribution.  In addition, Bencken testified that the 7

18   grams of crack sold on January 7th, a user could have

19   gone through in a couple of days or a weekend.

20         So at the moment I don't intend to give an

21   instruction that says they can infer intent to

22   distribute --

23                MR. LEVITT:  I don't think it's necessary,

24   your Honor.

25                THE COURT:  I am going to instruct that

1    because Finley is an immunized and paid witness, his

2    testimony should be scrutinized with care and relied on

3    with caution.  I'm going to give an instruction

4    regarding identification that gives them a little

5    framework of things to consider when they're considering

6    whether the identifications of Moynihan are reliable.  I

7    will give them an instruction on experts and that they

8    have to find the facts proven -- on which the expert

9    relies proven and then they can treat the opinion like

10   any other evidence.  I'm going to tell them --

11            MR. LEVITT:  Your Honor, on that point I'm

12   wondering who the expert is?

13            THE COURT:  Your chemist.

14            MR. LEVITT:  Oh, I see.

15            THE COURT:  Right?

16            MR. LEVITT:  Yeah.

17            THE COURT:  I mean, she testified to the

18   amount.  That's expert testimony.

19            MR. LEVITT:  No question.  No question.

20            THE COURT:  Maybe your power is out, too.

21            (Laughter.)

22            THE COURT:  I'm going to tell them that, you

23   know, it's permissible for the government to secretly

24   tape record conversations --

25            MR. SULTAN:  I'm sorry, I didn't hear what you

1    just said, your Honor.

2            THE COURT:  Yeah, it's permissible for the

3    government to tape record a conversation.  And if -- but

4    if they hear something on the tape that's different than

5    what's on the transcript, that they should rely on the

6    tape.

7            MR. SULTAN:  Your Honor, on that particular

8    point, um, I ask that in this case the notebooks with

9    the transcripts not go to the jury.  This is -- I mean,

10   these tapes are in English.  Um, there's no reason why

11   this is a case where they should be in there studying

12   these transcripts as aids.  They have the tapes and I

13   think that's what they should rely on.

14           THE COURT:  Well, I have discretion and I did

15   mark them as exhibits and I don't always do that when

16   it's in English, but I actually found the tapes hard to

17   follow.  Um, and given the fact that I have discretion,

18   given what I'll call "the vernacular," the "yos," the

19   "dogs," and the music, um, I think the tapes are

20   helpful, but I do think it's particularly appropriate

21   for me to tell them that if there's a discrepancy

22   between the tape and the transcript, to rely on the

23   tape.

24           If you want, I can tell you how I will instruct on

25   reasonable doubt.  Sometimes the parties want to hear

```
 1    that in advance.
 2               MR. SULTAN:  I'd like to hear that, your
 3    Honor.
 4               THE COURT:  I thought you might.  Well, in
 5    fact, I'll come back to that.
 6         All right.  It's my present intention to give --
 7    to cover the buyer/seller point.  The -- I mean, the
 8    government cited direct evidence that can be used to
 9    argue that Mr. Moynihan knew it was going to a third
10    party, including the transcript with which -- well,
11    anyway.  The Rule 29 memo ends when Finley's asking
12    Hester to arrange for him to meet directly with Moynihan
13    and the jury could reasonably infer, because if they
14    believe the identification, Moynihan's the one who
15    showed up on all the occasions that he was the
16    supplier.
17         But, as I noted earlier, Bencken, um, testified on
18    cross-examination that the 7 grams on January 7th could
19    be used by a user in a couple of days.  And arguably,
20    you know, Mr. Moynihan was selling to Hester for
21    Hester's personal use, which would be sufficient to
22    prove Count 1, it would be sufficient to prove 2, 3, 4
23    and 5.  But, as I understand it, it's not 2, 3, 4 and 5
24    that trigger the mandatory minimum, is that right?
25               MR. LEVITT:  Well, it's the conspiracy count
```

1    that does, your Honor.

2          THE COURT:  The conspiracy, Count 1.  Because

3    it was 7 grams on January 11th as well as on January 7th

4    and then 14 afterwards.  But I don't think anybody

5    testified about the implications of 14 grams.

6          MR. LEVITT:  So then is it the Court's notion

7    that it would give that instruction only with respect to

8    Counts 2 and 3, because there's no evidence -- I mean,

9    the Court is relying on that --

10          THE COURT:  No, I'm going to give it

11    generally.  I'm not instructing on Counts 2, 3, 4 and 5

12    discretely, I'm telling you what you have to prove to

13    prove possession with intent to distribute and that they

14    have to decide each count separately.  They could

15    conceivably find the defendant not guilty on Counts 2

16    and 3, which were 7 grams, and find him guilty on 4 and

17    5, which are 14.  So I'm not going to limit it.

18          MR. LEVITT:  Okay.  It's a little difficult to

19    understand given *Mitchell* and *Amerant* --

20          THE COURT:  Did either of them involve 7

21    grams?

22          MR. LEVITT:  Well, I mean, they -- you know,

23    they described the circumstances under which this kind

24    of an instruction is important and said, you know, a

25    classic buyer/seller relationship.  It's the single sale

```
 1    for personal use without prearrangement.  We have
 2    neither a single sale, we have prearrangement, we have
 3    -- we have no evidence of personal use, um, and, you
 4    know, that's Mitchell, and then in the Amerant, um --
 5              THE COURT:  Excuse me.  Just a second.
 6              (Pause.)
 7              THE COURT:  Yes, in Mitchell there was no
 8    request for the instruction and it wasn't plain error
 9    not to give it.
10              MR. LEVITT:  No, I understand, but I'm looking
11    at the language of the case in terms of, you know, both
12    cases describe the extremely limited circumstances under
13    which such an instruction is warranted, and frankly if
14    it's warranted in this case it's warranted in every
15    case, or, you know, any case involving street-level
16    sales.
17              THE COURT:  A street-level amount?  I mean, a
18    small amount?
19              MR. LEVITT:  I mean, what Mitchell says:  "The
20    classic buyer/seller relationship is a single sale for
21    personal use without prearrangement."
22              THE COURT:  Yeah, actually, I don't know why
23    that's right.  In other words, you know, Moynihan sold
24    four times to Finley, but if Finley -- while Finley was
25    saying he was selling to somebody else.  But if you had
```

1    a situation where somebody was an addict and he had a

2    source of supply and he went to him every day, there

3    wouldn't be one sale, um, but it wouldn't be a

4    conspiracy to possess with intent to distribute either.

5              MR. LEVITT:  And, you know, if there's

6    evidence that Hester's an addict, that would be

7    something, but there is none here.  Okay?  Nor is it

8    evidence of lack of prearrangement.  To the contrary,

9    these are very, um, well-arranged deals in terms of

10   phone calls, in terms of the meetings.  Um, you know,

11   it's -- and then, you know, what, um -- in *Amerant* he

12   says the same thing.  In *Amerant,* he says "depending on

13   the surrounding circumstances, a buyer/seller

14   relationship could, in some cases, be the very core of a

15   drug distribution conspiracy."  And that's this case.

16             THE COURT:  No, actually, that's -- and I was

17   just going to point that out, too.

18        I mean, here's all I intend to say, at the moment,

19   on this.

20             MR. LEVITT:  Okay.

21             (Pause.)

22             THE COURT:  "As I told you, to prove Moynihan

23   guilty of conspiracy, the government must prove beyond a

24   reasonable doubt that the agreement described in Count

25   1, and not some other agreement, existed between Hester

1    and Moynihan.  Count 1 charges a conspiracy to possess

2    crack or cocaine with intent to distribute it, which

3    means an agreement to have one or both of those

4    controlled substances in order to transfer it to a third

5    party either for money or without payment.  Therefore it

6    would not be sufficient for the purpose of Count 1 for

7    the government to prove only that Moynihan agreed to

8    sell or sold crack or cocaine to Hester for Hester's

9    personal use."  And I'll consider whether I would say,

10   "nor would it be sufficient for the government to prove

11   only that Hester agreed to sell or sold some controlled

12   substance to Moynihan for Moynihan's personal use."  "In

13   essence, in this case the government must prove that

14   Moynihan agreed to provide crack and/or cocaine to

15   Hester knowing that Hester intended to transfer the

16   drugs to someone else and intended to facilitate the

17   commission of that crime."

18              MR. LEVITT:  Well, with the exception of the

19   part about Hester selling to Moynihan, which is, you

20   know, there's no evidence whatsoever and I think it's

21   improper for that reason, I mean I think in that limited

22   way I don't have a real problem with that.  I guess, for

23   the record, I don't think it should be in there, but I

24   think the way the Court has fashioned it is -- without

25   that one portion is -- is okay.

1          THE COURT:  Mr. Sultan?

2          MR. SULTAN:  Well, I think what the Court has

3     read is exactly the instruction that should be given.

4     Um, there's certainly evidence that Hester is a drug

5     dealer, um, and there's no evidence as to exactly what

6     happened in that vehicle between Hester and Moynihan.

7     So I think that's exactly right.

8          THE COURT:  Well, I wouldn't say there's no

9     evidence.  I would say there's no direct evidence.

10          MR. SULTAN:  Well, there's no direct

11     evidence.  And I think that the defendant is entitled to

12     an instruction on what may have been the case.  And

13     there's no case that says only one sale is necessary for

14     a buyer/seller instruction.  **Mitchell**, which involved

15     kilograms of cocaine, certainly doesn't say that.  And

16     while maybe the classic buyer/seller case is one sale,

17     even in **Amerant** it says it can be a limited number of

18     sales.  And here we have a limited number, a small

19     quantity of cocaine.  So I think the Court is correct.

20          THE COURT:  So you also want me to add the

21     sentence, "Nor would it be sufficient for the government

22     to prove only that Hester agreed to sell or sold some

23     controlled substance to Moynihan for Moynihan's personal

24     use"?

25          MR. SULTAN:  Yes, your Honor.  And since the

1    government doesn't think that it's done so, I don't know

2    why they would be offended by that instruction.

3              MR. LEVITT:  Well, I mean --

4              THE COURT:  Well, the instructions have to

5    based on the evidence.  But there is -- there's evidence

6    in the case that on January 6th -- or at least I --

7    well, it's in the case, the jury heard it, that on

8    January 6th Hester got crack for Finley and he didn't

9    get it from Moynihan, so he's got another source.  And

10   he's selling marijuana out the window, in fact, being a

11   generous sole and charging only 8 bucks for what he paid

12   10 for, um, I'm going to say it.  And I don't think

13   that -- and, in fact -- well, the government's

14   objected.  By putting the second alternative in, might

15   not prejudice it, it just shows that I'm giving a series

16   of hypotheticals rather than focusing on the defendant's

17   primary theory.  So I'll do it.

18        Well, let's talk about this issue of the chalks

19   for the closing.  I'm tell you what my present thinking

20   on that is.

21        The defendant's -- my present thinking is that

22   with regard to January 7, 11 and 13, Bencken testified

23   about the time that Finley made the call to Hester to

24   initiate the day's events and the time the recording was

25   turned off and the fact that that was 15 to 20 minutes

```
1    after the buy on each of those three days.  So it seems
2    to me that the chalks relating to those three dates, to
3    the extent that they include the approximate times of
4    sales, since they're only being admitted as chalks under
5    611, for argument, there's an evidentiary basis to make
6    the inference concerning the time of the sales.
7    However, according to our notes and a review of the
8    draft of the transcript, that comes up on my computer,
9    Bencken wasn't asked and didn't testify to the time that
10   the recorder was turned off on the 15th and therefore
11   the chalk, concerning the 15th -- and we should mark all
12   of these now for identification so the record is clear
13   on what we're discussing, um, that one would have to be
14   revised in my present conception.
15        What's the next letter?
16             THE CLERK:  J.
17             THE COURT:  All right.  We're going to make
18   these J1, 2, 3, 4 and 5.  5?  Yeah, J1, 2, 3 and 4.
19   They're attached to the government's response to the
20   defendant's objection to the government chalks.
21             MR. LEVITT:  And these are them right here.
22             THE COURT:  Well, we just need to mark the
23   copies.
24             (Exhibits J1, J2, J3 and J4, marked.)
25             MR. LEVITT:  So, your Honor, you're saying on
```

1    the 15th, um, he did testify about the call --

2              THE COURT:  The first call.

3              MR. LEVITT:  -- um, the time of the call to

4    Hester on January 15th.  But you're -- I've got to say

5    that my recollection is different from that on January

6    15th and I also talked to Special Agent Bencken about it

7    and --

8              THE COURT:  I talked to my law clerk and had

9    him look at the draft of the transcript.  And we'll have

10   a little time.  I'll look again.

11             MR. LEVITT:  Well, I guess my recollection is

12   -- I guess I would ask the Court to look again because

13   my recollection is that we also, um, covered it in sort

14   of a global way by saying, you know, what was done in

15   each of those --

16             THE COURT:  Well, that's what I actually --

17   what I intended to look at for whether there was sort of

18   a sufficient basis to infer a habit, a routine or

19   practice and make an arrangement based on it.

20         Mr. Sultan, do you want to be heard on this?

21             MR. SULTAN:  Your Honor, I have not looked at

22   my notes on whether they established a sufficiently

23   precise routine to cover the 15th, but neither my notes

24   nor Ms. Grace's notes indicate that Bencken testified as

25   to what time the recording was turned off on the 15th.

```
 1            THE COURT:  Well, I'll consider that further.
 2   I think we're going to have some time before 11:00.  But
 3   the government should consider how it's going to revise
 4   it and block out the information.
 5            MR. LEVITT:  Well, I mean I think -- would it
 6   be possible to get a copy of the draft transcript of his
 7   testimony in between the time?
 8            THE COURT:  I'd have to talk to the
 9   stenographer about that.  You might have to purchase it.
10            MR. LEVITT:  Well, that's fine.  Well, I mean,
11   if -- you know, we would just cover it up, I suppose.
12            THE COURT:  Where it says, at the bottom,
13   4:30 p.m., the approximate time?
14            MR. LEVITT:  Well, we'd have to -- but we'd
15   have to cover up the 4:10, 4:15, too, because that's
16   based on --
17            THE COURT:  Right.  Right.
18            MR. LEVITT:  But like I said, I mean, this was
19   by design to do this, um, so I'd be very surprised if it
20   wasn't in there, it's a critical point, to try to create
21   the time period.
22            MR. SULTAN:  Looks like you forgot to do it.
23            MR. LEVITT:  I don't think so.
24            THE COURT:  All right.  I'll do a little more
25   work on that.
```

1        I told you I'd tell you what I intend to instruct

2   on reasonable doubt.  And this is derived from the First

3   Circuit pattern instruction, **United States vs.**

4   **Cleveland**, 106 F.3d 1056 at 1062 to 1063.  **O'Shea**, 426

5   F.3d 475 at 482.  **Woodward**, 149 F.3d 46 at 69, Note 15.

6        "As I have said, the burden is upon the

7   government to prove beyond a reasonable doubt that a

8   defendant is guilty of the charge made against him.  The

9   burden of proof has nothing to do with who called the

10  witness or offered documents into evidence, it has to do

11  with the quality of the evidence.  Proof beyond a

12  reasonable doubt is a strict and heavy burden, but it

13  does not mean a defendant's guilt must be proved beyond

14  all possible doubt.  It does require that the evidence

15  exclude any reasonable doubt concerning a defendant's

16  guilt.

17       A reasonable doubt may arise not only from the

18  evidence produced, but also from the lack of evidence

19  produced by the government.  Reasonable doubt exists

20  when, after weighing and considering all the evidence,

21  using reason and common sense, jurors cannot say that

22  they have a settled conviction of the truth of the

23  charge.  Of course a defendant is never to be convicted

24  on guesswork or suspicion.  If, for example, you view

25  the evidence in the case as reasonably permitting either

1    of two conclusions, one that a defendant is guilty as

2    charged, the other that the defendant is not guilty, you

3    will find the defendant is not guilty.

4         It is not sufficient for the government to

5    establish a probability, though a strong one, that an

6    element of an offense charged or a fact necessary to

7    prove an offense charged is more likely to be true than

8    not true.  That is not enough to meet the burden of

9    proof beyond a reasonable doubt.  On the other hand,

10   there are very few things in this world that we know

11   with absolute certainty and in criminal cases the law

12   does not require proof that overcomes every possible

13   doubt.

14        Concluding my instructions on this burden then, I

15   instruct you that what the government must to do to meet

16   its heavy burden is to establish the truth of each part

17   of each offense charged by proof that convinces you and

18   leaves you with no reasonable doubt and therefore

19   satisfies you that you can, consistent with your oath as

20   jurors, base your verdict upon it.  If you find a

21   particular charge against a defendant has been proven

22   beyond a reasonable doubt, you will return a verdict of

23   guilty on that charge.  If on the other hand you think

24   there is a reasonable doubt about whether a defendant is

25   guilty of a particular defense, you must give the

1    defendant the benefit of the doubt and find the

2    defendant not guilty of the offense."  Okay?

3         Do you want to, Mr. Sultan, speak briefly to your

4    Rule 29 motion?

5              MR. SULTAN:  Your Honor, yes, but before we

6    move on from the instructions, is the Court going to

7    give an instruction on mere presence, on association --

8              THE COURT:  Yes, it's going to be part of

9    my --

10             MR. SULTAN:  Conspiracy instruction?

11             THE COURT:  Yes.  I'll -- okay.  You'd have to

12   listen to this in the context of -- it's in the context

13   of describing membership.

14             MR. SULTAN:  I don't need to hear it all, your

15   Honor, as long as your Honor is going to cover the

16   subjects.

17             THE COURT:  I am.  I am.  Okay.

18             MR. SULTAN:  The only other thing, your Honor,

19   before you go to Rule 29, there's slightly different

20   jury verdict forms that the parties have proposed and --

21             THE COURT:  And you're going to see a third

22   one here.

23             MR. SULTAN:  I thought we might.

24             THE COURT:  Well, it's relatively simple.

25             (Hands document to counsel.)

1          THE COURT:  And I'll explain this to them.

2      Anybody have any thoughts they want to express

3   about this?

4          MR. SULTAN:  It's fine, your Honor.

5          THE COURT:  All right.

6      Now, your Rule 29 motion?

7          MR. SULTAN:  Yes, your Honor.

8      Your Honor, I guess, to me, the thrust of the Rule

9   29 motion is, frankly, there are some gaps in the

10  government's case and really the question conceptually

11  to me is sort of what's a reasonable inference versus

12  what's unreasonable speculation?  The particular -- to

13  me the most significant gap is, um, the government has

14  failed to connect anything that's in the videos to, um,

15  the phone calls, because there's no time on the videos

16  other than the fact that it's somewhere within this time

17  frame.  And therefore --

18      So, for example, when, on the video, um, Hester

19  says, you know, he's coming in 5 minutes, to me, you

20  know, that's a really, you know, one that concerned me.

21  If they had evidence that -- you know, that that video

22  is at 2:27 and then at 2:32, the Trailblazer arrives

23  with Moynihan, then I think I've got a real problem, but

24  they don't have that.  They never sought to sort of

25  synthesize the times of the video, because there are no

1    times on the video, they didn't try to provide one by

2    testimony or otherwise with either the phone calls which

3    they connect to Moynihan or with, um, Moynihan's actions

4    in showing up at the scene.  And given their failure to

5    make those connections -- you've got these sort of three

6    different sets of circumstantial evidence, you've got

7    phone calls, what's on the video, and then you've got

8    Moynihan showing up, and they're not connected.  And

9    therefore you leave it for the jury basically to say

10   "You figure it out.  You make the connections.  You

11   speculate," and to me it's not a reasonable inference at

12   that point, it's speculation.

13        And the government's going to say there are

14   reasonable inferences, but I think it's their obligation

15   to make that connection more precise particularly when

16   all they have is circumstantial evidence.  That's really

17   all they have in this case are those three different

18   bodies of evidence, and they need to be connected, they

19   need to be firmly connected to one another temporally

20   and they're simply not.  That is a gap in the

21   government's case and I think it's a fatal gap.

22             THE COURT:  Well, didn't they, for example,

23   testify that they're listening to the transmissions on

24   the Kel and, you know, they hear Hester say he'll be

25   here in 5 minutes and shortly afterwards the Trailblazer

1    arrives?  And that's not really a rhetorical question.

2            MR. SULTAN:  Well, I don't recall that they

3    tied it down that precisely.  I mean, certainly the

4    videotape, it covers a certain period of time, whatever

5    it is, an hour, an hour and a half, and Moynihan shows

6    up arguably within that period of time.  There's phone

7    calls that they -- that they connect to Moynihan in that

8    period of time.  Is that good enough or does that

9    require too much speculation?  To me that's really sort

10   of -- you know, that's the issue.  To me it leaves too

11   much to the jury's guessing, speculating, and it's not

12   connected enough sufficiently to satisfy the

13   constitutional standard.  That's my argument.

14           MR. LEVITT:  Your Honor, we can do this case

15   without the phone records, frankly, and you're

16   absolutely right, Bencken does testify to that.  He says

17   he's listening and hears Hester indicating the supplier

18   is coming and then Moynihan shows up.

19           January 7th, you know, it's -- Hester says, "He

20   said he'll be here in 5 minutes, so fucking let's go

21   grab that stuff."  Then he's on the phone, "Yo, where

22   you at?  Just come to Fourth Ave.  Just come to Fourth

23   Ave."  I came over here.  Then it's, "Yo, let me get

24   that dough."  He takes the money, gets out of the car,

25   meets with Moynihan, they make the block -- the agents

1    see them make the block together.  They come back

2    around.  He gets out of the car, he comes back, and you

3    see him hand the crack to Finley.

4         And when he gets back in his car, he says, "Yo, it

5    weighed 8.2, it weighed 8.2 in the bag.  Feels good?"

6    He said, "That's like rocket fuel."  The CW says, "I

7    don't know about the weight.  It looks a little small."

8    "Nah, I weighed it."  That's what I said.  He says, um,

9    "Well, look at the thickness."  I said, "Well, that's

10   what took us so long."  I was like, "We stopped there"

11   and I was like, "You know, you've got a scale."  He's

12   telling us about his conversation with Moynihan.  And

13   the agents testify -- you know, or Bencken testified

14   they saw him make the block together.  What were they

15   doing?  They were weighing it.  "Yeah, he was like boo,

16   he threw right there.  He threw right there.  Boo, I

17   threw it on the scale, it weighed like 8.2, 8.3."

18        You know, I mean, this is, um -- it's classic

19   circumstantial evidence.

20             MR. SULTAN:  How do we know it's a

21   conversation with Moynihan?

22             MR. LEVITT:  Well, the testimony is that he

23   says, "Give me the dough," he gets out, he gets in the

24   car with Moynihan, the agents see the two of them circle

25   the block together.  He gets back in and says -- he

```
1    talks about how he weighed it.
2              THE COURT:  Okay.  I mean, I -- it's
3    recognized.  I have to look at the evidence in the light
4    most favorable to the government, at this point, and in
5    my view Mr. Levitt's just identified one of many reasons
6    that the jury could properly find beyond a reasonable
7    doubt, based on the direct and circumstantial evidence,
8    that Moynihan was supplying the drugs and conspiring to
9    possess with intent to distribute on each of the
10   occasions charged in the indictment.  So I'm denying the
11   Rule 29 motion.  We'll go to the jury.  We'll see what
12   they say.
13             (Speaks to Court Reporter.)
14             THE COURT:  Okay.  I'm not going to be able to
15   give this.  They're governed by rules.  To the extent
16   there's a draft, it's helpful to me, like my notes would
17   be helpful to me, but it's not really in a form that can
18   be relied on.  But I'm going to look at our notes, my
19   notes, and -- as well as an intern's notes, and the
20   draft again in the next 45 minutes, um, both to double-
21   check with regard to whether Bencken was asked -- and
22   sometimes intended questions aren't asked, but also
23   whether there's sort of sufficient habit, routine or
24   practice-type evidence, and the government should be
25   thinking about how, if I don't change my mind, it's
```

```
 1    going to handle the January 15th chalk.
 2          But let's make sure that Mr. Hohler has a small
 3    set of these to mark as J and we can put them on the big
 4    ones also, um, you know, as duplicates.  For the purpose
 5    of sending the record to the Court of Appeals,
 6    potentially the small ones would probably be sufficient
 7    for them.
 8          All right.  Is there anything else?
 9          MR. LEVITT:  Your Honor, during closing I'd
10    request that the binders be handed out to the jury.  Um,
11    I plan on referring to specific pieces of transcript and
12    it would be helpful for them to be able to read that.
13    Um, and I'm also planning on playing two videotapes,
14    short clips, um, and I would just ask the Court to --
15          THE COURT:  And these are clips of, um, longer
16    tapes that are in evidence?
17          MR. LEVITT:  Correct, your Honor.
18          THE COURT:  And have you told Mr. Sultan
19    which?
20          MR. LEVITT:  I will.
21          THE COURT:  All right.  That's -- do you want
22    to be heard on those requests, Mr. Sultan?
23          MR. SULTAN:  Well, if it's evidence, your
24    Honor, he can play it, I guess, but I'd like to know
25    what it's going to be.  But I have no objection.
```

1          THE COURT:  All right.  And I'll let them have

2    the transcripts, too.

3          All right.  We'll come back at 11:00 and

4    hopefully we'll have all the jurors.  In fact, why don't

5    you come back at about 10 of 11:00, I'll update you on

6    the chalks and we'll go from there.

7          The Court is in recess.

8              (Recess, 10:15 a.m.)

9              (Resumed, 11:10 a.m.)

10         THE COURT:  We're still waiting for one of the

11   jurors.

12        My able staff has looked again and we don't find

13   any evidence that Bencken testified in a way that would

14   permit the information on the 15th to stay on the chart.

15         MR. LEVITT:  Okay.  I have a revised chart,

16   your Honor.

17         THE COURT:  Okay.  Why don't we make the

18   revised chart for the 15th, K.

19             (Exhibit K, marked.)

20         MR. LEVITT:  Your Honor, if I could just

21   ask --

22             (Marks chart.)

23         MR. LEVITT:  Normally, your Honor, if I

24   thought something was in evidence and there was a

25   question about it, I'd say -- I'd indicate, um -- I'd

```
 1   indicate the testimony I think supports it, but say
 2   something along the lines of "of course your memory
 3   controls."  So I guess my question is, if your
 4   conclusion is based primarily on the transcripts and
 5   it's a thorough review of the transcripts, am I
 6   precluded from saying that or is this really more of a
 7   combination of focusing more on the notes and --
 8            THE COURT:  Well, I don't think that -- with
 9   regard to the 15th, I don't think there's a basis in the
10   evidence to make the argument.
11            MR. LEVITT:  Thank you.
12            THE COURT:  I mean, if we hadn't focused on
13   it, the general admonition would be sufficient.  But I
14   think in these circumstances the transcript will tell
15   whether our review is reliable or not.  But we tried to
16   make it again, so.
17       Is there anything else that either of you would
18   like guidance on before we bring in the jury?
19            (Silence.)
20            THE COURT:  Okay.  And I've given you each up
21   to 40 minutes, which includes an opportunity for the
22   government to make a brief rebuttal, not more than 10
23   minutes is preferable.
24       I'll probably have the two closing arguments go
25   back to back without a break or maybe just a short
```

1    break, so they can stretch.  Their lunch is being

2    brought up.  I think, you know, given the fact that

3    we're starting at 11:15 and my instructions will take a

4    while -- well, we'll see where we are.  I may have them

5    have lunch and then instruct them right after lunch.

6             Okay?  We'll get the jury.

7                  (Pause.)

8                  THE COURT:  Oh, okay, Exhibit L is the revised

9    chart.  Thank you.

10                 (Exhibit L, marked.)

11                 (Jury enters, 11:15 a.m.)

12                 THE COURT:  All right.  Ladies and gentlemen,

13   welcome back.  I hope you've had a less eventful

14   weekend, with power outages and trees falling, than I

15   have.  But here we are.  Why don't you distribute those

16   notebooks, but don't open them.

17            We're now going to have the parties' closing

18   arguments.  I told you that what the lawyers say is not

19   evidence.  However, this is the opportunity they have to

20   remind you of the evidence as they remember it and argue

21   what inferences or conclusions they propose that you

22   draw from that evidence.  I've given them each up to 40

23   minutes for that purpose.  Because the government has

24   the burden of proof, it goes first, and it also gets an

25   opportunity for a brief rebuttal after the defendant's

```
 1    closing argument.  It's part of the government's 40
 2    minutes.  I'll see where we are when the closings
 3    conclude and I may have you eat your lunch before I
 4    instruct you, because my instructions will take a while,
 5    too, or I might give you the instructions before lunch.
 6    We'll see.
 7            All right.  Mr. Levitt, you may proceed.
 8            MR. LEVITT:  Thank you, your Honor.
 9
10    CLOSING ARGUMENT BY MR. LEVITT:
11            If you're a middle man, an operator, a hustler,
12    like Curtis Hester, and you want to sell crack and coke
13    on the streets of Haverhill, you need two things, you
14    need a customer with ready cash and you need a supplier
15    with a ready supply of drugs.  For one week in January,
16    2010, Curtis Hester had both, he had Kharis Finley with
17    ready cash, who said to Hester he was redistributing the
18    drugs, and he had that man, Timothy Moynihan, to supply
19    the drugs.
20            This case is about the roles that different people
21    play in the distribution chain in street-level drug
22    dealing.  There is the middle man, Curtis Hester, who is
23    brokering deals for crack and coke, and you saw for weed
24    as well, and getting a little money for it, asking for a
25    little crack for it, so he can sell some more and make
```

```
 1    more money.  Then there's the supplier, Moynihan, who
 2    controls things because he's got the product.  The deals
 3    don't happen until he gets there.  The deals -- the way
 4    the deals occur is on his terms.  He shows up in his
 5    white Chevy Trailblazer.  He doesn't get out of the
 6    car.  Hester has to go to him.  He doesn't meet the
 7    customer.  He doesn't want to expose himself.  He's in
 8    control of the situation because he's got the product.
 9    The roles that Mr. Hester and Mr. Moynihan played in
10    this case are shown well in the first buy and then they
11    repeat themselves.
12         In the first buy, you'll see, in Tab 12, Exhibit
13    12A, on the transcripts, Finley calls Hester, Hester
14    says, "What do you need?"  Finley says "The 7 hard."
15    Hester says, "All right.  Let me call him."  And you see
16    right away (On screen.) how this lines up with the
17    phones.  11:45, the approximate time of the call
18    ordering crack from Hester, and you see calls between
19    Finley and Hester, and then you see a call to Moynihan
20    from Hester.
21              THE COURT:  And, Mr. Levitt, excuse me.  Let
22    me explain something to the jury.
23         There were some charts that were admitted as
24    evidence and they were given numbers.  You'll have them
25    in the jury room.  The charts that Mr. Levitt's using
```

1   now, um, are not themselves evidence, they won't be back

2   in the jury room, they're being used to illustrate the

3   testimony as the government -- or the evidence as the

4   government argues it exists, and this is intended to

5   help you understand the argument.  But you won't have

6   these charts in the jury room.  Thank you.

7            MR. LEVITT:  Thank you, your Honor.

8        He called, he asked for the 7 hard, Hester says,

9   "Let me make a phone call.  I'll get back to you."

10  You'll recall there was another conversation on the

11  phone between Hester and Finley and they're talking

12  about the price, it's high, and Hester says, "I don't

13  even know if you want it," and, um, Finley says, "Let me

14  talk to my guy," the guy he's supposedly selling it to,

15  "and get back to you."  And then you see there's another

16  call between Finley and Hester and they arrange to make

17  the deal.

18       Now, the deal takes place about 45 minutes later

19  and you'll see in Government Exhibit 14, which is in

20  your transcripts, if you want to follow along --

21           THE COURT:  You can do that.

22           MR. LEVITT:  There it's Finley and Hester on

23  Fourth Avenue and they're waiting.  Hester has a phone

24  call with Moynihan.  He says, "He said he'll be here in

25  5 minutes, so fucking let's go grab that stuff."  And

1    then you see Hester outside the car, and you hear him,

2    it's faint, "Yo, where you at?"  "Oh, yeah, just come to

3    Fourth Ave.  Just come to Fourth Ave.  I came over here

4    all right."  And then you see what happens next --

5         And I'd ask permission to play the tape and to

6    show it to the jury, your Honor?

7              THE COURT:  Okay.

8              MR. LEVITT:  And it starts with Hester saying

9    "Yo, let me get that dough."  Just wait --

10             (Plays tape.)

11             MR. LEVITT:  It's on Page 2.

12             (Plays audio and videotape.)

13             MR. LEVITT:  And do you recall the testimony

14   of Special Agent Bencken?  He's on surveillance.  He

15   sees the while Chevy Trailblazer registered to Timothy

16   Moynihan pull up and park behind Finley's vehicle.  He

17   then hears Finley giving Hester the money.  He hears

18   Hester getting out of the car.  So the next thing he

19   sees is Hester, and the man he subsequently identifies

20   as Moynihan, who's driving the white Chevy Trailblazer,

21   pull in behind them and drive around.  And they're

22   making the block.  And we know what they were doing when

23   they made the block because Hester tells us, "That's

24   what took us so long.  I was like -- we stopped right

25   there and I was like, 'Yo, you got a scale?'  'Yeah, he

 1    was like, boo, he threw it right there.'"  That's what

 2    they were doing, they were weighing the product.  And

 3    the reason they're doing that is because they want their

 4    customer to be happy.  Okay?  It's like any business,

 5    they want their customer to be satisfied that he's not

 6    get ripped off, that he's getting a good amount, because

 7    they want more business.  It's in Moynihan's interest

 8    that his customer is satisfied.  It's in Moynihan's

 9    interest that his middle man is satisfied.  That's what

10    they're doing and that's the different roles these folks

11    play.

12        And you see on the video him get back in the car

13    and give him the crack, when he gets back.  And you see

14    on the calls, they match up.  Moynihan's the 8860

15    number, you know that from the Merchants' documents,

16    from the Commerce Insurance documents, from RMV records,

17    and from the phone call stipulation about certain calls,

18    certain people that he called, his father, his sister,

19    his girlfriend, during that same time period using that

20    phone number.  And Special Agent Bencken testified that

21    he turned off the equipment at about 2:50 p.m., to

22    retrieve the crack, and he testified that it took about

23    15 to 20 minutes on each buy for Finley to drop off

24    Hester and come and meet him.  And he testified that

25    after Hester brought the drugs to Finley, they were

1   moved immediately.

2        So, you know, you've got the deal happening

3   somewhere around 2:30, 2:35, and you see these last

4   calls, Hester-Moynihan, Hester-Moynihan, Hester-

5   Moynihan, and you see them talking on the phone just

6   before the deal, Hester talking to him, "Where are you?"

7   Telling him where he is.

8        Now, you heard about the identification.  Um,

9   Bencken, Doucot pulls up the RMV photo.  It's the RMV

10  photo for the registered owner of the white Chevy

11  Trailblazer, 383HA8, and there's the picture of

12  Moynihan, who we just saw, and he says, "That's the

13  guy."

14       Now, before I go on to each of these buys, let me

15  step back for a moment, um, and talk a little bit about

16  what I think are three sort of things to think about

17  when you deliberate, um, one is the charges, the law --

18  and Chief Judge Wolf will tell you about the law that

19  applies in this case, it's fairly straightforward, um,

20  the other is the evidence, and the third is your common

21  sense, and we'll talk about that in length.

22       First, with respect to the law, the law of

23  conspiracy is straightforward, it can be implicit, it

24  can be explicit, it can be based on a wink and a nod,

25  it's an agreement to do something.  In this case it's an

1    agreement between Hester and Moynihan to sell crack and

2    coke to Finley.  Okay?

3          Finley shows up.  Finley's on every buy, he's in

4    the driver's seat in the car, you'll hear the tapes --

5    you'll see the transcripts today and hear some of the

6    tapes and repeatedly Hester's telling Finley that he

7    told Moynihan about him.  Okay?  And you'll hear that --

8    well, you've already heard it.

9          With respect to the law, the government's going to

10   ask that you find that a conspiracy involved over 28

11   grams of crack cocaine.  The weight is based on the net

12   weight of the drugs.  The net weight is listed on the

13   DEA reports that you've got, um, and you'll see them.

14   And, um, there's four buys, January 7th, at 6.7 grams of

15   crack, January 11th, at 6.7 grams of crack, January

16   13th, it's 13.7 grams of crack, and January 15th, it's

17   13.3 grams in crack.  In total it's 40.4 grams of crack

18   cocaine.  Over 28 grams, that's what we'll be asking you

19   to find.  Um, again, it's the net weight, which includes

20   the whole mixture.  Okay, it's not the pure drug, it's

21   the mixture.  Whatever's mixed, whatever cut is used,

22   it's all included.  It's everything but the bag.

23          With respect to the evidence, the evidence is not

24   what the lawyers say.  You've heard that now a couple of

25   times.  The evidence came from that witness stand.  It

1    comes from the documents, it comes from the tapes, and

2    it comes from the phone records, the summary charts

3    you've seen.  And let me suggest to you that a way to

4    think about the evidence is not individual pieces of

5    evidence by themselves, but how they act together, the

6    collective nature of evidence.  That's how things work.

7    So the tapes related to the phone records, the

8    surveillance relates to the tapes, the phone records,

9    the documents, everything relates together.

10          When you walk into this courthouse, you don't

11   check your common sense at the door, to the contrary.

12   Your common sense is one of the most important things

13   that you bring to your service as jurors.  Okay?  You

14   can rely on your common sense and your common experience

15   about how things work.  That's proper.  Chief Judge Wolf

16   will tell you the same thing.

17          Your common sense tells you how -- um, whether an

18   argument that a lawyer makes in closing argument makes

19   sense, okay?  Your common sense tells that you.  Your

20   common sense tells you how the evidence relates to

21   itself, how the testimony, the surveillance, the phone

22   records, the documentary evidence, how it all relates

23   together.  Your common sense tells you that.

24          Your common sense helps you understand the roles

25   that Hester and Moynihan were playing.  It's not rocket

science.  Hester was the middle man.  Moynihan was the

supplier.  They call them a "connect," right?  He has

product.  He has work.

     January 11th, the second buy.  Most things are the

same, but there's a new wrinkle, they now have

Mr. Moynihan's address.  So Sean Richards is set up on

surveillance at 31 Whittier Street and after the calls

are made and after there's a back and forth between the

CW and Hester -- and you hear from the tapes Finley

asking for the drugs, you hear Hester say, Government

Exhibit 16A, "Let me hit you right back.  Let me hit you

right back.  I'm going to call him.  I'm going to call

him."

     Later, Government Exhibit 16C, "Yo, fucking he

said he only" -- "I just talked to him, he called me

right now, he said he only got half left and he ain't

going to let the whole half go."  Okay, he's talking

about a half ounce of crack.  He's not going to let the

whole half go.  He's got some other customers that he

needs to keep happy.  Okay?

     Finley says, "Does he got soft left?"  Hester,

"Yeah, he got soft, cocaine."  "All right, give me seven

of both of those, one of soft and one of hard."  "All

right.  Let me call him right now and tell him.  All

right."

1          And, again, see the phone connections.  January

2     11th, 2:15, the approximate time that Finley reported

3     call ordering crack.  You see a call between Hester and

4     Finley at 2:28:56.  2:29:59, less than a minute later,

5     Hester-Moynihan, Hester-Moynihan again at 2:30, Hester-

6     Moynihan again at 2:32, Hester-Moynihan at 2:37, Hester-

7     Moynihan at 2:41.  Okay?  A middle man is talking to his

8     supplier about making a deal.

9          Sean Richards is on surveillance at 31 Whittier

10    Street.  He sees Moynihan, whom he recognizes, come out

11    of the house, get into the same white Chevy Trailblazer,

12    and head to the Cordovan Apartments.  He follows him.

13    He doesn't make any stops.  There's nobody else in the

14    car.  He follows them all the way to the Cordovan

15    Apartments.  Bencken and Doucot were there, they pick up

16    the surveillance, and Richards peels off.

17         Hester and Finley are already there, all right,

18    they're always there, they're waiting for the supplier,

19    he comes when he wants to come.  He shows up.  He pulls

20    in behind them.  Bencken's on surveillance, he's got a

21    nice side view elevated.  He sees Hester get out of the

22    car.  Um, you see on the tapes -- actually before that,

23    um, two things.  One, Government Exhibit 18, as they're

24    driving there, you hear Hester on the phone and he's

25    talking to one of his customers.  All right?  He's got

```
 1    other customers.  He's a middle man.  He's a hustler.
 2    That's what he does.
 3         "What do you want?"  He's on the phone.  "Do you
 4    want hard or soft?"  "Yeah.  Go ahead.  The soft?"
 5    "He's coming.  I'm waiting for my guy."  My connection
 6    is what he's waiting for.  "Do you want the hard or do
 7    you want the soft, because he's coming right now."
 8    "Yeah.  Yeah.  I'm going to get you, I'm going to give
 9    you the good stuff.  If you have the right amount of
10    money, I'll give you the good stuff."  And then he
11    starts complaining about a customer named Steve.  Steve
12    is always short.  I don't know who that is.  Steve
13    Berry?  Who knows.  Some customer named Steve.  He never
14    has the right amount of money.  He's complaining about
15    that.
16         Then on the next page Hester and Finley are
17    waiting at the Cordovan and they had a conversation
18    about Moynihan's truck arriving.  Hester, "It's the
19    white SUV right there, right?  Do you see that, Dude?"
20    Finley, "Where?  The white SUV where?"  Hester, "Behind
21    the bus.  Behind the bus."  Hester gets on the phone,
22    because he just saw his supplier.  "Yo, boss man."  "I'm
23    right here, man.  I'm outside my baby mother's crib
24    waiting on you.  Holler in."  "I think I just seen you
25    going up the street, you shit."  Hester, "You've got a
```

nice little Ford Explorer, that white truck that went

up."  Finley, "Yeah, that's a Blazer.  I thought it was

a Blazer."  Hester, "Remember -- remember when we was on

Fourth Ave."  Do you remember January 7th when we were

on Fourth Ave.?  This is the guy that hooked us up.

This is my connect.  That's what he's saying.

Hester -- Bencken sees Moynihan pull up.  He

recognizes him.  He recognized the truck.  It's parked

behind Finley's truck.  He sees Hester get out.  And he

gets into the truck with Moynihan and he sees some kind

of movement between Hester and Moynihan.  They're kind

of leaning into each other, okay, leaning towards each

other as if they're exchanging something.

Finley says, on the tape, Page 4, "They left in a

white truck, the same white truck."  He calls out the

plate, "383HA8, taking a right, got some 18-inch chrome

rims on it."  And that's consistent with what Bencken

sees because Bencken sees them pull out, Moynihan and

Hester, drive right in front of them, turn around, make

the block, come back and park behind Finley.

Hester gets out, gets back in the car, and you

hear Finley and Hester talk about the drugs.  "Yeah,

this is that thick shit, nigga," that's what Hester

says, and this is the one there's no video on.  This is

the audio only.

1          And again -- so you see the calls between Moynihan

2     and Hester and immediately after the recorded call

3     ordering the drugs and that's an approximate time of

4     2:15, you see those calls I just told you about, and

5     then you see on the second page of the chart, Bencken

6     testifies he takes off -- he meets Finley and turns off

7     the recording equipment at 3:45, retrieves the crack and

8     cocaine.  15 to 20 minutes before that is the time the

9     deal goes down, that's what he testifies to, it takes

10    him that long to -- for Finley to drop off Hester and

11    meet Bencken and Doucot at the meeting location.

12         Four calls immediately preceding that.  Hester and

13    Moynihan at 3:22.  Hester and Moynihan at 3:23.  Hester

14    and Moynihan at 3:24.  Hester and Moynihan at 3:25.

15    Hester and Moynihan at 3:29.  You can see some of these

16    calls are longer than 26 seconds, some are short, 5, 0

17    seconds, didn't even connect, 3 seconds, 24 seconds.

18         Again, you hear him on the tape talking to him,

19    "Yo, where you at?"  "I just saw you."  "I just saw your

20    car, boss man.  I'm right here on Fourth Avenue."

21    Okay?  And you see how the evidence all links up.

22         January 13th.  More of the same.  The pattern is

23    the same on all four buys.

24         January 13th, Richards is in place.  He sees

25    Moynihan come out of the house.  Immediately preceding

1    that, we've got the phone calls.

2        Exhibit 20A, January 13th, Finley, "Yo, hit this

3    nigga up for me, for that." Hester, "You got the whole

4    650?" "Yes, sir." "All right. Hold on." He's got to

5    make the call to his supplier. Can't do it by himself,

6    he needs the drugs.

7        20B, Hester, he said, "Let him take a shower.

8    He's going to come and bring that." "For how long is he

9    going to be?" "Like half an hour." And they arrange to

10   meet.

11       And again you see the approximate time of the

12   Finley call, the recorded call, um, with Hester, 1:00.

13   You know, maybe it's this one, 12:51. You've got Hester

14   and Moynihan, 12:51:59. Hester and Moynihan, 12:57:30.

15   Hester and Moynihan, 1:03. Hester and Moynihan, 1:03.

16       Richards sees Moynihan again at 31 Whittier

17   Street, he's on Belmont Ave. looking down at him. He's

18   got his binoculars. He used the binoculars. He says he

19   doesn't even need them, he can see him, he can recognize

20   him, but he uses it. He comes out of the house. This

21   is the buyer, he's got a girl with him, I believe. Um,

22   nobody's in the back seat. He's watching the car for

23   like 45 minutes beforehand. He sees him coming out, he

24   goes, he follows him. He follows him all the way.

25       On all these buys he takes the back streets.

1    Okay?  He doesn't go on the main road.  You can use your

2    common sense, "Why do you do that?"  You're a drug

3    dealer and you've got drugs in the car, right?  You're

4    trying to avoid law enforcement.  You take the back

5    streets even if it's slower, even if it's less direct.

6    He follows him through the back streets to Fourth

7    Avenue.  No stops.  He doesn't pick anybody up.  He

8    turns on Fourth Avenue and Moynihan and Doucet and

9    Bencken pick up the surveillance.

10         And you see and you hear the exchange between

11   Hester and Finley, Government Exhibit 22.  Hester has a

12   phone call and then he gets off and he says, "All right,

13   that was him."  Right there.  This is Page 4.  "That was

14   him right there.  He's going to Fourth Ave., come meet

15   him at Fourth Ave. -- go meet him at Fourth Ave."

16         Later on that page -- and this is the one where

17   they buy the weed from Sean Do, right?  The first thing

18   they do, you know, Hester gets in the car and "Let's go

19   get some weed," they go get the weed from Sean Do.  And

20   they've already got it at that point, before they get

21   the crack, you know, Finley and Hester have an exchange,

22   "You got the bud," "I got the bud."

23         Then Hester has another conversation on the phone

24   about a customer, okay?  He's an operator and he's got

25   other customers.  "Yeah, I'm about to go get it right

```
 1    now.  I'm meeting my -- I'm meeting my" -- "All right,
 2    Blackey, you know what?  You call someone else,
 3    Blackey.  I'm getting it.  I'm telling you straight
 4    out.  I'm telling you straight out.  I'm about to go get
 5    it right now.  I don't have it right now.  I'm about to
 6    get it right now.  I'm waiting for him.  Give me 15
 7    minutes."  Okay?  He's got another customer that he's
 8    going to service.  And that's what you do when you're a
 9    middle man, you get the drugs and you service the
10    customers and, you know, and you make 50 bucks, 25
11    bucks, and maybe you get a little crack on your own you
12    can sell.  That's what he does.
13          The next page, Page 5, you hear Hester, because he
14    has to say, "Let me go outside and make a phone call."
15    He goes out and he come back.  "He said two seconds."
16    He's talking about his connect, Moynihan.  Later, "He
17    said he would be here in two seconds."  "Yo, that's him
18    right there.  Come on.  Hurry up."  "It's all there?"
19    That's when the CW gives him money.  "It's all there,
20    yeah."  He gets out of the car.
21          Now, Bencken is seeing that same white Chevy
22    Trailblazer show up on Fourth Avenue.  Again he
23    recognized the driver, Tim Moynihan.  He pulls up right
24    behind Finley's car.
25          Hester gets out and you hear Finley talking on the
```

1    transmitter, "383HA8, 383HA8, Chevy.  Chevy Tahoe, I

2    believe, Chevy Tahoe.  White guy.  Black glasses on.

3    Yeah, Trailblazer.  2005 Trailblazer.  Same guy.

4    They're going down fourth Ave. right now."  And Bencken

5    testifies they make the block again.

6         Hester and Moynihan pull in behind Finley's car.

7    Hester gets out.  Gets into the car.  Gives the crack to

8    Finley.  Finley says, Page 8, "It's solid."  Hester,

9    "It's that thicky thick."  And you heard that's what

10   crack is like, thick, like a cookie.  That's January

11   13th.

12        And again, 2:15, Bencken meets Finley, turns off

13   the recording equipment and retrieves the crack 15 to 20

14   minutes earlier is his testimony as to how long it

15   takes.  "After the deal, to drop off Hester and meet

16   Bencken," 1:55 to 2:00.  The last two calls before that

17   time, 1:47, Hester and Moynihan, 1:52, Hester and

18   Moynihan.  They're arranging to meet.  That's what you

19   see on the video.

20        January 15th, the same pattern.  The recollection

21   here is that Bencken didn't testify about the time he

22   took off the recording equipment, so we have the last

23   call from Hester and Moynihan at 4:16.

24        Let's talk about that buy.  We've come full circle

25   here, okay?  Because again this buy shows, as much as

any of these buys, the roles that these different folks
are playing here, Hester as the middle man, the hustler,
the street dealer, Moynihan, as the supplier, the guy
with the drugs, the guy who never gets out of his white
Chevy Trailblazer.

It starts with a call, Government Exhibit 24A,
"You hit this nigga up?"  "No, you didn't tell me what
you wanted," says Hester.  "I'm probably just going to
want 14 for today."  "All right.  I'm going to make a
phone call."

24B, Hester, he says, "Like in an hour," because
he could do that for you.  Okay?  Moynihan knows that
Hester's got this customer, right?  He's going to want
to know, that's the common sense, he's going to want to
know where his drugs are going, who this guy is, "Is he
someone we can trust?"  Okay?  This is the fourth deal
they've done now in the span of 8 days and every time
Hester shows up in the same truck with the same
customer.  Okay?  He's going to want to know who it is,
what's the story.  He said, "In an hour, dog, he could
do that for you."  "Tell him I want it."  "All right.
All right."  And, again, the phone calls corroborate the
surveillance, the physical evidence, what you're seeing
and hearing on the tapes.  Corroboration.

1:00 p.m. is the call to -- Special Agent

1    Bencken's testimony is there's a 1:00 p.m. call between

2    Finley and Hester.  There's not a 1:00 p.m. call here,

3    you know.  Maybe it's this one, 1:30.  He said they

4    don't always reach each other.  You've got this one at

5    1:30, 36 seconds, you've got Hester and Moynihan, you've

6    got Hester and Finley, and you've got Hester and

7    Moynihan.  Okay?  Consistent with what you heard on the

8    tapes.

9         Finley picks up Hester -- and this is the buy, if

10   you remember, where Finley's trying to get Hester to

11   introduce him to Moynihan, right?  The agents want him

12   to do it.  They're trying to get Moynihan on tape the

13   way they have Hester, right?  So they're trying to get

14   him introduced.

15        Finley, Government Exhibit 26, Page 1:  "Can you

16   call your connect and like fucking have him meet me?"

17   Hester, "That's what I'm trying to do, dog.  When he was

18   calling me on the other line, I told him I was talking

19   to you."  "Oh, dam.  All right. "

20        Page 2, "Yo, CJ, your dude's already straight?  I

21   said your dude's already straight?"  Hester, "Yeah, we

22   just got to call when we get into Haverhill."  Okay?

23   And you heard the testimony, "straight" means he's

24   already got the drugs.  "Yeah, he's already got the

25   drugs.  He's just got to call when he gets to

1   Haverhill."

2       Then Hester calls Moynihan:  "Yo, I'm on my way to

3   Haverhill right now.  I'll be there at 15:20.  Where do

4   you want me to meet you?"  "On Fourth Ave."  "On

5   fourth?"  "I'm going to my man after that one.  All

6   right?"  Where are they going to meet?  Fourth Ave.

7   Where do they meet?  Fourth Ave.

8       Page 3.  Hester's on the phone again talking to

9   his connection, "Yo, I'm coming off the highway right

10  now."  Finley, "Are you going to Fourth Ave.?"  Hester,

11  "Yeah, yeah, Fourth Ave."

12      Finley, more conversation, Page 4, with Hester

13  about trying to meet his supplier.  Finley, "That's why

14  I wanted to get the nigga's number, dog."  Hester,

15  "Yeah, that's what I was telling him, too, when he was

16  calling me."  Hester, "He's mad paranoid, you know what

17  I'm saying?"  Well, he's smart.  Okay?  He doesn't need

18  to get out of his car.  He doesn't need to meet the

19  customer.  He can stay insulated.  That's the benefit of

20  being the supplier, that's the benefit of having the

21  product.  Hester doesn't have that luxury.  Hester's the

22  street dealer.  He's got to be out meeting people on the

23  street making deals.

24      Hester says, "He don't even like selling you that

25  shit."  "Really?"  Hester, "Yeah, he just does it for

me, you know what I'm saying?  Like he fucked with that
coke.  He'd rather sell a little.  He'd rather sell the
weed, you know what I'm saying?  But like I call him
and, shit, like, you know what I'm saying?  I call the
nigga for balls like every day and shit."  Okay?
Hester's telling you that he calls Moynihan for 8 balls
of crack cocaine every day.  An 8-ball is 3.5 grams.
You heard the testimony.

        Hester, on the next page.  On the phone, "Yo, yo,
I'm right here going by Richdale's right now."
"Where?"  "At Richdale's."  "Right there on Fourth,
right?"  "All right.  All right."

        I'd ask permission to play the tape, your Honor?

                THE COURT:  Yes, and you've gone almost 35
minutes.

                MR. LEVITT:  Okay.  We're almost done.  Thank
you.

                (Plays audio and video.)

                MR. LEVITT:  That buy Richards is on
surveillance again.  He sees Moynihan outside the house,
follows him in the white Chevy Trailblazer, to Fourth
Avenue.  The agents pick up the surveillance there.
Same white Chevy Trailblazer.  You saw the surveillance
video.  You see Hester get out of Finley's car, get into
the white Chevy Trailblazer with Moynihan.  He gets

```
 1   out.  Moynihan takes off.  All right?
 2         The phone calls here, again, towards the end,
 3   Hester-Moynihan, Hester-Moynihan, Hester-Moynihan.
 4              (Indicates.)
 5              MR. LEVITT:  Ladies and gentlemen, thank you
 6   for your service.  Thank you for performing your civic
 7   duty.  These cases, these trials are about justice.  You
 8   dispense justice when you reach a verdict that is
 9   consistent with the evidence, the law, and your common
10   sense.  I ask you to render a verdict in this case that
11   is consistent with all three, with the evidence, with
12   the law, and with your common sense.  Find the
13   defendant, Timothy Moynihan, guilty of all charges.
14   Find that the conspiracy involved 28 grams or more of
15   cocaine base.
16         Thank you.
17              THE COURT:  Okay.  Mr. Sultan, you may
18   proceed.
19              MR. SULTAN:  Thank you, your Honor.
20         Let me turn this screen off, your Honor, please.
21
22   CLOSING ARGUMENT BY MR. SULTAN:
23         Good morning.  Well, you've just heard the
24   government's story and it sounded pretty good.  There's
25   no doubt that the government presented a strong case --
```

 1    against Curtis Hester.  But Hester isn't here.  The only

 2    person on trial in this courtroom is my client, Timothy

 3    Moynihan.  And what you need to determine is whether the

 4    government has proven beyond a reasonable doubt that

 5    Moynihan was personally involved in Hester's cocaine

 6    sales to Finley in January of 2010.  Not proof by

 7    association, not proof by mere presence or knowledge,

 8    not guesswork or speculation that he might have been

 9    involved, but credible evidence that proves that these

10    charges against Mr. Moynihan are true.  So where is it,

11    where's the evidence against Moynihan?  Where's the

12    beef?

13           You know, there's only two people in this

14    courtroom who have told you that Timothy Moynihan was

15    Hester's drug source, Kharis Finley and the prosecutor,

16    Mr. Levitt, and I'm going to talk about Finley in a few

17    minutes.  But let me speak for a moment about what the

18    prosecutor told you.  And Mr. Levitt is an excellent

19    prosecutor and he's done a fine job with what he has to

20    work with.  But Mr. Levitt is not a witness in this

21    case.  He provided you with no evidence.  And frankly no

22    matter how many times he points his finger at

23    Mr. Moynihan, he has no idea whether Moynihan was

24    Hester's drug supplier.  And his opinion is irrelevant,

25    so don't take his word for it, don't rely on what he

1    says or on what I say.  If it's not proven by the

2    evidence, it's not proven.  Period.

3         One of our greatest Supreme Court justices,

4    William O. Douglas once wrote:  "Any person faced with

5    the awesome power of government is in great jeopardy,

6    even though innocent."  This case is a dramatic

7    illustration of that observation.  The awesome power of

8    government.  Think about the awesome power of the

9    government in this case.  The power to employ Kharis

10   Finley again and again and again, despite his drug use,

11   his drug dealing, his lying.  The power to give him

12   immunity from prosecution.  As Judge Wolf told you, when

13   the government applies for immunity for a witness like

14   this, the Court has no discretion but to issue the

15   order.  That's what Kharis Finley got in this case.

16        Think about the enormous expenditure of resources

17   by the government in this case.  The awesome power of

18   government.  A whole army of law enforcement agents from

19   a whole bunch of different agencies listening in on

20   people's phone calls, secretly tape-recording their

21   meetings, following them around all over the place, for

22   weeks or months at a time.

23        Now, with all of that expenditure of resources,

24   with all of that awesome power, the government could

25   have carried out a thorough investigation to get to the

1    bottom of Hester's drug dealing, but they didn't do that

2    in this case.  Why didn't they do that?  Because on

3    January 7th, 2010, when Timothy Moynihan's Trailblazer

4    showed up on Fourth Avenue in Haverhill, the government

5    made a presumption, a presumption of guilt.  They

6    decided then and there that Moynihan was Hester's drug

7    supplier and they then set about to create a case to

8    find support for that presumption.

9         So they went out and got Hester's phone records, a

10   perfectly appropriate part of an investigation, but all

11   they focused on were the calls that supported their

12   presumption of guilt, all they focused on were the calls

13   between Hester and Finley and the calls between Hester

14   and this 8860 number, which they associated with

15   Moynihan.  What about all the other calls that Hester

16   was making or receiving on these very same dates from

17   other people, people like William Pena, and Alori

18   Luciano, and Steve Berry, and Sean Do?  They weren't

19   interested in those people.  They didn't even brother to

20   investigate who those people were.  Why?  Because it

21   didn't fit their theory, it didn't fit their presumption

22   of guilt.

23        So when they got this prescriber information for

24   this 8860 number, the number that -- Timothy Moynihan's

25   phone number -- that's their presumption, well, the

1     subscriber information shows the phone was subscribed to

2     somebody else with a different birthday.  They just put

3     that aside.  Put it aside.  Why did they put it aside?

4     It doesn't fit their theory.  It doesn't fit their

5     presumption of guilt.  On those Commerce Insurance

6     records, you recall there's a different number on some

7     of those records for Mr. Moynihan.  They just ignored

8     that.  Forget that number.  That number doesn't fit.

9     Just, whoosh, put it aside.

10         That's the investigation they did here.  It was a

11     backwards investigation.  Instead of investigating

12     getting all the facts and trying to come to a

13     conclusion, they started with the conclusion, they

14     started with the presumption of guilt and then they

15     tried to fill in what evidence, what could we find to

16     support our presumption of guilt?  That's not an

17     appropriate investigation and that is what led to my

18     client sitting here, in this courtroom, on trial for his

19     liberty.

20         Now, with all these resources, what do they

21     present?  Let's look at the evidence.  As I recall, they

22     presented five witnesses and a bunch of exhibits.  So

23     let's go through them.

24         We'll start with Mr. Finley, Kharis Finley,

25     because Finley, he's the star witness, he's the

1    centerpiece of their case.  What do we know about Kharis

2    Finley?  He's a convicted felon, a drug abuser, a drug

3    dealer, a liar.  He couldn't even keep his lies straight

4    from one minute to another on the witness stand.  He was

5    paid tens of thousands of dollars, a paid witness, an

6    immunized witness.  And Kharis Finley did his best, he

7    did his best to help his employer.  And he's not just

8    someone that they used over and over and over again, but

9    he's their guy.  He's on a first-name basis with these

10   agents, "Chris" and "Matt."

11        Deputy Doucot, you heard, offered to give him a

12   job recommendation.  Can you imagine that, a job

13   recommendation for Kharis Finley?  And when he lost his

14   driver's license earlier this year after his latest

15   arrest for distribution of drugs, who did he call?  His

16   good pal Special Agent Bencken, "Could you help me out

17   here, help me out with my license?  I got arrested.

18   They took my license."  And what did Bencken do?  Oh, he

19   didn't fault the Registry, no, no, no, he sent them an

20   e-mail on Finley's behalf.  He's their guy.  And do you

21   recall at the end of my cross-examination of Agent

22   Bencken, I said to him, "Do you consider Kharis Finley

23   to be a trustworthy person?"  Do you remember what he

24   said?  He said, "Yes."  Isn't that incredible?

25        Special Agent Bencken may trust Kharis Finley, the

1    government may trust Kharis Finley, but what's important

2    is do you trust Kharis Finley, would you trust him with

3    your children, with your grandchildren?  Would you rely

4    on the testimony of that man in a court of law to

5    convict my client of a serious offense?  I submit that

6    you can't do that.  So that's Mr. Finley.

7        Now, they call -- the second witness was the drug

8    analyst, Mandy McGehee, I think her name was, and she

9    told you she analyzed what Hester sold Finley as

10   cocaine.  Right, it's cocaine, no question about it.  It

11   doesn't say anything about Mr. Moynihan.  That's their

12   second witness.

13       They called Sean Richards.  He testified he

14   followed Moynihan around on a few occasions, January

15   11th, the 13th and 15th, he followed him around.  He

16   didn't see him do anything incriminating, he didn't see

17   him do anything involving drugs.  What does that add to

18   the government's case against Moynihan, what does that

19   prove?  Does that prove that Moynihan was involved in

20   Hester's drug deals with Finley?

21       And fourth, we get to Special Agent Bencken.  This

22   is his case.  He's the case agent.  He's been on this

23   case for several years.  He's Finley's handler.  He

24   takes care of Finley.  And even Special Agent Bencken,

25   he admitted he couldn't see into the back seat of that

1     Blazer.  Bencken acknowledged the deals that we're

2     talking about here, each of them was for under $1,000.

3     It's a very small quantity of drugs.  It's a quantity

4     consistent with personal use.

5          What did Bencken say about Moynihan?  He said, "I

6     saw Moynihan there on the scene on several of the

7     occasions when Hester sold drugs to Finley."  Did he see

8     Moynihan do anything incriminating?  Did he see Moynihan

9     do anything with drugs?  Is there testimony from anybody

10    in this case that Moynihan handed drugs to somebody,

11    took money from somebody, or is it all a bunch of

12    innuendo, speculation and guesswork?  That's what they

13    want you to do because they don't have the evidence.

14         And finally, the fifth witness was Mahoney.

15    Remember him?  He was the phone analyst.  He produced

16    those lovely phone charts that are in evidence, those

17    lovely phone charts which left out all of the dozens and

18    dozens and dozens of calls that Hester had with other

19    people on those dates.  All those calls that didn't fit

20    the government's theory.  Those charts were selective.

21    They were misleading.  They proved nothing.  They simply

22    fit the government's presumption of guilt.

23         So that's their five witnesses.  That's it.  Maybe

24    you wanted to hear from some other witnesses.  Maybe you

25    wished you had heard more.  But you have to go by what

1    the government chose to present.  That is all they

2    presented.

3         In addition, there were several dozen exhibits, I

4    think 57 or so exhibits that were introduced in evidence

5    during the trial, tapes, transcripts, photographs.

6    Moynihan isn't on any of those tapes.  Yeah, there's

7    lots of reference on those tapes to some drug dealer,

8    but where does it say it's Timothy Moynihan?  It's not

9    there.  Not a single photograph of Timothy Moynihan

10   doing anything in this case.  With all these law

11   enforcement agents and surveillance and everything else

12   and sitting up in the Comcast parking lot, not a single

13   photograph.  Nothing.

14        Their theory is, "Oh, Moynihan handed the drugs to

15   Hester and Hester handed the drugs to Finley."  That's

16   their theory.  Where's the evidence of that?  They have

17   the packages of drugs.  Did you hear any forensic

18   evidence, fingerprint evidence, DNA evidence, anything,

19   anything at all tying Moynihan to those drugs other than

20   the government's theory and a presumption of guilt?

21        So what does the government's evidence add up to?

22   What's the best you can say about it?  Well, there's

23   certainly evidence connecting Moynihan to that phone

24   number, 8860, there's evidence of that.  So what do you

25   do with that?  Is there any proof that Moynihan actually

1    spoke to Hester on the phone?  Is there any proof about

2    the content, if he did talk to Hester, about any of

3    their phone conversations, anything at all?  They want

4    you to guess, they want you to speculate, they want you

5    to fill in the gaps.  The evidence isn't there.

6         And keep in mind they never connected up -- all

7    that stuff on the video and then there were these phone

8    calls, they never connected the two up.  What time were

9    these videos going on?  There's no time on the video.

10   How do we know -- how does the video correlate with the

11   phone calls?  We don't know.  You're supposed to

12   speculate.  You're supposed to guess.  If you start with

13   a presumption of guilt, then it all makes sense.

14        In addition, there's evidence that Moynihan showed

15   up, he showed up around the time of each of these drug

16   sales from Hester to Finley and he met with Hester.

17   There's evidence of that.  No doubt about it.  So what

18   do you do with that evidence?  Well, was there evidence

19   as to what Moynihan was doing there?  Was he there to

20   buy drugs?  Was he there to sell drugs to Hester?  Was

21   he there to meet with Hester about something else?  Was

22   Hester getting into that vehicle to meet with somebody

23   else that was in the back seat?  We don't know.  There's

24   no evidence about any of that.

25        The government wants you to speculate, they want

1    you to guess, they want you to fill in the gaps.

2    There's no proof that Moynihan was there to provide

3    drugs to Hester which he was then going to resell to

4    Finley.  That's their theory.  But where's the proof?

5    Where's the proof?  That kind of speculation just

6    doesn't cut it in a criminal case where somebody's

7    liberty is at risk.

8         And, you know, the government called this evidence

9    "corroboration" a few minutes ago.  Well, corroboration

10   of what?  Corroboration of what?  There's no proof to

11   corroborate?  They don't have proof that Moynihan was

12   involved.  It's simply not there.

13        And the government, they chose to present to you

14   this selective carefully constructed case that fits

15   their presumption of guilt.  So, for example, Finley and

16   Hester were in this vehicle on tape for an hour, two

17   hours, but what they presented to you was a few minutes,

18   a little snippet here, a little snippet there, all tied

19   together, that's what they gave you.  Did they give you

20   a complete picture of what happened between Finley and

21   Hester?

22        We know that Hester and Finley had a lot of other

23   phone calls.  They didn't present those to you.  They

24   just presented you a select few, the ones that they

25   believed fit their theory, fit their presumption of

1    guilt.  Is that giving you a complete picture?

2         And we know that Hester made all these other phone

3    calls, received all these other phone calls from people,

4    including the same people, over and over and over again

5    on these dates.  They didn't want to talk about those.

6    They didn't want to include those on their charts.  They

7    didn't want you to have a complete picture.  They want

8    you to have a picture which pushes you, which

9    manipulates you in a certain direction to accept the

10   presumption of guilt.  That's what went on in this

11   courtroom.

12        Now, to make up for its lack of evidence, the

13   government today showed you some gigantic really nifty

14   charts.  As his honor, Judge Wolf, told you, those

15   charts are not evidence.  Those charts add nothing,

16   nothing to the amount of proof that's been presented in

17   this courtroom.  Those charts are simply a graphic

18   representation of the government's theory, the

19   government's presumption of guilt.  That's all they are.

20        Now, I don't have any nifty charts to show you,

21   but let me make you -- I'm going to make you a chart.

22             (Draws on paper.)

23             MR. SULTAN:  Here's a chart.  Six 0s.  0

24   evidence, credible evidence from Kharis Finley

25   implicating Timothy Moynihan.  0 evidence from McGehee,

the drug analyst, implicating Moynihan.  0 evidence from

Richards implicating Moynihan.  0 evidence from Bencken

implicating Moynihan.  0 evidence from Mahoney, the

phone person, implicating Moynihan.  0 evidence on the

tapes, on the exhibits about Moynihan.  What does that

all add up to?  It adds up to 0, a big 0.  0 evidence

that Moynihan conspired with Hester to provide drugs to

Finley.  0 evidence that Moynihan possessed with intent

to distribute drugs.  0 evidence that Moynihan aided and

abetted Hester.

Now, what if you don't agree with that

assessment?  What if you don't agree?  What if you

conclude, based on the evidence, that Moynihan may have

been involved here, he may have been Hester's drug

supplier.  What do you do then?  If that's your

conclusion, then you find him not guilty.  What if you

go further.  What if you say, based on the evidence, "I

believe that Moynihan was probably, he was probably

Hester's drug supplier."  What if that's your

conclusion?  What do you do?  You find him not guilty.

Why is that?  Well, because in our system of

justice, in this country, you, the jury, sit between the

government, as the accuser, and Mr. Moynihan, as the

accused.  And you sit there to protect, to protect

citizens from being convicted of crimes based on

1    speculation, based on guesswork, based on maybes,

2    probabilities, none of that is good enough under our

3    Constitution, under our system of justice.  This is a

4    beautiful courthouse.  That's what it stands for, it

5    stands for those principles.  You are here as the

6    embodiment of those principles, to implement them, to

7    apply them, to make sure they work, to hold the

8    government to its burden of proof, it's heavy burden of

9    proof.

10        In the absence of evidence proving Moynihan guilty

11   beyond a reasonable doubt, he has to be found not

12   guilty, and in this case the government simply has

13   failed to produce such evidence.  It hasn't even come

14   close.

15        Now, let me just talk about one more thing before

16   I sit down.

17        In a moment the prosecutor will have a chance to

18   get up again and address you.  He gets the last word.

19   But no matter how many times he points to Mr. Moynihan

20   or urges you to use common sense or to apply a

21   presumption of guilt, nothing he says can change the

22   evidence, the evidence that was presented here in the

23   courtroom.  And based on that evidence and based on the

24   lack of evidence, I ask you to find that the government

25   has failed to prove these charges against Timothy

1  Moynihan and I ask you to say that loudly and clearly by

2  your verdict of not guilty.  Thank you very much.

3           THE COURT:  Mr. Levitt, a brief rebuttal.

4

5  REBUTTAL BY MR. LEVITT:

6       The only time Mr. Sultan mentioned common sense is

7  when he talked about what I told you to use, your common

8  sense, okay?  Your common sense is what tells you that

9  all the evidence in this case ties together to only one

10  conclusion, that Mr. Moynihan is Mr. Hester's supplier.

11  Your common sense tells you that.  The evidence tells

12  you that.

13       Well, Mr. Sultan says there's no evidence of what

14  Moynihan was doing when he did these buys.  So what's he

15  doing there?  What about the fact that before Hester

16  gets out of his car each time, Finley gives him the

17  money, and when Hester comes back, he gives Finley the

18  crack?  He'll say, "Well, that's not evidence.  You

19  can't consider that."  Why not?  That's evidence.

20  That's circumstantial evidence.  There's not much he can

21  do with it, so he just ignores it.

22       The same thing with Sean Richards.  He says Sean

23  Richards was just driving around following his client.

24  Is that what you remembered, they were just kind of

25  driving around on the phone?  Or was he surveilling the

1   location and then after the phone was set up to do the

2   deal, he followed him to the deal, each time.  There's

3   nobody in the back seat.  He's watching the car the

4   whole time.

5       He says, "Finley's critical to the government's

6   case."  Do you think so?  Do you think Finley's critical

7   to the government's case or do you think the tapes are

8   critical to the government's case?  The tapes he made,

9   but the tapes.  Okay?

10      He wants you to not like Finley and take that out

11  on the government.  If you don't like him, write a

12  letter, write my boss a letter.  But the tapes don't

13  lie.  Hester tells you who his supplier is and he tells

14  you repeatedly.  The surveillance doesn't lie.  The

15  phone charts don't lie.

16      On the phone charts he says:  "They don't want to

17  include those calls on your phone records -- on the

18  phone records, the calls from other people."  But what

19  you saw and what you heard was painstaking testimony

20  from Mahoney about the time period of the call.  You

21  see, we didn't talk about the calls from 8:00 till

22  midnight, when the buy wasn't happening, we focused on

23  the time period of the buy.  So on January 7th, 1:45 to

24  2:50, that's what he focused on, not the calls that

25  Mr. Sultan's focusing on.  And you heard painstaking

1   testimony about that.  He ended up reading it in from

2   his report.  It wasn't thrilling, but what it showed is

3   he went through every other contact to see who they

4   were, to see how many calls there were.

5        Mr. Sultan mentions William Pena.  He does not

6   call on January 7th at all during that time period.

7   January 13th, one call -- two calls, one is 0 seconds,

8   one is 9 seconds.  Steve Berry, he's only on January

9   11th, four calls are incoming.  That's incoming to

10  Hester.

11       The evidence, ladies and gentlemen, is the tapes,

12  it's the phone records, it's the drugs, it's the

13  surveillance.  Don't look at each piece in isolation,

14  look at them all together.  What the evidence tells you,

15  what your common sense tells you, and what the law tells

16  you, is that Mr. Moynihan is guilty as charged of all

17  charges.  Thank you.

18            THE COURT:  Ladies and gentlemen, it's now

19  almost 12:30.  I think if we take about a 5-minute

20  break, I can give you my instructions, you can have

21  lunch and start deliberating.  So we'll do that.

22       Don't get too comfortable, but stretch, um, and

23  come back in about 5 minutes.  It will take me a little

24  while to explain all the applicable law, but I'll do it

25  for you, and then it will be time to deliberate and

```
 1   decide.
 2         The Court will be in recess for about 5 minutes.
 3               (Recess, 12:30 p.m.)
 4               (Resumed, 12:35 p.m.)
 5               THE COURT:  Is there anything before we get
 6   the jury?
 7               MR. LEVITT:  Your Honor, I just want to note
 8   that twice Mr. Sultan, in his closing, mentioned that
 9   his client is on trial for his liberty, um, which is
10   improper and he knows better, and he also mentioned it
11   in his opening.
12               THE COURT:  Yeah, I noted that and I would, in
13   any case, emphasize that punishment is exclusively up to
14   the Court and they should not be -- the jury should not
15   be influenced by the consequences of their decision.
16   Okay?
17               MR. LEVITT:  And then, your Honor, in terms of
18   the tapes, Mr. Hohler asked, um, if they want to play
19   something, you know, I can give Mr. Hohler our DVD
20   player, but it's small.
21               THE COURT:  Well, let me instruct them and
22   then we'll talk about the mechanics.  Okay?
23         Let's get the jurors.
24               (Jury returns, 12:40 p.m.)
25               THE COURT:  Ladies and gentlemen, I am now
```

1    going to give you your instructions on the law

2    concerning this case.  I'm going to give them to you in

3    three parts.  The first part are generally applicable

4    instructions that would be relevant to any criminal

5    case.  The second part will explain what the government

6    needs to prove beyond a reasonable doubt to prove -- to

7    obtain a conviction on each of the specific charges in

8    this case.  The third part will relate to your jury

9    deliberations.

10          Beginning with the general instructions.  As I

11    said at -- well, the law permits me to comment on the

12    evidence, but I choose not to do that.  As I told you at

13    the beginning of the case, you should not interpret, or

14    to be more precise, misinterpret anything that I may

15    have said or done in the course of the case or anything

16    that I say now as a suggestion of what I think your

17    verdict should be.  That's exclusively up to you.

18          What you need to do in your deliberations is

19    unanimously decide whether the government has proven any

20    or all of the charges in this case beyond a reasonable

21    doubt.  You'll make that decision based on the evidence

22    and the law as I'm going to describe it and you'll

23    decide if the government has satisfied its burden.

24          You have to know the law and it's my duty to

25    explain the law to you.  I discussed these instructions

1  with the lawyers, to some extent, previously, but if

2  anything that either or both of them said about the law

3  sounds different than what I'm telling you now, you have

4  to follow the law as I describe it now.  And if there's

5  anything I said at the beginning of the case in those

6  brief preliminary instructions that I gave you that

7  sounds different or inconsistent with what I'm telling

8  you now, follow the law as I describe it now.

9       I've worked to create an accurate, complete and

10  balanced description of the relevant law for you.  You

11  shouldn't single out any one sentence or part of it, but

12  consider the instructions as a whole.  And, of course,

13  you have a duty, as I have told you before, to follow

14  the law regardless of whether you agree with it or

15  understand the reasons for it.  You took an oath at the

16  beginning of the case.  If the government does not prove

17  every element, every essential thing that it has to

18  prove beyond a reasonable doubt, you must find the

19  defendant not guilty.  If you find the government has

20  proven every element of a charge beyond a reasonable

21  doubt, you must find the defendant guilty of that

22  charge.  And I'm going to describe the elements, as the

23  lawyers call them, to you shortly.

24       I told you that it's your job to decide if the

25  evidence proves the defendant guilty of a particular

charge beyond a reasonable doubt.  It's important that
you understand, however, that the issue of punishment is
solely for the Court.  It would be improper for you to
consider or be influenced by what the possible
punishment might be if you find the defendant guilty.

So I've told you that you should not interpret
anything I do as a suggestion of what your verdict
should be, that's entirely up to the jury, but what the
sentence should be is up to the judge and it would be
improper for the jurors to be influenced by what the
possible consequences of their verdict might be.

You've heard me say, since the day you were
selected, last Monday, that you're required to decide
the case based on the law and the evidence and that
means, among other things, that you're required to put
aside any possible bias, prejudice, or sympathy that you
may have.  Both the defendant and the public expect that
you will carefully and impartially consider all of the
evidence in the case, follow the law as I describe it,
and reach a just verdict regardless of the consequences.

As I've told you both last Monday, in the course
of jury selection, and Tuesday, in my preliminary
instructions, that there are certain fundamental
principles that apply in every criminal case like this
one.  I'm going to reiterate them and explain one of

1    them, at least, more fully.

2         First among these principles is that the

3    defendant, Mr. Moynihan, is presumed innocent.  The

4    indictment, which you'll have in the jury room, is only

5    an accusation, it's a way of informing Mr. Moynihan of

6    the charges against him and bringing him to court.  It

7    is not evidence or proof that he is guilty of any of

8    those charges.

9         The government must prove the defendant guilty

10   beyond a reasonable doubt to achieve his conviction on a

11   charge.  The defendant has no obligation to prove his

12   innocence and that means, among other things, that he

13   has no obligation to testify himself.  Where, as in this

14   case, a defendant has chosen not to testify, you may not

15   consider that as an indication that he is guilty.  You

16   should not discuss that or consider the fact that the

17   defendant did not testify at all in your deliberations.

18        I told you last week that when we got to this

19   point, I would explain to you this concept of reasonable

20   doubt.  I'm going to do that now.  As I have said, the

21   burden is on the government to prove beyond a reasonable

22   doubt that a defendant is guilty of the charge made

23   against him.  The burden of proof has nothing to do with

24   who called the witness or offered the documents into

25   evidence, it has to do with the quality of the

evidence.  Proof beyond a reasonable doubt is a strict

and heavy burden, but it does not mean that a

defendant's guilt must be proved beyond all possible

doubt.  It does require that the evidence exclude any

reasonable doubt concerning a defendant's guilt.

A reasonable doubt may arise not only from the

evidence produced, but also from the lack of evidence

produced by the government.  Reasonable doubt exists

when, after weighing and considering all the evidence,

using reason and common sense, jurors cannot say that

they have a settled conviction of the truth of the

charge.  Of course, a defendant is never to be convicted

on suspicion or guesswork.  If, for example, you view

the evidence in the case as reasonably permitting either

of two conclusions, one, that a defendant is guilty --

the defendant is guilty as charged, and the other that

the defendant is not guilty, you will find the defendant

is not guilty.  It is not sufficient for the government

to establish a probability, though a strong one, that an

element of an offense charged or a fact necessary to

prove an offense charged is more likely to be true than

not true.  That is not enough to meet the burden of

proof beyond a reasonable doubt.  On the other hand,

there are very few things in this world that we know

with absolute certainty and in criminal cases the law

1    does not require proof that overcomes every possible

2    doubt.

3         So concluding my instructions on the burden, I

4    instruct you that what the government must do to meet

5    its heavy burden is to establish the truth of each part

6    of each offense charged by proof that convinces you and

7    leaves you with no reasonable doubt and therefore

8    satisfies you that you can, consistent with your oath as

9    jurors, base your verdict upon it.  If you find a

10   particular charge against the defendant has been proven

11   beyond a reasonable doubt, you will return a verdict of

12   guilty on that charge.  If on the other hand you think

13   there is a reasonable doubt about whether the defendant

14   is guilty of a particular offense, you must give the

15   defendant the benefit of the doubt and find the

16   defendant not guilty of that charge.

17        You've heard me say repeatedly that you have to

18   decide the case based on the evidence.  The evidence has

19   come to you in three forms, it's come to you from the

20   testimony of witnesses, it's come to you in the form of

21   the exhibits, the documents, and videos that you'll have

22   in the jury room, and it's come to you in the form of

23   certain stipulations or facts that the parties agree are

24   true and you may accept as true.  Those written

25   stipulations will also be back in the jury room with

you.

As the jury, you're the judges of the facts, you decide what facts are proven, you decide what inferences or conclusions to draw from those proven facts.  You decide the credibility of the evidence that's been presented.  With regard to the testimony of any witness or the other evidence, you can accept all of it as true, you can reject all of it as untrue, or you can find that part of it is true and part of it is not true.  And once you decide that something's true, you decide what weight to give to that evidence.

In considering the evidence, you may draw reasonable inferences from facts that are proven.  You can use your experience and your common sense in doing this.  I told you before that you had to put aside any possible bias, sympathy or prejudice you have, but you are expected to use your common sense in deciding this case.

As I told you at the beginning of the case, facts can be proven by direct or circumstantial evidence. Direct evidence is, for example, the testimony of somebody who says he has the actual knowledge of a fact, "I was there, this is what I saw."  Circumstantial evidence is proof of events or circumstances on the basis of which you can, from your common experience,

1    infer the existence or nonexistence of certain other

2    facts.

3         Now, I gave you an example, when I introduced you

4    to this idea of common sense, last Tuesday that turns

5    out to be less hypothetical than I thought it would be

6    in October and I'll remind you and amplify it a bit

7    because you should understand that this idea of

8    reasoning from circumstantial evidence is not some

9    complicated legal concept, it's something you do

10   virtually every day whether you know it or not.

11        Do you remember I told you that if you go to sleep

12   at night, like maybe Saturday night, and the ground is

13   green in front of your house and you get up the next day

14   and it's covered with snow, you would infer that during

15   the night, while you were sleeping, it snowed, although

16   you didn't see it and nobody told you that happened.

17   That's reasoning from circumstantial evidence.  To take

18   it a little further, if when you opened your front door

19   you saw there were footsteps leading to your front door,

20   you would infer that during the night, while you were

21   sleeping and after it snowed, somebody had walked to

22   your front door.  And if the newspaper was at the end of

23   the footsteps, you would infer that during the night,

24   while you were sleeping and after it snowed, somebody

25   had delivered the newspaper at your front door.  That

1   would be reasoning from circumstantial evidence.

2          Direct and circumstantial evidence have equal

3   standing in the law.  You decide what weight to give to

4   each and no greater certainty is required of

5   circumstantial evidence than of direct evidence.  You

6   must give all of the evidence you've heard consideration

7   and decide what is true, you decide what inferences to

8   draw from the proven facts, and then you give whatever

9   evidence you find true, whatever facts you find proven,

10  the weight you decide they deserve.

11         Anything you may have seen or heard outside the

12  bar, the railing there of this court, is not evidence

13  and you should disregard it.  If a witness answered a

14  question before I could rule on an objection and I

15  ordered you to disregard the answer, you must follow

16  that instruction.  If I gave you a limiting instruction,

17  if I said that evidence is admitted for only a limited

18  purpose, then you must consider it only for that limited

19  purpose.

20         You should recall that as I've told you, anything

21  the lawyers said was not evidence.  Their opening

22  statements were not evidence, their questions were not

23  evidence -- although the responses to them were

24  evidence, and the closing arguments you've just heard

25  were not evidence.  If in the course of those closing

1    arguments a lawyer referred to evidence that differs

2    from your memory of the evidence, it's your

3    recollection, individually and collectively, that

4    controls in your deliberations.

5         Although it didn't happen that much in the course

6    of the case, there were some objections to the -- to

7    certain questions.  And do you remember I told you we

8    operate in federal court under these Federal Rules of

9    Evidence which establish standards for determining what

10   kind of information is sufficiently relevant and

11   reliable for you to use in deciding the case.  You

12   should not draw any inferences from the objections or

13   the way I ruled on them.  If I sustained an objection,

14   you should disregard the question and not speculate or

15   guess what the answer might have been.  If I overruled

16   an objection, you should consider the answer like any

17   other.  And as I said, if I gave any limiting

18   instruction, you should use the evidence I admitted for

19   the limited purpose I described.

20        I told you last week that when I got to this

21   point, um, since you have to judge the credibility of

22   the testimony and other evidence, I would give you some

23   common sense considerations to do that, and I'll give

24   you those common sense considerations now.

25        You should remember that you must judge the

 1    testimony of a law enforcement officer like the

 2    testimony of anyone else and not assume that somebody is

 3    more likely or less likely to be telling the truth

 4    because he's employed in law enforcement.

 5         With regard to all of the witnesses, you may want

 6    to ask yourself these kind of common sense questions.

 7    Did the witness seem honest?  Was what the witness said

 8    reasonable, did it make sense?  Did the witness have a

 9    reason not to tell the truth?  Did the witness have a

10    personal interest in the outcome of the case?  Did the

11    witness have a relationship to either side in the case?

12    Did the witness have a reason to be prejudiced against

13    or hostile to any party?  Would the witness be affected

14    by the verdict?  Did the witness have a good opportunity

15    to observe what he was testifying to?  Did he have a

16    good memory?  Did the witness seem to understand the

17    question and answer it directly?  Did the witness's

18    testimony differ from the testimony of other witnesses?

19    Was that testimony supported or contradicted by other

20    evidence in the case?

21         Inconsistencies between witnesses or in two

22    statements by the same witness may or may not bear on

23    credibility.  Sometimes there are just different and

24    innocent -- different perceptions or memories and it's

25    also possible that somebody's contriving, somebody's

1    making up testimony.  And so when you judge any

2    inconsistencies you perceive in the evidence, you may

3    want to ask does the witness have a motive to lie?  Does

4    the inconsistency concern an important matter or an

5    unimportant detail?  Does it seem to be an innocent

6    error or an intentional lie?

7         You heard some testimony that one or more

8    witnesses made a statement before trial.  You can

9    consider any statements made before trial, by anybody,

10   on whether to believe the testimony you heard in court.

11   You decide if the prior statement is inconsistent with

12   the trial testimony and if so whether it affects the

13   believability of what was said in court.  If the prior

14   statement was under oath, you may consider what was said

15   previously for the truth of what was said previously as

16   well as the credibility of the trial testimony.  And

17   finally, if the prior statement you heard about was made

18   by the defendant, you may consider it for the truth of

19   what the defendant said.

20        You heard testimony in this case from Kharis

21   Finley.  You heard that he was testifying pursuant to an

22   immunity order that provides that no testimony he gives

23   could be used against him, directly or indirectly,

24   except in a prosecution for perjury if he testified

25   falsely or otherwise violated the immunity order.  You

1    also heard that Mr. Finley was paid to assist the

2    government during the investigation of the crimes

3    charged in this case.

4        The government is entitled to apply for such an

5    immunity order and present the testimony of an immunized

6    witness.  In addition, it is not improper for a witness

7    to be paid for help in an investigation.  Some people in

8    Finley's position are entirely truthful when

9    testifying.  However, the testimony of Finley should be

10   examined by you with greater care than the testimony of

11   an ordinary witness.  You should scrutinize it closely

12   because a witness who provides information in exchange

13   for money may have a greater motive to present false

14   information than someone who is not being paid.

15       As with all evidence, in deciding whether to

16   credit, that is, believe some or all of Finley's

17   testimony, you should consider, among other things,

18   whether it was contradicted or corroborated by other

19   evidence in the case.  As I said, you should scrutinize

20   Finley's testimony with great care and rely on it with

21   caution.  If after doing so you find some or all of his

22   testimony to be true, you should give it the weight you

23   believe it deserves.

24       You also heard testimony in this case about

25   identification.  The government, of course, is obligated

1    not just to prove that the crimes charged in this case

2    were committed, but that one or more of them was

3    committed by Mr. Moynihan.  So identification of the

4    defendant is an essential part of the case.

5         With regard to any witness who gave identification

6    testimony, you should ask was the witness telling the

7    truth as the witness believes it to be and was the

8    witness accurate?  In deciding those questions, you

9    should consider the circumstances of the events.  You

10   should consider whether the witness knew or had seen the

11   person being identified before.  Did the witness have a

12   good opportunity to observe the person he later

13   identified?  How long did he observe that person?  What

14   were the conditions?  Was the witness paying attention

15   at the time?  And you should also consider the

16   circumstances of the identification including the time

17   between the event in the first identification and any

18   other factors that you believe are relevant.

19        You heard some testimony from a witness, a

20   chemist, who by virtue of her training and experience

21   was allowed to provide some opinion testimony.  The fact

22   that that person had some expertise does not mean you

23   must believe that testimony.  You decide.  The opinion

24   testimony you were given was intended to help you as

25   jurors, but not replace your judgment.

1          So in deciding the credibility of expert testimony

2     you should consider the expert's training and

3     experience, you should consider whether the reasons for

4     the opinion given make sense, you should consider the

5     facts on which she relied, and if all of the facts on

6     which the witness relied are not proven, you must

7     disregard the opinion to the extent it relies on any

8     unproven facts.  And with regard to the expert, like any

9     other witness, you can accept everything she testified

10    to, reject it, if you don't believe it, or accept and

11    believe some of it and not another part.

12         In this case you heard tape recordings that were

13    made by Mr. Finley at a time when the defendant and

14    Mr. Hester, particularly, um, did not know the tapes

15    were being made.  Once again, I -- as I told you in the

16    course of selecting the jury, it is lawful for the

17    government to use a technique like secretly recording

18    somebody to develop evidence in a case, um, in a case

19    like many where the alleged crime is one that people

20    ordinarily would want to keep secret if they're

21    permitted.  So this is a permissible law enforcement

22    technique and you should consider the quality of the

23    evidence, not how it was obtained.

24         With regard to the tapes, I also marked into

25    evidence transcripts and you'll have the tapes and a way

1   to play them and the transcripts in the jury room.  But

2   as I told you during the course of the case, if you

3   listen to the tapes again or if while in court you were

4   listening to a tape and you heard something that's

5   different than what you saw written on the transcript,

6   you must rely on what you heard and not on what you

7   read.

8          There are some telephone -- there are some charts

9   that, in the course of the case, before today, were

10  admitted into evidence.  They summarize voluminous

11  records and highlight certain of those records and those

12  charts were given numbers and you'll have them back in

13  the jury room.

14         Today, in the government's closing, the prosecutor

15  was permitted to use other charts, um, that not only

16  were intended to represent information in written

17  records in evidence, but also included the government's

18  memory of certain evidence in the case.  And those

19  charts were not given numbers.  They were used to help

20  you understand the argument, but they will not be back

21  in the jury room.  The charts you saw for the first time

22  today are not in evidence.

23         So that concludes my general instructions, the

24  first part of my instructions.  Now I'm going to give

25  you the case-specific part and in connection with this

1     I'm going to have Mr. Hohler give you the indictment and

2     the verdict form.  But don't read them yet.  I'll tell

3     you when you should look at those.

4                 (Passes out documents.)

5                 THE COURT:  All right.

6           The indictment in this case has five counts.

7     Here, don't read them.  In fact, you don't all have them

8     yet.  Listen to me, because I'll go through them in a

9     minute.

10          The indictment in this case has five counts or

11    charges against the defendant, Timothy Moynihan, and

12    you'll be able to take those copies of the indictment

13    back in the jury room with you.  As I told you, the

14    indictment is merely an accusation, it's not evidence or

15    proof against Mr. Moynihan.  Mr. Moynihan has pled not

16    guilty to all the charges.  That means the government

17    must prove he's guilty beyond a reasonable doubt to

18    achieve his conviction on any charge.

19          Each count charges a separate crime and you should

20    decide separately whether that crime has been proved

21    beyond a reasonable doubt.  Unless I gave you a limiting

22    instruction, you can consider all the evidence in

23    deciding all of the counts.

24          You see in the indictment and you've heard that

25    Curtis Hester was also charged in this case.  He's not

```
1    on trial.  You should not speculate or draw any
2    inference from the fact that Mr. Hester is not now on
3    trial.  Rather you should decide the case based on the
4    evidence presented against Mr. Moynihan.
5              (Juror sneezes.)
6              THE COURT:  And, essentially -- bless you, you
7    have three options.  You may find that none of the
8    charges against Mr. Moynihan have been proved beyond a
9    reasonable doubt, you may find that some of them have
10   been proved beyond a reasonable doubt and others have
11   not, or you could find that he is guilty on all of the
12   charges.  It depends on your view of the evidence.
13        With regard to the architecture of the indictment,
14   um, in Count 1 Moynihan is charged with conspiring with
15   Curtis Hester to commit the crime of possessing cocaine
16   base, which is commonly known as "crack" -- and when I
17   say "cocaine base," I mean "crack," and when I say
18   "crack," I mean "cocaine base," and also conspiring to
19   possess cocaine with intent to distribute it.
20        In addition, as you'll see, Count 1 also charges
21   that the conspiracy involved at least 28 grams of
22   crack.  As I'll explain, you'll be asked first to decide
23   whether the government has proven beyond a reasonable
24   doubt that Moynihan and Hester conspired with each other
25   to possess crack and/or cocaine with intent to
```

1    distribute it.  If the answer to that is "yes," you'll

2    be asked to determine how much crack was involved in the

3    conspiracy as a whole or more specifically whether at

4    least 28 grams of crack was involved.

5         Counts 2, 4 and 5 charge Mr. Moynihan with

6    possession with intent to distribute crack cocaine on

7    January 7th, 13th and 15th, 2010 respectively.

8         Just listen to this.  We'll read it together at

9    the right time.

10        And Count 3 charges that he possessed with intent

11   to distribute both crack and cocaine on January 11th,

12   2010.

13        So now I'm going to tell you what has to be proven

14   to prove each of the charges.  As I said, in Count 1

15   it's alleged that Moynihan and Hester conspired with

16   each other to commit the crime of possessing crack

17   and/or cocaine with intent to distribute it.  And then

18   Count 1 goes on to allege that the conspiracy, as a

19   whole, involved at least 28 grams of cocaine.

20        So now -- now -- all right.  Take a look on Page 1

21   of the superseding indictment.  It says: "Count 1:  The

22   grand jury charges that in or about January of 2010, in

23   Haverhill and elsewhere in the District of

24   Massachusetts, Curtis Hester, also known as "CJ,"

25   Timothy Moynihan, the defendants herein, did knowingly

1    and intentionally combine, conspire, confederate and

2    agree with each other" -- and it says "other persons

3    unknown to the grand jury," but you should disregard

4    that part.   "-- to possess with intent to distribute and

5    distribute cocaine base and cocaine, both Schedule II

6    controlled substances, in violation of federal law."

7    And then the next paragraph says:  "The grand jury

8    further alleges that the conspiracy described herein

9    involved at least 28 grams of a mixture and substance

10   containing a detectable amount of cocaine base, a

11   Schedule II controlled substance."

12        And if you look at the verdict form with regard to

13   Count 1, it's different than the other counts.  The

14   verdict form is pretty straightforward.  It says:  "We,

15   the jury, find the defendant, Timothy Moynihan, 1(a)

16   blank on Count 1."  So following my instructions,

17   applying my instructions, you will unanimously decide

18   whether Mr. Moynihan has been proven guilty on Count 1

19   beyond a reasonable doubt.  If the answer is "yes,"

20   you'll write "guilty."  If the government hasn't met

21   that burden and you all agree it hasn't met that burden,

22   you'll write "not guilty."  If you find Mr. Moynihan

23   guilty on Count 1, in response to Question 1(a), you'll

24   answer 1(b).  It says:  "Has the government proven

25   beyond a reasonable doubt that the conspiracy as a whole

```
 1    involved at least 28 grams of cocaine base?"
 2           All right.  Now put those documents down and
 3    listen.  I'm going to tell you what the standards are
 4    for answering those questions.  But I'll tell you one
 5    other thing first.
 6           Don't ask me why.  This is one of the places where
 7    you have to follow the law as I describe it.  Here it
 8    charges, in Count 1, that Mr. Hester and Mr. Moynihan
 9    conspired to possess with intent to distribute and
10    distribute cocaine base and cocaine.  But in this
11    context the law says "and" means "or."  So it would be
12    sufficient to prove that, for the conspiracy charge,
13    that they conspired to possess with intent to distribute
14    cocaine base, meaning crack cocaine, or cocaine, they
15    don't have to prove both.  The government doesn't have
16    to prove both.
17           All right.  So if you're to find Mr. Moynihan
18    guilty of the conspiracy charged in Count 1, you must
19    find that the government has proven each of the
20    following things beyond a reasonable doubt.  First, that
21    the agreement specified in the indictment to possess
22    crack and/or cocaine with intent to distribute it, and
23    not some other agreement or agreements, existed between
24    Moynihan and Hester in about January of 2010, and,
25    second, that Moynihan knowingly and willfully joined
```

1    that agreement.  As I use these terms throughout my

2    instructions, to act knowingly means to act

3    intentionally, rather than by accident or mistake.  To

4    act willfully means to act with the intention to do

5    something known to be unlawful.

6         To find Mr. Moynihan guilty of the conspiracy

7    charged in Count 1, you do not have to find that he

8    conspired to distribute at least 28 grams of crack as

9    alleged in the indictment.  To find him guilty you only

10   need to find that he conspired with Hester to distribute

11   some quantity of crack or cocaine.  If you find Moynihan

12   did so, you will then have to answer the second question

13   as to the quantity of the crack, if any, that was

14   involved in the conspiracy as a whole.  And as you see,

15   as I just read you, the verdict form is split up to make

16   that distinction.

17        With regard to the duration of the conspiracy, the

18   indictment charges that it existed in or about January

19   of 2010.  The government doesn't have to prove the exact

20   dates of any conspiracy.  It does have to prove that the

21   conspiracy existed for part of January of 2010 and the

22   jurors would have to be unanimous in agreeing on the

23   period of the conspiracy, among other things.

24        With regard to the first element of the crime of

25   conspiracy, the existence of the agreement, you should

1   understand that a conspiracy is simply a spoken or

2   unspoken agreement by two or more people to commit a

3   crime.  It is the agreement that is the essence of the

4   crime and it doesn't matter whether it achieved its

5   unlawful goals.  In this case Moynihan and Hester

6   allegedly agreed to possess cocaine and/or crack with

7   the intent to distribute it.

8        With regard to the existence of the conspiracy,

9   what the evidence must show beyond a reasonable doubt is

10  that the members, in some way or manner, came to a

11  mutual understanding to try to possess crack and/or

12  cocaine with the intent to distribute it to someone else

13  and they did so knowing that the plan was unlawful and

14  intending to carry it out.  However, the evidence to

15  establish the existence of a conspiracy need not show

16  that the conspirators entered into any express or formal

17  agreement or even that they directly, by spoken or

18  written words, stated between themselves what their

19  object or purpose was or the details of the scheme or

20  the means by which they would succeed.  Mere similarity

21  of conduct among various persons and the fact that they

22  may have associated with each other, discussed illegal

23  activity, or had taken steps to further the conspiracy's

24  purpose, does not necessarily establish proof of the

25  existence of a conspiracy, however you may consider such

1    factors.  It is sufficient if an agreement is shown by

2    conduct evidencing a silent understanding to share a

3    purpose to violate the law.

4         You may consider all of the direct and

5    circumstantial evidence in deciding whether a conspiracy

6    has been proven.  Since a conspiracy by its very nature

7    is often secret, neither the existence of the

8    conspiratorial agreement nor a person's participation in

9    it must be proven by direct evidence.  Both may be

10   proven by circumstantial evidence alone.

11        As I've explained, the object of the conspiracy

12   alleged in Count 1 is an agreement, in about January of

13   2010, to possess with intent to distribute cocaine

14   and/or crack.  To prove the conspiracy charged in Count

15   1, the government must prove that Moynihan and Hester

16   agreed to transfer crack or cocaine to a third person.

17   The government does not have to prove that they agreed

18   to transfer a particular amount of crack or cocaine to

19   prove the alleged conspiracy.

20        As I told you, to prove Moynihan guilty beyond a

21   reasonable doubt, that the agreement -- I'm sorry.  I'll

22   say that again.

23        As I told you, to prove Moynihan guilty of

24   conspiracy, the government must prove beyond a

25   reasonable doubt that the agreement described in Count

1, and not some other agreement, existed between Hester
and Moynihan. Count 1 charges a conspiracy to possess
crack or cocaine with intent to distribute it, which
means an agreement to have one or both of those
controlled substances in order to transfer it to a third
party either for money or without payment. Therefore,
it would not be sufficient for the purpose of Count 1
for the government to prove only that Moynihan agreed to
sell or sold crack or cocaine to Hester for Hester's
personal use, nor would it be sufficient for the
government to prove only that Hester agreed to sell or
sold some controlled substance to Moynihan for
Moynihan's personal use.

In essence, in this case the government must prove
that Moynihan agreed to provide crack and/or cocaine to
Hester knowing that Hester intended to transfer the
drugs to someone else and intended to facilitate the
commission of that crime. As I told you earlier, to
prove the conspiracy charged in Count 1, the government
is not required to prove that any particular amount of
crack or cocaine was involved.

To convict Moynihan on Count 1, the government
must also prove beyond a reasonable doubt that he was a
member of the alleged conspiracy, meaning that he
knowingly and willfully joined in an agreement with

1    Hester to commit the crime of possessing crack and/or

2    cocaine with intent to distribute it.

3          To prove that Moynihan joined the conspiracy

4    knowingly and willfully, the government must prove

5    beyond a reasonable doubt that he both intended to agree

6    with Hester to possess crack and/or cocaine with intent

7    to distribute it and he also intended that the crime

8    actually be committed.  It is not sufficient for the

9    government to prove that Moynihan merely had knowledge

10   of a crime or merely associated with Hester.  It is also

11   not sufficient for the government to prove merely that

12   Moynihan acted in a way that happened to help Mr. Hester

13   commit a crime.  Rather the government must prove that

14   Moynihan intended to agree with Hester to distribute

15   crack and/or cocaine and intended that the crime be

16   committed.

17         Moynihan's membership in the alleged conspiracy

18   must be proven by evidence of his own words and

19   actions.  In deciding whether he was a member of the

20   conspiracy alleged in Count 1, you should consider first

21   the direct and circumstantial evidence of Moynihan's own

22   acts and statements.  Such evidence may include acts or

23   statements of Hester only to the extent that they are

24   evidence of the words and actions of Moynihan.

25         The government does not have to prove that

1    Moynihan knew about or agreed to all the specific

2    details of the crime, including the identity of the

3    person Hester planned to transfer the crack or cocaine

4    to.  However, the government does have to prove beyond a

5    reasonable doubt that Moynihan knew of and intended to

6    agree to the essential features and general aims of the

7    venture.

8         A defendant cannot be convicted of conspiracy on

9    the basis of suspicion or surmise.  He cannot be

10   convicted of conspiracy if it is only proven that he

11   associated with someone committing a crime or that he

12   merely knew of the illegal activity by other people or

13   that he was merely present when a crime was committed,

14   nor can he be convicted of conspiracy if he merely took

15   actions that happened to further the objectives of a

16   conspiracy he did not agree to join.  These are,

17   however, relevant factors that you may consider in

18   deciding the ultimate question, which is whether the

19   government has proved beyond a reasonable doubt that

20   Moynihan knowingly and willfully agreed with Hester to

21   commit the crime of possessing cocaine and/or crack with

22   intent to distribute it and intended that the crime be

23   committed.

24        If, however, you find that the conspiracy charged

25   did exist and that Moynihan knowingly and willfully

participated in it, the extent of his participation has

no bearing on his guilt or innocence.  The guilt of a

conspirator is not measured by the extent of his

participation.  Each member of a conspiracy may perform

separate and distinct acts at different times and at

different places.  Even if Moynihan participated in the

conspiracy to a lesser degree than Hester, he is also

guilty so long as he was, in fact, a conspirator.  Thus,

a single act may be enough to make Moynihan a

conspirator provided the proof establishes that Moynihan

entered into the conspiratorial agreement.

If you find every element of the conspiracy

charged in Count 1 to be proven beyond a reasonable

doubt, you will find Moynihan guilty on Count 1 and

decide the second question concerning the weight of any

crack involved in the proven conspiracy.  If you do not

find every element proven beyond a reasonable doubt, you

will find Moynihan not guilty on Count 1 and you'll skip

the question on drug weight, that's 1(b), and decide

Counts 2, 3, 4 and 5.

Now, I told you that if you find Mr. Moynihan

guilty on Count 1, you'll write that on Line 1(a) and

then you'll go on and answer Question 1(b), has the

government proven beyond a reasonable doubt that the

conspiracy as a whole involved at least 28 grams of

cocaine base?

       With regard to this, if you reach this question,

um, you're focusing only on the amount of crack cocaine

and not cocaine itself -- cocaine base, but not any

evidence of cocaine that was not cocaine base, meaning

crack.  And the fact that I'm instructing you on 1(b)

should not be interpreted as a suggestion that I think

you're going to have to answer this question, it's my

job to give you all the law you need to know in deciding

the questions that may be relevant.

       In answering this question, the relevant weight to

be calculated is the weight of any mixture containing

some cocaine base that you find is involved in the

conspiracy as a whole.  The weight of the mixture

includes the amount of the pure drug and any filler or

cutting agent, it is not limited to the weight of the

pure cocaine base in the mixture alone.  However, the

relevant weight does not include the weight of any

packaging.

       This is going a little longer than I thought.

Don't start talking about this.  I'm going to give you

another 5-minute break and then I'm going to conclude

the instructions and let you eat your lunch.  Okay?

       The Court is in recess for 5 minutes.

              (Recess, 1:25 p.m.)

1                    (Resumed, 1:30 p.m.)

2                    (Jury returns.)

3                    THE COURT:   Okay.   So I've completed my

4     instructions to you with regard to Count 1, the

5     conspiracy charge.   Counts 2, 3, 4 and 5, each, um,

6     charges Mr. Moynihan with possessing a controlled

7     substance with intent to distribute it.   Counts 2, 4 and

8     5, um, charge that Mr. Moynihan unlawfully possessed

9     crack, cocaine base with intent to distribute it.   So,

10    for example, if you look at Count 2, and only the dates

11    are different, um -- it's on Page 3.

12         It says:   "The grand jury charges that on or about

13    January 7th, 2010, in Haverhill in the District of

14    Massachusetts, Timothy Moynihan did knowingly and

15    intentionally possess with intent to distribute and

16    distribute cocaine base, a Schedule II controlled

17    substance" -- and again "and" here means "or."   The

18    government would have to prove possession with intent to

19    distribute or actual distribution -- in this case, crack

20    cocaine.

21         And 4 -- I'm sorry.   In Count 3, it's a little

22    different.   It charges that:   "On or about January 11th,

23    2010 at Haverhill, in the District of Massachusetts,

24    Curtis Hester, also known as CJ, and Timothy Moynihan,

25    the defendant herein, did knowingly and intentionally

possess with intent to distribute and distribute cocaine

base and cocaine, a Schedule II controlled substance."

The difference being here this charge involves crack

cocaine and cocaine, not just crack, like the other

three substantive counts.

So you'll consider all of the evidence and decide

whether each of these charges has been proven beyond a

reasonable doubt.

There are -- here, put the indictments down now.

Stop reading them.

There are actually three ways the government may

prove Mr. Moynihan guilty of any of these four counts.

First, Mr. Moynihan is guilty of a charge if the

government proves beyond a reasonable doubt that he

knowingly possessed crack or cocaine base intending to

transfer it to Hester or to someone else.

Let me say that again.

Mr. Moynihan would be guilty if the government

proves beyond a reasonable doubt that he knowingly

possessed -- depending on what's charged in the count,

crack or cocaine, intending to transfer it to Hester or

to someone else.

Second, Mr. Moynihan can be proven guilty of

possessing crack or cocaine with intent to distribute it

if the government proves beyond a reasonable doubt that

1    Hester committed the particular crime and that
2    Mr. Moynihan aided and abetted the commission of the
3    crime by Hester.
4         A person who aids and abets the commission of a
5    crime is guilty as if he committed every element of the
6    crime himself.  To aid and abet means to intentionally
7    help someone else commit a crime.  To establish that
8    Moynihan aided and abetted the commission of a specific
9    charge, the possession with intent to distribute or
10   distribution, the government must prove beyond a
11   reasonable doubt that Moynihan knew that Hester
12   possessed crack or cocaine with intent to distribute it
13   and Moynihan intentionally did something to help Hester
14   commit that crime.  To be held liable as an aider and
15   abettor, Moynihan need not have performed the underlying
16   criminal act or have been present when it was performed
17   or been aware of all the details of the crime, including
18   the person who would be receiving the drugs, in order to
19   be guilty of aiding and abetting.  However, a general
20   suspicion that an unlawful act may occur or that
21   something criminal is happening is not enough.  Mere
22   presence at the scene of a crime and knowledge that a
23   crime is being committed are also not alone enough to
24   establish that a person is guilty of aiding and abetting
25   a crime.

1      Finally there's a third way that Moynihan may be

2    found guilty of the charges in Counts 2, 3, 4 and 5.

3    Moynihan may be convicted if you find a conspiracy

4    charged in Count 1, between Moynihan and Hester, has

5    been proven beyond a reasonable doubt and you also find

6    that Hester possessed the drugs charged in a particular

7    count with intent to distribute them pursuant to

8    Moynihan's conspiratorial agreement with him, in an

9    effort to achieve a shared goal of their conspiracy, and

10   that the crime Hester committed was one that Moynihan

11   should have reasonably foreseen might be committed as a

12   result of the conspiracy.

13      So now I'll tell you the elements of possession

14   with intent to distribute.

15      In order to prove that a person committed the

16   crime of possessing crack or cocaine with intent to

17   distribute it, the government must prove three things

18   beyond a reasonable doubt.  First, on or about the date

19   alleged in the count you're considering, the person

20   possessed crack cocaine or cocaine either actually or

21   constructively.  Second, that he did so with the

22   specific intent to transfer that crack or cocaine to

23   someone else.  And third, that he did so knowingly.  As

24   I told you before, "knowingly" means to act

25   intentionally rather than by accident or mistake.

1          To prove possession with intent to distribute, the

2     government is not required to prove that a person

3     actually delivered the drugs to someone else or that he

4     intended to make any money from the transaction.  It is

5     enough for the government to prove beyond a reasonable

6     doubt that he had in his possession what he knew was

7     crack or cocaine and that he intended to transfer it to

8     someone else.

9          The term "possess" means to exercise authority or

10    control over something.  The law recognizes different

11    kinds of possession.  Possession includes both actual

12    and constructive possession.  A person who has direct

13    physical control of something on or around his person is

14    then in actual possession of it.  A person who's not in

15    actual possession but who has both the power and

16    intention to exercise control over something is in

17    constructive possession.  When I use the term

18    "possession" in these instructions, I mean actual as

19    well as consecutive -- I'm sorry, as well as

20    constructive possession.

21         In addition, "possession" includes both sole

22    possession, meaning actual or constructive possession of

23    something by a person alone, and joint possession,

24    meaning actual or constructive possession which is

25    shared by two or more people.

1            And to distribute crack or cocaine, um, means to

2       transfer it to somebody else, and that's one of the

3       alternative allegations in Counts 2, 3, 4 and 5.  It

4       charges possession with intent to distribute and

5       distribution, which means transferring it to somebody

6       else.

7            So to summarize, with regard to Counts 2, 3, 4 and

8       5, if the government's proven beyond a reasonable doubt

9       that Moynihan himself possessed crack and/or cocaine as

10      specified in a particular count in the indictment, that

11      he did so with the intent to distribute it to Hester or

12      someone else or did distribute it to Hester or someone

13      else, he's guilty on that count.  In addition, if the

14      government proves that on or about the date alleged in a

15      specific count Moynihan aided and abetted the commission

16      by Hester of the crime charged in that count, Moynihan,

17      too, is guilty of the offense.  And finally, if you find

18      Moynihan guilty of the conspiracy charged in Count 1 and

19      the government proves beyond a reasonable doubt that on

20      or about the date alleged in a specific count that

21      Hester possessed the drugs alleged in that count with

22      intent to distribute them in a foreseeable effort to

23      achieve a shared goal of the conspiracy, Moynihan's

24      guilty of the charge on that count, too.  If the

25      government has not proven any of these things beyond a

1    reasonable doubt, you must find Mr. Moynihan not guilty

2    to the count you are considering.

3         So that concludes my case-specific instructions

4    and now I'll give you the third part, the instructions

5    relating to your jury deliberations.

6         I'm going to be obliged to allow only the first

7    twelve of you to deliberate because everybody has

8    survived up to this point.  But, um, once you go back

9    and have your lunch, you should first select a

10   foreperson, a person to moderate your discussion and to

11   communicate with me on your behalf.  You should then

12   engage in rational discussion by all jurors for the

13   purpose of reaching a unanimous verdict.

14        Each juror has to decide the case for himself in

15   the context of the evidence and the law and with proper

16   consideration for the views of your fellow jurors.  You

17   should reconsider your initial views if you're persuaded

18   by rational discussion that what you first thought is

19   not correct, but you shouldn't abandon your views just

20   to reach a unanimous verdict.  You should discuss the

21   case only when you're all together, so everybody gets

22   the benefit of everybody else's view, and your verdict

23   has to be unanimous on each count.  You have to --

24   before you can return a verdict, you have to all twelve

25   agree the defendant has not been proven guilty or all

1    twelve agree that he has been proven guilty beyond a

2    reasonable doubt, um, on a particular charge.

3         If you want to communicate with me during your

4    deliberations, before you reach a unanimous verdict on

5    each count or if you reached the question unanimously --

6    to decide whether the whole conspiracy involved 28 grams

7    of crack, at least, um, the foreperson will write out a

8    note and you may, if you want, ask me to explain

9    something again.  Whatever.  The foreperson should sign

10   the note and give it to the Court Security Officer who

11   will be outside the door.  If you're communicating with

12   me before you have a unanimous verdict, you should not

13   disclose whether you've decided some counts or how you

14   may be divided in your deliberations.

15        When you've reached a unanimous verdict, this

16   verdict form will be all filled out, the foreperson will

17   sign and date it, you'll tell the Court Security Officer

18   you've reached a unanimous verdict, and you'll come back

19   to court.  And if you ask me a question, um, I'll talk

20   to the lawyers about it, I'll put you back in the jury

21   box, and I will respond to the question to the extent I

22   can.

23        All right.  Let me see counsel at the sidebar and

24   then I'll talk to you about the schedule, among other

25   things.

```
 1
 2              AT THE SIDEBAR
 3              THE COURT:  Are there any objections to the
 4      instructions?
 5              MR. SULTAN:  No, your Honor.
 6              MR. LEVITT:  No, your Honor.
 7              THE COURT:  Okay.
 8          They're going to get the case.  It's now 1:45.  I
 9      have another matter at 4:00, I have to swear in the new
10      Assistant Federal Public Defenders, and I'm educated to
11      understand the importance of Halloween, but I think what
12      I'll tell them is that I have no idea how long it will
13      take them to reach a unanimous verdict.  If they've done
14      that before 3:30, they should let us know.  But I'm a
15      little reluctant to tell them they have to go home at
16      3:30 if they want to continue to deliberate.
17              MR. SULTAN:  How about 4:00, your Honor?
18              THE COURT:  What I was going to tell them to
19      do is to tell me, you know, if at about 3:45, whether,
20      you know, they want to go home until tomorrow morning.
21      And I'll tell them I'm not available.  I'll tell them
22      that it's been a short case, but if they insist to keep
23      going, I think I need to respect that.
24              MR. LEVITT:  I agree.
25              THE COURT:  All right.
```

```
 1
 2              (In open court.)
 3              THE COURT:  All right.  Here is where we are.
 4    The two alternates should grab their lunch.  It should
 5    be back there.  You'll be taken down to the jury room or
 6    someplace else.  And I hate to do this, but I need to do
 7    it, because sometimes we lose a deliberating jury and an
 8    alternate moves up.  You can't discuss the case between
 9    the two of you, as tempting as that would be, because
10    one of you might become a jury and you can't be
11    influenced by somebody who is not a juror.  So bear with
12    me.  But I want you to stay here today.  We'll see what
13    happens.
14         I have no idea how long your deliberations should
15    take and you should take the time necessary to make the
16    decisions you need to make.  But, um, I have another
17    matter that I have to deal with at 4:00.  It won't take
18    very long.  At about 3:40, if you haven't reached a
19    unanimous verdict, or even 3:30, if you know you want to
20    go home, send me a note.  If you haven't reached a
21    unanimous verdict at 3:30 and you know you want to go
22    home, let me know and I'll have you back in the
23    courtroom and we'll come back at 9:00 tomorrow morning.
24    You know, if you're making a lot of progress and you
25    want to continue this afternoon, although it's Halloween
```

1    and some people have younger children than me, um, then

2    we'll be guided by your preference.

3         So, you know, if you -- send me a note around 3:30

4    or 3:40 as to what you want to do.  Okay?  You can start

5    eating, choose the foreperson, deliberate, um, and I'll

6    await your unanimous verdict.  Mr. Hohler will work with

7    the lawyers.  We'll get the exhibits in to you and

8    something to play the tapes, if you want to play the

9    tapes.  And, um, we'll go from there.

10        The Court is in recess for the jury.

11             (Jury leaves, 1:50 p.m.)

12        THE COURT:  You should work with Mr. Hohler to

13   make sure the exhibits are right, there's something to

14   play the tapes, and we'll await a message or a verdict

15   from the jurors.

16        The Court is in recess.

17             (Lunch recess, 1:51 p.m.)

18             (Resumed, 2:45 p.m.)

19        THE COURT:  I have a note from the jury.

20   "Would you please describe the conspiracy with regard to

21   this case," and I can because I substantially read it,

22   which I generally don't like to do, except so often I'm

23   asked to repeat the instruction.

24        We have to get the defendant and it will be after

25   3:00.  What I propose to do is ask them whether they

1    want me to do that and whether they want to keep

2    deliberating until say at least 5:00 -- it wouldn't make

3    any sense otherwise, or whether they would like to go

4    home right now and have me instruct them again on

5    conspiracy at 9:00 tomorrow morning, in part because I'm

6    concerned that if I tell them now, they'll come in

7    tomorrow morning and say, "Can you tell us that a third

8    time."

9         So basically I'll explain to them that there's no

10   transcript, to consider this in the context of

11   everything I've told you previously.  But here's what I

12   told you this morning -- or I'll tell you at 9:00

13   tomorrow morning.

14            MR. SULTAN:  So whatever it is, your Honor,

15   you're going to reread your entire instructions on

16   conspiracy, I assume?

17            THE COURT:  Right.

18        Mr. Levitt, I mean, does anybody have a problem

19   with my giving them that option?  Some may want to just

20   stay or they may want to go and come back tomorrow

21   morning.

22        Anybody want to be heard on that?

23            MR. LEVITT:  I guess I'd just assume you'd

24   give it to them now.  I mean, they're asking for it and

25   you can give it to them and just tell them -- well,

```
 1    you've already told them to let us know by 3:40 what
 2    they want to do.
 3              THE COURT:  It's now 5 minutes of 3:00 and
 4    we're going to give them the instruction by 3:30?
 5              MR. LEVITT:  That's my view.
 6              THE COURT:  As long as they understand we
 7    can't do anything until we get the defendant.
 8         Well, we'll be in recess until we have the
 9    defendant.
10              (Recess, 2:55 p.m.)
11              (Resumed, 3:05 p.m.)
12              THE COURT:  All right.  Okay.  We'll get the
13    jury and I will either instruct them again on conspiracy
14    now or in the morning, depending on their preference.
15              MR. SULTAN:  Your Honor, if the jury is still
16    deliberating, will they be deliberating tomorrow
17    afternoon or will you send them home?
18              THE COURT:  No, they'll be deliberating
19    tomorrow afternoon.  I'll be here in the courthouse and
20    available.
21              (Jury enters, 3:05 p.m.)
22              THE COURT:  All right.
23         Mr. Foreman, I have the first question, which I'll
24    mark as Question 1.  It says:  "Can you please describe
25    the legal definition of conspiracy as it regards this
```

1    case?"  And the short answer is "yes," the question is

2    when.

3        I read you a good deal of the heart of my

4    instructions and that's because I knew there wouldn't be

5    a transcript.  I'm often asked to repeat the definition

6    of conspiracy or something else and I could essentially

7    read it to you again, and then if there's something that

8    required more explanation, I didn't adequately describe

9    it the first time, if you asked me a more particular

10   question in writing, I'd talk to the lawyers and amplify

11   my explanation.

12       However, I had asked you to let me know at about

13   3:30, 3:40 whether you wanted to go home and if you want

14   to go home, I'll do this at 9:00 tomorrow morning, it

15   will be fresh in your mind, and, you know, you can

16   deliberate as long tomorrow and into the afternoon as

17   you want.  If I'm going to repeat the instruction now, I

18   think it would only make sense if you wanted to stay

19   until 5:00 or later.

20           (Indications by jury.)

21           THE COURT:  Well, no.  All right.  I told you

22   that essentially now you're in charge.  I want to be

23   respectful of that.

24       So here's what I'm going to do.  I'm going to ask

25   Mr. Hohler to go get the two alternates or send one of

1  them in, so they can hear this, too.

2          (Pause.)

3          THE COURT:  But essentially I'm going to

4  excuse you for today.  I'm going to remind you that it's

5  still important not to discuss this case with anybody

6  who's not on the jury.  You should only discuss it when

7  you're all here.  If there are eleven of you here

8  tomorrow morning and one's delayed, don't start.

9          I'm going to see you at 9:00 tomorrow morning just

10  to make sure you really are all here in one piece, um,

11  that you haven't had a tree fall on you or something,

12  which won't happen, and, um, you know, tomorrow, you'll

13  be able to get back to your deliberations after I

14  explain conspiracy to you again.

15          I have no idea how long your deliberations should

16  take, but -- although I have a court meeting tomorrow

17  afternoon to preside at, this is more important and I'll

18  be in the building.  So if you have a question or a

19  verdict after 1:00 tomorrow and I'm at the court

20  meeting, I'll just come up and we'll deal with the

21  question or take the verdict.  I think this is the way

22  to proceed.

23          And I'm going to ask the alternates to come back

24  tomorrow, too, because if something does happen --

25          THE CLERK:  They are on their way.  The CSO is

1    bringing them.

2              THE COURT:  Okay.

3              (The alternates enter room, 3:10 p.m.)

4              THE COURT:  All right.

5         I'd like to explain to the alternates who have

6    just come back where we are and where we're going.  The

7    jury, not surprisingly, has not completed their

8    deliberations.  The jury has a question.  The jury,

9    though, would like to go home now and I'm going to

10   answer the question at 9:00 tomorrow morning.  And I'm

11   going to impose on the alternates for at least one more

12   day in the hope that I won't have to impose on you

13   beyond that, one way or the other, that we'll either

14   excuse you or we'll have a verdict tomorrow.  But I'd

15   like you to come back again and we'll probably put you

16   in the jury room tomorrow so you can sit separate and

17   apart and not be tempted to have your own mini

18   deliberation.  I've told the jurors that they can't

19   discuss this case with anybody who's not on the jury,

20   which at the moment would include you two.

21        So you're all excused until tomorrow morning.

22   Please don't read, watch or listen to anything about the

23   case.  Don't do any research.  Um, Halloween seems to

24   have become a bigger holiday than it used to be.  I hope

25   you have a good Halloween.  And I'll see you at 9:00

```
 1    tomorrow morning.
 2              (Jury leaves, 3:15 p.m.)
 3              THE COURT:  All right.  Is there anything
 4    before we recess?
 5              (Silence.)
 6              THE COURT:  All right.  The Court is in
 7    recess.
 8              (Adjourned, 3:15 p.m.)
 9
10                   C E R T I F I C A T E
11
12         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER, do
13    hereby certify that the foregoing record is a true and
14    accurate transcription of my stenographic notes, before
15    Chief Judge Mark L. Wolf, on Monday, October 31, 2011,
16    to the best of my skill and ability.
17
18
19    /s/ Richard H. Romanow 09-10-12
20    _____
      RICHARD H. ROMANOW  Date
21
22
23
24
25
```